No. 23-01393

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

AMY RHINEHARDT CRAVEN,

AS ADMINISTRATRIX OF THE ESTATE OF CHRISTOPHER KIMMONS CRAVEN,

*Plaintiff-Appellant,*

v.

CHRISTOPHER NOVELLI, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS OFFICER OF THE MOORESVILLE POLICE DEPARTMENT, ALEXANDER ARNDT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS OFFICER OF THE MOORESVILLE POLICE DEPARTMENT, AND THE TOWN OF MOORESVILLE,

*Defendants-Appellees.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT STATESVILLE

---

**JOINT APPENDIX**

---

Preston O. Odom, III
John Alexander Heroy
Jennifer M. Houti
JAMES, MCELROY & DIEHL P.A.
525 North Tryon Street,
Suite 700
Charlotte, North Carolina 28202
(704) 372-9870 (telephone)
(704) 333-5508 (facsimile)
podom@jmdlaw.com
aheroy@jmdlaw.com
jhouti@jmdlaw.com
*Counsel for Plaintiff-Appellant*

Jake William Stewart
Patrick Houghton Flanagan
CRANFILL SUMNER & HARTZOG, LLP
2907 Providence Road
Suite 200
Charlotte, North Carolina 28211
(704) 940-3441 (telephone)
(704) 831-5514 (facsimile)
jstewart@cshlaw.com
phf@cshlaw.com
*Counsel for Defendants-Appellees*

## <u>TABLE OF CONTENTS</u>

**VOLUME ONE**                                    <u>Appendix Page</u>

W.D.N.C. Civil Docket Report for Case No. 5:21-CV-00174-
    KDB-SCR ........................................................................ JA1

Notice of Removal to Federal Court (with exhibits)
    Filed December 3, 2021 ............................................... JA6
        <u>Exhibit A</u> – Summons and Verified Complaint
            Filed September 7, 2021 ..................................... JA10
        <u>Exhibit B</u> – Notice of Removal to Federal Court
            Filed (in Superior Court) December 3, 2021 ....................... JA24

Defendants' Answer to Plaintiff's Complaint
    Filed December 10, 2021 ............................................... JA25

Consent Protective Order
    Entered July 25, 2022.................................................. JA34

Defendants' Motion to Seal
    Filed January 20, 2023................................................. JA38

Defendants' Memorandum of Law in Support of Motion to Seal
    Filed January 20, 2023................................................. JA41

Defendants' Motion for Summary Judgment
    Filed January 20, 2023…………………………………………….............JA46

Memorandum of Law in Support of Defendants' Motion for
    Summary Judgment (with exhibits)
    Filed January 20, 2023................................................. JA49
        Index of Exhibits to Defendant's Motion for Summary
            Judgment……………………………………………….…………..JA69
        <u>Exhibit 1</u> – Affidavit of Christopher Novelli............................ JA71
        <u>Exhibit 2</u> – Affidavit of Alexander Arndt ................................ JA75
        <u>Exhibit 3</u> – Affidavit of Christopher Russell ............................ JA78
        <u>Exhibit 4</u> – Lloyd's of London Certificate of Insurance............ JA80
        <u>Exhibit 5</u> – Deposition Excerpts of Taylor Dunn.................... JA185

<u>Exhibit 6</u> – Deposition Excerpts of Amy Craven .................... JA197
<u>Exhibit 7</u> – Deposition Excerpts of Christopher Novelli ........ JA215
<u>Exhibit 8</u> – Deposition Excerpts of Alexander Arndt ............. JA222
<u>Exhibit 9</u> – [Autopsy Report – Under Seal] ........................... JA224
<u>Exhibit 10</u> – Mooresville Police Department
    Communications 911 Transcript (Redacted) .................... JA225
<u>Exhibit 11</u> – [Recording of 911 Call – Under Seal] ............... JA232
<u>Exhibit 12</u> – Alexander Arndt Body Camera Footage
    (00:00-7:00; 16:24-end) (Remainder Under Seal).............. JA233

Consent Motion to Seal Exhibit
    Filed February 7, 2023 ............................................................. JA234

Plaintiff's Memorandum of Law in Support of
    Motion to Seal Exhibit
    Filed February 7, 2023 ............................................................. JA237

Plaintiff's Memorandum of Law in Opposition to
    Defendants' Motion for Summary Judgment
    Filed February 10, 2023…………………………………………JA241

Index for Brief in Support of Plaintiff's Memorandum
    of Law in Opposition to Defendants' Motion for
    Summary Judgment
    Filed February 10, 2023…………………………………….. JA266

Declaration of J. Alexander Heroy in Support of Plaintiff's
    Memorandum of Law in Opposition to Defendants'
    Motion for Summary Judgment (with exhibits)
    Filed February 10, 2023……………………….……………….JA267
<u>Exhibit A</u> – Deposition Excerpts of Alexander Arndt ..........   JA270
<u>Exhibit B</u> – Deposition Excerpts of Christopher Novelli ……...JA272
<u>Exhibit C</u> – [Video from Body Worn Camera of
    Christopher Novelli – Under Seal] ...............................….JA275
<u>Exhibit D</u> – Report of Plaintiff's Police Practice Expert ........... JA276
<u>Exhibit E</u> – Exhibit 3 from the November 28, 2022
    Deposition of Alexander Arndt……..……………….………..JA291
<u>Exhibit F</u> – Exhibit 2 from the November 28, 2022

Deposition of Alexander Arndt……………………….…….…...JA317

Plaintiff's Motion *in Limine* to Exclude Exhibits and
   Motion to Strike (with exhibits)
   Filed February 10, 2023 ......................................................... JA326
      <u>Exhibit 1</u> – Deposition Excerpts of Alexander Arndt………...JA331
      <u>Exhibit 2</u> – Deposition Excerpts of Christopher Novelli ….…...JA337

Plaintiff's Memorandum of Law in Support of Motion
   *in Limine* to Exclude Exhibits and Motion to Strike
   Filed February 10, 2023 ........................................................... JA341

Defendants' Reply to Plaintiff's Response to Defendants'
   Motion for Summary Judgment (with exhibits)
   Filed February 21, 2023 ........................................................... JA346
      <u>Exhibit 1</u> – Deposition Excerpts of Christopher Novelli …….. JA356
      <u>Exhibit 2</u> – Deposition Excerpts of Alexander Arndt ……..….JA361

Defendants' Response to Plaintiff's Motion *in Limine* to
   Exclude Exhibits and Motion to Strike
   Filed February 24, 2023……………………………….………….… JA364

Plaintiff's Notice of Filing of Corrected Exhibits
   (to the Heroy Declaration) (with exhibits)
   Filed March 1, 2023…………………………………….....JA370
      <u>Exhibit A</u> – Corrected Excerpts from Deposition
        Transcript of Alexander Arndt….……………….…….…JA373
      <u>Exhibit B</u> – Corrected Excerpts from Deposition
        Transcript of Christopher Novelli………….……………JA395
      <u>Exhibit E</u> – Corrected Exhibit 3 to Deposition
        of Alexander Arndt……………………………….......JA418

Transcript of Summary Judgment Hearing
   Dated March 1, 2023…................................................. JA469

Order (on Summary Judgment, Motion *in Limine*,
   and Motion to Strike)
   Entered March 13, 2023 .......................................................... JA526

Clerk's Judgment
    Entered March 28, 2023 ............................................................ JA565

Notice of Appeal
    Filed April 11, 2023 ................................................................... JA586

APPEAL,CLOSED,IAC

# U.S. District Court
## Western District of North Carolina (Statesville)
## CIVIL DOCKET FOR CASE #: 5:21−cv−00174−KDB−SCR

Craven v. Novelli et al
Assigned to: District Judge Kenneth D. Bell
Referred to: US Magistrate Judge Susan C. Rodriguez
Case in other court:  Iredell County Superior Court,
              21−CVS−2476
              Fourth, 23−01393
Cause: 42:1983 Civil Rights Act

Date Filed: 12/03/2021
Date Terminated: 03/28/2023
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Amy Rhinehart Craven**
*as Administratrix of the Estate of*
Christopher Kimmons Craven

represented by **Jennifer Michelle Houti**
JAMES MCELROY & DIEHL, P.A.
525 N Tryon St Ste 700
Charlotte, NC 28202−0202
United Sta
704−372−9870
Fax: 704−333−5508
Email: jhouti@jmdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Alexander Heroy**
James, McElroy & Diehl, PA
600 S. College St.
Charlotte, NC 28202
704−372−9870
Fax: 704−348−0800
Email: aheroy@jmdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Christopher Novelli**
*individually and official capacity as*
*Officer of Mooresville Police Department*

represented by **Jake William Stewart**
Cranfill Sumner & Hartzog, LLP
2907 Providence Road, Suite 200
Charlotte, NC 28211
704−940−3441
Fax: 704−831−5514
Email: jstewart@cshlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Houghton Flanagan**
Cranfill, Sumner & Hartzog, L.L.P.
2907 Providence Road
Suite 200
Charlotte, NC 28211
704−940−3419
Fax: 704−831−5522
Email: phf@cshlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alexander Arndt**
*individually and official capacity as*

represented by **Jake William Stewart**
(See above for address)

**JA001**

*Officer of Mooresville Police Department*                    *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Patrick Houghton Flanagan**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Town of Mooresville**                  represented by **Jake William Stewart**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Patrick Houghton Flanagan**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2021 | 1 | NOTICE OF REMOVAL with Jury Demand from Iredell County Superior Court, case number 21CVS2476. (Filing fee $ 402 receipt number ANCWDC−5343857), filed by Town of Mooresville, Alexander Arndt, Christopher Novelli. (Attachments: # 1 Exhibit, # 2 Exhibit)(Flanagan, Patrick) (Entered: 12/03/2021) |
| 12/06/2021 | | Case assigned to District Judge Kenneth D. Bell and Magistrate Judge David S. Cayer. Notice: You must click this link to retrieve the **Case Assignment Packet**. *This is your only notice − you will not receive a separate document.*(nvc) (Entered: 12/06/2021) |
| 12/06/2021 | | Clerk's Entry and Service of **Standing Order Requiring an Initial Settlement Conference in Civil Cases** assigned to the Honorable Kenneth D. Bell (5:19−mc−5 (Doc. No. 1)). The parties are directed to click on the link above to retrieve the Order. The filing party is directed to serve a copy of the Order with service. (nvc) (Entered: 12/06/2021) |
| 12/10/2021 | 2 | NOTICE of Appearance by John Alexander Heroy on behalf of All Plaintiffs (Heroy, John) (Entered: 12/10/2021) |
| 12/10/2021 | 3 | NOTICE of Appearance by Jennifer Michelle Houti on behalf of All Plaintiffs (Houti, Jennifer) (Entered: 12/10/2021) |
| 12/10/2021 | 4 | ANSWER to Complaint contained in 1 Notice of Removal, by Alexander Arndt, Christopher Novelli, Town of Mooresville.(Flanagan, Patrick) (Entered: 12/10/2021) |
| 12/10/2021 | 5 | NOTICE of Certificate of Settlement Conference Pursuant to Standing Order 5:19−mc−5. Result: Unable to resolve. (Flanagan, Patrick) (Entered: 12/10/2021) |
| 12/10/2021 | | NOTICE pursuant to Local Rule 16.1 you are **required** to conduct an Initial Attorney's Conference within 14 days. At the conference, the parties are **required** to discuss the issue of consent to jurisdiction of a magistrate judge in accordance with Local Rules 16.1(A) and 73.1(C). The **Certificate of Initial Attorneys Conference**, and if applicable, the **Joint Stipulation of Consent to Exercise jurisdiction by a US Magistrate Judge**, should be filed within 7 days of the conference. If appropriate, a party may file a Motion to Stay the Initial Attorney's Conference. CIAC Report due by 1/3/2022. (nvc) (Entered: 12/10/2021) |
| 12/21/2021 | 6 | CERTIFICATION of initial attorney conference and discovery plan . (Houti, Jennifer) Modified text to remove "Consent to MJ text" on 1/4/2022 (nvc). (Entered: 12/21/2021) |
| 01/04/2022 | 7 | **Pretrial Order and Case Management Plan: Estimated Trial Time: four to five days. Discovery due by 9/5/2022. Motions due by 10/4/2022. Mediator Designation deadline set for 3/4/2022. Mediation deadline set for 9/5/2022. Jury Trial set for 3/20/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by Magistrate Judge David S. Cayer on 1/4/2022. (mek)** (Entered: 01/04/2022) |

| | | |
|---|---|---|
| 01/18/2022 | 8 | Joint MOTION for Protective Order *for Release of SBI File* by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 2/1/2022 (Attachments: # 1 Proposed Order) (Flanagan, Patrick). Motions referred to David S. Cayer. (Entered: 01/18/2022) |
| 01/19/2022 | 9 | **CONSENT PROTECTIVE ORDER. Signed by Magistrate Judge David S. Cayer on 1/19/2022. (mek)** (Entered: 01/19/2022) |
| 02/28/2022 | 10 | DESIGNATION of Bill Brazil as Mediator by all the parties. (Houti, Jennifer) (Entered: 02/28/2022) |
| 07/08/2022 | 11 | Consent MOTION for Extension of Time of Scheduling Order Deadlines by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 7/22/2022 (Flanagan, Patrick). Motions referred to David S. Cayer. (Entered: 07/08/2022) |
| 07/08/2022 | | **TEXT−ONLY ORDER granting 11 Consent MOTION for Extension of Time of Scheduling Order Deadlines. Discovery due by 12/2/2022. Motions due by 1/6/2023. Mediation deadline set for 12/2/2022. Jury Trial set for 5/15/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. So Ordered. Entered by Magistrate Judge David S. Cayer on 7/8/2022. (DLG)** (Entered: 07/08/2022) |
| 07/22/2022 | 12 | Consent MOTION for Protective Order by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 8/5/2022 (Attachments: # 1 Proposed Order) (Stewart, Jake). Motions referred to David S. Cayer. (Entered: 07/22/2022) |
| 07/22/2022 | 13 | MEMORANDUM in Support re 12 Consent MOTION for Protective Order by Alexander Arndt, Christopher Novelli, Town of Mooresville. (Stewart, Jake) (Entered: 07/22/2022) |
| 07/25/2022 | 14 | **CONSENT PROTECTIVE ORDER. Signed by Magistrate Judge David S. Cayer on 7/25/2022. (mek)** (Entered: 07/25/2022) |
| 12/02/2022 | 15 | Consent MOTION for Extension of Time of Mediation Deadline by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 12/16/2022 (Stewart, Jake). Motions referred to David S. Cayer. (Entered: 12/02/2022) |
| 12/02/2022 | | **TEXT−ONLY ORDER granting 15 Consent MOTION for Extension of Time of Mediation Deadline. Mediation deadline set for 1/6/2023. So Ordered. Entered by Magistrate Judge David S. Cayer on 12/2/2022. (DLG)** (Entered: 12/02/2022) |
| 12/13/2022 | 16 | Consent MOTION for Extension of Time for Dispositive Motions by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 12/27/2022 (Stewart, Jake). Motions referred to David S. Cayer. (Entered: 12/13/2022) |
| 12/13/2022 | | **TEXT−ONLY ORDER granting 16 Consent MOTION for Extension of Time for Dispositive Motions. Motions due by 1/20/2023. So Ordered. Entered by Magistrate Judge David S. Cayer on 12/13/2022. (DLG)** (Entered: 12/13/2022) |
| 01/20/2023 | 17 | MOTION to Seal Document by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 2/3/2023 (Stewart, Jake). Modified on 1/23/2023 to remove referral (mek). (Entered: 01/20/2023) |
| 01/20/2023 | 18 | MEMORANDUM in Support re 17 MOTION to Seal Document by Alexander Arndt, Christopher Novelli, Town of Mooresville. (Stewart, Jake) (Entered: 01/20/2023) |
| 01/20/2023 | 19 | MOTION for Summary Judgment by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 2/3/2023 (Stewart, Jake) (Entered: 01/20/2023) |
| 01/20/2023 | 20 | MEMORANDUM in Support re 19 MOTION for Summary Judgment by Alexander Arndt, Christopher Novelli, Town of Mooresville. (Attachments: # 1 Appendix Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Stewart, Jake) (Entered: 01/20/2023) |
| 01/27/2023 | 21 | Consent MOTION for Extension of Time to File Response/Reply *to Defendants' Motion for Summary Judgment* by Amy Rhinehart Craven. Responses due by 2/10/2023 (Attachments: # 1 Exhibit Proposed Order) (Heroy, John). Motions referred |

| | | to David S. Cayer. (Entered: 01/27/2023) |
|---|---|---|
| 01/27/2023 | | **TEXT–ONLY ORDER granting 21 Consent MOTION for Extension of Time to File Response re 19 MOTION for Summary Judgment. Responses due by 2/10/2023. So Ordered. Entered by Magistrate Judge David S. Cayer on 1/27/2023. (DLG)** (Entered: 01/27/2023) |
| 01/30/2023 | 22 | REPORT of Mediation. Outcome of Mediation: Parties reached an Impasse. (Heroy, John) (Entered: 01/30/2023) |
| 01/30/2023 | | NOTICE of Hearing on Motion re: 19 MOTION for Summary Judgment : Motion Hearing set for 3/1/2023 10:00 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice − you will not receive a separate document.*(brl) (Entered: 01/30/2023) |
| 02/07/2023 | 23 | Consent MOTION to Seal Document by Amy Rhinehart Craven. Responses due by 2/21/2023 (Heroy, John). Modified on 2/8/2023 to remove referral (mek). (Entered: 02/07/2023) |
| 02/07/2023 | 24 | MEMORANDUM in Support re 23 Consent MOTION to Seal Document by Amy Rhinehart Craven. (Heroy, John) (Entered: 02/07/2023) |
| 02/10/2023 | 25 | MEMORANDUM in Opposition re 19 MOTION for Summary Judgment by Amy Rhinehart Craven. Replies due by 2/17/2023 (Heroy, John) (Entered: 02/10/2023) |
| 02/10/2023 | 26 | DECLARATION of J. Alexander Heroy in Opposition re 19 MOTION for Summary Judgment by Amy Rhinehart Craven. (Attachments: # 1 Exhibit A Excerpts from the November 28, 2022 deposition of Alexander Arndt, # 2 Exhibit B Excerpts from the November 28, 2022 deposition of Christopher Novelli, # 3 Exhibit C Novelli body cam video (CONFIDENTIAL – FILED UNDER SEAL), # 4 Exhibit D Expert Report of Howard Jordan, # 5 Exhibit E Exhibit 3 from the November 28, 2022 Deposition of Alexander Arndt, # 6 Exhibit F Exhibit 2 from the November 28, 2022 Deposition of Alexander Arndt)(Heroy, John) Modified text on 2/10/2023 (mek). (Entered: 02/10/2023) |
| 02/10/2023 | 27 | INDEX of Exhibits to 26 Declaration by Amy Rhinehart Craven. (Heroy, John) Modified text on 2/10/2023 (mek). (Entered: 02/10/2023) |
| 02/10/2023 | 28 | MOTION in Limine to Exclude Exhibits and MOTION to Strike by Amy Rhinehart Craven. Responses due by 2/24/2023 (Attachments: # 1 Excerpts from Alexander Arndt Deposition, # 2 Excerpts from Christopher Novelli Deposition) (Heroy, John) (Entered: 02/10/2023) |
| 02/10/2023 | 29 | MEMORANDUM in Support re 28 MOTION to Exclude Exhibits and MOTION to Strike by Amy Rhinehart Craven. (Heroy, John) Modified text on 2/10/2023 (mek). (Entered: 02/10/2023) |
| 02/13/2023 | 30 | MOTION for Extension of Time to File Response/Reply re: 19 MOTION for Summary Judgment by Alexander Arndt, Christopher Novelli, Town of Mooresville. Responses due by 2/27/2023 (Stewart, Jake). Motions referred to David S. Cayer. (Entered: 02/13/2023) |
| 02/13/2023 | | **TEXT–ONLY ORDER granting 30 unopposed MOTION for Extension of Time to File Reply re: 19 MOTION for Summary Judgment. Replies due by 2/21/2023. So Ordered. Entered by Magistrate Judge David S. Cayer on 2/13/2023. (DLG)** (Entered: 02/13/2023) |
| 02/21/2023 | 31 | REPLY to Response to Motion re 19 MOTION for Summary Judgment by Alexander Arndt, Christopher Novelli, Town of Mooresville. (Attachments: # 1 Exhibit Deposition Excerpts of Novelli, # 2 Exhibit Deposition Excerpts of Arndt)(Stewart, Jake) (Entered: 02/21/2023) |
| 02/24/2023 | 32 | RESPONSE in Opposition re 28 MOTION in Limine *to exclude exhibits* by Alexander Arndt, Christopher Novelli, Town of Mooresville. Replies due by 3/3/2023 (Stewart, Jake) (Entered: 02/24/2023) |
| 03/01/2023 | 33 | NOTICE *of Filing of Corrected Exhibits* by Amy Rhinehart Craven re 26 Affidavit in Opposition to Motion (Attachments: # 1 Exhibit A – Corrected Excerpts from Deposition Transcript of Alexander Arndt, # 2Exhibit B – Corrected Excerpts from |

| | | |
|---|---|---|
| | | Deposition Transcript of Christopher Novellli, # 3 Exhibit E – Corrected Exhibit 3 to Deposition of Alexander Arndt)(Houti, Jennifer) (Entered: 03/01/2023) |
| 03/01/2023 | | Minute Entry: MOTION HEARING held before District Judge Kenneth D. Bell. Re 17 MOTION to Seal, 19 MOTION for Summary Judgment, 23 Consent MOTION to Seal Document, 28 MOTION in Limine. Motions taken under advisement, written order to issue. Plaintiffs attorney: John Alexander Heroy. Defendants attorney: Jake William Stewart, Patrick Houghton Flanagan. Court reporter: Cheryl Nuccio. (mek) (Entered: 03/01/2023) |
| 03/13/2023 | 34 | **ORDER: Defendants' 19 Motion for Summary Judgment is GRANTED; judgment is entered in favor of Defendants on Plaintiff's claims; Plaintiff's 28 Motion in Limine and Motion to Strike is DENIED; the Parties' 17 and 23 Motions to Seal are GRANTED in part and DENIED in part as described in the Order; the Town of Mooresville is directed to provide the Clerk of Court with a redacted copy of Officer's Arndt's body camera video showing only 0:00 to 7:00 and 16:24 to the end within 14 days of the date of this order; and following the filing of the redacted exhibit, the Clerk is directed to close this matter in accordance with this Order. Signed by District Judge Kenneth D. Bell on 3/12/2023. (mek)** (Main Document 34 replaced on 3/13/2023) (mek). (Entered: 03/13/2023) |
| 03/13/2023 | | Set Deadline: Redacted Exhibit re 34 Order due by 3/27/2023. (mek) (Entered: 03/13/2023) |
| 03/27/2023 | 39 | Cover Letter to Redacted Exhibit re 34 Order received via FedEx in Statesville Division from Defendant Town of Mooresville on 3/27/2023. Flash Drive containing redacted exhibit forwarded to Charlotte Division. Case closed per Order. (mek) (Entered: 04/19/2023) |
| 03/28/2023 | 35 | **CLERK'S JUDGMENT is hereby entered in accordance with the Court's Order dated 3/13/2023. Signed by Clerk, Frank G. Johns. (mek)** (Entered: 03/28/2023) |
| 04/11/2023 | 36 | NOTICE OF APPEAL as to 34 Order, 35 Clerk's Judgment by Amy Rhinehart Craven. Filing fee $ 505, receipt number ANCWDC–6018904. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Heroy, John) Modified text on 4/11/2023 (mek). (Entered: 04/11/2023) |
| 04/11/2023 | | Case reassigned to US Magistrate Judge Susan C. Rodriguez. Magistrate Judge David S. Cayer no longer assigned to the case. *This is your only notice – you will not receive a separate document.*(mek) (Entered: 04/11/2023) |
| 04/11/2023 | 37 | Transmission of Notice of Appeal to US Court of Appeals re 36 Notice of Appeal (mek) (Entered: 04/11/2023) |
| 04/12/2023 | 38 | USCA Case Number 23–1393 for 36 Notice of Appeal, USCA Case Manager: Marcy E. Beall. (nvc) (Entered: 04/12/2023) |
| 04/28/2023 | 40 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT re 36 Notice of Appeal [23–1393]. Court Reporter: Cheryl Nuccio; Current Deadline: 07/03/2023; Proceedings: Motions hearing held on 3/01/2023; Ordering Party(ies): Amy Craven. (Attachments: # 1 Transcript Order Form)(nvc) (Entered: 04/28/2023) |
| 06/19/2023 | 41 | TRANSCRIPT of Motion for Summary Judgment held on 3/1/23 before Judge Bell **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request.* If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** (*Does this satisfy all appellate orders for this reporter? – Yes.*) Release of Transcript Restriction set for 9/14/2023. (Reporter: Cheryl Nuccio, 704–350–7494) (Entered: 06/19/2023) |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. _____

| | |
|---|---|
| AMY RHINEHART CRAVEN, as ) Administratrix of the Estate of ) CHRISTOPHER KIMMONS CRAVEN, ) ) Plaintiff, ) ) v. ) ) CHRISTOPHER NOVELLI, individually ) and in his official capacity as Officer of the ) Mooresville Police Department, ) ALEXANDER ARNDT, individually and ) in his official capacity as Officer of the ) Mooresville Police Department, and the ) TOWN OF MOORESVILLE, ) ) Defendants. ) | **NOTICE OF REMOVAL TO FEDERAL COURT** |

Defendants Christopher Novelli, Alexander Arndt and Town of Mooresville (hereinafter "Defendants") by and through the undersigned counsel, respectfully remove the above-captioned action from the Superior Court of Iredell County, North Carolina, to the United States District Court for the Western District of North Carolina, pursuant to 28 U.S.C. § 1331, § 1441, § 1446, and §1367.

In support of this *Notice of Removal to Federal Court*, Defendants state as follows:

1.      On September 7, 2021, Plaintiff filed a Complaint in the Superior Court of Iredell County, North Carolina, styled *Amy Rhinehardt, as Administratrix of the Estate of Christopher Kimmons Craven v. Christopher Novelli, et al*, which matter was assigned Civil Action No. 21 CVS 2476. The undersigned, on behalf of Defendants, waived service on November 8, 2021.

**EXHIBIT 1**

JA006

2.      Pursuant to 28 U.S.C. § 1446(b), a copy of all process and pleadings served upon Defendants are attached hereto as **Exhibit A**.

3.      This notice is being filed within thirty (30) days of the date of waiver of service of the Summons and Complaint in this case on Defendants; accordingly, this Notice is timely filed pursuant to 28 U.S.C. § 1446(b). Defendants are represented by the undersigned counsel and each Defendant consents to removal.

4.      In the Complaint, Plaintiff has alleged various causes of action against Defendants, including a claim of a violation of Mr. Craven's Fourth Amendment rights pursuant to 42 U.S.C. §1983 and for damages arising under the laws of the United States.

5.      Because this is a civil suit for damages arising under the laws of the United States, specifically, the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, this case involves a federal question and federal jurisdiction is therefore founded upon 28 U.S.C. § 1331 and is removable to federal court pursuant to 28 U.S.C. § 1441. Further this Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

6.      Based on federal question jurisdiction, Defendants contend that the aforesaid state action may be removed by Defendants pursuant to 28 U.S.C. § 1441. Defendants contend that the United States District Court would be acting within its discretion by exercising supplemental jurisdiction over the remaining state claims, if any, pursuant to 28 U.S.C. § 1367.

7.      The United States District Court for the Western District of North Carolina is the District in which the aforementioned state court action is now pending. Therefore, the undersigned hereby removes this action from the aforesaid Superior Court of Iredell County, North Carolina, in which it is now pending, to the United States District Court for the Western District of North Carolina by filing this Notice of Removal.

8.      Written notice of filing of this Notice of Removal will be served upon the adverse party in this action as required by law.

9.      A copy of this Notice of Removal has been sent for filing with the Clerk of the Superior Court of Iredell County, North Carolina, as shown by the Notice attached hereto as **Exhibit B**.

WHEREFORE, the Defendants Christopher Novelli, Alexander Arndt and Town of Mooresville hereby give notice that this action has been removed from the Superior Court of Iredell County, North Carolina, to the United States District Court for the Western District of North Carolina.

This the 3rd day of December, 2021.

CRANFILL SUMNER LLP

BY:     /s/ Patrick H. Flanagan
        Patrick H. Flanagan, State Bar #17407
        *Attorneys for Defendants*
        Post Office Box 30787
        Charlotte, North Carolina 28230
        Telephone: (704) 332-8300
        Facsimile: (704) 332-9994
        phf@cshlaw.com

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day electronically filed the foregoing *Notice of Removal to Federal Court* with the Clerk of Court using the CM/ECF system and served the same on all of the parties to this cause by depositing a copy hereof, postage prepaid, in the United States Mail, addressed as follows:

J. Alexander Heroy
Jennifer M. Houti
JAMES, McELROY & DIEHL, P.A.
525 N. Tryon Street, Suite 700
Charlotte, NC 28202
aheroy@jmdlaw.com
jhouti@jmdlaw.com
*Attorneys for Plaintiff*


This the 3rd day of December, 2021.

CRANFILL SUMNER LLP


BY:    /s/ *Patrick H. Flanagan*
_____
Patrick H. Flanagan, State Bar #17407
*Attorneys for Defendants*
Post Office Box 30787
Charlotte, North Carolina 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
phf@cshlaw.com

# STATE OF NORTH CAROLINA

▶ *File No.*
21-CVS-2476

_____ IREDELL _____ County

In The General Court of Justice
☐ District  ☒ Superior Court Division

| *Name of Plaintiff*<br><br>AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN | |
|---|---|
| *Address*<br>c/o J. Alexander Heroy | **CIVIL SUMMONS** |
| *City, State, Zip*<br>525 N. Tryon Street, Ste. 700, Charlotte, NC 28202 | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| **VERSUS** | G.S. 1A-1, Rules 3, 4 |
| *Name of Defendant(s)*<br>CHRISTOPHER NOVELLI, invidiually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summon(es) Issued* |

## To Each of The Defendant(s) Named Below:

| *Name And Address of Defendant 1*<br>CHRISTOPHER NOVELLI<br>154 AVALON PARK CIR., APT 202<br>MOORESVILLE, NORTH CAROLINA 28117 | *Name And Address of Defendant 2*<br>ALEXANDER ARNDT<br>675 BROWN ROAD<br>CHINA GROVE, NORTH CAROLINA 28023 |
|---|---|

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)*<br>J. Alexander Heroy, Esq.<br>James, McElroy and Diehl, P.A.<br>525 N. Tryon Street, Suite 700<br>Charlotte, North Carolina 28202 | *Date Issued* 9-7-21 | *Time* 12:08 ☐ AM ☒ PM |
|---|---|---|
| | *Signature* | |
| | ☒ *Deputy CSC* | ☐ *Assistant CSC* ☐ *Clerk of Superior Court* |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ *Deputy CSC* | ☐ *Assistant CSC* ☐ *Clerk of Superior Court* |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts                    (Over)

Case 5:21-cv-00174   Document 1-1   Filed 12/03/21   Page 1 of 14

**EXHIBIT**

**A**

**JA010**

| RETURN OF SERVICE | | | |
|---|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to person named below.

> Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name of Sheriff (Type or Print) |
| Date of Return | County of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative of the Courts

Case 5:21-cv-00174   Document 1-1   Filed 12/03/21   Page 2 of 14

JA011

STATE OF NORTH CAROLINA  IN THE GENERAL COURT OF JUSTICE
            SUPERIOR COURT DIVISION
COUNTY OF IREDELL     21-CVS-2476

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as **Administratrix of the Estate of** **CHRISTOPHER KIMMONS CRAVEN,**     **Plaintiff,** **v.** **CHRISTOPHER NOVELLI, individually** **and in his official capacity as Officer of** **the Mooresville Police Department,** **ALEXANDER ARNDT, individually and** **in his official capacity as Officer of the** **Mooresville Police Department, and the** **TOWN OF MOORESVILLE,**    **Defendants.** | **COMPLAINT** |

  Plaintiff, Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven, by and through counsel, complaining of Defendants, Christopher Novelli, individually and in his  official capacity as an Officer of the Mooresville Police Department, Alexander Arndt, individually and in his official capacity as Officer of the Mooresville Police Department, and the Town of Mooresville (collectively referred to hereinafter as "Defendants"), alleges and says as follows:

<u>**PARTIES, JURISDICTION AND VENUE**</u>

  1. Plaintiff Amy Rhinehardt Craven (hereinafter "Plaintiff") is an adult citizen and resident of Iredell County, North Carolina.  At all times pertinent herein, Plaintiff was the wife of the decedent, Christopher Kimmons Craven (hereinafter "Decedent" or "Chris") and she is now the duly qualified administratrix of Decedent's estate.

  2. Decedent was a citizen and resident of Iredell County, North Carolina, at the time of his death.

  3. Upon information and belief, Defendant Officer Christopher Novelli (hereinafter "Officer Novelli") is an adult citizen and resident of Iredell County, North Carolina.  At all times pertinent to the allegations alleged in this Complaint, Officer Novelli was a police officer with the Mooresville Police Department and an agent and employee of the Defendant Town of Mooresville. Officer Novelli is sued in his individual capacity under state law for conduct that was intentional, deliberate, malicious, willful and wanton, and exhibited a reckless disregard for Decedent's rights and safety, losing any public officer immunity he might assert in defense of his conduct.  In the

1

**JA012**

alternative, Officer Novelli is sued in his official capacity under state law for the negligent use of force that was excessive and unreasonable under the circumstances, in violation of 42 U.S.C. § 1983 and N.C.G.S. §15A-401(d)(2).

4.    Upon information and belief, Defendant Officer Alexander Arndt (hereinafter "Officer Arndt") is an adult citizen and resident of Iredell County, North Carolina. At all times pertinent to the allegations alleged in this Complaint, Officer Arndt was a police officer with the Mooresville Police Department and an agent and employee of the Defendant Town of Mooresville. Officer Arndt is sued in his individual capacity under state law for conduct that was intentional, deliberate, malicious, willful and wanton, and exhibited a reckless disregard for Decedent's rights and safety, losing any public officer immunity he might assert in defense of his conduct. In the alternative, Officer Arndt is sued in his official capacity under state law for the negligent use of force that was excessive and unreasonable under the circumstances, in violation of 42 U.S.C. § 1983 and N.C.G.S. §15A-401(d)(2).

5.    Defendant Town of Mooresville (hereinafter the "Town") is a municipal corporation in Iredell County, North Carolina, duly chartered under the laws of the State of North Carolina. It maintains and operates pursuant to its charter a police force called the Mooresville Police Department (hereinafter "MPD"). The Town of Mooresville bears legal responsibility for acts and omissions of the MPD and its police officers that occur in the course of any officer's employment as a MPD police officer and agent of the City.

6.    Upon information and belief, the Town has waived governmental immunity that might otherwise apply to the negligence claim in this case. Upon information and belief the Town has purchased insurance, either by contract with an insurance company or by participation in an insurance risk pool, that covers the claims raised in this action, and has thereby waived any defense of sovereign or governmental immunity. Furthermore, and upon information and belief, Defendants have waived sovereign immunity through the purchase of one or more policies of liability insurance pursuant to N.C.G.S. § 153A-435, by purchasing a bond pursuant to N.C.G.S. § 162-8, and/or by participating in a local government risk pool pursuant to N.C.G.S. § 58-23-5.

7.    The Superior Court of Iredell County, North Carolina has jurisdiction over the parties and subject matter of this action.

8.    Venue is proper in Iredell County because this is where the cause of action alleged in this Complaint arose.

9.    This is an action to recover money damages resulting from the negligence, gross negligence and intentional conduct of Defendants, as well as the assault, battery, and wrongful death of Christopher Kimmons Craven, whose death occurred, as a result of gunshot wounds intentionally fired at him by Officers Novelli and Arndt, on August 2, 2020 in Iredell County, North Carolina.

10.    The amount in controversy exceeds $25,000.

2

JA013

## FACTUAL ALLEGATIONS

11.    On April 5, 2007, Plaintiff married Chris.

12.    Plaintiff and Chris have three children together. Chris was the primary caregiver for the two minor children. Chris financially supported and nurtured the children, contributing towards the children's education, growth and development.

13.    On the evening of August 2, 2020, Chris was experiencing a mental health crisis as a result of ongoing issues with depression and anxiety, for which he had been approved for FMLA leave just two days before.

14.    On August 2, 2020, and at all pertinent times alleged in this Complaint, Officers Novelli and Arndt were employed as uniform police officers by the Town.

15.    On August 2, 2020, and at all pertinent times alleged in this Complaint, the Town had issued Officers Novelli and Arndt firearms for use in their job as officers. Officer Novelli's and Officer Arndt's possession and use of the firearm was with the actual knowledge, consent and permission of the Town.

16.    On August 2, 2020, Officers Novelli and Arndt were on duty for the MPD.

17.    At approximately 9:29 p.m., Chris's oldest daughter placed a 911 call to Iredell County Emergency Communications at approximately. She reported that Chris was threatening to commit suicide.

18.    Multiple officers with MPD deployed to the scene. The dispatcher reported to the officers that Chris was suicidal, had a concealed carry permit, and may have a gun in his possession.

19.    Dispatch also notified officers as they approached the house – including Officers Novelli and Arndt – that no shots had been fired.

20.    After parking down the street, at least half a dozen officers approached Chris' house from all sides.

21.    As the officers approached, Chris rose from where he sat on his front steps. Chris then descended his front steps, shoeless and shirtless, and began to proceed down his sidewalk towards a camper parked in the family's driveway.

22.    Officers immediately began yelling at Chris to put his hands up and shined the lights on their assault rifles at him.

23.    Chris immediately complied and raised his hands.

24.    Officers then yelled for Chris to get on the ground.

3

**JA014**

25.    Chris began to put his hands down, as ordered, when Officer Novelli abruptly and without warning immediately shot Chris, firing more than 10 shots at close range with his high-powered rifle.

26.    As Officer Novelli began shooting Chris, Officer Arndt also began firing his rifle at Chris.

27.    Officers Novelli and Arndt fired dozens of rounds at Chris. Approximatey twenty bullets struck Chris' body, hitting him in the chest, abdomen, shoulder, and extremities. Numerous other rounds penetrated the house where Plaintiff and her three children were, blasting into the brick and through the windows, door, and walls. One bullet struck a fire extinguisher inside the house, causing it to explode.

28.    After being shot by Officers Novelli and Arndt, Chris was pushed backwards a couple of steps, then fell to the ground, motionless and bleeding.

29.    The rounds fired by Officers Novelli and Arndt caused significant and ultimately fatal injuries to Chris.

30.    A total of four seconds elapsed from the time the first officer instructed Chris to put his hands up, then get on the ground, and when Officer Novelli began firing at Chris.

31.    During those four seconds, Chris did not threaten any of the officers, did not approach or get close to any officer, made no attempt to flee or resist arrest, or make any hostile gesture or statement to the officers.

32.    During those same four seconds, neither Officer Novelli, Officer Arndt, nor any other MPD officer asked Chris whether he was armed, whether he was okay, or whether he needed help.

33.    Two separate autopsies of Chris's body were performed in the days following his death, both of which determined that Chris was killed by multiple gunshot wounds.

34.    Chris had not committed, nor was he in the process of committing, any criminal act which would threaten the safety or welfare of anyone that would justify Officer Novelli's or Officer Arndt's use of deadly force.

35.    A firearm was located several feet behind Chris' body after he was killed. At no point, did Chris pull out a weapon or gun at any officer, much less point it at anyone, endanger or fire any shot at officers.

4

JA015

**FIRST CAUSE OF ACTION**
**[Violation of 42 U.S.C. § 1983]**

36.    The preceding paragraphs are realleged and incorporated herein as if fully set forth.

37.    Officers Novelli and Arndt are liable in their official capacities as employees of the Town.

38.    This cause of action is brought against Defendants Town and Officers Novelli and Arndt, in their individual and official capacities, for excessive use of force. Officers Novelli and Arndt used excessive force in shooting and killing Chris, in violation of the Fourth Amendment's right to be free from unreasonable seizures.

39.    Officer Novelli's and Officer Arndt's use of force on Chris was objectively unreasonable. Rather, Officers Novelli and Arndt inflicted unnecessary and wanton pain, suffering, and death upon Chris by shooting him four seconds after ordering him to raise his hands and get on the ground, despite the fact that Chris had not made any attempt to threaten or harm the Officers and had not fired any weapon.

40.    Officers Novelli and Arndt's use of force violated clearly established statutory or constitutional rights of which a reasonable person in their position would have known.

41.    Officers Novelli and Officer Arndt's misconduct described herein is imputed to the Town under agency principles, vicarious liability, and the doctrine of *respondeat superior*.

42.    In addition, the Town failed to implement adequate policies with respect to the proper use and application of deadly force, de-escalation, and how to interact with and respond to citizens experiencing a mental health crises and threatening suicide.

43.    The Town further failed to adequately train and instruct officers such as Officers Novelli and Arndt in the proper use and application of deadly force, de-escalation, and how to interact with and respond to citizens experiencing a mental health crises and threatening suicide.

44.    Defendants' actions and omissions were made under color of state law.

45.    As a direct and proximate result of Officer Novelli's and Officer Arndt's excessive use of force described in more detail above, Chris was forced to endure extreme pain, suffering, and ultimately the loss of his life, together with a total deprivation of his rights guaranteed him by the Constitution of the United States of America, including but not limited to, his right under the Fourth Amendment to be free from unreasonable seizures.

46.    Plaintiff is entitled to recover from Defendants, jointly and severally, an amount in excess of $25,000 as a result of Defendants' violations of 42 U.S.C. § 1983.

5

JA016

## SECOND CAUSE OF ACTION
### [Negligence / Gross Negligence]

47.     The preceding paragraphs are realleged and incorporated herein as if fully set forth.

48.     Officers Novelli and Arndt owed a legal duty under N.C.G.S. § 15A-401(d)(2) to use only a level of force that was reasonable and necessary under the circumstances. Officers Novelli and Arndt breached this duty by the way they grossly mishandled the events on August 2, 2020 and used deadly force against Chris.

49.     Officers Novelli and Arndt, individually and in their official capacity as officers for the Town, were negligent or grossly negligent at the time and place alleged hereinabove, in at least the following particulars:

      a.  Officers Novelli and Arndt failed to give Chris an opportunity to comprehend the situation and comply with commands before using excessive force;

      b.  Officers Novelli and Arndt used deadly forced against Chris when they knew, or reasonably should have known, that the use of deadly force was not necessary;

      c.  Officers Novelli and Arndt negligently used excessive force against Chris, when such force was not justified under the circumstances;

      d.  Officers Novelli and Arndt used deadly force against Chris when Chris never threatened or used any force, much less deadly force, against anyone;

      e.  Officers Novelli and Arndt fatally escalated the situation, rather than de-escalating their interaction with Chris;

      f.  Officers Novelli and Arndt negligently and recklessly discharged their firearms at least fifteen times in the direction of a house which they knew, at the time, contained at least four innocent bystanders; and

      g.  Officer Novelli and Officer Arndt gave conflicting orders and shot and killed Chris as he was attempting to follow their orders.

50.     Either the Town failed to properly train Officers Novelli and Arndt consistent with MPD rules and regulations, or they completely ignored them in aggressively shooting and killing Chris.

51.     The negligent acts and omissions of Officers Novelli and Arndt, as described hereinabove, were the sole and proximate cause of Chris's tragic death.

52.     The acts and omissions of Officers Novelli and Arndt, as described hereinabove, were willful, wanton and/or reckless, and amount to gross negligence.

6

JA017

53.    Officers Novelli and Arndt are not entitled to qualified immunity for the reasons set forth herein;

54.    Officers Novelli and Arndt acted with conscious and intentional disregard and indifference to the rights and safety of others, including Chris.

55.    Officers Novelli and Arndt was aware of the probable consequences of their conduct in recklessly discharging their firearms as described above, due to the likelihood that their conduct was reasonably likely to result in injury or death to others, including Chris.

56.    The negligence of Officers Novelli and Arndt is imputed by law to the Town by reason of Officer Novelli's and Officer Arndt's agency relationship with, and employment by, the Town at the time and place the incident occurred, under the doctrine of *respondeat superior.*

57.    But for Officer Novelli's and Officer Arndt's aggressive acts, the shooting would not have occurred, and Chris would not have been killed.

58.    As set forth more fully above, Officers Novelli and Arndt had the last clear chance and opportunity to prevent the tragic death of Chris.

59.    Plaintiff is entitled to recover from Defendants, jointly and severally, an amount in excess of $25,000 as a result of Defendants' negligence, gross negligence, and/or willful and wanton negligence.

### THIRD CAUSE OF ACTION
### [Assault and Battery]

60.    The preceding paragraphs are realleged and incorporated herein as if fully set forth.

61.    Officers Novelli and Arndt, individually and in their official capacity as officers for the Town, pointed a firearm at Chris and, unjustifiably, used deadly force against Chris, which force was excessive under the circumstances.

62.    Officer Novelli's and Officer Arndt's intentional acts, as described more fully hereinabove, put Chris in actual, subjective apprehension of imminent harmful or offensive conduct.

63.    Chris's apprehension was objectively reasonable under the circumstances that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful or offensive contact was about to occur.

64.    Officer Novelli's and Officer Arndt's intentional act of shooting Chris constituted a harmful or offensive contact with Chris.

65.    Officer Novelli's and Officer Arndt's actions proximately caused the harmful or offensive contact with Chris.

7

**JA018**

66.    Chris did not consent to contact with Officers Novelli or Arndt.

67.    Defendants are jointly and severally liable for maliciously assaulting and battering Chris, in an amount to be determined by a jury, but believed to be in excess of $25,000.

## FOURTH CAUSE OF ACTION
### [Wrongful Death of Christopher Kimmons Craven]

68.    The preceding paragraphs are realleged and incorporated herein as if fully set forth.

69.    The acts and omissions of Officers Novelli and Arndt, as described hereinabove, were the sole and proximate cause of the injuries sustained by Chris that led to his wrongful death.

70.    The Town is liable for the acts and omissions of Officers Novelli and Arndt under the doctrines of *respondeat superior* and agency, either express or implied.

71.    All Defendants are jointly and severally liable to Plaintiff for the wrongful death of Chris.

72.    As a direct and proximate result of Chris's wrongful death, his heirs at law have been deprived of the net economic value of his earnings for the remainder of his life expectancy, as well as his protection, care, assistance, society, companionship, comfort, guidance, effects, offices and services.  Plaintiff is entitled to recover in excess of $25,000 in damages from Defendants, pursuant to N.C.G.S. §28A-18-2.

## FIFTH CAUSE OF ACTION
### [Punitive Damages]

73.    The preceding paragraphs are realleged and incorporated herein as if fully set forth.

74.    Defendants' actions as alleged hereinabove constitute willful and wanton conduct, as set forth in N.C.G.S. §1D.

75.    Pursuant to N.C.G.S. § 1D, Plaintiff is entitled to recover punitive damages from Defendants, jointly and severally, in an amount to be determined by a jury, for not less than $25,000.

8

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the following relief:

1.    That Plaintiff have and recover of Defendants, jointly and severally, an amount exceeding $25,000 for Defendants' violations of 42 U.S.C. § 1983;

2.    That Plaintiff have and recover of Defendants, jointly and severally, an amount exceeding $25,000 for Defendants' negligence, gross negligence, assault, battery, and the wrongful death of Chris;

3.    Grant Plaintiff punitive damages against Defendants, jointly and severally, for their malicious, and willful and wanton conduct, pursuant to N.C.G.S. §§ 1D-1, *et seq*;

4.    That Plaintiff have a trial by jury on all issues so triable;

5.    That Plaintiff recover from Defendants the costs of this action and her reasonable attorney's fees to the fullest extent allowed by North Carolina law; and

6.    That Plaintiff be granted all other relief, both legal and equitable, which the Court deems just and proper.

This the 1st day of September, 2021.

JAMES, McELROY & DIEHL, P.A.

J. Alexander Heroy
Jennifer M. Houti
525 N. Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Telephone: (704)372-9870
Facsimile: (704) 350-9332
Email:  aheroy@jmdlaw.com;
          jhouti@jmdlaw.com
*Attorneys for Plaintiff*

9

STATE OF NORTH CAROLINA

COUNTY OF IREDELL

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21-CVS-2476

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

       Plaintiff,

v.

CHRISTOPHER NOVELLI, individually
and in his official capacity as Officer of
the Mooresville Police Department,
ALEXANDER ARNDT, individually and
in his official capacity as Officer of the
Mooresville Police Department, and the
TOWN OF MOORESVILLE,

       Defendants.

**ACCEPTANCE OF SERVICE**

The undersigned attorney for Defendant Christopher Novelli (collectively, "Defendant Novelli") in the above-captioned action hereby accepts service of the Summons issued to Defendant Christopher Novelli, the Complaint filed in this action, as well as Plaintiff's First Set of Interrogatories and Request for Production of Documents to Defendant Christopher Novelli. The undersigned stipulates that service of the above has been made in this action as of the date signed below. Further, the undersigned attorney stipulates that he is authorized to accept service of process on Christopher Novelli, and hereby waive further service of process of the above-referenced documents.

This the 6 day of November, October, 2021.

Patrick Flanagan
Cranfill Sumner
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com
Attorney for Christopher Novelli

1

STATE OF NORTH CAROLINA

IREDELL COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 2476

AMY RHINEHARDT CRAVEN, as )
Administratrix of the Estate of )
CHRISTOPHER KIMMONS CRAVEN, )
)
              Plaintiff, )
)
           v. )
)
CHRISTOPHER NOVELLI, individually )
and in his official capacity as Officer of )
Mooresville Police Department, )
ALEXANDER ARNDT, individually and )
in his official capacity as Officer of the )
Mooresville Police Department, and the )
TOWN OF MOORESVILLE, )
)
           Defendants. )

**ACCEPTANCE OF SERVICE**

      The undersigned hereby accepts service of the Summons issued to Defendant Town of Mooresville, the Complaint filed in this action, as well as Plaintiff's First Set of Interrogatories and Request for Production of Documents to Defendant the Town of Mooresville. The undersigned stipulates that service of the above has been made in this action as of the date signed below. Further, the undersigned stipulates that he is authorized to accept service of process on the Town of Mooresville, and hereby waive further service of process for the above-referenced documents.

      This the _____ day of November, 2021.

                            CRANFILL SUMNER LLP

                         BY: _____
                              Patrick H. Flanagan, NC Bar #17407
                              Attorney for Town of Mooresville
                              2907 Providence Road, Suite 200
                              Charlotte, North Carolina 28211
                              Telephone (704) 332-8300
                              Facsimile (704) 332-9994
                              phf@cshlaw.com

STATE OF NORTH CAROLINA

COUNTY OF IREDELL

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21-CVS-2476

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

        Plaintiff,

v.

CHRISTOPHER NOVELLI, individually
and in his official capacity as Officer of
the Mooresville Police Department,
ALEXANDER ARNDT, individually and
in his official capacity as Officer of the
Mooresville Police Department, and the
TOWN OF MOORESVILLE,

        Defendants.

ACCEPTANCE OF SERVICE

        The undersigned attorney for Defendant Alexander Arndt (collectively, "Defendant
Arndt") in the above-captioned action hereby accepts service of the Summons issued to Defendant
Alexander Arndt, the Complaint filed in this action, as well as Plaintiff's First Set of Interrogatories
and Request for Production of Documents to Defendant Alexander Arndt. The undersigned
stipulates that service of the above has been made in this action as of the date signed below.
Further, the undersigned attorney stipulates that he is authorized to accept service of process on
Alexander Arndt, and hereby waive further service of process of the above-referenced documents.

        This the 8 day of November October, 2021.

                                            Patrick Flanagan
                                            Cranfill Sumner
                                            2907 Providence Road, Ste. 200
                                            Charlotte, North Carolina 28211
                                            Via e-mail: phf@cshlaw.com
                                            Attorney for Christopher Novelli

1

STATE OF NORTH CAROLINA

COUNTY OF IREDELL

IN THE GENERAL COURT OF JUSTICE
COURT DIVISION
21-CVS-2476

|  |  |  |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **NOTICE OF REMOVAL TO FEDERAL COURT** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

PLEASE TAKE NOTICE that Defendants Christopher Novelli, Alexander Arndt and

Town of Mooresville, by and through counsel, have this day filed a Notice of Removal to Federal

Court with the United States District Court for the Western District of North Carolina, for the

removal of this action from Iredell County Superior Court, North Carolina, to the United States

District Court for the Western District of North Carolina.  A copy of the Notice of Removal to

Federal Court, electronically filed with the Federal Court today, is attached hereto as Exhibit 1.

This the 3rd day of December, 2021.

CRANFILL SUMNER LLP

BY: _~/t·l·H·f._____
Patrick H. Flanagan, NC Bar #17407
Attorney for Defendants
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
phf@cshlaw.com

EXHIBIT
B

JA024

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Defendants Christopher Novelli, Alexander Arndt and Town of Mooresville, ("Defendants") by and through counsel, Cranfill Sumner LLP, file this Answer in response to the Plaintiff's Complaint as follows:

## FIRST DEFENSE

Defendants plead lack of subject matter jurisdiction and personal jurisdiction pursuant to the provisions of rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.

## SECOND DEFENSE

Plaintiff's Complaint, in whole or in part, fails to state a claim upon which relief may be granted pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure.

**THIRD DEFENSE**

Defendants plead all applicable immunities to which they are entitled to by operation of law and in bar of Plaintiff's claims herein, including governmental immunity, qualified immunity and public officials immunity.

**FOURTH DEFENSE**

In response to individual paragraphs of Plaintiff's Complaint, Defendant states as follows:

1. Denied for lack of information or belief.

2. Denied for lack of information or belief.

3. It is admitted that Defendant Christopher Novelli is an adult citizen and resident of Iredell County and at all times pertinent was a police officer with the Mooresville Police Department and an employee of the Town. It is specifically denied that Defendant Novelli committed any misconduct and it is denied that he is liable to the Plaintiff under any statute, law, or theory. The remaining allegations contained in paragraph 3 call for a legal conclusion for which no response is required. To the extent a response is necessary they are denied. Except as admitted, denied.

4. It is admitted that Defendant Alexander Arndt is an adult citizen and resident of Rowan County and at all times pertinent was a police officer with the Mooresville Police Department and an employee of the Town. It is specifically denied that Defendant Arndt committed any misconduct and it is denied that he is liable to the Plaintiff under any statute, law, or theory. The remaining allegations contained in paragraph 4 call for a legal conclusion for which no response is required. To the extent a response is necessary they are denied. Except as admitted, denied.

5. It is admitted that Defendant Town of Mooresville is a municipal corporation in Iredell County duly chartered under the laws of the State of North Carolina and maintains and operates pursuant to its Code of Ordinances, a police department called the Mooresville Police Department.

The remaining allegations of paragraph 5 call for a legal conclusion for which no response is required.  To the extent a response is necessary, denied as stated.

6. Denied.

7. Denied

8. Denied.

9. Paragraph 9 contains no allegations and, therefore, no response is required.  To the extent a response is necessary, it is specifically denied that Defendants are liable to the Plaintiff under any statute, law, or theory.

10. Denied.

11. Denied for lack of information or belief.

12. Denied for lack of information or belief.

13. Denied for lack of information or belief.

14. Admitted.

15. Admitted.

16. Admitted.

17. It is admitted that a 911 call was placed from the Craven home and reported possible suicide and violence.  Except as admitted, denied as stated or for lack of information or belief.

18. Admitted.

19. Denied as stated.

20. Denied as stated.

21. It is admitted that as officers approached the house, Christopher Craven ("Craven"), shoeless and shirtless, descended the steps of his house, and reached into his waistband and pulled out his gun. Except as admitted, denied as stated or for lack of information or belief.

22. It is admitted that officers identified themselves as police officers, told him to put his hands up and get on the ground and that lights were shining on Craven. Except as admitted, denied as stated or for lack of information or belief.

23. Denied.

24. It is admitted that officers told Craven to get on the ground but that he did not comply. Except as admitted, denied as stated or for lack of information or belief.

25. It is admitted that Craven failed to comply with the officers' commands, that he reached into his waistband and pulled out his gun and that officers fired their weapons at him. Except as admitted, denied as stated or for lack of information or belief.

26. It is admitted that Craven failed to comply with the officers' commands, that he reached into his waistband and pulled out his gun and that officers fired their weapons at him. Except as admitted, denied as stated or for lack of information or belief.

27. It is admitted that Craven failed to comply with officers' commands, that he reached into his waistband and pulled out his gun, and that officers fired their weapons at him. It is admitted that rounds struck Craven. Except as admitted, denied as stated or for lack of information or belief.

28. It is admitted that Craven fell backwards and was bleeding. Except as admitted, denied as stated or for lack of information or belief.

29. It is admitted that Craven died as a result of the rounds that were fired. Except as admitted, denied as stated or for lack of information or belief.

30. Denied for lack of information or belief.

31. Denied.

32. It is admitted that the officers knew that Craven was armed because he reached into his waistband and pulled out his gun, and that they did not have an opportunity to ask him if he was okay or needed help. Except as admitted, denied as stated.

33. Admitted

34. Denied.

35. It is admitted that Craven had a firearm and reached into his waistband and pulled it out, and the firearm was found close to Craven.  Except as admitted, denied.

36. No response is required for this paragraph.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. No response is required for this paragraph.

48. The allegations of paragraph 48 call for a legal conclusion for which no response is required.  To the extent a response is necessary, denied as stated.

49. Denied, including all subparts.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. No response is required for this paragraph.

61. Denied.

62. Denied.

63. Denied.

64. Denied

65. Denied as stated.

66. Denied as stated.

67. Denied.

68. No response is required for this paragraph.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. No response is required for this paragraph.

74. Denied.

75. Denied.

All allegations not specifically admitted, including Plaintiff's prayer for relief, are denied.

**FIFTH DEFENSE**

If it is determined that Defendants were negligent, which is again denied, and that such negligence was a direct and proximate cause of Mr. Craven's death, then it is alleged that Mr. Craven himself was negligent and that such negligence was the proximate cause of his death. Therefore, contributory negligence is pled in bar of Plaintiff's right to recover from these Defendants.

**SIXTH DEFENSE**

Defendants allege that at all times relevant to this action, they were acting without malice and with a good faith belief that its duties were carried out in accordance with the Laws and the Constitution of the United States and the State of North Carolina.

**SEVENTH DEFENSE**

Defendants did not engage in, promote or further any policy or practice which deprived Mr. Craven of any rights secured by the Constitution or laws of this land.

**EIGHTH DEFENSE**

Plaintiff's claim for punitive damages is in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States in that it deprives Defendants of property without due process of law; further the claim for punitive damages is violative of the Fourteenth Amendment of the United States concerning protection; and the punitive damages claim is further

in violation of the Eighth Amendment of the Constitution of the United States prohibiting imposition of excessive fines.

## **NINTH DEFENSE**

Defendants reserve the right to amend their Answer and to assert additional defenses as the claims of the Plaintiffs are more fully disclosed during this litigation.

WHEREFORE, Defendants pray unto the Court as follows:

1.    That Plaintiff have and recover nothing of these Defendants;

2.    For the dismissal of Plaintiff's actions;

3.    For the cost of defending this action, including reasonable attorneys' fees;

4.    For such other and further relief as the Court may deem just and proper; and,

5.    For trial by jury of all issues triable herein.

This the 10th day of December, 2021.

CRANFILL SUMNER LLP

BY:    /s/ *Patrick H. Flanagan*
Patrick H. Flanagan, State Bar #17407
*Attorneys for Defendants*
Post Office Box 30787
Charlotte, North Carolina 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
phf@cshlaw.com

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day electronically filed the foregoing ***Defendants' Answer to Plaintiff's Complaint*** with the Clerk of Court using the CM/ECF system and served the same on all of the parties to this cause by depositing a copy hereof, postage prepaid, in the United States Mail, addressed as follows:

J. Alexander Heroy
Jennifer M. Houti
aheroy@jmdlaw.com
jhouti@jmdlaw.com
*Attorneys for Plaintiff*

This the 10th day of December, 2021.

CRANFILL SUMNER LLP

BY:     /s/ *Patrick H. Flanagan*
          Patrick H. Flanagan, State Bar #17407
          *Attorneys for Defendants*
          Post Office Box 30787
          Charlotte, North Carolina 28230
          Telephone: (704) 332-8300
          Facsimile: (704) 332-9994
          phf@cshlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**WDNC Civil Action No. 5:21-cv-174-KDB-DSC**

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as<br>Administratrix of the Estate of<br>CHRISTOPHER KIMMONS CRAVEN,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER NOVELLI, individually<br>and in his official capacity as Officer of the<br>Mooresville Police Department,<br>ALEXANDER ARNDT, individually and<br>in his official capacity as Officer of the<br>Mooresville Police Department, and the<br>TOWN OF MOORESVILLE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CONSENT PROTECTIVE ORDER** |

Documents and information have been and will be sought, produced or exhibited by and among the parties to the above captioned proceeding, which documents and information relate to employee personnel matters that may be disclosed only under court order, pursuant to N.C.G.S. §160A-168. The parties have sought such an order so as to be in compliance with this statute and to protect the safety, security and integrity of the Town of Mooresville Police Department.

By consent, IT IS HEREBY ORDERED THAT:

1.     Upon proper request pursuant to the Federal Rules of Civil Procedure, the Parties may obtain confidential information.

2.     Any such confidential information obtained in this action shall be clearly and prominently marked on its face with the legend: "CONFIDENTIAL" or a comparable notice. Any party may object to a designation of any documents or information as "CONFIDENTIAL" by any

other party.  After an objection is made to any designation according to this paragraph, the designated documents or information shall be treated according to the designation and not disclosed as set forth in paragraph 3 below, until the matter is resolved according to the procedures described in paragraph 8 below.

3.    In the absence of further order of this Court, Confidential information obtained in accordance with the provisions of paragraph 2 shall not be disclosed to any person other than: (i) the Court and the employees thereof, (ii) court reporters and stenographers engaged for the taking of testimony, (iii) the Defendant(s) whose records are produced, (iv) all counsel, including necessary secretarial, paralegal and clerical personnel assisting such counsel; (v) experts and their staff who are employed for the purposes of this litigation but who are not otherwise employed by, consultants to, or otherwise affiliated with a party; (vi) witnesses as necessary to prepare for trial or testimony in this action; (vii) Plaintiff; and (viii) any mediators used in this matter.  Any confidential personnel information shall be used solely for the purpose of this original action and in preparation for trial.  Nothing in this Order is intended to interfere with an individual's right to examine confidential records under N.C.G.S. § 160A-168, to the extent permitted by law.

4.    Confidential information obtained in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3 (v) unless he or she shall have first read this Order and shall have agreed, by letter submitted to counsel for the Defendants named in this Order: (i) to be bound by the terms thereof, (ii) not to reveal such confidential personnel information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential personnel information solely for purposes of this litigation.

5.    If the Court orders, or if counsel for the Defendants named in this Order agrees, that access to, or dissemination of, information obtained as confidential information shall be made

2

4858-8972-7530, v. 1
**JA035**

to persons not included in paragraph 3 above, such matters shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this Order, and such persons shall be considered subject to it.

6.      Any confidential information submitted to the Court in connection with a motion or other proceeding within the purview of this action, and marked in accordance with paragraphs 2 above, shall be submitted along with a concurrently filed motion to seal made pursuant to LCvR 6.1(c).  Any portion of a transcript in connection with this action containing any confidential information submitted pursuant to paragraphs 1 and 2 shall be bound separately and filed under seal.  When any confidential information is included in an authorized transcript of a proceeding or exhibits thereto, arrangements shall be made with the court reporter recording the proceeding to bind such confidential portions and separately label them "CONFIDENTIAL."

7.      If confidential information obtained in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this Protective Order, the party responsible for the disclosure must immediately bring all pertinent facts relating to this disclosure to the attention of  the Court and opposing counsel, and without prejudice to other rights and remedies of the other party, make every reasonable effort to prevent further disclosure by it or by the person who was the recipient of such information.

8.      If a party contends that any material is not entitled to confidential treatment, such party may at any time give written notice to the party who designated the material.  The party who designated the material shall have twenty-five days from the receipt of such written notice to apply to the Court for an order designating the material as confidential.  The party seeking the order has the burden of establishing that the document is entitled to protection.

9.    Upon final adjudication of this action, all confidential information subject to the provisions of this Order (including any copies made and/or computer materials made or stored) shall be disposed of in the manner provided by a separate final order to issue from this Court.

10.    This Order is entered without prejudice to any Party seeking further orders from the Court regarding the additional disclosure of, or restriction of, confidential information.

**SO ORDERED**.          Signed: July 25, 2022

_____
David S. Cayer
United States Magistrate Judge

CONSENTED TO BY:

/s/ Jennifer M. Houti
Attorney for Plaintiff

/s/ J. Alexander Heroy
Attorney for Plaintiff

/s/ Jake W. Stewart
Attorney for Defendants

/s/ Patrick H. Flanagan
Attorney for Defendants

4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as<br>Administratrix of the Estate of<br>CHRISTOPHER KIMMONS CRAVEN,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER NOVELLI, individually<br>and in his official capacity as Officer of<br>the Mooresville Police Department,<br>ALEXANDER ARNDT, individually and<br>in his official capacity as Officer of the<br>Mooresville Police Department, and the<br>TOWN OF MOORESVILLE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **DEFENDANTS' MOTION TO SEAL** |

NOW COME Defendants, by and through the undersigned counsel, and move the Court pursuant to United States District Court Western District of North Carolina Local Rules Governing Civil Practice 6.1, to allow Defendants to file under seal certain confidential documents referenced in the Defendants' Motion for Summary Judgment, Memorandum in Support of Summary Judgment, Affidavit of Christopher Novelli, Alexander Arndt, and Christopher Russell. Said documents are contained in the North Carolina State Bureau of Investigation file which was produced to the parties pursuant this Court's Protective Order [D.E. 9]. Specifically, Defendants request they be allowed to seal Chris Craven's autopsy report (Proposed Exhibit 9 in Defendants' Summary Judgment Brief), the 911 call made by Taylor Dunn (Proposed Exhibit 11 in Defendants' Summary Judgment Brief), and the body camera footage of Corporal Arndt (Proposed Exhibit 12 in Defendants' Summary Judgment Brief). In sum, there is good cause to seal these documents as

the competing interests for public access are outweighed by the strong public policy favoring

confidentiality of such records.  Plaintiff consents to this Motion.

Wherefore, Defendants respectfully request that this Motion be granted and that the Court

allow the Defendants to file the documents under seal.

This the 20th day of January, 2023.

/s/ Jake W. Stewart
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **Motion To Seal** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

> J. Alexander Heroy
> Jennifer M. Houti
> Counsel for Plaintiff
> aheroy@jmdlaw.com
> jhouti@jmdlaw.com

This the 20th day of January, 2023.

> /s/ Jake W. Stewart
> Jake W. Stewart
> N.C. Bar No. 51157
> Patrick H. Flanagan
> N.C. Bar No. 17407
> CRANFILL SUMNER, LLP
> P.O. Box 30787
> Charlotte, NC 28230
> Telephone: (704) 332-8300
> Facsimile: (704) 332-9994
> jstewart@cshlaw.com
> phf@cshlaw.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **DEFENDANTS' MEMORANDUM OF** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) | **LAW IN SUPPORT OF MOTION TO SEAL** |
| Defendants. | ) ) | |

Defendants, by and through undersigned counsel, respectfully submit this Memorandum of Law in support of their Consent Motion to Seal. In support of said Motion, Defendants state as follows:

1.    Plaintiff filed her Complaint in the Superior Court of Iredell County on September 7, 2021, and it was removed to Federal Court on December 3, 2021. (D.E. 1).

2.    Defendants filed an Answer to Plaintiff's Complaint on December 10, 2021, denying liability and asserting affirmative defenses. (D.E. 4).

3.    On January 4, 2022 the Court entered a Pretrial Order and Case Management Plan [D.E. 7] which was modified on July 8, 2022 (D.E. 11) and December 13, 2022 (D.E. 15).

4.    On July 22, 2022, the parties filed a Consent Motion for Release of North Carolina SBI Files and requested that the Court enter a Consent Protective Order concerning the disclosure of the State Bureau of Investigation file. [D.E. 12].

5.    On July 25, 2022, this Court granted the Motion and issued a Protective Order which allowed the parties to obtain the SBI criminal investigative file related to this matter for use in this litigation. [D.E. 14].

6.    The parties subsequently obtained the SBI file for use in the case including for review by the parties' experts.

7.    Defendants now respectfully request that the Court grant their Motion and allow the Defendants to file under seal parts of the SBI file referenced in Affidavits, Motions, and Memorandum in Support of Defendants' Motion for Summary Judgement. Specifically, Defendants request they be allowed to seal Chris Craven's autopsy report (Proposed Exhibit 9 in Defendants' Summary Judgment Brief, and filed under seal), the recording of Taylor Dunn's 911 call (Proposed Exhibit 11 in Defendants' Summary Judgment Brief, and filed under seal), and Corporal Arndt's body camera footage (Proposed Exhibit 12 in Defendants' Summary Judgment Brief, and filed under seal).

**ARGUMENT**

Pursuant to Local Rule 6.1, this Court has express authority to seal materials contained in the record. Defendants need only demonstrate "the necessity and propriety" of sealing the document at issue, and the Court, in its discretion, may seal such document

2

if deemed appropriate. *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) (noting that the trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interest).

Further, as demonstrated by Defendants in their Motion to Seal filed herewith, the SBI's criminal investigative file, which contains the Exhibits Defendants seek to have sealed is legally privileged and not subject to public disclosure. *See* N.C.G.S. § 132-1.4(a). Additionally, information, recordings, photographs and documents contained in a Medical Examiner's autopsy report are not subject to disclosure to the general public under North Carolina law. *See* N.C.G.S. § 130A-389.1. Moreover, violating the non-disclosure requirements of N.C.G.S. § 130A-389.1 constitutes a criminal offense. *See* N.C.G.S. § 130A-389.1(g) and (h).

Defendants request only that the Court seal documents already made confidential pursuant this Court's Protective Order so that the parties can present them to the Court without violating the Protective Order and applicable North Carolina statutes. There is no common law or First Amendment presumption to access these confidential SBI and autopsy records, and the interest in keeping these records private outweighs any competing interest for access.

## CONCLUSION

For these reasons, Defendants respectfully request that their Consent Motion to Seal be granted.

This the 20th day of January, 2023.

/s/ Jake W. Stewart
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com

4

4883-4525-1148, v. 1

JA044

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **Brief in Support of Motion to Seal** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

> J. Alexander Heroy
> Jennifer M. Houti
> Counsel for Plaintiff
> aheroy@jmdlaw.com
> jhouti@jmdlaw.com

This the 20th day of January, 2023.

> /s/ Jake W. Stewart
> Jake W. Stewart
> N.C. Bar No. 51157
> Patrick H. Flanagan
> N.C. Bar No. 17407
> CRANFILL SUMNER, LLP
> P.O. Box 30787
> Charlotte, NC 28230
> Telephone: (704) 332-8300
> Facsimile: (704) 332-9994
> jstewart@cshlaw.com
> phf@cshlaw.com

4883-4525-1148, v. 1

**JA045**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

NOW COMES the Defendants, by and through the undersigned, and respectfully submit this Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in Defendants' favor and dismissing all of Plaintiff's claims with prejudice.  The Defendants respectfully contend that the pleadings, medical records, deposition testimony, exhibits, and the attached affidavits of Alexander Arndt, Christopher Novelli, and Christopher Russell, establish that there is no genuine issue of material fact and that Defendants are entitled to judgment for the following reasons, among others:

The grounds for Defendants' Motion for Summary Judgment are explained in further detail in the accompanying Memorandum of Law.

WHEREFORE, Defendants ask that the Court enter Summary Judgment on behalf of the Defendants as to all of Plaintiff's claims.

This the 20th day of January, 2023.

/s/ Jake W. Stewart
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com

JA047

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing **Motion for Summary Judgment** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

          J. Alexander Heroy
          Jennifer M. Houti
          Counsel for Plaintiff
          aheroy@jmdlaw.com
          jhouti@jmdlaw.com

This the 20th day of January, 2023.

                    /s/ Jake W. Stewart
                    Jake W. Stewart
                    N.C. Bar No. 51157
                    Patrick H. Flanagan
                    N.C. Bar No. 17407
                    CRANFILL SUMNER, LLP
                    P.O. Box 30787
                    Charlotte, NC 28230
                    Telephone: (704) 332-8300
                    Facsimile: (704) 332-9994
                    jstewart@cshlaw.com
                    phf@cshlaw.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) ) | **Fed. R. Civ. P. 56** |
| Defendants. | ) | |

NOW COME Defendants, through undersigned counsel, and respectfully submit this Brief in support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As shown herein, there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law with regard to each of Plaintiff's claims. Defendants therefore respectfully request that their Motion for Summary Judgment be GRANTED.

## STATEMENT OF THE CASE

Plaintiff filed her Complaint in the Superior Court of Iredell County on September 7, 2021, and it was removed to Federal Court on December 3, 2021. (D.E. 1). Plaintiff's Complaint sought damages pursuant to 42 U.S.C. § 1983 and state common law claims, and alleged five causes of action: (1) Violations of 42 U.S.C. § 1983; (2) Wrongful Death; (3) Assault and Battery; (4) Negligence/Gross Negligence; and (5) Punitive Damages. (*Id.*). Defendants filed an

Answer to Plaintiff's Complaint on December 10, 2021, denying liability and asserting affirmative defenses. (D.E. 4).

On January 4, 2022, the Court entered a Pretrial Order and Case Management Plan (D.E. 7). Pursuant to the Pretrial Order and Case Management Plan, dispositive motions were due by October 4, 2022. (*Id.*). On July 8, 2022, the parties filed a Motion for an Extension of Time to file dispositive motions. (D.E. 11), and a second Motion for Extension of Time to file dispositive motions by January 20, 2023 to file dispositive motions, which the Court granted. (D.E. 15). Pursuant to the extension granted by the Court, Defendants timely filed their Motion for Summary Judgment on January 20, 2023 and contemporaneously file this memorandum of law in support of said motion.

## STATEMENT OF THE FACTS

This lawsuit is the result of an incident that occurred on August 2, 2020, when Chris Craven ("Craven") was shot and killed by Corporal Alexander Arndt ("Arndt") and Officer Christopher Novelli ("Novelli"). (D.E. 1 ¶¶ 29, 33).

Craven and his wife, Amy Craven married in 2007. (Amy Craven dep. pp. 20-21). Amy Craven had a daughter from her previous marriage, Taylor Dunn ("Dunn"), who lived with her and Craven throughout their marriage. (*Id.* pp. 20-21). Amy Craven and Chis Craven had two more children together during their marriage, a son, Raleigh, and a daughter, Macie. (*Id.* pp. 18-19). Craven worked for Hendricks Motor Sports as a parts coordinator for the entirety of Amy Craven's marriage to him. (*Id.* pp. 30-31). Amy Craven worked as the Director of Nursing at The Pines at Davidson from 2015 to 2021. (*Id.* pp. 15-16). Prior to the COVID pandemic, Craven regularly went into work for Hendricks Motor Sports. (*Id.* p. 30).

Once the COVID pandemic hit, Craven had to start working from home. (*Id.* pp. 30-31)

During the summer of 2020, Craven was working from home due to the COVID pandemic. (*Id.*).

Due to the nature of her job, Amy Craven continued to go into work during the COVID

pandemic. (*Id.* pp. 15-16). Since Amy Craven had to go into work every day and Craven worked

from home during the pandemic, Craven assumed a lot of the at home parent duties and

responsibilities. (*Id.* pp. 29-30). Amy Craven and Dunn testified that because of the COVID

pandemic Craven struggled with depression and his pre-existing anxiety was exacerbated. (*Id.*

pp. 38-39; Dunn dep. p. 28). On August 2, 2020, Amy Craven went into work and Craven

remained at home. (Amy Craven dep. p. 56). That evening, Amy Craven was in bed and testified

that Craven "went into this mental health crisis because I had not been there for the family." (*Id.*

p. 57). Dunn testified she had been at work that day and had been home for about an hour when

Craven became increasingly anxious and frustrated. (Dunn dep. p. 33).

Dunn was in the living room when she noticed Craven's agitation. (Dunn dep. pp. 14, 33-

34). Dunn could tell Craven was upset and heard him expressing feelings that he did not want to

live. (*Id.* p. 34). At the time, Dunn believed Raleigh and Macie were in their rooms. (*Id.*). Dunn

asked her mother if she felt that calling 911 would help and Amy Craven told Dunn to call. (*Id.*

p. 35). Dunn called 911 at approximately 9:30 pm. (*Id.* p. 33; Dunn dep. Ex. 1). The first thing

Dunn  said to the dispatcher was, "My stepdad hit my mom in front of me and my siblings and

he is threatening to blow his brains out and he is screaming and getting in her face and he won't

stop." (Dunn dep. Ex. 1 p. 1; Dunn dep. Ex. 2 at 00:05-00:14; Dunn dep. p. 53). After reviewing

the call transcript (Dunn dep. Ex. 1) and listening to the calls (Dunn dep. Ex. 2, 3), Dunn agreed

that the transcript and recordings were accurate.  (Dunn pp. 43, 51, 56-57).

3

After Craven got upset, he left the bedroom.  Amy Craven remained in the bedroom. (Amy Craven dep. p. 61).  Shortly after leaving the bedroom, Craven returned, shut the door with Amy Craven still inside, and held a gun to his head, threatening to kill himself. (*Id.*). Presumably at the same time, Dunn was screaming at dispatch that Craven locked her mom in their room. (Dunn dep. Ex. 1 p. 2; Dunn dep. Ex. 2 at 02:06-02:20).  After Craven threatened to kill himself in the bedroom, Amy Craven left their bedroom and went to Raleigh's room with Dunn and her two minor children. (Amy Craven dep. p. 63).  Amy Craven testified that it was when she was in Raleigh's room with her children that she remembered realizing that Dunn was on the phone with the police. (*Id.* p. 64).  While in Raleigh's room, the dispatcher asked Dunn if Craven had a gun on him, Dunn then asked Amy Craven if Craven had a gun on him and Amy Craven said he did. (Amy Craven dep. p. 69; Dunn dep. Ex. 1 p. 4; Dunn dep. Ex. 3 at 03:00-03:14).  At the time, Dunn also reported Craven had left the residence but she was unable to see what he was doing. (Dunn dep. Ex. 1 p. 4; Dunn dep. Ex. 3 at 03:15-03:55).

At some point during the call, Craven came back into the house and asked for his phone. (Dunn dep. p. 39; Dunn dep. Ex. 1 p. 5; Dunn dep. Ex. 3 at 04:52-04:58).  Craven said he wanted his phone so he could call his mother to tell her goodbye. (Dunn dep. p. 39; Dunn dep. Ex. 1 p. 5; Dunn dep. Ex. 3 at 05:18-05:23).  Seconds later, Craven can be heard saying, "When the police show up here, thank Taylor because (inaudible)" and "You won't have a fucking daddy no more (inaudible). (Dunn dep. Ex. 1 p. 5; Dunn dep. Ex. 3 at 005:32-05:42).  Dunn reports to the dispatcher that she hears gunshots shortly after Craven made those comments . (Dunn Ex. 1 p. 6; Dunn Ex. 3 at 06:33-06:40).

At around 9:30 pm on August 2, 2020, Novelli was sitting in the Food Lion parking lot in his patrol car when he heard a call come through dispatch regarding a domestic dispute at 226

Heritage Place. (Novelli dep. pp. 38-39; Novelli Aff. ¶ 3).  Dispatch indicated a female called because her father or step-father had assaulted her mother. (Novelli Aff. ¶ 3).  Dispatch indicated the man's name was Chris Craven and that he possibly had a gun. (*Id.*).  Sometime after 9:00 pm, Arndt was at the Mooresville Police Department with his trainee when he heard a call come through dispatch regarding a domestic dispute at 226 Heritage Place. (Arndt dep. p. 100; Arndt Aff. ¶ 3).  Arndt recalled hearing dispatch indicate a man had assaulted his wife and that the man was threatening to "blow his brains out." (Arndt Aff. ¶ 3).

Both Arndt and Novelli responded to the call and began to head towards 226 Heritage Place. (Novelli Aff. ¶ 4; Arndt Aff. ¶ 4).  During their rides, additional information came through dispatch indicating Craven was armed, was threatening to "blow his brains out", and had walked outside of his residence. (Novelli Aff. ¶ 4; Arndt Aff. ¶ 4).  The officers decided to park a few houses away from 226 Heritage Place so that they could approach on foot. (Arndt Aff. ¶ 5; Novelli Aff. ¶ 5).  Arndt and his trainee, Officer Mercado arrived on the scene first, and Novelli arrived shortly after. (*Id.*).  Any time officers respond to calls where someone is possibly suicidal and/or has a firearm, the officers can get their long guns out so that they have a tactical advantage. (Novelli Aff. ¶ 7; Arndt Aff. ¶ 6).  Novelli and Arndt either retrieved or readied their long guns after parking their vehicles. (*Id.*).  After dispatch indicated Craven was going back into the residence, Arndt, Novelli, and several other officers started towards the Craven residence. (*Id.*).

As Arndt approached the Craven residence he heard someone who he thought was Craven say something like "just shoot me" or "you are going to have to shoot me" or "fucking shoot me." (Arndt Aff. ¶ 8).  As Novelli approached the Craven residence, he saw Craven near the front door and heard him say something like "what are you going to do" or "you're going to

4869-7160-9162, v. 1

**JA053**

have to fucking kill me." (Novelli Aff. ¶ 9). Novelli observed that Craven was not wearing a shirt and had a black handgun in the waistband of his pants located slightly off to the right near his appendix. (Novelli Aff. ¶ 10). He believed Craven's gun was in a holster in his waistband. (*Id.*). Novelli testified he had seen both his and Arndt's body camera footage prior to the footage being shown to him during his deposition. (Novelli dep. pp. 39-40). During his deposition, Novelli was shown body camera footage and he identified which body camera footage was his (Pl. Ex. 7) and which body camera footage was Arndt's (Pl. Ex. 6). (Novelli dep. pp. 74-76).

Once Arndt saw Craven, he announced "Mooresville Police Department" and then commanded Craven to show his hands. (Arndt Aff. ¶ 9; Novelli Aff. ¶ 11; Pl. Ex. 6 at 06:29-06:33)[1]. Craven initially complied with the order to show his hands and raised his hands up. (Novelli Aff. ¶ 12; Pl. Ex. 6 at 06:31). Craven then lowered his hands before any order to get on the ground had been issued. (Novelli Aff. ¶ 12-13; Pl. Ex. 6 at 06:32). Craven reached into his waistband with his right hand and pulled his gun out of the holster. (Novelli Aff. ¶ 12; Arndt Aff. ¶ 10). Craven then quickly pulled the gun up to approximately his mid-torso. (Novelli Aff. ¶ 12). Once Craven pulled the gun out of his holster, Arndt and Novelli fired upon him until he fell to the ground. (Novelli Aff. ¶ 13; Arndt Aff. ¶ 10).

After firing their weapons, Arndt and Novelli walked up to Craven's body. As he approached Craven's body, Arndt said "where is the gun" and shined his flashlight behind Craven onto the steps leading up to his residence, where he saw the gun resting on its magazine well pointing upwards. (Novelli Aff. ¶ 14; Arndt Aff. ¶ 11; Pl. Ex. 6 at 06:57-06:58). Novelli was ordered to go into the Craven residence and secure the residence, and Arndt remained

---

[1] This body camera footage was included in the SBI file and will be filed under seal.

outside where he unsuccessfully attempted life saving measures on Craven. (Novelli Aff. ¶ 14; Arndt Aff. ¶ 12).

Dunn testified she was able to hear the gunshots while she was in her brother's room but did not hear any voices or anything else coming from outside prior to the shooting. (Dunn dep. pp. 42-43). Dunn did not see or hear any interaction between Craven and the police and was unable to see Craven at any point while he was outside. (*Id.* p. 61). Amy Craven was able to hear the gunshots as well but was not able to hear Craven or any officers say anything while they were outside of the house. (Amy Craven dep. pp. 62-63). Amy Craven also could not see Craven at any point while he was outside of the house. (*Id.* p. 62).

An autopsy confirmed Craven died as a result of multiple gunshot wounds. (Autopsy, included in the SBI file, which will be filed under seal).

The State Bureau of Investigation ("SBI") conducted an investigation into the incident. Following its investigation, which included interviews with the officers involved, neighbors, Amy Craven, and other officers who responded on scene, no charges were filed against the Defendants.

## <u>STANDARD OF REVIEW</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted when the pleadings, responses to discovery, depositions, and declarations, if any, establish that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. *Schulze v. Meritor Automotive*, 163 F.Supp.2d 599, 608 (W.D.N.C. 2000). Once the moving party has met that burden, the nonmoving party must come

7

4869-7160-9162, v. 1

**JA055**

forward with specific facts showing that there is a genuine issue for trial. *Schulze*, 163

F.Supp.2d at 608.

## **LEGAL ARGUMENT**

**I.    Novelli And Arndt Did Not Violate Craven's Fourth Amendment Rights**

Excessive force claims against law enforcement officers are analyzed under the Fourth

Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865,

104 L.Ed.2d 443 (1989). The question under the totality of the circumstances is "whether a

reasonable officer in the same circumstances would have concluded that a threat existed

justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). In

determining whether a reasonable officer on the scene would have used force, courts are to

consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. An officer may reasonably "use

deadly force when the officer has 'probable cause to believe that the suspect poses a threat of

serious physical harm, either to the officer or others.' " *Anderson*, 247 F.3d at 129 (quoting

*Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). "[T]he

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396,

109 S.Ct. 1865. Courts must consider "that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397, 109

S.Ct. 1865. Courts are also instructed to focus "on the circumstances at the moment force was

used and on the fact that officers on the beat are not afforded the luxury of armchair reflection."

*Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

Plaintiff has failed to establish a plausible claim against Novelli or Arndt for violating Craven's rights under the Fourth Amendment. It was reasonable for Novelli and Arndt, based upon the information they had available to them at the time and the totality of circumstances, to believe that their lives were in grave danger based upon Craven's actions. Upon approaching the Craven residence, Arndt and Novelli understood that Craven was armed with a handgun, had just committed an assault on his wife, and was threatening to blow his brains out. (Novelli Aff. ¶¶ 3-4; Arndt Aff. ¶¶ 3-4). Such information would lead any reasonable officer to conclude that Craven was armed and potentially dangerous. Both officers also heard Craven say something to the effect of "you're going to have to fucking kill me" or "you are going to have to shoot me" as they approached the house. (Novelli Aff. ¶ 9; Arndt Aff. ¶ 8). Any reasonable officer would conclude that such a statement suggests Craven is prepared to resist any attempt at a civil discussion. While Novelli and Arndt did not hear the 911 call, such a statement by Craven is consistent with the statements he made when he walked out of his residence: "When the police show up here, thank Taylor because (inaudible)" and "You won't have a fucking daddy no more (inaudible). (Dunn dep. Ex. 1 p. 5; Dunn dep. Ex. 3 at 005:32-05:42).

The information noted above, coupled with Craven's actions once the officers made contact with him, support the decision by Novelli and Arndt to use deadly force. There is no dispute that Arndt announced their presence as police officers. (Arndt Aff. ¶ 9; Novelli Aff. ¶ 11; Pl. Ex. 6 at 06:29-06:33). Further, the fact that Craven initially complied with the order to show his hands is proof that he heard and understood Arndt's commands. (Novelli Aff. ¶ 12; Pl. Ex. 6 at 06:31). The body camera footage shows that Craven clearly lowered his hands down to his waist before any command to get on the ground was issued, and while not visible on the body camera footage, both Novelli and Arndt testified that Craven pulled a gun out of a holster in his

4869-7160-9162, v. 1

waistband when he lowered his hands. (Novelli Aff. ¶ 12; Arndt Aff. ¶ 10; Pl. Ex. 6 at 06:31-06:33).  The Fourth Circuit wrote in *Lee v. Bevington*, 647 F. App'x 275, 283 (4th Cir. 2016):

> No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life ... the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self-protection.

There is no testimony or evidence to support any allegation that Craven did not brandish or threaten the officers with a firearm.  Amy Craven and Dunn testified they could not see or hear anything that occurred outside of the residence so any allegation that Craven did not draw a gun would be speculative and unsupported by evidence. (Dunn dep. p. 61; Amy Craven dep. p. 62).  Unfortunately, due to lighting issues, the body camera footage does not conclusively show Craven pulling a firearm out of his waistband or holster.  However, the footage is consistent with Arndt and Novelli's testimony since it shows Craven lowering his hands and not complying with Arndt's orders. (Pl. Ex. 6 at 06:31-06:58).

"If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 585 (4th Cir. 2017).  Even in situations where an individual's intentions turn out to be harmless, an officer can still reasonably prepare for the worst during the split-second when he acts. *Id. See Slattery v. Rizzo*, 939 F.2d 213, 215-16 (4th Cir. 1991) (holding an officer reasonably feared for his life when he ordered a suspect to put his hands up twice but he suspect ignored the officer's commands and reached down to an area out of the officer's sight to grab an object that turned out to be a bottle); *Anderson v. Russell*, 247 F.3d 125, 128, 131 (4th Cir. 2001) (holding an

10

officer was reasonable in fearing for his life when he ordered a man he thought was armed to get

on his knees and put his hands up, but the man reached into his pocket for what turned out to be a

radio).

The facts of this claim are even more compelling than those in *Anderson* and *Slattery*.

Like the suspects in *Anderson* and *Slattery*, Craven can clearly be seen lowering his hands after

an order to show his hands was given, but before any other order was given. (Pl. Ex. 6 at 06:31-

06:33). However, in this claim, Craven reached for and pulled a gun out of his waistband, not a

radio or a bottle. Even if he did not pull a gun out of his waistband, the facts of this claim are

more compelling and Novelli and Arndt were reasonable in fearing for their lives since Craven

had been ordered to show his hands and he made a clear furtive movement to his waist where at

the very least he had a holster. (Pl. Ex. 6 at 06:31-06:58).

## II. Alternatively, Plaintiff's § 1983 Claims Based On The Fourth Amendment Against Novelli And Arndt In Their Individual Capacities Are Barred By Qualified Immunity

Even if Novelli and/or Arndt violated Craven's Federal or N.C. Constitutional rights, which

they did not, they are still entitled to qualified immunity. Qualified immunity protects government

officials "from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). Officials who are sued for civil damages are entitled to qualified immunity unless (1) the

complaint sufficiently alleges a violation of a constitutional right, and (2) the right at issue, defined

at the appropriate level of generality, was "clearly established" at the time of the alleged

misconduct. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010).

Such specificity is especially important in the Fourth Amendment context, where the Court has

recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." 533 U.S., at 205, 121 S.Ct. 2151. *See Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015).

In the excessive force setting, Defendants are not aware of any Fourth Circuit case where the Court has ruled that an officer is not allowed to defend themselves where they order an armed suspect to show his hands and that suspect instead reaches for and pulls a firearm out of his holster. Even in deadly force cases much less compelling than this, the Court has ruled in favor of officers as a matter of law. *See, e.g., Sigman v. Chapel Hill*, 161 F.3d 782, 786 (1998)(question of fact did not exist as to the reasonableness of the officers' perceptions despite evidence that Sigman was not armed or exhibiting threatening behavior at the time he was shot); *See Anderson* 247 F.3d at 128, 131; *See Slattery* 939 F.2d at 216.

In this case, as in the above noted cases, Novelli and Arndt are entitled to prevail as a matter of law. Here, there is no evidence disputing Novelli and Arndt's testimony that they believed they were in imminent danger of being shot by Craven. Based on the undisputed facts, even if Novelli and Arndt violated Craven's Fourth Amendment rights, they are entitled to qualified immunity.

### III.    Plaintiff's 42 U.S.C. § 1983 Claims Against Novelli And Arndt In Their Official Capacities Are Subject To Dismissal

Official capacity suits are not suits against the person of the defendant, but rather, are suits against the office or entity of which the defendant is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). An official capacity claim is, therefore, actually nothing more than a claim against the governmental entity by whom the official is employed. *Kentucky,* 473 U.S. 159 at 165-67 (noting that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent.").

12

The Fourth Circuit has held that when a governmental employee is sued in his or her official capacity, the claim is actually against the governmental office that the employee holds, rather than the particular individual occupying the office. *Brissett v. Paul*, 141 F.3d 1157 (4th Cir. 1998) (upholding dismissal of claims against Defendants in their official capacities as Chiefs of Police, because local government that employed them was named as a party and therefore naming the local officials in their official capacities was redundant and unnecessary); *See also Armstrong v. City of Greensboro*, 190 F.Supp.3d 450, 463 (2016) ("[D]uplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed."). North Carolina state courts have also held that when governmental employees are sued in their official capacities, "the claim is against the office the employee holds rather than the particular individual who occupies the office." *May v. City of Durham*, 136 N.C. App. 578, 584, 525 S.E.2d 223, 229 (2000) (*citing Kentucky v. Graham,* 473 U.S. 159 (1985)).

Here, Plaintiff has simultaneously alleged claims against Novelli and Arndt in their official capacity and claims against the Town that employs them.  The claims against Novelli and Arndt in their official capacity are redundant and unnecessary and are subject to dismissal with prejudice.

### IV.    Plaintiff's § 1983 Claims Against The Town Of Mooresville Fail

Plaintiff seeks to assert a § 1983 claims against the Town of Mooresville under multiple theories including respondeat superior, a *Monell* theory of purported unlawful policy, custom or usage, and supervisory liability for failure to supervise, discipline and train. (D.E. 1, ¶¶ 41-43). Because Novelli and Arndt are not liable in their individual capacities on Plaintiff's Fourth Amendment claim, it follows that there can be no liability for the Town of Mooresville as to any of Plaintiff's theories. *See, e.g., Hinkle v. City of Clarksburg,* 81 F.3d 416, 420 (4th Cir. 1996).

13

Moreover, Plaintiff has failed to show any basis for liability under *Monell*. In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), the Supreme Court of the United States held that a municipality may not be held liable pursuant to §1983 based upon the doctrine of *respondeat superior*. Pursuant to *Monell,* a plaintiff must allege and establish the existence of an <u>official policy</u> in one of the four following ways:(1) By establishing the existence of a policy which was formally made by the local governmental body; (2) By establishing that a policy was made by the acts and decisions of high ranking officials with final decision making authority; (3) By establishing the existence of a persistent and well-settled custom sufficient to constitute a <u>de facto</u> policy; (4) By establishing the existence of a deliberate indifference by the governmental body to supervise and train its employees. *City of St. Louis v. Praprotnik*, 108 S.Ct. 915 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Fayetteville v. Spell*, 44 U.S. 1027, 108 S. Ct. 752, 98 L.Ed.2d 765 (1988).

Significantly, Plaintiff has not pointed to an official custom or policy that was effectuated in violation of Plaintiff's constitutional rights.  Instead, Plaintiff contends that the Town failed to implement adequate policies with respect to proper use and application of deadly force, de-escalation, and how to interact with and respond to citizens experiencing a mental health criss and threatening suicide. (D.E. 1 ¶ 42).  To prevail under *Monell*, officials must be acting under a policy that violates constitutional rights, yet Plaintiff only seems to be alleging that adequate policies did not exist. (*Id.*).  Since Plaintiff has not even alleged the existence of an official policy, it follows that there can be no *Monell* liability for the Town due to such a policy violating Craven's constitutional rights.

Furthermore, in *Monell*, the Supreme Court held that a custom may not arise out of a single incident. *Monell*, 436 U.S. at 691.  The courts have ruled that only where a history of widespread

abuse of constitutional rights exists can knowledge be imputed to a municipality. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983); *Milligan v. City of Newport News*, 743 F.2d 227 (4th Cir. 1984). Here, the Plaintiff has only alleged one incident, which is not enough to support a custom or practice under *Monell*. Plaintiff's Section 1983 claims against the Town fails as a matter of law and should be dismissed.

## V.     Plaintiff's State Law Claims Against Defendants Are Subject To Dismissal

Plaintiff seeks to assert state law wrongful death claims and negligence/gross negligence claims against all Defendants. (D.E. 1 ¶¶ 48-58, 69-72). Novelli and Arndt are subject to public officials' immunity as to the individual capacity claims, and the Town is entitled to governmental immunity as to any official capacity claim.

The essence of the doctrine of public official immunity is that public officials engaged in the performance of their governmental duties involving the exercise of judgment and discretion, and acting within the scope of their authority, may not be held liable for such actions, in the absence of malice or corruption. *Price v. Davis*, 132 N.C. App. 556, 562, 512 S.E.2d 783, 787 (1999) (citation omitted); *Meyer v. Walls*, 347 N.C. 97, 489 S.E.2d 880 (1997). The named officers are public officials who enjoy absolute immunity from personal liability for discretionary acts done without corruption or malice. *Schlossberg v. Goins*, 141 N.C.App. 436, 445–46, 540 S.E.2d 49, 56 (2000). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Thomas v. Sellers*, 142 N.C.App. 310, 524 S.E.2d 283, 286 (2001) (quoting *Grad v. Kaasa*, 312 N.C. 310, 313, 312 S.E.2d 888, 890 (1984)). Public official's immunity is not available where an officer violates clearly established

rights because he does what a man of reasonable intelligence would have known to be contrary to his duty. *See Baily v. Kennedy,* 349 F.3d 731, 742 (4th Cir.2003).

There is no evidence that indicates malice or corruption on the part of Novelli or Arndt, therefore, they are entitled to public official immunity regarding the wrongful death claim. Both officers indicated they only fired upon Craven because they feared he would use his firearm against an officer. (Novelli Aff. ¶¶ 15-16; Arndt Aff. ¶¶ 13-14).

Further, there has been no waiver of governmental immunity. Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited to the extent of insurance coverage. *Satorre v. New Hanover Cnty. Bd. Of Comm'rs,* 165 N.C. App. 173, 176 (2004). All of the acts complained of occurred on August 2, 2020. During that time, the Town of Mooresville had an insurance policy in effect; a general liability policy issued by Brit Global Specialty USA, policy number PK1027220. (See Russell Aff.) The policy contains a non-waiver of governmental immunity provision. (*Id.* and attached true copies). The provision specifically state "This policy is not intended by the ASSURED to waive its governmental immunity as allowed by North Carolina General Statutes Section 115C-42, Section 153A-435, Section 160A-485, or any amendments thereof." (*Id.* and attached true copies). This language has been repeatedly held to preserve governmental immunity. *See, e.g., Evans v. Chalmers,* 703 F.3d 636, 656 (4th Cir. 2012) ( See also *Patrick v. Wake Cty. Dep't of Human Servs.,* 188 N.C.App. 592, 596, 655 S.E.2d 920, 923 (2008); *Estate of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs.*, 204 N.C. App. 338, 341, 694 S.E.2d 405, 408 (2010); *Owen v. Haywood County*, 697 S.E.2d 357 (N.C. App. 2010)).

Novelli and Arndt are still subject to public official's immunity as to the claims against them for gross negligence since "the North Carolina Supreme Court has never allowed a showing

of gross negligence to suffice to pierce an officer's immunity, absent a statute specifically abolishing the common law immunity." *Shaw v. Stroud,* 13 F.3d 791, 803 (4th Cir. 1994) (citing *Wiggins v. City of Monroe,* 73 N.C.App. 44, 326 S.E.2d 39 (1985)).  The required elements to pierce public official's immunity are malice or corruption, neither of which are present in this claim.  Similarly, any gross negligence claims against the Town are subject to dismissal as well due to governmental immunity. (See *Hogan v. Cherokee County*, 519 F.Supp.3d 263, 286-87 (W.D.N.C. 2021)) (where the Plaintiff's state law claims, including gross negligence and respondeat superior, against the County were dismissed because the "County has not waived its governmental immunity from suit for state tort claims.")

## VI. Plaintiff's Claims For Assault And Battery Against Novelli And Arndt Are Subject To Dismissal

The Fourth Circuit has recognized that, "the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *Knight Estate of Graham v. City of Fayetteville,* 234 F. Supp. 669, 692 (E.D.N.C. 2017).  Therefore, state law tort claims that are premised on the officer's use of force, force which was reasonable and not excessive under the circumstances, is not actionable under North Carolina law. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Todd v. Creech*, 23 N.C. App. 537, 209 S.E.2d 293 (1974); *Bell v. Dawson,* 144 F. Supp.2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) (Flannagan, J.)( "[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims.").

Novelli and Arndt used deadly force because of the circumstances they were faced with. After making contact with Craven and ordering him to show his hands, he quickly reached into his waistband and pulled a gun out of the holster. (Novelli Aff. ¶¶ 11-13; Arndt Aff. ¶¶ 9-11). The officers reasonably believed that Craven was going to use his firearm against the officers on site, thus justifying their use of deadly force. (Novelli Aff. ¶ 16; Arndt Aff. ¶ 14).

## VII.    Plaintiff's Claim For Punitive Damages Fails As A Matter Of Law

Although a municipality may be liable for compensatory damages in § 1983 actions, it may not be subjected to punitive damages. *Newport v. Fact Concerts, Inc.* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("consideration of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials"). Municipalities are also immune from punitive damages for state law claims "in the absence of statutory provision to the contrary." *Jackson v. Housing Authority of City of High Point,* 316 N.C. 187, 208, 341 S.E.2d 523, 525 (1986). Notably, to abrogate the common law, a statutory provision must do more than merely provide for punitive damages; it must remove governmental immunity for those damages. *Id.,* 316 N.C. at 263, 341 S.E.2d 523. Here, the Town cannot be held liable for punitive damages.

As to the individual defendants, punitive damages are available under § 1983 only when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 57, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Plaintiff forecast includes no evidence of such an evil motive in this case, and the claim for punitive damages should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that their Motion for Summary Judgment be GRANTED, and that Plaintiff's claims against them be DISMISSED WITH PREJUDICE.

This the 20th day of January, 2023.

/s/ Jake W. Stewart
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com



4869-7160-9162, v. 1
**JA067**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **Brief in Support of Motion for Summary Judgment** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

> J. Alexander Heroy
> Jennifer M. Houti
> Counsel for Plaintiff
> aheroy@jmdlaw.com
> jhouti@jmdlaw.com

This the 20th day of January, 2023.

> /s/ Jake W. Stewart
> Jake W. Stewart
> N.C. Bar No. 51157
> Patrick H. Flanagan
> N.C. Bar No. 17407
> CRANFILL SUMNER, LLP
> P.O. Box 30787
> Charlotte, NC 28230
> Telephone: (704) 332-8300
> Facsimile: (704) 332-9994
> jstewart@cshlaw.com
> phf@cshlaw.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | |
|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **INDEX FOR BRIEF IN SUPPORT OF SUMMARY JUDGMENT** |

## <u>INDEX</u>

Affidavit of Christopher Novelli ............................................................................Exhibit 1

Affidavit of Alexander Arndt................................................................................Exhibit 2

Affidavit of Christopher Russel ............................................................................Exhibit 3

Insurance Policy....................................................................................................Exhibit 4

Excerpts from deposition of Taylor Dunn ............................................................Exhibit 5

Excerpts from deposition of Amy Craven ............................................................Exhibit 6

Excerpts from deposition of Christopher Novelli .................................................Exhibit 7

Excerpts from deposition of Alexander Arndt......................................................Exhibit 8

[1]Autopsy Report..................................................................................................Exhibit 9

---

[1] The Autopsy Report is to be filed under seal.

911 Transcript/Dunn dep. Ex. 1 ..........................................................................Exhibit 10

[2]Recording of 911 Call/Dunn dep. Ex. 2    [3] ........................................Exhibit 11

[3]Alexander Arndt Body Camera Footage/Pl. Ex. 6 .............................................Exhibit 12

---

[2] The recording of the 911 call is to be filed under seal.
[3] The body camera footage is to be filed under seal.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **AFFIDAVIT OF CHRISTOPHER NOVELLI** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

I, Christopher Novelli, being duly sworn, deposes and says as follows:

1.      I am over the age of eighteen and competent to testify.  I have personal knowledge of the matters set forth in this Affidavit.

2.      At the time of the incident that is the subject of this lawsuit, August 2, 2020, I was a patrol officer for Mooresville Police Department.  I am currently a Corporal with the Mooresville Police Department.

3.      On the evening of August 2, 2020, I was sitting in my patrol vehicle in a Food Lion parking lot when I received a call from dispatch over the radio regarding an incident at 226 Heritage Place.  Dispatch indicated a female called because her father or step-father had assaulted her mother.  Dispatch indicated the man's name was Chris Craven and that he possibly had a gun.

**EXHIBIT 1**

JA071

4.      I turned on my emergency lights and sirens and began heading towards 226 Heritage Place to respond to the call. During the ride, I received additional information over the radio from dispatch. I heard that Mr. Craven was outside of his residence, and that he was threatening to "blow his brains out."

5.      We decided to park a few houses away from 226 Heritage Place so that we could approach on foot. I arrived at the scene around the same time as Corporal Arndt and Officer Mercado.

6.      Multiple officers responded to the call due to the severity of the call, the threat of suicide, and the fact that Mr. Craven may have been armed with a firearm.

7.      Once arriving at the scene, I retrieved my rifle. Anytime we receive calls where someone is possibly suicidal and/or has a firearm, we can get our long guns for a tactical advantage. More officers arrived and once we received information from dispatch that Mr. Craven was going back into the house, Corporal Arndt and I started towards the house.

8.      We knew Mr. Craven had already assaulted his wife, was threatening to kill himself, and was potentially armed, so when we heard he was heading back into the residence, where we knew his wife and children were, we felt it was emergent to go up to the house.

9.      As I approached the home at 226 Heritage Place, I saw Mr. Craven near the front door. I heard him say something to us before any of the officers said anything. I do not remember exactly what he said but thought it was something like "what are you going to do" or "you're going to have to fucking kill me."

10.     Mr. Craven did not have a shirt on and I noticed a black handgun in the waistband of his pants. The handgun was located lightly off to the right near his appendix. I believe the gun was in a holster in Mr. Craven's waistband.

11.    Corporal Arndt announced we were the police, told Mr. Craven to show his hands, and then told Mr. Craven to get on the ground. I did not issue any verbal commands.

12.    Mr. Craven initially complied with the order to show his hands and did in fact show his hands. Mr. Craven then reached into his waistband with his right hand and pulled his gun out of the holster. He quickly pulled the gun up to approximately his mid-torso.

13.    When Mr. Craven pulled his gun out of his holster, I then fired my rifle at Mr. Craven until he fell to the ground. Mr. Craven reached for his handgun before Corporal Arndt issued the command for him to get on the ground.

14.    I then walked up to Mr. Craven and saw a handgun next to his body. After I saw his gun, I was ordered to go inside and secure the residence.

15.    I fired my weapon at Mr. Craven because I feared he posed an imminent threat of bodily harm to myself or a third person. This fear was due to him threatening to kill himself, his failure to obey orders, and his sudden move to draw his handgun from his holster.

16.    Based upon the circumstances of the situation, I believed that Mr. Craven would use his firearm against myself or a third person.

17.    I believe that my use of force against Mr. Craven was appropriate given the circumstances and the threat that he posed.

FURTHER THE AFFIANT SAYETH NOT.

Executed this the 14th day of January, 2023.

_Chris Novelli_
Christopher Novelli

Subscribed and sworn before me, this 14th day of January, 2023.

_Tina Canterbury_
Signature of Notary Public

_Tina Canterbury_
Printed Name of Notary Public

My commission expires: Oct. 19 2026

> TINA CANTERBURY
> Notary Public, North Carolina
> Iredell County
> My Commission Expires
> Oct. 19, 2026

4889-2196-9737, v. 1
**JA074**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) ) | **AFFIDAVIT OF ALEXANDER ARNDT** |
| Defendants. | | |

I, Alexander Arndt, being duly sworn, deposes and says as follows:

1.      I am over the age of eighteen and competent to testify.  I have personal knowledge of the matters set forth in this Affidavit.

2.      At the time of the incident that is the subject of this lawsuit, August 2, 2020, I was a Corporal with the Mooresville Police Department.  I am currently a Corporal with the Mooresville Police Department.

3.      On the evening of August 2, 2020, I was eating dinner with my trainee, Officer Mercado, when I received a call from dispatch over the radio regarding an incident at 226 Heritage Place.  Dispatch indicated a man had assaulted his wife and that the man was threatening to "blow his brains out."

4.      Officer Mercado and I left and began heading towards 226 Heritage Place to respond to the call.  During the ride, I received additional information over the radio from

**EXHIBIT 2**

JA075

dispatch.  Dispatch initially said a shot may have been fired, then indicated a shot had not been fired.  Dispatch indicated the man, who I found out was Chris Craven, was armed but that he had walked outside of the residence.

5.       We decided to park a few houses away from 226 Heritage Place so that we could approach on foot.  Officer Mercado and I arrived on scene first.  Shortly after we parked, other officers arrived as well.

6.       Once arriving at the scene, I readied my rifle.  Anytime we receive calls where someone is possibly suicidal and/or has a firearm, we can get our long guns for a tactical advantage.  Once we received information from dispatch that Mr. Craven was going back into the house, Officer Novelli, myself, and several other officers, started towards the house.

7.       We knew Mr. Craven had already assaulted his wife, was threatening to kill himself, and was potentially armed, so when we heard he was heading back into the residence, where we knew his wife and children were, we felt it was emergent to go up to the house.

8.       As I approached the home at 226 Heritage Place, I heard someone who I thought was Mr. Craven say something like "just shoot me" or "you are going to have to shoot me" or "fucking shoot me."

9.       When I saw Mr. Craven, I said "Mooresville Police Department" and then commanded that he show his hands and get on the ground.  I cannot recall if Mr. Craven complied with my command for him to show his hands.

10.      Whether or not Mr. Craven raised his hands, shortly after the command to show his hands, Mr. Craven reached into his waistband and pulled out a black handgun with his right hand.  Once I saw Mr. Craven draw the handgun, I fired my rifle multiple times until he fell to the ground and was no longer a threat.

11.     After firing my weapon, I walked up to Mr. Craven and observed the gun that he had in his hand behind him on the steps of the residence.  I noticed the gun was resting on its magazine well pointing upwards.  I also noticed Mr. Craven had an empty holster in his waistband on his person.

12.     I attempted life saving measures on Mr. Craven but they were not effective.

13.     I fired my weapon at Mr. Craven because I feared he posed an imminent threat of bodily harm to myself or a third person.  This fear was due to him threatening to kill himself, his failure to obey orders, and his sudden move to draw his handgun from his holster.

14.     Based upon the circumstances of the situation, I believed that Mr. Craven would use his firearm against myself or a third person.

15.     I believe that my use of force against Mr. Craven was appropriate given the circumstances and the threat that he posed.


FURTHER THE AFFIANT SAYETH NOT.

Executed this the _20th_ day of January, 2023.

_____
Alexander Arndt

Subscribed and sworn before me, this _20_ day of January, 2023.

_J. David Whitlow_____
Signature of Notary Public

_J. David Whitlow_____
Printed Name of Notary Public

My commission expires: _March 1, 2027_

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | |
|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | **AFFIDAVIT OF CHRISTOPHER RUSSELL** |

I, Christopher Russell, being duly sworn, deposes and says as follows:

1.      I am over the age of eighteen and competent to testify.  I have personal knowledge of the matters set forth in this Affidavit.

2.      I am the Risk and Safety Manager for the Town of Mooresville.

3.      From February 15, 2020 to February 15, 2021, the Town of Mooresville had in effect the following general liability policy: Brit Global Specialty USA, policy number PK1027220.  A true and accurate copy of this policy is attached.

4.      The policy contains a non-waiver of governmental immunity provision.

5.      The attached policy is the only insurance policy obtained by the Town of Mooresville relevant or applicable to the allegations set forth in Plaintiff's lawsuit for the period of February 15, 2020 to February 15, 2021.

EXHIBIT 3

JA078

6.    I make this affidavit in good faith, of my own personal knowledge concerning the matters herein, and not for any other or improper purpose.


FURTHER THE AFFIANT SAYETH NOT.

Executed this the _17th_ day of January, 2023.


_____
Christopher Russell, Risk and Safety Manager


Subscribed and sworn before me, this 17 day of January, 2023.

_____
Signature of Notary Public

_____
Printed Name of Notary Public

My commission expires: 10/7/2025

CAITLYN McKENZIE
NOTARY PUBLIC
ROWAN COUNTY, NC



# Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

**Brit Global Specialty USA**
**161 North Clark Street, Suite 3200**
**Chicago, IL 60601**
**USA**

LCAO0416

EXHIBIT 4

JA080

## Certificate Provisions

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declarations.

2. **Correspondent Not Insurer.** The Correspondent is not an Insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Insurers hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as set forth in this Certificate. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Service of Suit.** It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of the Assured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm or person named in Item 7 of the attached Declarations, and that in any suit instituted against any one of them upon this Certificate, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

   The Correspondent is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon request of the Assured to give a written undertaking to the Assured that they will enter a general appearance on behalf of Underwriters in the event such a suit shall be instituted.

   Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this Certificate, and hereby designate the above-mentioned as the person to whom the said officer is authorized to mail such process or a true copy thereof.

   LMA5020
   14/09/2005

5. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

6. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

7. **Short Rate Cancellation.** If the attached provisions provide for cancellation, the table below will be used to calculate the short rate proportion of the premium when applicable under the terms of cancellation.

LCAO0416

### Short Rate Cancellation Table For Term of One Year.

| Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium |
|---|---|---|---|---|---|---|---|
| 1 | 5% | 66 - 69 | 29% | 154 - 156 | 53% | 256 - 260 | 77% |
| 2 | 6 | 70 - 73 | 30 | 157 - 160 | 54 | 261 - 264 | 78 |
| 3 - 4 | 7 | 74 - 76 | 31 | 161 - 164 | 55 | 265 - 269 | 79 |
| 5 - 6 | 8 | 77 - 80 | 32 | 165 - 167 | 56 | 270 - 273 ( 9 mos ) | 80 |
| 7 - 8 | 9 | 81 - 83 | 33 | 168 - 171 | 57 | 274 - 278 | 81 |
| 9 - 10 | 10 | 84 - 87 | 34 | 172 - 175 | 58 | 279 - 282 | 82 |
| 11 - 12 | 11 | 88 - 91 ( 3 mos ) | 35 | 176 - 178 | 59 | 283 - 287 | 83 |
| 13 - 14 | 12 | 92 - 94 | 36 | 179 - 182 ( 6 mos ) | 60 | 288 - 291 | 84 |
| 15 - 16 | 13 | 95 - 98 | 37 | 183 - 187 | 61 | 292 - 296 | 85 |
| 17 - 18 | 14 | 99 - 102 | 38 | 188 - 191 | 62 | 297 - 301 | 86 |
| 19 - 20 | 15 | 103 - 105 | 39 | 192 - 196 | 63 | 302 - 305 ( 10 mos ) | 87 |
| 21 - 22 | 16 | 106 - 109 | 40 | 197 - 200 | 64 | 306 - 310 | 88 |
| 23 - 25 | 17 | 110 - 113 | 41 | 201 - 205 | 65 | 311 - 314 | 89 |
| 26 - 29 | 18 | 114 - 116 | 42 | 206 - 209 | 66 | 315 - 319 | 90 |
| 30 - 32 ( 1 mos ) | 19 | 117 - 120 | 43 | 210 - 214 ( 7 mos ) | 67 | 320 - 323 | 91 |
| 33 - 36 | 20 | 121 - 124 ( 4 mos ) | 44 | 215 - 218 | 68 | 324 - 328 | 92 |
| 37 - 40 | 21 | 125 - 127 | 45 | 219 - 223 | 69 | 329 - 332 | 93 |
| 41 - 43 | 22 | 128 - 131 | 46 | 224 - 228 | 70 | 333 - 337 ( 11 mos ) | 94 |
| 44 - 47 | 23 | 132 - 135 | 47 | 229 - 232 | 71 | 338 - 342 | 95 |
| 48 - 51 | 24 | 136 - 138 | 48 | 233 - 237 | 72 | 343 - 346 | 96 |
| 52 - 54 | 25 | 139 - 142 | 49 | 238 - 241 | 73 | 347 - 351 | 97 |
| 55 - 58 | 26 | 143 - 146 | 50 | 242 - 246 ( 8 mos ) | 74 | 352 - 355 | 98 |
| 59 - 62 ( 2 mos ) | 27 | 147 - 149 | 51 | 247 - 250 | 75 | 356 - 360 | 99 |
| 63 - 65 | 28 | 150 - 153 ( 5 mos ) | 52 | 251 - 255 | 76 | 361 - 365 ( 12 mos ) | 100 |

Rules applicable to insurance with terms less than or more than one year:

A.   If insurance has been in force for one year or less, apply the short rate table for annual insurance to the full annual premium determined as for insurance written for a term of one year.

B.   If insurance has been in force for more than one year:

   1.   Determine full annual premium as for insurance written for a term of one year.

   2.   Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the Policy was originally written.

   3.   Add premium produced in accordance with items (1) and (2) to obtain earned premium during full period insurance has been in force.

LCAO0416

<u>**Declarations**</u>

This Policy (and any documents referred to in it) contains the whole agreement between Underwriters and the NAMED ASSURED relating to the insurance provided by this Policy; and supersedes all previous understandings and agreements between Underwriters and the NAMED ASSURED relating to the terms and conditions of this Policy.

Please note that words or terms that appear in bold and capitalized are defined within the Policy.

**Previous Policy No:**    PK1027219

**Authority Ref. No:**    B0356JA281N20

**Policy No:**    PK1027220

**1.    NAMED ASSURED:**

Town of Mooresville, NC

**2.    NAMED ASSURED Address:**

PO Box 878

Mooresville, NC 28117

**3.    Effective date:**  February 15, 2020
**Expiration date:**  February 15, 2021
both days at 12:01 a.m. local standard time.

**4.    Insurance is effective with certain Underwriters at Lloyd's, London (Brit Syndicate 2987).**

Percentage: 100.00%

**5.    Coverage:**

<u>**AUTOMOBILE PHYSICAL DAMAGE, GENERAL LIABILITY, AUTOMOBILE LIABILITY, PUBLIC OFFICIALS MISCELLANEOUS LIABILITY, WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY, EMPLOYEE BENEFITS LIABILITY, CRIME, LAW ENFORCEMENT LIABILITY**</u> and as more fully defined in the attached wording which is understood to be incorporated in and form part of this Certificate.

**6.    Forms attached hereto and special conditions:**

The Public Entity Package Wording and agreed Endorsements as per **Schedule of Endorsements** attached.

**Wherever the attached wordings refer to this 'Policy' it is deemed to mean this 'Certificate'.**

Territorial Limits: Worldwide as more fully defined in the attached wording.

Choice of Law: North Carolina

Jurisdiction: United States of America

Limits of Liability: Underwriters' Limits of Liability shall not exceed the limits as indicated for each

**PKGDEC2016**

coverage section on the attached wording or Declarations and apply only to those coverages for which a limit is shown. Underwriters Limits of Liability are excess over a **SELF INSURED RETENTION** and a **LOSS FUND** (if applicable) as specified in the attached wording.

7.    **Service of Suit may be made upon:**

Corporation Service Company 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608

8.    **In the event of a reportable claim as per General Policy Condition 7, the THIRD PARTY CLAIMS ADMINISTRATOR must notify the following:**

By email (*Preferred method*):
  USA.Claims@britinsurance.com

By mail:
  Brit Global Specialty USA, 161 North Clark Street, Suite 3200
  Chicago, IL 60601 USA

By telephone:
  +1 (312) 577-9450

9.    **Currency Clause:**

All premiums, limits, deductibles, claims and other amounts under this Policy are expressed and payable in United States Dollars.

The dollar symbol ($) used within this Policy represents United States Dollars.

10.   **Policy Premium:**

Gross Premium    $214,000

11.   **Minimum Earned Premium:**

$107,000

The minimum earned premium is 50% of the annual Policy Premium. If the Policy is cancelled at the **NAMED ASSURED'S** request, or by Underwriters for non-payment of premium, the minimum earned premium will be the greater of either the Minimum Earned Premium above or the premium as calculated by the Short Rate Cancellation Table in this Policy.

*Janet Moody*

_____
Authorized Correspondent signatory:         Brit Global Specialty USA.

Dated:     12-MAY-2020

**Pkg.Ver.Aug.2016**

**Several Liability Notice**

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

08/94
LSW1001 (Insurance)

**Pkg.Ver.Aug.2016**

USCA4 Appeal: 23-1393      Doc: 19      Filed: 08/21/2023      Pg: 91 of 573

# NORTH CAROLINA SURPLUS LINES NOTICE

The insurance company with which this coverage has been placed is not licensed by the State of North Carolina and is not subject to its supervision.  In the event of the insolvency of the insurance company, losses under this policy will not be paid by any State insurance guaranty or solvency fund.

LMA9068
01 September 2013

BRT60041 ed. 07/2018                                                                                                    Page **1** of **1**
Case 5:21-cv-00174-KDB-DSC   Document 20-5   Filed 01/20/23   Page 7 of 105
**JA086**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS (PLEASE READ IT CAREFULLY)

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. Please read this Notice carefully.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other **ASSURED**, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**Complaints Procedure**

*We* strive to provide an excellent service to all *Our* customers but occasionally things can go wrong. *We* take all concerns seriously and endeavour to resolve all customers' problems promptly. If *You* have a question or concern about *Your* policy *You* should, in the first instance follow the guidance notes or instructions in the insurance documentation *You* have been sent. *Your* broker will also be able to advise *You* and provide assistance in this regard.

Alternatively, if *You* wish to contact *Us* directly *You* should either write or telephone:

> **The Complaints Department**
> **Brit Syndicates Limited**
> 122 Leadenhall Street
> London
> EC3V 4AB
> Telephone: 020 3857 0000
> Email: BGS.Complaints@britinsurance.com

In the unlikely event that *You* remain dissatisfied and wish to make a complaint *You* can do so at any time by referring the matter to *Us* at the above stated address or the Complaints Team at Lloyd's at the following address:

> **Complaints Team**
> **Lloyd's**
> Fidentia House
> Walter Burke Way
> Chatham Maritime
> Chatham, Kent ME4 4RN
> Telephone: 020 7327 5693
> Facsimile: 020 7327 5225
> E-mail: complaints@lloyds.com

Details of Lloyd's complaints procedure are set out in a leaflet "Your Complaint - How We Can Help" available at www.lloyd's.com/complaints and are also available from the above address.

Should *You* remain dissatisfied after Lloyd's has considered your complaint and *You* are NOT a policyholder in the UK, *You* should, in the first instance, seek advice from *Your* broker as to whom *You* should direct your complaint.

**SCHEDULE OF ENDORSEMENTS**

The following Endorsements attach to and form part of the terms and conditions of this Policy:

| Endorsement No | Title |
|---|---|
| 1 | TRIA - WC |
| 2 | TRIA – All Other Lines Rejected |
| 3 | Failure to Supply Exclusion w/exception for Water ($1,000,000 Sublimit) |
| 4 | Section VI - Occurrence Basis |
| 5 | Procedures for Third Party Claims Administrators |
| 6 | Section I Property - Automobile Physical Damage |
| 7 | Additional Assured Endorsement – Vacuum Truck Rentals, LLC |
| 8 | General Policy Conditions Notification of Claims, Occurrences or Suits |
| 9 | Section II and Section VIII – Unmanned Aircraft Coverage Endorsement |
| 10 | Section VII- Employee Dishonesty Coverage Extension-Funds Transfer Fraud ($100,000 Sublimit) |
| 11 | North Carolina- Governmental Immunity Endorsement |

## Schedule of SELF INSURED RETENTIONS

This Policy has the following underlying **SELF INSURED RETENTIONS**, which apply to a covered loss for each **OCCURRENCE** or **CLAIM**.

**MAINTENANCE DEDUCTIBLES** are payable by the **ASSURED** and only apply when an amount is filled in. **MAINTENANCE DEDUCTIBLES** do not apply to the erosion of the **LOSS FUND**.

| | Coverage Section | SELF INSURED RETENTION | MAINTENANCE DEDUCTIBLE |
|---|---|---|---|
| I | $50,000 | **$50,000*** | **$1,000*** |
| | **AUTOMOBILE** Physical Damage: | $50,000* | $1,000* |
| | **FLOOD AND SURFACE WATER:** | $50,000* | $1,000* |
| | **EARTHQUAKE:** | $50,000* | $1,000* |
| | **NAMED WINDSTORM:** | $50,000* | $1,000* |

*Coverage Section I Property is limited to AUTOMOBILE Physical Damage only*

| | Coverage Section | SELF INSURED RETENTION | MAINTENANCE DEDUCTIBLE |
|---|---|---|---|
| II | **General Liability:** | **$50,000** | |
| | **SEXUAL HARASSMENT** Liability: | $50,000 | |
| | **SEXUAL ABUSE** Liability: | $50,000 | |
| III | **AUTOMOBILE Liability:** | **$75,000** | |
| IV | **Public Officials Miscellaneous Liability:** | **$75,000** | |
| | unless listed below: | | |
| | Errors & Omissions: | $75,000 | |
| | Employment Practice Liability: | $75,000 | |
| | **SEXUAL HARASSMENT** Liability: | $75,000 | |
| | **SEXUAL ABUSE** Liability: | $75,000 | |
| V | **Excess Workers' Compensation and Employers' Liability for a qualified self-insurer:** | | |
| | Coverage A Excess Workers' Compensation: | **$500,000** | |
| | Coverage B Excess Employers' Liability: | **$500,000** | |
| VI | **Employee Benefits Liability:** | **$75,000** | |
| VII | **Crime:** | | |
| | **MONEY** and **SECURITIES:** | $25,000 | **$1,000*** |
| | Forgery or Alteration: | $25,000 | $1,000* |
| | **EMPLOYEE** Dishonesty: | $25,000 | $1,000* |
| VIII | **Law Enforcement Liability:** | **$75,000** | |
| | **SEXUAL HARASSMENT** Liability: | $75,000 | |
| | **SEXUAL ABUSE** Liability: | $75,000 | |
| IX | **Terrorism:** | NOT COVERED | |
| | Property Terrorism: | NOT COVERED | |
| | Liability Terrorism: | NOT COVERED | |
| | Employers Liability Terrorism: | NOT COVERED | |
| | **LOSS FUND:** | $800,000 in the Aggregate Annually | |

### Specific Excess Insurance

**1.** This Policy contains various **SELF INSURED RETENTIONS** as listed in the **Schedule of SELF INSURED RETENTIONS** of this Policy. The **ASSURED** is responsible for payment of each applicable **SELF INSURED RETENTION** except as otherwise stated in **Clash Coverage** and **Excess LOSS FUND Protection**.

**2.** This Policy contains various **Specific Excess Limits of Insurance** above the **SELF INSURED RETENTIONS** as listed in the **Schedule of Specific Excess Limits of Insurance**.

**3.** This Policy contains various Annual Aggregate **Excess Limits of Insurance** as listed in **the Schedule of Specific Excess Limits of Insurance**. Underwriters' duty to indemnify under this Policy ends when the applicable Annual Aggregate **Excess Limit of Insurance** has been exhausted by payments to the **ASSURED**.

4. This Policy provides coverage in accordance with all of the terms of each Coverage Section attached to and forming part of this Policy. For **Coverage Section IV Public Officials Miscellaneous Liability**, and **Coverage Section VI Employee Benefits Liability**, coverage is provided on a Claims Made basis. Claims Made coverage applies only to claims made against the **ASSURED** during the **PERIOD OF INSURANCE** or Extended Reporting Periods, if applicable.

5. It is understood and agreed that if more than one Insuring Agreement under any Coverage Section hereunder is involved in one **CLAIM** or **OCCURRENCE**, then the highest **SELF INSURED RETENTION** and **Specific Excess Limit of Insurance** for each **CLAIM** or **OCCURRENCE,** in respect to that Coverage Section, shall apply.

### Schedule of Specific Excess Limits of Insurance

**Coverage Section I Property**:
**Specific Excess Limit of Insurance** for each **OCCURRENCE:**

| | | |
|---|---|---|
| All coverages under Section I combined: | $950,000* | |
| Subject to the following **SUBLIMITS**/Annual aggregates: | | |
| **AUTOMOBILE** Physical Damage Only: | $950,000* | |
| **FLOOD AND SURFACE WATER:** | $950,000* | $950,000* Annual Aggregate |
| **EARTHQUAKE:** | $950,000* | $950,000* Annual Aggregate |
| **NAMED WINDSTORM:** | $950,000** | |
| **DATA PROCESSING EXTRA EXPENSE:** | NOT COVERED | |
| **DATA PROCESSING SYSTEMS EQUIPMENT:** | NOT COVERED | |
| **DATA PROCESSING MEDIA:** | NOT COVERED | |
| **VALUABLE PAPERS:** | NOT COVERED | |
| **FINE ARTS:** | NOT COVERED | |
| **ACCOUNTS RECEIVABLE:** | NOT COVERED | |
| **EXTRA EXPENSE:** | NOT COVERED | |
| **MOBILE EQUIPMENT:** | NOT COVERED | |
| Transit**:** | NOT COVERED | |
| **BUSINESS INCOME** including **RENTAL VALUE:** | NOT COVERED | |
| **BUSINESS INCOME** other than **RENTAL VALUE:** | NOT COVERED | |
| **RENTAL VALUE:** | NOT COVERED | |
| Tuition And Fees**:** | NOT COVERED | |
| Newly Acquired Property Reporting Limit as provided in Coverage Section I Conditions, Automatic Acquisition Clause: | NOT COVERED | |

*___Coverage Section I Property is limited to AUTOMOBILE Physical Damage only___*

**Coverage Section II General Liability**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE:**
    All coverages under Coverage Section II combined:    $5,000,000        $5,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section II General Liability Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

| | | |
|---|---|---|
| **SEXUAL HARASSMENT** Liability: | $5,000,000 | $5,000,000 Annual Aggregate |
| **SEXUAL ABUSE** Liability: | $5,000,000 | $5,000,000 Annual Aggregate |
| Damage to the Premises Rented to the **ASSURED** | NOT COVERED | Ground Up Any One **OCCURRENCE** |
| Premises Medical Payments: | NOT COVERED | Ground Up Any One Person |
| | NOT COVERED | Ground Up Any One **OCCURRENCE** |

**Coverage Section III AUTOMOBILE Liability**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE:**
    All Coverages under Coverage Section III combined:    $5,000,000        N/A Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section III AUTOMOBILE Liability Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

| | | |
|---|---|---|
| **AUTOMOBILE MEDICAL PAYMENTS:** | NOT COVERED | Ground Up Any One person |
| | NOT COVERED | Ground Up Any One **OCCURRENCE** |
| Uninsured Motorists/Underinsured Motorists: | $1,000,000 | Ground Up Any One **OCCURRENCE** |
| No Fault Insurance: | NOT COVERED | Ground Up Any One **OCCURRENCE** |
| Garagekeeper's Legal Liability: | $450,000 | Ground Up Any One **OCCURRENCE** |

**Coverage Section IV Public Officials Miscellaneous Liability:**
    **Specific Excess Limit of Insurance** for each **CLAIM:**
    All Coverages under Coverage Section IV combined:    $5,000,000        $5,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section IV Public Officials Miscellaneous Liability – Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

| | | |
|---|---|---|
| Errors & Omissions:<br>Retroactive Date: <u>February 15, 2002</u> | $5,000,000 | $5,000,000 Annual Aggregate |
| Employment Practice Liability:<br>Retroactive Date: <u>February 15, 2002</u> | $5,000,000 | $5,000,000 Annual Aggregate |
| **SEXUAL HARASSMENT** Liability:<br>Retroactive Date: <u>February 15, 2002</u> | $5,000,000 | $5,000,000 Annual Aggregate |
| **SEXUAL ABUSE** Liability:<br>Retroactive Date: <u>February 15, 2002</u> | $5,000,000 | $5,000,000 Annual Aggregate |

**Coverage Section V Excess Workers' Compensation and Employers' Liability for a Qualified Self-Insurer**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE:**

| | |
|---|---|
| Coverage A Excess Workers' Compensation: | $150,000 |
| Coverage B Excess Employers' Liability: | $150,000 |

PKG.Ver.Aug.2016

**Coverage Section VI Employee Benefits Liability**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE**:

All Coverages under Coverage  Section VI Combined:   $5,000,000       $5,000,000 Annual Aggregate
Retroactive Date: <u>NOT APPLICABLE</u>


**Coverage Section VII Crime**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE**:

    **MONEY & SECURITIES:**            $750,000
    Forgery or Alteration:               $750,000
    **EMPLOYEE** Dishonesty:           $750,000


**Coverage Section VIII Law Enforcement Liability**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE**:
    All coverages under Coverage Section VIII combined:   $5,000,000     $5,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section VIII Specific Excess Limit of Insurance** and Aggregate Limit above:

    **SEXUAL HARASSMENT** Liability:      $5,000,000    $5,000,000 Annual Aggregate
    **SEXUAL ABUSE** Liability:         $5,000,000    $5,000,000 Annual Aggregate


**Coverage Section IX Terrorism:**
**Specific Excess Limit of Insurance** for each **OCCURRENCE**:

    Property Terrorism:              NOT COVERED    N/A Annual Aggregate
    Liability Terrorism:              NOT COVERED    N/A Annual Aggregate
    Employers' Liability Terrorism:     NOT COVERED    N/A Annual Aggregate


<div align="center">

**<u>Clash Coverage</u>**

</div>

1.    In the event of a covered loss involving more than one Coverage Section, the **ASSURED** will only be liable for one **SELF INSURED RETENTION**. This will be the **SELF INSURED RETENTION** for the Coverage Section that results in the largest **ULTIMATE NET LOSS**.

2.    Underwriters will indemnify the **ASSURED** for **ULTIMATE NET LOSS** arising within each **SELF INSURED RETENTION** applicable to the Coverage Section involved in the loss, less the **SELF INSURED RETENTION** determined in Paragraph 1. above.

**3.**    Indemnity paid under Clash Coverage is in addition to amounts payable under the **Schedule of Specific Excess Limits of Insurance**.

Clash Coverage does not apply to **Coverage Section IX – Terrorism**.

**Excess LOSS FUND Protection**

**Excess Loss Fund Protection Annual Aggregate Limit:  $1,000,000   Annual Aggregate**

1.   This Policy contains various **SELF INSURED RETENTIONS** as listed in the **Schedule of SELF INSURED RETENTIONS** of this Policy.  The **ASSURED** is responsible for the payment of applicable **SELF INSURED RETENTIONS** in accordance with the terms and conditions of this Policy.

2.   The **ASSURED'S LOSS FUND** is the aggregate amount stated in the **Schedule of SELF INSURED RETENTIONS** to be paid by the **ASSURED** for covered loss amounts incurred during the **PERIOD OF INSURANCE** within the **ASSURED'S SELF INSURED RETENTION**. This coverage applies only if an **Excess Loss Fund Protection Limit** is stated above and a corresponding **LOSS FUND** amount stated in the **SCHEDULE OF SELF INSURED RETENTIONS**.

3.   If there is an applicable **MAINTENANCE DEDUCTIBLE** underlying the **SELF INSURED RETENTION**, this **MAINTENANCE DEDUCTIBLE** is not considered part of the **SELF INSURED RETENTION**, and does not accrue to the exhaustion of the **LOSS FUND**.

4.   Each payment made by the **ASSURED** for covered loss amounts within the applicable **SELF INSURED RETENTION** shall reduce the outstanding **LOSS FUND** by the amount of such payment until the **LOSS FUND** is exhausted.  Upon exhaustion of the **LOSS FUND** stated in the **Schedule of SELF INSURED RETENTIONS**, Underwriters obligation to indemnify the **ASSURED** begins for covered loss amounts within the **SELF INSURED RETENTION**.

5.   The amount of **Excess LOSS FUND Protection** payment(s) made by Underwriters to the **ASSURED**:

(a)   Shall not be for more than the applicable **SELF INSURED RETENTION**; <u>and</u>

(b)   Shall not be greater than the **Excess LOSS FUND Protection Annual Aggregate Limit**, as stated under **Excess LOSS FUND Protection**.

6.   Each **Excess LOSS FUND Protection** payment made reduces Underwriters' **Excess LOSS FUND Protection Annual Aggregate Limit** by the amount of such payment.

7.   Underwriters' duty to indemnify under **Excess LOSS FUND Protection** ends when the **Excess LOSS FUND Protection Annual Aggregate Limit** has been exhausted by payments to the **ASSURED**.

PKG.Ver.Aug.2016

**General Policy Conditions**

Underwriters assume no other obligation or liability to the **ASSURED** to indemnify sums or perform acts or services unless explicitly provided under this Policy.

These conditions shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

1.  **Abandonment:** There shall be no abandonment to Underwriters of any property.

2.  **Arbitration:** In the event the **ASSURED** and Underwriters are unable to agree as to the amount recoverable by the **ASSURED** from Underwriters under the terms and conditions of this Policy, each party shall name a competent and disinterested arbitrator, and the two so chosen shall, before proceeding further, appoint a competent and disinterested umpire. The arbitrators together shall calculate the indemnity due, and failing to agree, shall submit their differences to the umpire.

    The award in writing, duly verified by any two, shall determine the points in question. Both parties shall pay the cost of their arbitrators and equally pro rate the cost of the umpire. The **ASSURED'S** portion of such fee does not accrue to the **ULTIMATE NET LOSS**.

    The decision by the arbitrators shall be binding on Underwriters and the **ASSURED,** and that judgment may be entered in any court of competent jurisdiction.

3.  **Assignment:** Assignment of interest under this Policy does not bind  Underwriters'  unless Underwriters consent is endorsed hereon.

4.  **Bankruptcy and Insolvency:** In the event of the bankruptcy or insolvency of the **ASSURED** or any entity comprising the **ASSURED,** Underwriters shall not be relieved of the payment of any covered loss amounts hereunder because of such bankruptcy or insolvency, but Underwriters shall be liable only to the same extent had there been no bankruptcy or insolvency.

5.  **Cancellation and Non-Renewal:** In the event of non-payment of premium by the **NAMED ASSURED,** Underwriters will give ten (10) days' notice of cancellation in writing to the **NAMED ASSURED** and all coverage will terminate ten (10) days after the mailing of such notice. If Underwriters cancel, the earned premium is calculated pro rata, and the **NAMED ASSURED** is responsible for the full annual amount of the **LOSS FUND** as stipulated in **Excess Loss Fund Protection**.

    The **NAMED ASSURED** shown on the Declarations may cancel this Policy by giving thirty (30) days' notice of cancellation in writing. If the **NAMED ASSURED** cancels, the earned premium is calculated in accordance with the short rate table and procedure subject to the minimum earned premium. The **NAMED ASSURED** is responsible for the full annual amount of the **LOSS FUND** as stipulated in **Excess Loss Fund Protection**.

    If the period of limitation relating to the giving of notice is prohibited or made void by any law, such period is amended to provide the minimum period of limitation permitted by such law.

    **Non-Renewal:** Either the **NAMED ASSURED** or Underwriters may elect to non-renew this Policy at its expiration date for any reason.

6.  **Changes:** By acceptance of this Policy the **ASSURED** agrees that it embodies all agreements existing between the **ASSURED** and Underwriters or any of their agents relating to this Policy. None of the provisions, conditions or other terms of this Policy shall be waived or altered except by endorsement; nor shall notice to any agent or knowledge possessed by any agent or by any other person be held in effect a waiver or change to any part of this Policy.

**Pkg2016.2**

7.    **CLAIMS**, **OCCURRENCES** or **SUITS**: The **ASSURED** shall as soon as practical notify Underwriters through the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** of any **CLAIM**, **OCCURRENCE** or **SUIT** meeting the following criteria:

(a)  The cost of which is likely to result in payment by Underwriters under this Policy;

(b)  All claims reserved at 75% or more of **SELF INSURED RETENTION**;

(c)  Catastrophic losses (including Paraplegia, Quadriplegia, Severe Burns, Fatalities, Significant Brain Injury, Amputation of Major Extremity);

(d)  **SEXUAL ABUSE** claims;

(e)  Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(f)  Third-party claims involving **LAW ENFORCEMENT ACTIVITIES**;

(g)  Act or series of **ACTS OF TERRORISM**;

(h)  Any claims where there is a question as to whether there will be coverage under this Policy.

Underwriters shall have the right but not the duty to be associated with the **ASSURED** in the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both.

The **ASSURED** shall make no commitment to pay or settle any **CLAIMS**, **OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. Neither shall the **ASSURED** refuse any reasonable opportunity to pay or settle a claim that will result in Underwriters having liability under this Policy without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. If the **ASSURED** refuses to consent to settlement of any **CLAIMS**, **OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is potentially involved, and settlement or compromise is recommended by Underwriters and acceptable to the claimant, then calculation of, and Underwriters obligation under **ULTIMATE NET LOSS** with respect to the **CLAIMS**, **OCCURRENCES** or **SUITS** shall be limited to the amount of damages or payments for which the **CLAIMS**, **OCCURRENCES** or **SUITS** could have been settled for, plus any expenses payable under **ULTIMATE NET LOSS** incurred until the date of the **ASSURED'S** refusal to settle or compromise the **CLAIMS**, **OCCURRENCES** or **SUITS** as recommended by Underwriters.

**Pkg2016.2**

8.  **Conflicting Statutes:** If any terms of this Policy conflict with the statutes of the state in which this Policy is issued, those terms are amended to conform to such statutes.

9.  **Currency:** The premium and losses under this Policy are payable in United States currency. Payment of premium shall be made to Underwriters or via the **NAMED ASSURED**'s intermediary.

10. **Due Diligence:** The **ASSURED** shall use due diligence and concur in doing all things reasonably practical to avoid or diminish any loss of or damage to the property insured.

11. **Duties:** Underwriters have no duty to investigate, handle, adjust, settle or defend any **CLAIM**, **OCCURRENCE**, proceeding or **SUIT** against the **NAMED ASSURED**, any **ASSURED**, or against any other person or organization for whom the **NAMED ASSURED** is, or may be found to be, legally liable, or whom asserts or claims a right of coverage under the Policy. These duties shall be the responsibility of the **NAMED ASSURED.**

    Underwriters' duty under the Policy shall be to indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** in excess of the applicable **SELF INSURED RETENTION**, **MAINTENANCE DEDUCTIBLE**, or any other applicable deductible or deduction; and not more than the **Specific Excess Limit of Insurance.**

    Underwriters' duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS**.

    Underwriters may, at their sole discretion, tender periodic advance payments of amounts in excess of the **SELF INSURED RETENTION**, before **ULTIMATE NET LOSS** as defined in the Policy is reached; provided that:

    (a) Only amounts where coverage is not in dispute will be used to compute the partial **ULTIMATE NET LOSS**; and

    (b) Only payments made by the **NAMED ASSURED** and not disputed by Underwriters will be used to compute the partial **ULTIMATE NET LOSS**; and

    (c) Any potential **RECOVERY** source has been identified; has been put on notice if appropriate; and **RECOVERY** is being aggressively pursued; and

    (d) Delaying payment until the final **ULTIMATE NET LOSS** is determined will result in financial hardship to the Assured; and

    (e) All payments are without prejudice.

    Further, and in regard to advance payments under **SECTION I – PROPERTY**; advance payments will be based upon **ACTUAL CASH VALUE** for property that is not being actively repaired or replaced.

    This condition shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

12. **False or Fraudulent Claims:** If the **ASSURED** shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited.

13. **Inspections / Audits / Verification of Values:** Underwriters or their duly authorized representatives may inspect the premises used by the **ASSURED** and audit the **ASSURED'S** books or records at any time during the **PERIOD OF INSURANCE** or within three (3) years after its

**Pkg2016.2**

expiration or termination. Underwriters assume no liability and will not be made liable for their right to make inspections or audit or not make inspections or not audit, or for their results, findings or reports, nor shall any inspection warranty the safety of a premises or an audit confirm the accuracy of books or records.

14. **Mortgage:** Underwriters will pay for covered losses of or damage to property to each mortgage holder, lienholder or creditor to the extent of their interest as of the date of loss or damage subject to the limits of insurance as states in the **Declarations** and subject to all terms and conditions of this Policy.

15. **Other Insurance:** If the **ASSURED** has other insurance against loss or damage covered under this Policy, Underwriters are liable, under the terms of this Policy, only as excess of coverage provided by such other insurance. No monies payable or collectible from such other insurance shall accrue to the **LOSS FUND**. However, this clause does not apply to the purchase of excess insurance above the **Specific Excess Limits of Insurance** stated in the **Schedule of Specific Excess Limits of Insurance** of this Policy.

16. **Representations:** By accepting this Policy and as a condition precedent to coverage, the **ASSURED** agrees that:

(a) The information contained within the **Declarations** is complete and accurate and is based upon representations made by the **ASSURED** to Underwriters in the submission and/or application(s) for this Policy;

(b) Underwriters have issued this Policy in reliance upon the **ASSURED'S** representations in the submission and/or application(s);

(c) Except as otherwise provided in this Policy or by law, this Policy is void in any case of fraud; or, if the **ASSURED** conceals or misrepresents any material facts in the **ASSURED'S** submission and/or application(s) for this Policy. If the Policy is wholly voidable due to fraud, misrepresentation or concealment by the **ASSURED** as aforementioned, Underwriters, at their sole discretion, may elect to void coverage only for the particular loss or claim which is affected by such concealment and/or misrepresentation and/or fraud.

17. **Risk Control Services:** Underwriters assume no liability for, nor will it be made liable by any person or organization for risk control or consulting services, including the results or failure of results, findings or failure of findings, performance or failure of performance of said services.

18. **Separation of ASSUREDs:** With the exception of the **Specific Excess Limits of Insurance**, **SELF INSURED RETENTIONS** and any rights or duties specifically assigned in this Policy to the **NAMED ASSURED**, this insurance applies:

(a) As if each **ASSURED** were the only **ASSURED**; and

(b) Separately to each **ASSURED** against whom a claim is made or a **SUIT** is brought.

19. **Subrogation, Salvage and RECOVERY:** As a condition precedent to the issuance of this Policy, it is agreed that Underwriters shall be subrogated, at their sole discretion, to all rights which any **ASSURED** may have against any person or other entity in respect to any claim or payment made under this Policy; including any person or organization hired to investigate, handle, settle or defend any **OCCURRENCE**, **CLAIM**, proceeding or **SUIT** resulting in the aforementioned payment. The **ASSURED** shall execute all papers required by Underwriters and must cooperate with Underwriters to secure and prosecute Underwriters rights; to include the filing and prosecution of any **CLAIM** or **SUIT** for any right or cause of action which the **ASSURED** cannot legally or contractually assign to Underwriters. If any reimbursement is obtained, or salvage or **RECOVERY** made by the **ASSURED** or Underwriters on account of any loss covered by this Policy, the net amount of such

**JA098**

reimbursement, salvage or **RECOVERY**, after deducting the actual cost of obtaining or making the same, shall be applied in the following order:

1.  Amount of loss which exceeds the applicable **Specific Excess Limits of Insurance**;

2.  To reduce Underwriters loss until Underwriters are fully reimbursed;

3.  To reduce the **ASSURED'S** loss because of the application of the **SELF INSURED RETENTION**, and then any applicable **MAINTENANCE DEDUCTIBLE**.

In the event Underwriters decline to be subrogated to the rights which the **ASSURED** may have against any person or other entity in respect to any claim or payment made under this Policy, the **ASSURED** shall regain its rights and may pursue **RECOVERY** against said parties at its discretion. If any reimbursement is obtained, or salvage or **RECOVERY** made by the **ASSURED** on account of any loss covered by this Policy, the net amount of such reimbursement, salvage or **RECOVERY**, after deducting the actual cost of obtaining or making the same, shall be applied in the following order:

1.  Amount of loss which exceeds the applicable **Specific Excess Limit of Insurance**;

2.  To reduce the **ASSURED'S** loss because of the application of the **SELF INSURED RETENTION**, but not any applicable **MAINTENANCE DEDUCTIBLE**;

3.  To reduce the Underwriters loss until Underwriters are fully reimbursed;

4.  To reduce the **ASSURED'S** loss because of the application of any **MAINTENANCE DEDUCTIBLE**.

20. **Territory:** This Policy applies worldwide; however, indemnity by Underwriters shall be made only if the original **SUIT** and any related legal actions is brought in the United States of America, its territories or possessions, or transferred to the United States of America, its territories or possessions from a foreign jurisdiction.

21. **THIRD PARTY CLAIM ADMINISTRATOR:** It is a condition precedent that this Policy of insurance is issued by Underwriters on the express condition that:

(a) The **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIM ADMINISTRATOR**, as agreed upon by Underwriters prior to the **PERIOD OF INSURANCE**; and

(b) All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy must be adjusted and handled by the contracted **THIRD PARTY CLAIM ADMINISTRATOR**; and

(c) The duties involved in adjusting and handling **CLAIMS**, **SUITS** or **OCCURRENCES** by the **THIRD PARTY CLAIM ADMINISTRATOR** include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials; and

(d) All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy are adjusted and handled by the **THIRD PARTY CLAIM ADMINISTRATOR** in accordance with all statutory and regulatory standards; and in accordance with all accepted industry standards and practices.

Underwriters or their representative shall have the right but not the duty to conduct audits and inspections of **the CLAIMS, SUITS or OCCURRENCES** reported to the **NAMED ASSURED'S THIRD PARTY CLAIMS ADMINISTRATOR** to better inform Underwriters of the potential liability

Pkg2016.2

under this Policy. The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate should the audit or inspection be requested.

The **NAMED ASSURED**, through its **THIRD PARTY CLAIM ADMINISTRATOR**, may utilize the services of an attorney or lawyer or other specialized party to assist the **THIRD PARTY CLAIM ADMINISTRATOR** in the disposition of its duties, and defend an **ASSURED**; but only provided that:

(a) the **THIRD PARTY CLAIM ADMINISTRATOR** retains control of the adjusting process, reserving, settlement activity and documentation of the claims financials including erosion of the **NAMED ASSUREDS SELF INSURED RETENTION** and;

(b) The **THIRD PARTY CLAIMS ADMINISTRATOR** continues to monitor and direct the actions of these other parties; and

(c) Any control of the adjusting process designated to parties other than the **NAMED ASSUREDS THIRD PARTY CLAIM ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED** must be approved by Underwriters in writing; and

(d) Any control of the adjusting process retained by the **NAMED ASSURED** (i.e. "self-administering **CLAIMS**") must be approved by Underwriters in writing; and

(e) Payment to these other parties shall be subject to all other terms and conditions of the Policy; specifically, but not limited to, **General Policy Condition 11. Duties** and **General Policy Definition 30. ULTIMATE NET LOSS**.

(f) Further, this Policy of insurance is issued by Underwriters on the express condition that all **CLAIMS**, **SUITS** or **OCCURRENCES,** for which coverage is sought under this Policy and which are being defended by the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED,** are defended by the attorney or lawyer in accordance with all statutory and regulatory standards; and in accordance with all accepted professional standards and practices

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and the designated **THIRD PARTY CLAIM ADMINISTRATOR**, the **NAMED ASSURED** must notify Underwriters ninety (90) days prior to the effective date of such cancellation, expiration or material revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIM ADMINISTRATOR** or the material revision of the incumbent **THIRD PARTY ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

22. **Waiver of Subrogation:** This Policy shall not be invalidated if the **ASSURED**, by written agreement, has waived or shall waive its right of **RECOVERY** from any party for loss or damage covered hereunder; provided that any such waiver is made prior to the **OCCURRENCE** of said loss or damage.

### General Policy Exclusions

This Policy does not insure against:

A. Loss or damage caused by, or resulting from fraudulent or dishonest acts committed by the **ASSURED**, whether working alone or with others, except as covered in **Coverage Section VII Crime**;

Pkg2016.2

**B.**   Expenses from any cost, civil fine, penalty or expense against any **ASSURED** for any compliance or enforcement action from any Federal, State or local governmental regulatory or administrative agency; except as provided in **Coverage Section I Property – Conditions 7. Ordinance Deficiency Clause** and **Coverage Section IV Public Officials Miscellaneous Liability – Exclusions E**;

**C.**   Any liability arising out of the operation of the principles of eminent domain, condemnation proceedings, adverse possession or inverse condemnation proceedings by whatever name called, whether such liability accrues directly against the **ASSURED** or by virtue of any agreement entered into by or on behalf of the **ASSURED**;

**D.**   **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE** or loss or damage to the **PROPERTY OF THE ASSURED**, either directly or indirectly occasioned by, happening through, or in consequence of:  war (including undeclared or civil war), warlike action by a military force (including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents), insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority, except as provided in **Coverage Section I Property – Conditions 6. Civil Authority Clause.** This Exclusion does not apply to loss or damage to the **PROPERTY OF THE ASSURED** caused secretly by a foreign enemy or agent of any government or sovereign power, when not in connection with the operations of armed forces in or against the country where the described location is situated;

**E.**   The investigation, defense, loss or damage, including loss of use, **BODILY INJURY**, **PERSONAL INJURY** or **PROPERTY DAMAGE** caused by the release, discharge, dispersal, seepage or migration of **POLLUTANTS** anywhere, anytime, in any way, whether accidental or intentional, sudden or intermittent or continuous:

(a)   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any **ASSURED**;

(b)   At or from any premises, site or location which is or was at any time used by or for any **ASSURED** or others for the handling, storage, disposal, processing or treatment of waste;

(c)   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any **ASSURED** or any person or organization for whom any **ASSURED** may be legally responsible; or

(d)   At or from any premises, site or location on which any **ASSURED** or any contractor or subcontractor working directly or indirectly on any **ASSURED'S** behalf  are  performing operations:

(i)   If the **POLLUTANTS** are brought on or to the premises, site or location in connection with such operations by such **ASSURED**, contractor or subcontractor; or

(ii)   If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

(e)   That are, or that are contained in any property that is:

(i)   Being transported or towed by, handled, or handled for movement into, onto or from, an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(ii)   Otherwise in the course of transit by or on behalf of the **ASSURED**; or

(iii) Being stored, disposed of, treated or processed in or upon an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(f) Before the **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are moved from the place where they are accepted by the **ASSURED** for movement into or onto an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(g) After the **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are moved from an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** to the place where they are finally delivered, disposed of or abandoned by the **ASSURED**.

(1) The investigation, defense, loss or damage, including loss of use, caused by the release, discharge or dispersal of **POLLUTANTS** anywhere, anytime, in any way, whether accidental or intentional, sudden or intermittent or continuous for any loss, cost or expense arising out of any:

(a) Request, demand, or other order that any **ASSURED** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**; or

(b) Claim or **SUIT** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **POLLUTANTS**;

**Except**:

1. This exclusion does not apply to the reverse of flow of sewage into any building from a sewage facility, fixed conduit or sanitary sewer that the **ASSURED** owns, operates or maintains; and

As respects **Coverage Section II General Liability** only:

2. Subparagraph E.(a) **only** of this exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of heat, smoke or fumes from a "hostile fire" as defined below;

   As used in this Extension, the definition of **PROPERTY DAMAGE** excludes loss of use.

   As used in this Extension, a "hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

3. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE** arising out of the use, handling, storage, discharge, dispersal, release or escape of chemicals when introduced by an **ASSURED** into such **ASSURED'S** drinking water system solely for the purpose of purifying or treating such drinking water; provided that the chemicals' generally accepted use is for the purification or treatment of drinking water.

4. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of the use, handling, storage, discharge, dispersal, release or escape of chemicals when used in the day-to-day operation and/or maintenance of swimming pools owned or operated by an **ASSURED;** provided that the chemicals' generally accepted use is for the operation/maintenance of swimming pools.

5. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of the application of pesticides, or herbicides provided such application is performed by employees of the **NAMED ASSURED** who are properly licensed or certified by a federal or state agency to apply those chemicals, pesticides or herbicides; and where the

Pkg2016.2

application or use is in strict compliance with all federal, state, and local laws, statutes, regulations, ordinances, or the like; and where the application or use is in compliance with industry standards for application or use.

As respects **Coverage Section III AUTOMOBILE Liability** only:

6. Subparagraph (e) of this exclusion does not apply to fuels, lubricants, fluids, exhaust gases or other similar **POLLUTANTS** that are needed for, or result from the normal electrical, hydraulic or mechanical functioning of an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** or its parts, if:

   (a) The **POLLUTANTS** escape, seep, migrate, or are discharged, dispersed or released directly from an **AUTOMOBILE** part designed by its manufacturer to hold, store, receive or dispose of such **POLLUTANTS**; and

   (b) The **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** does not arise out of the operation of any equipment defined as **MOBILE EQUIPMENT**.

7. Paragraphs 7(c) and 7(d) of this exclusion do not apply to accidents that occur away from premises owned by or rented to an **ASSURED** with respect to **POLLUTANTS** not in or upon an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** if:

   (c) The **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are upset, overturned or damaged as a result of the maintenance or use of an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; and

   (d) The discharge, dispersal, seepage, migration, release or escape of the **POLLUTANTS** is caused directly by such upset, overturn or damage.

As respects **Coverage Section VIII Law Enforcement Liability** only:

8. This exclusion does not apply to **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE** resulting from **LAW ENFORCEMENT ACTIVITIES** and due to the use of teargas, mace or similar substances by an **ASSURED** within the scope of their employment by the **NAMED ASSURED**. This coverage extension applies only if the **NAMED ASSURED'S** operations meet all the standards of any statute, ordinance, regulation or license requirement of any federal, state or local government which apply to those operations.

F. Loss of, damage to, or loss of use of **PROPERTY OF THE ASSURED, BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE**, directly or indirectly caused by the presence of asbestos or lead in any form, except as covered in **Coverage Section I Property – Insuring Agreements** and **Coverage Section V Part A Workers' Compensation for a Qualified Self-Insured – Insuring Agreements;**

G. Any claim based upon the **ASSURED'S** failure to comply with the Federal Employee Retirement Income Security Act of 1974 (ERISA), including subsequent amendments or any similar federal, state or local law or regulations;

H. Any claim arising out of investment activities, or the administration of self-insurance funds, except as covered in **Coverage Section VII Crime**;

I. **Nuclear Incident:**

   (a) Loss or damage to **PROPERTY OF THE ASSURED**, or liability from **PROPERTY DAMAGE, BODILY INJURY** or **PERSONAL INJURY** accruing to the **ASSURED** directly or indirectly from, any and all forms of radioactive **CONTAMINATION**;

Pkg2016.2

(b) Any loss or damage to **PROPERTY OF THE ASSURED,** or liability from **PROPERTY DAMAGE, BODILY INJURY** or **PERSONAL INJURY** accruing to the **ASSURED** directly or indirectly, from any Pool of Insurers or Reinsurers formed for the purpose of covering atomic or Nuclear Energy risks;

(c) Any loss or liability accruing to the **ASSURED,** directly or indirectly, for physical damage of **PROPERTY OF THE ASSURED** including **BUSINESS INTERRUPTION** or consequential loss arising out of such physical damage, in addition to **PROPERTY DAMAGE, BODILY INJURY,** or **PERSONAL INJURY,** due to:

   (i) **NUCLEAR REACTOR** power plants including all auxiliary property on this site, or

   (ii) Any **NUCLEAR MATERIALS**, or the dispersal or discharge of **NUCLEAR MATERIALS**, at any **NUCLEAR FACILITY** owned by, or operated by or on behalf of, any **ASSURED**;

   (iii) Any other **NUCLEAR REACTOR** installation, including laboratories handling radioactive materials in connection with reactor installations, and critical facilities as such;

   (iv) Installations for fabricating complete fuel elements or for processing substantial quantities of, **NUCLEAR MATERIALS** and for reprocessing, salvaging, chemically separating, storing or disposing of **SPENT NUCLEAR FUEL** or **WASTE** materials, or

   (v) Installations other than those listed above using substantial quantities of radioactive isotopes or other products of nuclear fission;

   (vi) Any **NUCLEAR MATERIALS** contained in spent fuel or **WASTE** and at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **ASSURED**; or

   (vii) Loss which arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **NUCLEAR FACILITY**;

(d) Any loss or damage or liability resulting from the **HAZARDOUS PROPERTIES** of **NUCLEAR MATERIALS** and with respect to which:

   (i) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

   (ii) The **ASSURED** is, or had this Policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

(e) Any loss relating to expenses incurred with respect to:

   (i) Immediate medical or surgical relief or first aid;

   (ii) **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE,** or **PROPERTY OF THE ASSURED** resulting from the **HAZARDOUS PROPERTIES** of **NUCLEAR MATERIALS** and arising out of the operation of **NUCLEAR FACILITY** by any person or organization.

**DEFINITIONS** as used in this Exclusion:

(1) **CONTAMINATION** means any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of **NUCLEAR MATERIALS**, **SPENT NUCLEAR FUEL** or **WASTE**, whether permanent or transient in any **ENVIRONMENT**.

Pkg2016.2

(2)  **ENVIRONMENT** includes any person, any real or personal property, animals, crops and vegetation, land including land under the building, bodies of water, underground water or water table supplies, air and any other feature of the earth or its atmosphere, whether or not altered, developed or cultivated, including, but not limited to, any of the above owned, or controlled, or occupied by any **ASSURED**.

(3)  **HAZARDOUS PROPERTIES** include radioactive, toxic or explosive properties.

(4)  **NUCLEAR FACILITY** means:

(a)  Any **NUCLEAR REACTOR**;

(b)  Any equipment or device designed or used for separating the isotopes of uranium or plutonium, or processing or utilizing spent fuel, or handling, processing or packaging **WASTE**;

(c)  Any equipment or device used for the processing, fabricating or alloying of **NUCLEAR MATERIALS** in the custody of the **ASSURED** at the premises where such equipment or device is located;

(d)  Any structure, basin, excavation, premises or place prepared or used for the storage of **WASTE**, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(5)  **NUCLEAR MATERIALS** means, source material, special nuclear material, byproduct material and have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(6)  **NUCLEAR REACTOR** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(7)  **SPENT NUCLEAR FUEL** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **NUCLEAR REACTOR**.

(8)  **WASTE** means any waste material (1) containing byproduct material from any ore processed primarily for its source material content and (2) resulting from the operation by any person or organization of any **NUCLEAR FACILITY** included within the definition of **NUCLEAR FACILITY**.

**J.**  Any loss, damage, cost, claim, expense, **BODILY INJURY**, **MEDICAL PAYMENTS**, or liability of whatsoever nature directly or indirectly caused by, resulting from or in any way involving **FUNGAL PATHOGENS**. This exclusion shall apply regardless of any other cause or event that contributes concurrently or in sequence to the loss, damage, cost, claim, expense, **BODILY INJURY**, **MEDICAL PAYMENTS**, or liability.

This exclusion shall not apply to:

(a)  **Coverage Section I Property**; but only when such loss arises directly from a peril not otherwise excluded under **Coverage Section I Property**.

(b)  **Coverage Section V Part A Excess Workers' Compensation for a Qualified Self-Insurer – Insuring Agreements**; but only when coverage for losses arising from **FUNGAL PATHOGENS** is required by law or regulation.

(c)  **Coverage Section II General Liability**; **BODILY INJURY** or **PROPERTY DAMAGE** arising from the **NAMED ASSURED'S** Food Products

Pkg2016.2

**K.**  Any claim, including defense of same, arising directly or indirectly from any actual or alleged **SEXUAL ABUSE** or **SEXUAL HARASSMENT** of any person by any **ASSURED**, or anyone to whom the **NAMED ASSURED** is obligated by virtue of a written contract or agreement; except as covered in   Coverage **Section II General Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability, Coverage Section IV Public Officials Miscellaneous Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability, and Coverage Section VIII Law Enforcement Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability** -

**L.**  Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any **ACT OF TERRORISM**, and/or the threat thereof, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any **ACT OF TERRORISM**.

This exclusion will apply to any loss or claim unless specific limits and a **SELF INSURED RETENTION** are listed under **Coverage Section IX Terrorism**.

**M.**  Loss of, damage to, or loss of use of **PROPERTY OF THE ASSURED**, **BODILY INJURY**, **PERSONAL INJURY** or **PROPERTY DAMAGE**, and any loss or claim directly or indirectly caused by or arising out of:

(a)  Loss, theft, loss of use of, corruption, or inability to access or manipulate tangible or intangible **ELECTRONIC DATA** or paper data, whether owned by the **ASSURED** or others and including but not limited to any handheld or portable device with user-generated content.

(b)  Loss, theft, breach, publication, unauthorized access, disclosure or use, collection or disposal of any person's or organization's tangible or intangible **ELECTRONIC DATA** or paper data including but not limited to private, confidential or personal identifying information, medical, financial, employment, health and educational information which triggers any local, state or federal privacy regulations, as well as patents, trade secrets, processing methods or customer lists.

(c)  Any claim for return or reimbursement of any sums or monetary value of any electronic fund transfers or transactions which is lost or diminished during the transfer, unless covered under the definition of computer theft under **Coverage Section VII Crime.**

(d)  Any threat or series of threats to commit an intentional act against a computer network or system for purposes of demanding money or other tangible or intangible value from the **ASSURED**;

(e)  Cyberterrorism or any intrusive or disruptive activities against any computer system or network, or the explicit threat to use such activities with the intention to cause harm, by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

In no event will this insurance provide coverage for any breach notification; credit, identity and health monitoring and restoration costs; public relations costs; compliance audits, data requests, legal fees; and any local, state, federal or industry or professional organization's investigation, enforcement, remediation or monitoring costs and any fines, penalties, claims, proceedings or **SUITS** arising directly or indirectly from (a –e) above.

Pkg2016.2

**N.**   Loss, damage, cost or expense arising out of the failure of any **ASSURED** to adequately supply gas, oil, water, electricity or steam.

## General Policy Definitions

**1.**   **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

**2.**   **ASSURED** means not only the **NAMED ASSURED** as stated on the **Declarations**, but also includes any past, present or future officials; members of boards or commissions; and trustees, directors, officers, volunteers, or employees of the **NAMED ASSURED** while acting within the scope of their duties as such. **ASSURED** shall also mean any person, organization, trustee or estate to whom the **NAMED ASSURED** is obligated by virtue of a written contract or written mutual aid agreement or other written agreement to provide insurance such as is offered by this Policy, but only in respect to acts or operations by or on behalf of the **NAMED ASSURED,** and subject to the limitations on coverage contained in any such written contract or written mutual aid agreement or other written agreement.

**3.**   **AUTOMOBILE** means any motor vehicle intended or designed for highway use, trailer or semi-trailer, including its equipment and any other equipment permanently attached thereto, but **AUTOMOBILE** does not include **MOBILE EQUIPMENT**. However, self-propelled vehicles with the following types of permanently attached equipment are considered **AUTOMOBILE**:

Equipment designed primarily for:

(a)   Snow removal;

(b)   Road maintenance, but not construction or resurfacing; or

(c)   Street cleaning.

**4.**   **BODILY INJURY** means physical injury (including death) to any person, and any mental anguish or shock, sickness, disease, disability or death associated with or arising from such physical injury.

**5.**   **EARTHQUAKE** means seismic geologic activity, which causes movement in the earth's surface including loss or damage from any other cause or event that contributes concurrently or in any sequence to the loss, except direct loss of or damage to **PROPERTY OF THE ASSURED** caused by ensuing fire and/or explosion. If more than one **EARTHQUAKE** shock occurs within any period of one hundred and sixty-eight (168) hours during the **PERIOD OF INSURANCE**, such **EARTHQUAKE** shock is deemed to be a single **EARTHQUAKE OCCURRENCE**.

**6.**   **ELECTRONIC DATA** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, cloud computing platforms, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**7.**   **EMPLOYEE BENEFIT PROGRAMS** means group life insurance, group accident or health insurance, pension plans, profit sharing plans, employee savings and investment plans, employee stock   subscription plans, travel or vacation plans, workers' compensation,   unemployment insurance, social security, disability benefits insurance, employee welfare benefit plans and welfare plans, and any other similar **EMPLOYEE BENEFIT PROGRAMS**.

**8.**   **EMPLOYMENT PRACTICE VIOLATION** means:

Pkg2016.2

    (a)    Refusal to employ;

    (b)    Termination of employment;

    (c)    Practices, policies, acts or omissions such as Coercion, Demotion, Failure to Promote, Evaluation, Reassignment, Discipline, Humiliation, Retaliation, Libel, Slander, Defamation of Character, Harassment (other than **SEXUAL HARASSMENT**), including Violation of Civil Rights or Discrimination by the **ASSURED**, which are employment related;

    (d)    Any act relating to the selection, supervision or dismissal of any **ASSURED.**

All claims based on or arising out of the same **EMPLOYMENT PRACTICE VIOLATION** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS** by one or more **ASSUREDS** shall be deemed one **EMPLOYMENT PRACTICE VIOLATION**. Only one (1) Policy issued by Underwriters, one (1) **SELF INSURED RETENTION**, and one (1) **EXCESS LIMIT OF INSURANCE** is applicable to any one **EMPLOYMENT PRACTICE VIOLATION**.

9.    **FLOOD AND SURFACE WATER** means:

    (a)    Waves, surge, storm surge, and all other movement of tide or tidal waters; or

    (b)    The accumulation and movement of rain, melting snow or melting ice, including run-off; or

    (c)    The rising (including the overflowing or breaking of banks, boundaries, berms, retaining walls or levees) of any body of water; including but not limited to ponds, lakes, reservoirs, creeks, streams, rivers, bayous, canals, inlets, harbors, bays, seas, oceans, storm water drains and drainage ditches, viaducts, aqueducts, and other similar bodies of water; whether the bodies of water and their boundaries are man-made or naturally occurring; and whether or not the preceding (a), (b) or (c) is a result, direct or indirect, of any man-made, mechanical, natural, unnatural or catastrophic **OCCURRENCE**, happening, cause or event.

10.    **FUNGAL PATHOGENS** means any fungus or mycota or any byproduct or type of infestation produced by such fungus or mycota, including but not limited to, mold, mildew, mycotoxins, spores or any biogenic aerosols.

11.    **LAW ENFORCEMENT ACTIVITIES** means the activities of any **ASSURED** while acting as a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED**. **LAW ENFORCEMENT ACTIVITIES** does not include **EMPLOYMENT PRACTICE VIOLATIONS**.

12.    **LOSS FUND,** if applicable, means the aggregate United States Dollar amount specified in the **Schedule of SELF INSURED RETENTIONS** to be paid by the **ASSURED** for covered loss amounts incurred during the **PERIOD OF INSURANCE** within the **ASSURED'S SELF INSURED RETENTION**.

13.    **MAINTENANCE DEDUCTIBLE** means that United States Dollar amount specified in the **Schedule of SELF INSURED RETENTIONS** which the **ASSURED** is obligated to pay of the **ULTIMATE NET LOSS** prior to the application of the applicable **SELF INSURED RETENTION**. The **MAINTENANCE DEDUCTIBLE** is not considered part of the **SELF INSURED RETENTION**, and does not accrue to the exhaustion of the **LOSS FUND.**

14.    **MEDICAL PAYMENTS** means reasonable expenses for first aid, medical, surgical, X-ray and dental services, ambulance, hospital, professional nursing and funeral services as are necessary as a result of an **OCCURRENCE** not otherwise excluded on account of **BODILY INJURY** provided the **MEDICAL PAYMENTS** are incurred within one (1) year of the **OCCURRENCE**.

Pkg2016.2

15.  **MOBILE EQUIPMENT** means any of the following types of land vehicles, including any attached machinery or equipment:

(a)  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(b)  Vehicles maintained for use solely on or next to premises the **ASSURED** owns or rents;

(c)  Vehicles that travel on crawler treads;

(d)  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

  (i)  Power cranes, shovels, loaders, diggers or drills; or

  (ii)  Road construction or resurfacing equipment such as graders, scrapers or rollers;

(e)  Vehicles not described in (a), (b), (c), or (d) above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  (i)  Air compressors, pumps and generators including spraying, welding, building, cleaning, geophysical exploration, lighting and well servicing equipment;  or

  (ii)  Cherry pickers and similar devices used to raise or lower workers;

(f)  Vehicles not described in (a), (b), (c), or (d) above, maintained primarily for purposes other than the transportation of persons or cargo.

16.  **NAMED ASSURED** means the person and/or organization first named in Item 1. of the **Declarations** of this Policy.

17.  **NAMED WINDSTORM** means a storm system that has been declared a Tropical Depression, Tropical Storm or Hurricane by the National Hurricane Center of the National Oceanic and Atmospheric Administration. As regards a **NAMED WINDSTORM**, an **OCCURRENCE** shall mean all Windstorm or Hail losses and ensuing rain damage, sustained by the insured occurring during any period of seventy-two (72) consecutive hours arising out of and directly occasioned by the **NAMED WINDSTORM**.

18.  **PERIOD OF INSURANCE** means the length of time that the Policy is in force as stated in Item 3 of the **Declarations** as the Effective Date and Expiration Date.

19.  **PERSONAL INJURY** means any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE)** arising out of one or more of the following:

Wrongful Entry; Wrongful Eviction; Malicious Prosecution; Humiliation; Piracy; Infringement or Misappropriation of any Intellectual Property Rights (including: Copyrights; Patents; Trademarks; Service Marks; and Advertising, Broadcasting, and Publishing Ideas); Invasion of Rights of Privacy; Libel; Slander; Defamation of Character; Disparagement of Property; Erroneous Service of Civil Papers; False Arrest; False Imprisonment; and Detention.

Injury includes: Mental Anguish, Shock, Sickness, Disease, Disability or Death, which do not arise from **BODILY INJURY** or **PROPERTY DAMAGE**.

In addition, as respects to **LAW ENFORCEMENT LIABILITY** only, **PERSONAL INJURY** also includes any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE**) arising out of Discrimination or Violation of Civil Rights.

20. **POLLUTANTS** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals, liquids, solids, gases, thermal pollutants, waste, and all other irritants, or contaminants. Waste includes materials to be recycled, reconditioned or reclaimed.

21. **PROPERTY DAMAGE** means direct damage to or destruction or loss of property, including all resulting loss of use of property, excluding, however, damage to the **PROPERTY OF THE ASSURED**.

22. **PROPERTY OF THE ASSURED or ASSURED'S PROPERTY** means all Real and Personal Property which is in the care, custody or control of the **ASSURED** or which the **ASSURED** owns or agrees to insure by any contractual agreement normal to its operation, including: leasehold improvements and betterments; Personal Property in transit; Property in the course of construction, installation, repair, renovation and the like; **AUTOMOBILES**; **ACCOUNTS RECEIVABLE**; **DATA PROCESSING SYSTEMS**; **DATA PROCESSING MEDIA**; **FINE ARTS**; **VALUABLE PAPERS**; and **MOBILE EQUIPMENT**. However, **PROPERTY OF THE ASSURED** and **ASSURED'S PROPERTY** do not include third party **AUTOMOBILES** left in the **ASSURED'S** care, custody and control, as more fully described in **Coverage Section III AUTOMOBILE Liability – Insuring Agreements E. - Garagekeeper's Legal Liability**.

23. **RECOVERY** means all claims, **SUITS** or other causes of action that any **ASSURED** has against any person or entity resulting from a covered loss; any right of subrogation, whether the **ASSURED'S** or Underwriters resulting from a covered loss; and any rights that any **ASSURED** has to the monetary value of any damaged Property, whether tangible or intangible, for which a claim for total loss or damage is made under the Policy.

24. **SELF INSURED RETENTION** means that United States Dollar amount specified in the **SCHEDULE OF SELF INSURED RETENTIONS** which the **ASSURED** is obligated to pay of the **ULTIMATE NET LOSS,** after the application of any applicable **MAINTENANCE DEDUCTIBLE,** and before the **Specific Excess Limit of Insurance** of this Policy responds to the same loss.

25. **SEXUAL ABUSE** means any actual, attempted or alleged criminal sexual conduct of a person by another person, or persons acting in concert, regardless if criminal charges or proceedings are brought, which causes physical injuries and/or mental anguish.   **SEXUAL ABUSE** also includes actual, attempted or alleged: sexual molestation, sexual assault, sexual exploitation or sexual injury.

   But **SEXUAL ABUSE** does not include **SEXUAL HARASSMENT**.

26. **SEXUAL HARASSMENT** means any actual, attempted or alleged unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature of a person by another person, or persons acting in concert, which causes mental anguish:

   But **SEXUAL HARASSMENT** does not include **SEXUAL ABUSE**.

27. **SUBLIMIT** means the maximum amount of **ULTIMATE NET LOSS** as specified in the **Schedule of Specific Excess Limits of Insurance** that may be attributable to a Coverage Subsection for any one **OCCURRENCE** or **CLAIM**. **SUBLIMITS** and any Aggregate Limits applicable to them are part of, and not in addition to, the **SELF INSURED RETENTION**, Specific Excess Limit of Insurance and Annual Aggregate Limit for the Coverage Section which they are a part of. Where a **SUBLIMIT** is specified as being "ground up", such **SUBLIMIT** is inclusive of, and may be contained within, the **SELF INSURED RETENTION**. Ground up **SUBLIMIT** payments within the **SELF INSURED**

Pkg2016.2

**RETENTION** shall contribute to the erosion of the **LOSS FUND,** if applicable, and will form part of the overall **ULTIMATE NET LOSS** for the **OCCURRENCE** or **CLAIM**.

28.   **SUIT** means a civil proceeding in which injuries or damages are alleged.  **SUIT** includes:

(a)   An arbitration proceeding in which such damages are claimed and to which the **ASSURED** must submit or does submit with or without Underwriters consent; or

(b)   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **ASSURED** submits with or without Underwriters consent.

29.   **THIRD PARTY CLAIM ADMINISTRATOR** means a duly qualified and competent firm that administers on behalf of the **ASSURED** all claims under this Policy, which shall include claims processing, adjustment, field investigation, data collection and reporting duties, including **LOSS FUND** tracking if a limit is stated in the **Declarations** under **Excess Loss Fund Protection**, in accordance with all statutory and regulatory standards and in accordance with all accepted industry standards and practices.

30.   **ULTIMATE NET LOSS** means the total sum which the **ASSURED** is obligated to pay because of loss or damage covered under any Coverage Section of this Policy, either through adjudication or compromise, after first making proper deductions for all subrogation, **RECOVERY(IES)** and salvages.

**ULTIMATE NET LOSS** also includes:

(a)   Premium on attachment, appeal or similar bonds (but without any obligation on the part of Underwriters to apply for or furnish such bonds); or

(b)   Expenses of lawyers, private investigators and other persons for  litigation,  settlement, adjustment and investigation of claims and **SUITS** which are paid as a consequence of any loss or damage covered hereunder.

However, the **ULTIMATE NET LOSS** does not include:

(c)   Any costs, fees and other expenses incurred by the **ASSURED** for litigation, settlement, adjustment and investigation of claims or **SUITS** for any loss or damage not covered under any Section of this Policy;

(d)   Payment for any judgments or acts deemed uninsurable by law;

(e)   Contractual fees paid to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** by the **ASSURED** for services rendered in administering, investigating or settlement of any claim for loss or damage;

(f)   Payments, including salaries and expenses, to any employee or official of the **ASSURED** for services rendered in administering any claim for loss or damage; or

(g)   Expenses incurred by the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** in the hiring of experts or other specialists to establish the existence or value of a covered claim or **OCCURRENCE** unless specifically provided for in the Policy or agreed to in advance by Underwriters.

Underwriters are liable only for the **ULTIMATE NET LOSS** in excess of the applicable **MAINTENANCE DEDUCTIBLE** and **SELF INSURED RETENTION,** and not more than the **Specific Excess Limit of Insurance.** Underwriters' duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS**.

31.  **UNMANNED AIRCRAFT** means an aircraft that is not designed, manufactured or modified after manufacture to be controlled directly by a person from within or on the aircraft.

32.  **WRONGFUL ACT** means any actual or alleged error or mis-statement, omission, act or neglect or breach of duty due to misfeasance, malfeasance, and non-feasance, Discrimination, and Violation of Civil Rights by the **ASSURED**.

All claims based on or arising out of the same **WRONGFUL ACT** or a series of related **WRONGFUL ACTS** by one or more **ASSUREDS** shall be deemed one **WRONGFUL ACT**. Only one Policy issued by Underwriters, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **WRONGFUL ACT**.

**Pkg2016.2**

## Coverage Section I Property

### Coverage Section I Property – Insuring Agreements

**A.**    **PROPERTY OF THE ASSURED** (except **AUTOMOBILES** and Personal Property in transit)**:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, as more fully defined by the term **ULTIMATE NET LOSS**, occurring during the **PERIOD OF INSURANCE** to all Real and Personal Property, wherever located and identified in Schedules on file with Underwriters, unless provided for by the **Automatic Acquisition Clause.**

**B.**    **AUTOMOBILE PHYSICAL DAMAGE:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, as more fully defined by the term **ULTIMATE NET LOSS**, occurring during the **PERIOD OF INSURANCE** to **AUTOMOBILES** owned by the **ASSURED** or on which the **ASSURED** has an obligation to provide insurance, wherever located.

**C.**    **EXTRA EXPENSE:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for **EXTRA EXPENSE,** due to the suspension of operations caused by Direct Physical Loss or Damage insured hereunder, occurring during the **PERIOD OF INSURANCE** to the **PROPERTY OF THE ASSURED** at the premises described in the Schedule of Locations on file with Underwriters.

**D.**    **Transit:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, occurring during the **PERIOD OF INSURANCE** to Personal **PROPERTY OF THE ASSURED**, or property held by the **ASSURED** in trust or on commission or in the care, custody or control of the **ASSURED** or for which the **ASSURED** may be held legally liable, while in due course of transit.

**E.**    **BUSINESS INTERRUPTION:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for the actual loss of **BUSINESS INCOME** and **RENTAL VALUE** due to the necessary suspension of **OPERATIONS** during the **PERIOD OF RESTORATION**. The suspension must be caused by Direct Physical Loss or Damage insured hereunder, occurring during the **PERIOD OF INSURANCE** to the **PROPERTY OF THE ASSURED** at the premises described in the Schedule of Locations on file with Underwriters.

### Coverage Section I Property – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section I Property** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance** over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage hereunder, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of **the Schedule of Specific Excess Limits of Insurance.**

### Coverage Section I Property – Conditions

Amounts paid by Underwriters under any of the following clauses are part of, and not in addition to, Underwriters **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section I Property** as stated in the **Schedule of Specific Excess Limits of Insurance** in the **Declarations** including any applicable Annual Aggregate**.**

**Pkg2016.2**

1.    **Valuation:**

(a)  **Real and Personal Property (except ACCOUNTS RECEIVABLE, AUTOMOBILES, DATA PROCESSING, FINE ARTS, MOBILE EQUIPMENT AND VALUABLE PAPERS):**

Underwriters will indemnify the **ASSURED** for loss or damage based on the lesser of the cost to repair, rebuild or replace the destroyed or damaged property in a condition equal to, but not superior to, or more extensive, than its condition when new, provided that the **ASSURED** has commenced repairs, rebuilding, or replacement within two years of the date of loss or damage; and subject to the following conditions:

However, the following conditions apply:

If property damaged or destroyed covered Real or Personal Property is not repaired, rebuilt or replaced within two years after loss or damage, Underwriters shall not be liable for any amount to repair, rebuild, or replace in excess of the **ACTUAL CASH VALUE** of the property damaged or destroyed.

The **ASSURED** may, at its discretion, elect to apply any **RECOVERY** for rebuilding or replacement due under this Section towards a new capital expenditure provided that:

i.   The new capital expenditure is made within two years of the date of loss or damage;

ii.  The new capital expenditure is in lieu of, and not in addition to, the Real or Personal Property damaged; and

iii. The actual cost of the new capital expenditure is equal to, or greater than, the cost to rebuild or replace the Real or Personal Property damaged.

If the **ASSURED** decides to replace destroyed or damaged property on another site, cost of such site is not included.

(b)  **ACCOUNTS RECEIVABLE:** Underwriters will indemnify the **ASSURED** for actual  loss sustained for sums due the **ASSURED,** including the expenses reasonably incurred in re-establishing the records of **ACCOUNTS RECEIVABLE:**

i.   When there is proof that a covered loss has occurred but the **ASSURED** cannot accurately establish the total amount of **ACCOUNTS RECEIVABLE** outstanding as of the date of such loss, such amount shall be based on the **ASSURED'S** monthly statements and shall be computed as follows:

(1) Determine the total of the average monthly amounts of **ACCOUNTS RECEIVABLE** at the end of the twelve (12) months immediately preceding the month in which the loss or damage occurs;

(2) Adjust that total for any normal fluctuations in the amount of **ACCOUNTS RECEIVABLE** for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

ii.  There shall be deducted from the total amount of **ACCOUNTS RECEIVABLE**, however established:

(1) The amount of accounts not lost or damaged;

(2) The amount of the accounts the **ASSURED** is able to collect or re-establish;

(3) An amount to allow for probable bad debts that the **ASSURED** is normally unable to collect;

(4) All unearned interest and services charges.

(c) **AUTOMOBILE:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair the **AUTOMOBILE**, or the **ACTUAL CASH VALUE** of the **AUTOMOBILE** at the time of loss; including the cost to rent a vehicle of like kind.

(d) **DATA PROCESSING:** Underwriters will indemnify the **ASSURED** for:

    i.    **DATA PROCESSING SYSTEMS** based upon the lesser of the actual cost to replace or repair the property. If the property is replaced, based upon the most closely equivalent property available similar in kind and function to that insured hereunder.

    ii..  **DATA PROCESSING MEDIA** based upon the lesser of the actual cost to replace, repair or reproduce the property, or if not replaced, repaired or reproduced, the blank hardware value of the **DATA PROCESSING MEDIA**. If the property is replaced, based upon the most closely equivalent property available similar in kind and function to that insured hereunder.

(e) **FINE ARTS:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair the property, or if not repairable the replacement cost, or if not replaceable the appraised or market value.

(f) **MOBILE EQUIPMENT:** Underwriters will indemnify the **ASSURED** for loss or damage based on the lesser of the cost to repair, rebuild or replace the destroyed or damaged property in a condition equal to, but not superior to, or more extensive, than its condition when new.

(g) **VALUABLE PAPERS:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to replace, repair or reproduce the property with other of like kind, or if not replaced, repaired or reproduced the blank value of the **VALUABLE PAPERS**.

(h) **Vacant Buildings:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair a covered building or the **ACTUAL CASH VALUE** of a covered building that has been vacant for a period of more than ninety (90) consecutive days at the time of loss.

Vacant means a covered building that is abandoned.

A covered building that is unoccupied is not considered vacant. A covered building is considered unoccupied when the building contains contents to conduct the **ASSURED'S** customary operations, but such operations are temporarily suspended.

A covered building under construction or renovation is not considered vacant.

**2.**     **Expense to Reduce or Prevent Loss:** Underwriters will indemnify the **ASSURED** for expenses necessarily incurred to reduce or prevent any loss under this Policy, not exceeding, however, the amount by which the loss under this [insurance] is thereby reduced.

**3.**     **Debris Removal:** In the event of a direct physical loss or damage to the property covered under this Policy, Underwriters will indemnify the **ASSURED** for expenses incurred in removal of debris, and the cost of clean-up (other than **POLLUTANTS**) of the insured property destroyed or damaged, from the premises of the **ASSURED**.

**4.**     **Asbestos and Lead Clean Up and Removal:** Notwithstanding **General Policy Exclusion F.** in this Policy, Underwriters agree to extend **Coverage Section I Property** to cover expense to remove damaged asbestos or lead from any structure due to the enforcement of any law or

**Pkg2016.2**

ordinance regulating asbestos or lead, when the asbestos or lead is itself damaged by a Peril not otherwise excluded under this Policy, and then only to the extent of such damage.

5.  **Architects' and Engineers' Fees:** This Policy covers the additional assessment involving architects' and engineers' fees for consultations arising from losses resulting from a Peril not otherwise excluded under this Policy.

6.  **Civil Authority Clause:** Notwithstanding anything contained in this Policy, property which is insured under this Policy is also covered against the risk of damage or destruction by civil authority during a conflagration, and for the purpose of retarding the same; provided that neither such conflagration or destruction is caused or contributed to by war (including undeclared or civil war), warlike action by a military force (including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents), insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. This coverage includes damage or destruction by civil authority during a conflagration, and for the purpose of retarding the same, if caused by terrorists or secretly by a foreign enemy or agent of any government or sovereign power, when not in connection with the operations of armed forces in or against the country where the described location is situated.

7.  **Ordinance Deficiency Clause:** If Building property is damaged or destroyed by Perils not otherwise excluded under this Policy, Underwriters shall be liable for the increased cost to repair or reconstruct that Building property, including the undamaged part of that Building property, but only when the increased cost is a consequence of enforcement of any federal, state or municipal law, ordinance or code which necessitates such increased cost to repair or reconstruct to meet the minimum of such requirements. If demolition is required to comply with such enforcement, Underwriters shall also be liable for such additional cost, including the cost to demolish and clear undamaged parts of the Building property. Underwriters will not pay such increased cost to repair or reconstruct if the Building property is not repaired or reconstructed.

8.  **Automatic Acquisition Clause:** This insurance is automatically extended to cover additional property and/or interests of the **ASSURED**, usual and/or incidental to the operations of the **ASSURED**, which do not exceed the Newly Acquired Property Reporting Limit stated in the **Schedule of Specific Excess Limits of Insurance**, and which are acquired, or for which the **ASSURED** becomes legally liable, during the **PERIOD OF INSURANCE** under this Policy.

    This Policy is further extended to cover additional property and/or interests of the **ASSURED**, usual and/or incidental to the operations of the **ASSURED**, when newly acquired property values exceed the Newly Acquired Property Reporting Limit stated in the **Schedule of Specific Excess Limits of Insurance**, provided the **ASSURED** reports details of said property and/or interests to Underwriters for premium consideration within ninety (90) consecutive days from the date the **ASSURED** acquires or becomes legally liable for the property provided that the property is acquired or interests secured during the **PERIOD OF INSURANCE** under this Policy.

9.  **Unintentional Errors and Omissions:** The property insured under this Policy, and its insured value, is the property and values shown on the Schedule of Values on file with Underwriters, as submitted by the **ASSURED** prior to the inception of this Policy.

    If any **PROPERTY OF THE ASSURED** is omitted or undervalued because of negligence, error or oversight of the **ASSURED,** Underwriters will accept that property provided it is usual or incidental to the **ASSURED'S** operations. Such omission will not prejudice the **ASSURED'S** right of **RECOVERY** under this Policy; except that for any **PROPERTY OF THE ASSURED** unintentionally omitted from the Schedule of Values on file with Underwriters, Underwriters shall not be liable for any amount to repair, rebuild, or replace in excess of the **ACTUAL CASH VALUE** of the property until payment of any applicable additional premium for the **PERIOD OF INSURANCE** that the **PROPERTY OF THE ASSURED** was unintentionally omitted from the Schedule of Values on file

Pkg2016.2

with Underwriters by the **ASSURED**, as calculated by Underwriters, has been paid. Upon receipt of payment of the additional premium by Underwriters, the liability of Underwriters will revert to its liability as outlined in **Coverage Section I Property – Conditions 1.(a).** The **ASSURED** agrees to report to Underwriters any omission of property as soon as practicable after it is discovered.

**10.** **Joint Loss Clause:** In the event of damage to or destruction of property, at a location designated in this Policy and also designated in a boiler and machinery insurance policy and there is a disagreement between the insurers with respect to:

(a) Whether such damage or destruction was caused by a Peril insured against by this Policy or by an accident insured against by such boiler and machinery insurance Policy;  or

(b) The extent of participation of this Policy and of such boiler and machinery insurance policy in a loss which is insured against, partially or wholly, by any or all policies.

Underwriters shall, upon written request of the **NAMED ASSURED**, pay to the **NAMED ASSURED** one-half of the amount of loss which is in disagreement, but in no event more than Underwriters would have paid if there had been no boiler and machinery insurance Policy in effect, subject to the following conditions:

i. The amount of the loss which is in disagreement after making provisions for any undisputed claims payable under the said policies and after the amount of loss is agreed upon by the **ASSURED** and the insurers, is limited to the minimum amount remaining payable by any or all policies;

ii. The boiler and machinery insurer shall simultaneously pay to the **ASSURED** one-half of said amount which is in disagreement;

iii. The payments by the insurers hereunder and acceptance of the same by the **ASSURED** signify the agreement of the insurers to submit to and proceed with arbitration within ninety (90) consecutive days of such payments. The arbitrators shall be three in number, one of which shall be appointed by the boiler and machinery insurer and one of whom shall be appointed by Underwriters hereon and the third appointed by consent of the other two arbitrators, the decision by the arbitrators shall be binding on the insurers and that judgment upon such award may be entered in any court of competent jurisdiction;

iv. The **ASSURED** agrees to cooperate in connection with such arbitration but not to intervene within;

v. The provisions of this clause shall not apply unless such other Policy issued by the boiler and machinery insurance company contains a similar clause or is similarly endorsed;

vi. Acceptance by the **ASSURED** of sums paid pursuant to the provisions of this clause including an arbitration award, shall not operate to alter, waive, surrender or in any way affect the rights of the **ASSURED** against any of the insurers.

<u>**Coverage Section I Property –  Exclusions**</u>

**In addition to the General Exclusions of this Policy, this Coverage Section does not insure against:**

**A.** Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance;**

**B.**    Loss by moth, termite, or other insect(s); by vermin; by wear or tear; by rust, erosion, corrosion or other gradual deterioration; or by wet rot, dry rot or **FUNGAL PATHOGEN**, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril;

**C.**    Loss as a result of lack of proper maintenance;

**D.**    Loss of use (except as respects **Coverage Section I Property – Insuring Agreements B. AUTOMOBILE Physical Damage and C. EXTRA EXPENSE** and **MOBILE EQUIPMENT**), delay or loss of markets;

**E.**    Direct loss by breakdown of machinery and/or explosion of steam boilers, steam pipes, steam engines or steam turbines, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril. This exclusion does not apply to loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass;

**F.**    Loss of electrical appliances or devices of any kind, including wiring, arising from electrical injury or disturbance to the said electrical appliances or devices or wiring from artificially generated electrical current unless fire and/or explosion ensues, and then only for direct loss or damage caused by such ensuing fire and/or explosion, except as may be covered under **DATA PROCESSING**;

**G.**    Loss resulting from variation of humidity or temperature, shrinkage, evaporation, loss of weight or leakage in respect of a temperature controlled environment: unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril;

**H.**    Loss by normal settling, normal shrinkage, or expansion of foundations, floors or ceilings;

**I.**    Inventory shortage, mysterious disappearances or loss resulting from any kind of infidelity or dishonesty on the part of the **ASSURED** or any employees; whether alone or in collusion with others;

**J.**    Penalties for non-completion or delay as respects property in course of construction or undergoing renovation;

**K.**    Loss by mechanical derangement, inherent defect or latent defect; unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused solely by such ensuing peril;

**L.**    Loss resulting from processing or faulty workmanship with regard to all Property, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused solely by such ensuing peril;

**M.**    Loss of or damage to animals;

**N.**    Loss of or damage to aircraft including **UNMANNED AIRCRAFT**;

**O.**    Loss of or damage to watercraft over fifty (50) feet;

**P.**    Loss of or damage to standing timber, growing crops, land and land value;

**Q.**    Loss of or damage to accounts, bills, currency, money, notes, securities, deeds, evidences of debts;

**R.**    Loss of or damage to underground pipes, sewers, flues and drains outside of the covered building, unless as otherwise listed on the Schedule of Values on file with Underwriters;

**Pkg2016.2**

**S.**  Loss of or damage to **ACCOUNTS RECEIVABLE** due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning, or as covered under **DATA PROCESSING**;

**T.**  Loss of or damage to:

(a)  **DATA PROCESSING MEDIA** due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning;

(b)  **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to dryness or dampness of atmosphere, extremes of temperature, corrosion, rust unless directly resulting from physical damage to the **DATA PROCESSING SYSTEM'S** air conditioning facilities caused by a Peril not otherwise excluded hereunder directly resulting therefrom;

(c)  **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to loss of or damage to **DATA PROCESSING MEDIA** for accounts, bills, evidences of debt, **VALUABLE PAPERS**, records, abstracts, deeds, manuscripts or other documents, except as they may be converted to **DATA PROCESSING MEDIA** form, and then only in that form;

(d)  **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to loss or damage caused by error in machine programming or instructions to machine.

**U.**  Loss of or damage to electrical transmission and distribution lines outside of a covered building, unless as otherwise listed on the Schedule of Values on file with Underwriters.

**V.**  Loss due to or resulting from **FLOOD AND SURFACE WATER** for any Property in Flood Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-A30, Zone AR/A, Zone V, Zone VE, and Zones V1-V30 or to any other Flood Zone with a designation that begins with the letter A or V.

**W.**  Direct loss due to freeze as result of any intentional or negligent failure to:

(a)  Properly and sufficiently maintain heat in any unoccupied or vacant building or property, regardless of the length of or reason for any unoccupancy or vacancy, in accordance with all applicable standards or guidelines.

(b)  Properly and sufficiently protect machinery, pipes, other systems and/or equipment in accordance with all applicable standards, guidelines or manufacturer's instructions.


## Coverage Section I Property – Definitions

**1.**  **ACCOUNTS RECEIVABLE** means the sums due the **ASSURED** from customers; interest charges on any loan to offset impaired collections pending repayment of such sums; collection expense in excess of normal collection cost.

**2.**  **ACTUAL CASH VALUE** means the present day value of the cost to repair, rebuild, or replace property at the time of loss after first deducting for any physical wear and tear, and obsolescence of the property.

**3.**  **DATA PROCESSING** means the **ELECTRONIC DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** owned, leased or rented, or under the control of the **ASSURED** or for which the **ASSURED** is liable.

**4.**  **DATA PROCESSING MEDIA** means the recording or storage devices such as films, tapes, discs, drums or cells, used for **ELECTRONIC DATA PROCESSING**.

5. **DATA PROCESSING SYSTEMS** means the equipment and its component parts.

6. **FINE ARTS** means paintings, etchings, pictures, tapestries, and other bona fide works of art including but not limited to statuary, marbles, bronzes, antique furniture, rare books, antique silver, rare manuscripts, porcelains, rare glass, and bric-a-brac of rarity, historical value or artistic merit.

7. **OCCURRENCE** means an accident or accidental happening or accidental event or a series of related accidents or accidental happenings or accidental events involving one or more **ASSUREDS** which results in a direct physical damage or loss to the **PROPERTY OF THE ASSURED** that is both unexpected and unintended by the **ASSURED(S)**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

8. **VALUABLE PAPERS** means written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, but does not mean money or securities.

## Coverage Section I Property – EXTRA EXPENSE

If property under **Coverage Section I Property** is damaged or destroyed by Perils insured against during the **PERIOD OF INSURANCE** which necessitates the incurrence of **EXTRA EXPENSE**, Underwriters will be liable for this **EXTRA EXPENSE**, not exceeding the actual loss sustained, and not exceeding such length of time, hereinafter referred to as the **PERIOD OF RESTORATION**. It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters' **Specific Excess Limit of Insurance** as shown in **the Schedule of Specific Excess Limits of Insurance**.

This Extension also includes loss to **DATA PROCESSING** when (1) the premises in which the property is located is so damaged as to prevent access to such property or (2) as a direct result of a Peril insured against, the air conditioning system or electrical system necessary for the operation of the **DATA PROCESSING SYSTEMS** is so damaged as to reduce or suspend the **ASSURED'S** ability to actually perform the operations normally performed by the **DATA PROCESSING SYSTEMS**. **EXTRA EXPENSE** for **DATA PROCESSING** includes the expense of using other property or facilities of other concerns or other necessary emergency expenses.

## Coverage Section I Property – EXTRA EXPENSE Conditions

1. **Resumption of Operations:** It is a condition of this Policy that as soon as practical, the **ASSURED** will resume **NORMAL** business operations and dispense with **EXTRA EXPENSE**.

2. **Interruption by Civil Authority:** Coverage hereunder is extended to include actual loss sustained when access to the premises in which the **PROPERTY OF THE ASSURED** is located is prohibited by order of civil authority as a direct result of loss caused by a Peril insured against.

## Coverage Section I Property – EXTRA EXPENSE Exclusions

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

A. The suspension, lapse or cancellation of any lease, license, contract or order beyond the **PERIOD OF RESTORATION**;

**B.**   Interference at premises by strikers or other persons with the rebuilding, repairing or replacing of the property damaged or destroyed, or with the resumption or continuation of business;

**C.**   Loss of income, profits or earnings;

**D.**   The cost of repairing or replacing any of the Real or Personal Property covered hereunder, or the cost of research or other expense necessary to replace or restore damaged or destroyed books of account, abstracts, drawings, card index systems or other records (including film, tape, disc, drum, cell or other  magnetic recordings or **DATA PROCESSING MEDIA**), that have been damaged or destroyed by the Perils insured against, except cost in excess of the normal cost of such repair, replacement or restoration necessarily incurred for the purpose of reducing loss under this Policy. In no event shall such excess cost exceed the amount by which the total **EXTRA EXPENSE** loss otherwise payable under this Policy is thereby reduced;

**E.**   Loss resulting from theft of any property which at the time of loss is not an integral part of a building or structure (except direct loss by pillage and looting occurring during and at the immediate place or a riot or  civil commotion), unless loss by a Peril covered under this Policy ensues from theft or attempted theft, and then Underwriters are liable for only such ensuing loss;

**F.**   Any other consequential loss.

### Coverage Section I Property –  EXTRA EXPENSE Definitions

**1.**   **EXTRA EXPENSE** means the excess (if any) of the total cost incurred during the **PERIOD OF RESTORATION** chargeable to the continuance of the **ASSURED'S** operations, over and above the total cost that would normally have been incurred to conduct those operations during the same period had there been no direct physical loss or damage to the property.

Any salvage value of property obtained for temporary use during the **PERIOD OF RESTORATION** which remains after resumption of **NORMAL** operations, will be taken into consideration in the adjustment of any loss incurred.

**2.**   **NORMAL** means the condition that would have existed had no loss occurred.

**3.**   **PERIOD OF RESTORATION** means the period of time that:

(a)  Begins after a direct physical loss or damage to the **ASSURED'S** property; and

(b)  Ends the earlier of:

(i)   The date when the property or such part of property that was damaged or destroyed at the Schedule of Locations on file with Underwriters is repaired, rebuilt or  replaced  with reasonable speed or similar quality;  or

(ii)  The date when the property or such part of property that was damaged or destroyed could have been repaired, rebuilt or replaced with the exercise of due diligence; or

(iii) The date when business is resumed at a new permanent location or at the same repaired, rebuilt or replaced location.

**PERIOD OF RESTORATION** does not include any increased period required due to the enforcement of any ordinance or law that:

(c)  Regulates the construction, use or repair, or requires the tearing down of any property; or

(d)  Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

The **PERIOD OF RESTORATION** is not limited by the expiration date of this Policy.

## Coverage Section I Property – Transit

This Policy covers Personal **PROPERTY OF THE ASSURED** or property held by the **ASSURED** in trust or on commission or in the care, custody or control of the **ASSURED** or for which the **ASSURED** may be held legally liable while in due course of transit against All Risks of Direct Physical Loss or Damage to the property insured occurring during the **PERIOD OF INSURANCE** of this Policy (including general average and salvage charges on shipments covered while waterborne). It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

The **ASSURED** may accept ordinary Bills of Lading or receipts insured by carriers including those containing released and/or partially released value provisions, but the **ASSURED** shall not agree to release carriers from their common law or statutory liability.

## Coverage Section I Property – Transit Exclusions

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

**A.**  Shrinkage, evaporation, loss of weight, leakage, breakage of glass or other fragile articles, marring, scratching, exposure to light, or change in color, texture or flavor, unless such loss is caused by a Peril not otherwise excluded in this Policy;

**B.**  Loss caused by or resulting from misappropriation, conversion, infidelity or any dishonest act on the part of the **ASSURED** or other party of interest, or employees or agents or others to whom the property may be delivered or entrusted (carriers for hire excepted);

**C.**  Loss caused by breakdown or derangement of refrigerating units;

**D.**  Shipments by mail after delivery into the custody of any governmental postal service.

## Coverage Section I Property – BUSINESS INTERRUPTION

If property under **Coverage Section I Property** is damaged or destroyed by Perils insured against during the **PERIOD OF INSURANCE** which necessitates suspension of operations, Underwriters will be liable for loss of **BUSINESS INCOME** and **RENTAL VALUES** not exceeding the actual loss sustained, and not exceeding such length of time, hereinafter referred to as the **PERIOD OF RESTORATION**. It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

## Coverage Section I Property – BUSINESS INTERRUPTION Conditions

**1.**  **Valuation**: Underwriters will indemnify the **ASSURED** for the amount of **BUSINESS INCOME** or **RENTAL VALUES** loss based on:

(a)  The Net Income of the business before the direct physical loss or damage occurred;

Pkg2016.2

(b)  The likely Net Income of the business if no loss or damage occurred;

(c)  The operating expenses including payroll expenses, necessary to resume **OPERATIONS** with the same quality of service that would have existed if no direct physical loss or damage occurred; and

(d)  Other relevant sources of information including:

    (i)  Financial records and accounting procedures;

    (ii)  Bills, invoices, and other vouchers;

    (iii)  Deeds, liens or contracts.

**2.**  **Resumption of OPERATIONS**: Underwriters will reduce the amount of the **ASSURED'S BUSINESS INCOME** or **RENTAL VALUES** loss to the extent the **ASSURED** can resume **OPERATIONS**, with reasonable speed, in whole or in part, by using damaged or undamaged property at the described scheduled premises or elsewhere.

If the **ASSURED** does not resume **OPERATIONS** with reasonable speed, or does not resume **OPERATIONS** in whole or in part, Underwriters will indemnify the **ASSURED** for a **BUSINESS INCOME** or **RENTAL VALUES** loss based on the length of time it would have taken to resume **OPERATIONS** with reasonable speed, or to resume **OPERATIONS** in whole or in part.

**3.**  **Interruption by Civil Authority**: Coverage hereunder is extended to include actual loss sustained when access to the premises in which the **PROPERTY OF THE ASSURED** is located is prohibited by order of civil authority as a direct result of loss caused by a Peril insured against.

**4.**  **Expenses to Reduce Loss**: If there is a **BUSINESS INCOME** or **RENTAL VALUES** loss Underwriters will indemnify the **ASSURED** for expenses necessarily incurred to reduce further loss of **BUSINESS INCOME** or **RENTAL VALUES**. The total loss payment for **BUSINESS INCOME** or **RENTAL VALUES** loss, and expense to reduce loss will not be more than the **BUSINESS INCOME** or **RENTAL VALUES** loss that would have been payable under this Extension if the expenses to reduce loss had not been incurred.

**5.**  **BUSINESS INCOME**: If the necessary suspension of the **ASSURED'S OPERATIONS** produces a **BUSINESS INCOME** loss payable under this Policy, Underwriters will indemnify the **ASSURED** for the actual loss of **BUSINESS INCOME** incurred during the **PERIOD OF RESTORATION** that would have existed if no direct physical loss or damage had occurred. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**6.**  **RENTAL VALUES**: If the necessary suspension of the **ASSURED'S OPERATIONS** produces a **RENTAL VALUES** loss payable under this Policy, Underwriters will indemnify the **ASSURED** for the actual loss of **RENTAL VALUES** incurred during the **PERIOD OF RESTORATION**, and up to ninety (90) consecutive days thereafter, that would have existed if no direct physical loss or damage had occurred. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

<u>**Coverage Section I Property – BUSINESS INTERRUPTION Exclusions**</u>

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

**A.**  The suspension, lapse or cancellation of any lease, license, contract or order beyond the **PERIOD OF INSURANCE**;

Pkg2016.2

**B.**   Interference at premises by strikers or other persons with the rebuilding, repairing or replacing the property damaged or destroyed or with the resumption or continuation of business;

**C.**   Enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures;

**D.**   Any other consequential loss.

### Coverage Section I Property – BUSINESS INTERRUPTION Definitions

**1.**   **BUSINESS INCOME** means the:

   (a)   Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

   (b)   Continuing normal operating expenses incurred, including payroll.

**2.**   **BUSINESS INTERRUPTION** means the loss sustained during the suspension of **OPERATIONS** as a result of direct physical damage to the property insured.

**3.**   **OPERATIONS** means:

   (a)   The **ASSURED'S** business activities occurring at the scheduled premises; and

   (b)   The tenantability of the scheduled premises, (only if coverage for **BUSINESS INTERRUPTION** includes **RENTAL VALUES)**.

**4.**   **PERIOD OF RESTORATION** means the period of time that:

   (a)   Begins after a direct physical loss or damage to the **ASSURED'S** property; and

   (b)   Ends on the earlier of:

      (i)   The date when the property or such part of property that was damaged or destroyed at the Schedule of Locations on file with Underwriters is repaired, rebuilt or replaced with reasonable speed or similar quality;  or

      (ii)   The date when the property or such part of property that was damaged or destroyed could have been repaired, rebuilt or replaced with the exercise of due diligence; or

      (iii)   The date when business is resumed at a new permanent location or at the same repaired, rebuilt or replaced location.

   **PERIOD OF RESTORATION** does not include any increase period required due to the enforcement of any ordinance or law that:

   (c)   Regulates the construction, use or repair, or requires the tearing down of any property; or

   (d)   Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

   The **PERIOD OF RESTORATION** is not limited by the Expiration Date of this Policy.

**5.**   **RENTAL VALUES** means the:

Pkg2016.2

(a) Total anticipated rental income from tenant occupancy at the premises in the Schedule of Locations on file with Underwriters as furnished and equipped by the **ASSURED**; and

(b) Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be the **ASSURED'S** obligations; and

(c) Fair **RENTAL VALUES** for any portion of the premises stated in the Schedule of Locations on file with Underwriters, which is occupied by the **ASSURED**.

Pkg2016.2

## Coverage Section II General Liability
### Coverage Section II General Liability – Insuring Agreements

**A.**    **General Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law or assumed by the **ASSURED** under contract or agreement, for damage direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY**, suffered or alleged to have been suffered by any person(s) or organization(s), and/or **PROPERTY DAMAGE** or the loss of use thereof, arising out of an **OCCURRENCE** from any cause including **HOST LIQUOR LIABILITY** and/or **LIQUOR LIABILITY**, and **INCIDENTAL MEDICAL MALPRACTICE** (except **INCIDENTAL MEDICAL MALPRACTICE**, arising out of **LAW ENFORCEMENT ACTIVITIES**) occurring during the **PERIOD OF INSURANCE**.

**B.**    **Premises MEDICAL PAYMENTS:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all reasonable **MEDICAL PAYMENTS** incurred by the **ASSURED** to others (except employees of the **ASSURED** injured in the course of their employment, and to and for students), as are necessary at the time of an **OCCURRENCE** on account of **BODILY INJURY** occurring during the **PERIOD OF INSURANCE**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance under Coverage Section II General Liability**.

**C.**    **SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, for the liability on the part of the **NAMED ASSURED**, including liabilities arising from negligent hiring, training and supervision, arising out of any **OCCURRENCE** resulting from any actual or alleged acts by any past, present or future official, board or commission member, trustee, director, employee or volunteer worker, of the **NAMED ASSURED** or other person or persons of **SEXUAL HARASSMENT** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL HARASSMENT**; however, with respect only to this **Coverage Section II General Liability – Insuring Agreement C SEXUAL HARASSMENT**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL HARASSMENT** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** only, Underwriters will indemnify that official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT**. Coverage only applies if the act of **SEXUAL HARASSMENT** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT**

Pkg2016.2

Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

**D.**   **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, out of any **OCCURRENCE** resulting from any actual or alleged acts by past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons of **SEXUAL ABUSE** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL ABUSE**; however, with respect only to this **Coverage Section II General Liability – Insuring Agreement D. SEXUAL ABUSE**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL ABUSE** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** only, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** committed an act of **SEXUAL ABUSE**. Coverage only applies if the act of **SEXUAL ABUSE** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons which occurred after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than 120 consecutive days after the initial **DISCOVERY**, and in any event within the **PERIOD OF INSURANCE** or sixty (60) consecutive days after the expiration of the **PERIOD OF INSURANCE** during which the **OCCURRENCE** of **SEXUAL ABUSE** first took place; whichever is later. Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE** claim or claims, irrespective of whether Underwriters have been prejudiced by said failure.

Pkg2016.2

**E.**     **Damage to Premises Rented to the ASSURED**: Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay for loss or damage caused by fire, explosion, smoke, riot or civil commotion occurring during the **PERIOD OF INSURANCE** to premises rented to the **ASSURED** or temporarily occupied by the **ASSURED** with the permission of the owner. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **Damage to Premises Rented to the ASSURED** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability**.

### Coverage Section II General Liability –  Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section II General Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this Coverage **Section II General Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance.**

### Coverage Section II General Liability –  Exclusions

**In addition to the General Policy – Exclusions, this Coverage Section does not insure against:**

**A.**     Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

**B.**     **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** which the **ASSURED** intended or expected; unless resulting from:

    (a)     **BODILY INJURY** resulting from the use of reasonable force to protect persons or property;

    (b)     Corporal punishment (unless providing coverage for corporal punishment is prohibited by law).

    (c)     **Coverage Section II General Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **Coverage Section II General Liability – Insuring Agreements D. SEXUAL ABUSE Liability**; but only to the extent that coverage for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** is specifically given, and only if a **SUBLIMIT** for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** coverage is stated in the **Schedule of Specific Excess Limits of Insurance.**

**C.**     Liability arising out of the ownership, maintenance or use, including loading or unloading, of watercraft over 50 feet, except with respect to use of same where operations are performed by independent contractors;

**D.**     Damage to or destruction of **PROPERTY OF THE ASSURED**;

**E.**     Liability arising out of the ownership, maintenance, loading or unloading, use or operations of any aircraft including **UNMANNED AIRCRAFT**, airfields, runways, hangars, buildings,  or other properties in connection with aviation activities, other than premises liability in buildings to which the general public is admitted;

Pkg2016.2

**F.** Any claim for which the **ASSURED** may be held liable under any Workers' Compensation, unemployment compensation, disability benefits law, employers' liability or under any similar law; or to **BODILY INJURY** to any employee of the **ASSURED**; or to any liability for indemnity or contribution brought by any party against the **ASSURED** for **BODILY INJURY** to any employee of an **ASSURED**;

**G.** The cost of any investigation, disciplinary or criminal proceedings against an individual **ASSURED** except that Underwriters may, at their own option and expense, associate counsel in the defense of any such investigation, criminal or disciplinary proceeding. Should Underwriters elect to associate counsel, such elections shall not constitute a waiver or estoppel of any rights Underwriters may have pursuant to the terms, conditions, exclusions and limitations of this Policy;

**H.** Any claim arising from **WRONGFUL ACTS** and/or **EMPLOYMENT PRACTICE VIOLATIONS**;

**I.** Any claim arising from **LAW ENFORCEMENT ACTIVITIES**;

**J.** Any claim arising out of Medical Malpractice, but not to exclude **INCIDENTAL MEDICAL MALPRACTICE**.

### Coverage Section II General Liability –  Definitions

**1.** **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

    (a) of any lawsuit alleging **SEXUAL ABUSE;** or

    (b) of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

    (c) of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

    (d) of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

    (e) of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

    (f) that the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

**2.** **DEFENSE COSTS** means the expenses incurred for the investigation and defense of an **OCCURRENCE** or **SUIT** arising out of the **SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **SEXUAL HARASSMENTS** or **SEXUAL ABUSES** by one or more **ASSUREDS**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

**3.** **HOST LIQUOR LIABILITY** and/or **LIQUOR LIABILITY** means indemnification for the **ASSURED'S** liability for the sale or distribution of alcoholic beverage by reason of any local, State or Federal liquor control laws in force at the time of the **OCCURRENCE**.

4.    **INCIDENTAL MEDICAL MALPRACTICE** means **BODILY INJURY** or **PERSONAL INJURY** arising out of the rendering of or failure to render emergency and/or first aid medical services which shall be understood to include, but not limited to, the dispensing of medication and/or the administering of inoculations and/or blood tests and the like (i.e.: medicines/tests normally administered by a Healthcare Department that are preventative in nature and do not require advanced medical diagnosis) but where there are no overnight stays.

However, **INCIDENTAL MEDICAL MALPRACTICE** does not include services provided by:

(a)  a hospital or emergency room facility;

(b)  a physician, medical doctor, osteopath, chiropractor, resident, extern, or intern;

(c)  a psychiatrist;

(d)  a pharmacist;

(e)  a dentist, orthodontist, or periodontist.

5     **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, **PERSONAL INJURY, SEXUAL HARASSMENT** or **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES**, **PERSONAL INJURIES** or **SEXUAL HARASSMENT** or **SEXUAL ABUSE** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

## Coverage Section III AUTOMOBILE Liability

### Coverage Section III AUTOMOBILE Liability – Insuring Agreements

**A.** **AUTOMOBILE Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is obligated to pay by reason of the liability imposed upon the **ASSURED** by law or assumed by the **ASSURED** under contract or agreement, including non-owned and hired **AUTOMOBILES**, for damages direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, arising out of any **OCCURRENCE** on account of **BODILY INJURY** or **PERSONAL INJURY**, suffered or alleged to have been suffered by any person(s) or organization(s) and/or **PROPERTY DAMAGE**, arising out of the ownership, operation, maintenance or use of an **AUTOMOBILE**, occurring during the **PERIOD OF INSURANCE**.

**B.** **AUTOMOBILE MEDICAL PAYMENTS:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all reasonable **MEDICAL PAYMENTS** incurred by the **ASSURED** to others (except employees of the **ASSURED** injured in the course of their employment) as are necessary at the time of an **OCCURRENCE** on account of **BODILY INJURY** arising out of the ownership, operation, maintenance or use of an **AUTOMOBILE** occurring during the **PERIOD OF INSURANCE**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**C.** **Uninsured Motorist/Underinsured Motorist:** Uninsured/Underinsured Motorist Coverage is afforded in respect of any **OCCURRENCE** at least to the minimum extent required by the law of the State in which each owned or hired **AUTOMOBILE** is principally garaged. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**D.** **No Fault Insurance:** No Fault insurance is afforded in respect of any **OCCURRENCE** at least to the minimum extent required by the law of the State in which each owned or hired **AUTOMOBILE** is principally garaged. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**E.** **Garagekeeper's Legal Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay for loss or damage occurring during the **PERIOD OF INSURANCE** to **AUTOMOBILES** left in the **ASSURED'S** care for which the **ASSURED** is legally obligated. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **Garagekeeper's Legal Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section III Automobile Liability.**

### Coverage Section III AUTOMOBILE Liability – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section III AUTOMOBILE Liability** is limited to, and not to exceed the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage under this **Coverage Section III AUTOMOBILE Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section III AUTOMOBILE Liability – Exclusions

**In addition to General Policy – Exclusions, this Coverage Section does not insure against:**

**A.**    Any claims for damages, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of this Policy, whether or not a limit is stated in the **Schedule of Excess Limits of Insurance**;

**B.**    Any claim that is paid or is payable to or for the **ASSURED** under any Worker's Compensation, disability benefits law, employers' liability or under any similar law or to **BODILY INJURY** to any employee or to any liability for indemnity or contribution brought by any party for **BODILY INJURY** to any employee;

**C.**    Covered **AUTOMOBILES** used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity;

### Coverage Section III AUTOMOBILE Liability – Definitions

**1.**    **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES** or **PERSONAL INJURIES** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

**2.**    **ASSURED** means not only the **ASSURED** as defined in the **GENERAL POLICY DEFINITIONS**, but under this **Coverage Section III AUTOMOBILE Liability** also includes any person while using an owned or hired **AUTOMOBILE** with the permission of the **ASSURED**.

**Pkg2016.2**

**JA132**

## **Coverage Section IV Public Officials Miscellaneous Liability**

### **This is a Claims Made Section**

### **Coverage Section IV Public Officials Miscellaneous Liability – Insuring Agreements**

Coverage is provided for one or more of the coverage options in this Coverage Section only if a **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS** for each Coverage chosen.

**A.    Errors & Omissions:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of a **WRONGFUL ACT**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

This coverage applies only if a **CLAIM** for damages, because of a **WRONGFUL ACT**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **WRONGFUL ACT** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the based on or arising out of one **WRONGFUL ACT** shall be considered "first made" when the first of such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

**B.    Employment Practice Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of an **EMPLOYMENT PRACTICE VIOLATION**, including mental anguish resulting from an **EMPLOYMENT PRACTICE VIOLATION**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

This coverage applies only if a **CLAIM** for damages, because of an **EMPLOYMENT PRACTICE VIOLATION**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **EMPLOYMENT PRACTICE VIOLATION** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any. All **CLAIMS** based on or arising out of one **EMPLOYMENT PRACTICE VIOLATION** shall be considered "first made" when the first of such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

**C.    SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums for which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of **SEXUAL HARASSMENT** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** to an **ASSURED**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance.**

This coverage applies only if a **CLAIM** for damages, because of **SEXUAL HARASSMENT**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **SEXUAL HARASSMENT** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section. All **CLAIMS** based on or arising out of one **SEXUAL HARASSMENT** shall be considered first made when the first of such **CLAIMS** is made to the **ASSURED**, regardless of:

(a)   The number of persons **SEXUALLY HARASSED**;

(b)   The number of locations where the **SEXUAL HARASSMENT** occurred;

(c)   The number of acts of **SEXUAL HARASSMENT** prior to or after the first **CLAIM** is made; or

(d)   The period of time over which the **SEXUAL HARASSMENT** took place, whether the **SEXUAL HARASSMENT** is during, before or after the **PERIOD OF INSURANCE**. However, only acts of **SEXUAL HARASSMENT** that take place after the Retroactive Date and before the end of the **PERIOD OF INSURANCE** are covered.

Underwriters will not make payment for any loss, **CLAIM** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** in respect of actual or alleged **SEXUAL HARASSMENT** to an **ASSURED**. However, with respect only to this Insuring Agreement C., Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any **CLAIM** or **SUIT** for **SEXUAL HARASSMENT** against an **ASSURED** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a **CLAIM** or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT** against an **ASSURED**. This coverage forms part of the overall **SEXUAL HARASSMENT LIABILITY** limit and not in addition thereof as stated in the **Schedule of Specific Excess Limits of Insurance.**

D.   **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums for which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of **SEXUAL ABUSE** by past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** to an **ASSURED**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance.**

This coverage applies only if a **CLAIM** for damages, because of **SEXUAL ABUSE**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **SEXUAL ABUSE** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty   (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any.

All **CLAIMS** based on or arising out of one **SEXUAL ABUSE** shall be considered first made when the first of such **CLAIMS** is made to the **ASSURED**, regardless of:

Pkg2016.2

(a)  The number of persons **SEXUALLY ABUSED**;

(b)  The number of locations where the **SEXUAL ABUSE** occurred;

(c)  The number of acts of **SEXUAL ABUSE** prior to or after the first **CLAIM** is made; or

(d)  The period of time over which the **SEXUAL ABUSE** took place, whether the **SEXUAL ABUSE** is during, before or after the **PERIOD OF INSURANCE**. However, only acts of **SEXUAL ABUSE** that take place after the Retroactive Date and before the end of the **PERIOD OF INSURANCE** are covered.

Underwriters will not make payment for any loss, **CLAIM** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** in respect of actual or alleged **SEXUAL ABUSE** to an **ASSURED**. However, with respect only to this **Coverage Section IV Public Officials Miscellaneous Liability - Insuring Agreement D. SEXUAL ABUSE** liability. Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any **CLAIM** or **SUIT** for **SEXUAL ABUSE** against an **ASSURED** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a **CLAIM** or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker committed an act of **SEXUAL ABUSE** against an **ASSURED**. This coverage forms part of the overall **SEXUAL ABUSE LIABILITY** limit and not in addition thereof as stated in the **Schedule of Specific Excess Limits of Insurance.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same official, board or commission member, trustee, director, employee, or volunteer worker which occurred  after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than one hundred and twenty (120) consecutive days after the initial **DISCOVERY**, and in any event within sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or any Extended Reporting Period.  Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE CLAIM** or **CLAIMS**, irrespective of whether Underwriters have been prejudiced by said failure.

**<u>Coverage Section IV Public Officials Miscellaneous Liability – Specific Excess Limits of Insurance</u>**

Underwriters' **Specific Excess Limit of Insurance** per **CLAIM** for any coverage under **Coverage Section IV – Public Officials Miscellaneous Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION** as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this **Coverage Section IV Public Officials Miscellaneous Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

**<u>Coverage Section IV Public Officials Miscellaneous Liability – Conditions</u>**

**A.    Basic Extended Reporting Period:**

A Basic Extended Reporting Period is automatically provided without additional charge.  This period starts with the end of the **PERIOD OF INSURANCE**, and lasts for sixty (60) consecutive days.

If, however, this Policy and this Coverage Section is succeeded by similar Claims Made insurance coverage, with any insurer, on which the Retroactive Date is the same as or earlier than the Retroactive Date shown in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance** of this Policy, the succeeding Policy shall be deemed to be a renewal of this Policy, and the **ASSURED** shall have no right to an Extended Reporting Period from Underwriters.

The Basic Extended Reporting Period does not apply to **CLAIMS** that are covered under any subsequent insurance applicable to this Coverage Section which the **ASSURED** purchases, or that would have been covered but for exhaustion of the amount of  insurance applicable to such **CLAIMS**.

**B.    Supplemental Extended Reporting Period:**

Underwriters will provide an Extended Reporting Period, as described below, if:

(a)  This Policy or this Coverage Section of this Policy is cancelled or non-renewed;   or

(b)  Underwriters renew or replace this Policy, or this Coverage Section of this Policy, with insurance that does not apply to a **WRONGFUL ACT, EMPLOYMENT PRACTICE VIOLATION, SEXUAL HARASSMENT** or **SEXUAL ABUSE** on a Claims Made basis.

A Supplemental Extended Reporting Period of one (1) year duration is available but only by endorsement to this Policy and for an additional premium not to exceed 100% of the annual premium for this Coverage Section. This supplemental period starts when the Basic Extended Reporting Period ends.

The **ASSURED** must give Underwriters a written request for the endorsement within thirty (30) consecutive days after the end of the **PERIOD OF INSURANCE**. The Supplemental Extended Reporting Period will not go into effect unless the **ASSURED** pays the additional premium within thirty (30) consecutive days. This endorsement will set forth the terms consistent with the Coverage Section.

Underwriters shall determine the additional premium in accordance with its applicable rules, rates and underwriting practices. Coverage for **CLAIMS** received during such Supplemental Extended Reporting Period is excess over any other valid and collectible insurance available under any other policies.

Extended Reporting Periods do not reinstate or increase the applicable **SELF INSURED RETENTION,** the **LOSS FUND,** the applicable **Specific Excess Limit of Insurance,** or the **Excess Loss Fund Protection**.

Extended Reporting Periods do not extend the **PERIOD OF INSURANCE** or change the scope of coverage provided within this Coverage Section. They apply to **CLAIMS** arising out of a **WRONGFUL ACT, EMPLOYMENT PRACTICE VIOLATION, SEXUAL HARASSMENT** or **SEXUAL ABUSE** that take place before the end of the **PERIOD OF INSURANCE** that this Policy and this Coverage Section are in force. Once in effect, Extended Reporting Periods may not be canceled.

**C.**      **Reporting to Underwriters:**

For the purposes of compliance with the reporting requirements of this Coverage Section, the **ASSURED'S** reporting of a **CLAIM** to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** shall be considered reporting of the **CLAIM** to Underwriters, provided that:

(a) The **CLAIM** is reported to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** no later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or the applicable **Extended Reporting Period**, if any; and

(b) The **CLAIM**, if not otherwise reportable to Underwriters pursuant to **General Policy Condition 7**, appears on the **ASSURED'S** list of **CLAIMS** or loss run, as reported by the **THIRD PARTY CLAIM ADMINISTRATOR** to Underwriters, that includes all **CLAIMS** for the **PERIOD OF INSURANCE** or applicable **Extended Reporting Period**, if any.

### <u>Coverage Section IV Public Officials Miscellaneous Liability – Exclusions</u>

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.**      Any **CLAIM** for damages, whether direct or consequential, for **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE**; or for any cause of action which is covered under any other Coverage Section of this Policy;

**B.**      Any **CLAIM** based upon or attributable to any **ASSURED** gaining in fact any personal profit or advantage to which they were not legally entitled including remuneration paid in violation of law as determined by the Courts;

**C.**      Any **CLAIM** based upon or attributable to the rendering or failure to render any opinion, treatment, consultation or service unless acting within the scope of their duties as an **ASSURED**;

**D.**      Any **CLAIM** arising out of or in any way involving any employee benefit plan, except as covered under this **Coverage Section IV – Public Officials Miscellaneous Liability – Insuring Agreements B. Employment Practice Liability** for discrimination;

**E.**      **CLAIMS**, **SUITS**, proceedings, demands, or actions seeking relief or redress in any form other than monetary damages, including defense of same; or any loss, fees, costs or expenses which the **ASSURED** may be obligated to pay to any third-party as a result of any adverse judgment for declaratory relief or administrative relief or injunctive relief, except that this exclusion shall not apply to any **CLAIM** made to the Equal Employment Opportunity Commission (E.E.O.C.), or such similar federal, state or local administrative agency established to handle or adjudicate **EMPLOYMENT PRACTICE VIOLATIONS** that involve or arise from alleged employment discrimination other than **CLAIMS** brought under the federal Fair Labor Standards Act or similar state act or law;

**F.**      Any cost, civil fine, penalty or expense against any **ASSURED** arising from any complaint or enforcement action from any federal, state or local governmental regulatory agency;

**G.**      Any **CLAIM** for which an **ASSURED** is entitled to indemnity under any Policy or policies the term of which has expired prior to the inception date of this Policy, or for which an **ASSURED** would be entitled to indemnity except for the exhaustion of the limit of such prior insurance;

**H.**      Any **CLAIM** arising out of any pending or prior litigation or hearing, as well as future **CLAIMS** arising out of any pending or prior litigation or hearing. If this Policy is a renewal of a Policy issued by Underwriters, this exclusion shall only apply with respect to **CLAIMS** arising out of any pending

or prior litigation or hearing, prior to the effective date of the first Policy issued and continuously renewed by Underwriters.

**I.**     Any **CLAIM** brought as a counter-**CLAIM** or cross **CLAIM** by an **ASSURED** against any other **ASSURED** however, this exclusion does not apply to **EMPLOYMENT PRACTICE VIOLATIONS**;

**J.**     Any **CLAIM** alleging, based upon, arising out of or attributable to breach of any express, implied, actual or constructive contract, agreement, warranty, guarantee or promise, unless liability would have attached to the **ASSURED** even in the absence of such contract, agreement, warranty, guarantee or promise. However, this exclusion shall not apply to **CLAIMS** alleging violation of employment contracts brought by employees or officials;

**K.**     Any **CLAIM** for the return of money or property, other than **PROPERTY OF THE ASSURED**, that is being held by the **ASSURED**, or that is in the care, custody, or control of the **ASSURED**;

**L.**     Any **CLAIM** for the return of any fees, taxes, assessments, or other similar payments made to the **ASSURED.**

**M.**    Any **CLAIM** arising from **LAW ENFORCEMENT ACTIVITIES**.


### Coverage Section IV Public Officials Miscellaneous Liability – Definitions

**1.**     **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **WRONGFUL ACT, SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **WRONGFUL ACTS, SEXUAL HARASSMENT** or **SEXUAL ABUSE** by one or more **ASSUREDS**.

However, as respects to **EMPLOYMENT PRACTICE LIABILITY**, **CLAIM** means: all notices or **SUITS** demanding payment of money, or charges filed with the Equal Employment Opportunity Commission or comparable federal, state or local administrative agency based on, or arising out of the same **EMPLOYMENT PRACTICE VIOLATION** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS** by one or more **ASSUREDS**.

**2.**     **DEFENSE COSTS** means the expenses incurred for the investigation and defense of a **CLAIM** or **SUIT** arising out of the same **EMPLOYMENT PRACTICE VIOLATION, WRONGFUL ACT, SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS, WRONGFUL ACTS, SEXUAL HARASSMENTS** or **SEXUAL ABUSES** by one or more **ASSUREDS**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

**3.**     **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

(a)   Of any lawsuit alleging **SEXUAL ABUSE;** or

(b)   Of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

(c)   Of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

(d)   Of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

(e)  Of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

(f)  That the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

Pkg2016.2

### Coverage Section V Excess Workers' Compensation and Employers' Liability f o r a Qualified Self -Insurer

**Who is Insured**: Under this Coverage Section, the **NAMED ASSURED** as stated in the Declarations. If the **NAMED ASSURED** is a partnership or joint venture, each partner or member of the joint venture is insured only in the capacity as employer of employees of the partnership or joint venture.

### Coverage Section V Excess Workers' Compensation and Employers' Liability f o r a Qualified Self-Insurer SELF INSURED RETENTION and Specific Excess Limits of Insurance

**SELF INSURED RETENTION**: The **ASSURED** will pay all sums up to the amount stated in the **Schedule of SELF INSURED RETENTIONS**.

Underwriters will indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** resulting from any one **ACCIDENT** or disease for **Coverage Section V Workers' Compensation and Employers' Liability** for the **Specific Excess Limit of Insurance** stated in the **Schedule of Specific Excess Limits of Insurance** over the **SELF INSURED RETENTION** stated in the **Schedule of SELF INSURED RETENTIONS**. The **SELF INSURED RETENTION** and **Specific Excess Limit of Insurance** apply to sums paid by the **NAMED INSURED** as a Qualified Self Insurer of Workers' Compensation and Employers' Liability as follows:

(1)     To one or more employees because of **BODILY INJURY** or death in any one **ACCIDENT**.

(2)     To any one employee for **BODILY INJURY** or death by disease.

The most Underwriters will indemnify the **NAMED ASSURED** will not change regardless of the number of persons or organizations who are **ASSUREDS**, claims made or **SUITS** brought against any or all persons or organizations who are **ASSUREDS**, or persons or organizations making a claim or bringing a **SUIT**.

### Coverage Section V Part A Excess Workers' Compensation For a Qualified Self-Insurer – Insuring Agreements

**A.**   Underwriters agree to indemnify the **ASSURED** promptly when due for those sums that the **ASSURED** shall become legally obligated to pay as a Qualified Self-Insurer under **WORKERS' COMPENSATION LAW**, subject to the terms of this Policy, this Coverage Section and the exclusions that follow.

This insurance applies to **BODILY INJURY** by **ACCIDENT** or **BODILY INJURY** by disease including resulting death, provided:

(1)   The **BODILY INJURY** by **ACCIDENT** occurs during the **PERIOD OF INSURANCE** this Policy and this coverage are in force;   or

(2)   The **BODILY INJURY** by disease is caused or aggravated by the conditions of employment by the **ASSURED**. The employee's last day of last exposure to those conditions of that employment causing or aggravating such **BODILY INJURY** by disease must occur during the **PERIOD OF INSURANCE** this Policy and this coverage are in force.

**B.**   **Other STATES Excess Workers' Compensation Extension:** This coverage Extension applies in other **STATES** than the **STATE** of hire if an employee of the **ASSURED** is injured in such a **STATE** and if the work of such injured employee of the **ASSURED** was within the scope of such employee's

Pkg2016.2

employment, at the direction of the **ASSURED**, and was temporary and transitory in such other **STATE** provided the **ASSURED** is not insured a Qualified Self-Insurer in such other **STATE**.

All other terms, conditions and exclusions applicable to **Coverage Section V Part A Workers' Compensation** shall apply to this coverage Extension.

### Coverage Section V Part A Excess Workers' Compensation For a Qualified Self-Insurer – Exclusions

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.**   Any claims**,** whether direct or consequential, or any cause of action which is covered under any other Coverage Section of this Policy;

**B.**   Loss payable under the **WORKERS' COMPENSATION LAW** of any **STATE** if the **ASSURED** is protected from the loss by any other insurance;

**C.**   Punitive or exemplary claims because of:

(a)   **BODILY INJURY** to any employee;

(b)   The **ASSURED'S** conduct or the conduct of anyone acting for the **ASSURED** in investigation, trial or settlement, or failure to pay, or delay in payment of any Workers' Compensation claim;

(c)   The **ASSURED'S** failure to comply with any health or safety law or regulation or any **WORKERS' COMPENSATION LAW**;

**D.**   Any payments made by the **ASSURED** arising out of operations for which the **ASSURED** has rejected any **WORKERS' COMPENSATION LAW**;

**E.**   Any assessment made upon self-insurers, whether imposed by statute, regulation or otherwise.

### Coverage Section V Part B Employers' Liability – Insuring Agreement

Underwriters agree to indemnify the **ASSURED** promptly for **DAMAGES** that the **ASSURED** is legally obligated to pay as a Qualified Self-Insurer of Employers' Liability, subject to the terms of this Policy, this Coverage Section and the exclusions that follow.

This insurance applies to **BODILY INJURY** by **ACCIDENT** or disease which arises out of and in the course of the injured employee's employment by the **ASSURED**, provided:

(1)   The **BODILY INJURY** by **ACCIDENT** occurs during the period this Policy and this coverage are in force;   or

(2)   The **BODILY INJURY** by disease is caused or aggravated by the conditions of employment by the **ASSURED**.  The employee's last day of last exposure to those conditions of that employment causing or aggravating such **BODILY INJURY** by disease must occur during the period this Policy and this coverage are in force and employment by the **ASSURED** is necessary or incidental to work conducted by the **ASSURED** in the **STATE** of hire, or as covered under the **Coverage Section V Other STATES Excess Workers' Compensation Extension**.

### Coverage Section V Part B Employers' Liability – Exclusions

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

Pkg2016.2

A.  Any claims, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of this Policy;

B.  Liability assumed under a contract or agreement; however, this exclusion does not apply to a warranty that the **ASSURED'S** work will be done in a workmanlike manner;

C.  Punitive or exemplary **DAMAGES**;

D.  **BODILY INJURY** to an employee while employed in violation of law;

E.  **DAMAGES** arising out of operations for which the **ASSURED** or the **ASSURED'S** supervisory personnel have:

    (a)  Violated or failed to comply with any **WORKERS' COMPENSATION LAW**;

    (b)  Rejected any **WORKERS' COMPENSATION LAW**;

    (c)  Intentionally caused or aggravated **BODILY INJURY**;

F.  Any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

G.  **BODILY INJURY** occurring outside the United States of America, its territories or possessions. This exclusion does not apply to **BODILY INJURY** to a citizen or resident of the United States of America who is temporarily working outside of the United States of America, its territories or possessions for the **ASSURED**;

H.  Any obligation imposed by the:

    (a)  Merchant Marine Act of 1920 known as the Jones Act, 46 U.S. Code, Section 688, 1970;

    (b)  Federal Employers' Liability Act (F.E.L.A.), 45 U.S. Code, Sections 51-60, 1970;

    (c)  U.S. Longshoremen's and Harbor Workers' Compensation Act (U.S.L. & H. Act);

    (d)  Defense Base Act, U.S. Code (1946) Title 42, Sections 1651-54, Public Law. 77th Congress, as amended;

    (e)  Outer Continental Shelf Lands Act, U.S. Code (1946) Title 33, Sections 901-49 as extended by Act of August 7, 1953, Public Law 212, 83rd Congress; or Section 8171, Public Law 85-538, 85th Congress.

### Coverage Section V Excess Workers' Compensation and Employers' Liability f o r a Qualified Self -Insurer – Definitions

1.  **ACCIDENT** means each accident or **OCCURRENCE** or series of accidents or occurrences arising out of any one event. An **ACCIDENT** is deemed to end 72 hours after the event commences. Each subsequent 72 hours is deemed to be a separate **ACCIDENT** period. Disease means an **ACCIDENT** only if it results in **BODILY INJURY** directly caused from that **ACCIDENT**.

2.  **DAMAGES** means those amounts which the **ASSURED** is obligated to pay due to **BODILY INJURY** by **ACCIDENT** or disease for:

    (a)  Which the **ASSURED** is liable to a third party by reason of a claim, **SUIT**, or proceeding against the **ASSURED** to recover **DAMAGES** obtained from the third party;

Pkg2016.2

(b) Care and loss of services of an injured employee of the **ASSURED**;

(c) Consequential **BODILY INJURY** to a spouse, child, parent, brother or sister of the injured employee of the **ASSURED**;

provided such **DAMAGES** in (a), (b), and (c) above are the direct consequence of **BODILY INJURY** that arises out of and in the course of the injured employee's employment by the **ASSURED**;

(d) **BODILY INJURY** to an employee of the **ASSURED** arising out of and in the course of employment, claimed against the **ASSURED** in a capacity other than as employer.

3.  **STATE** means any **STATE** of the United States of America and the District of Columbia.

4.  **SUIT** means a civil proceeding in which **BODILY INJURY** is alleged.  **SUIT** includes:

    (a) An arbitration proceeding in which such **BODILY INJURY** is claimed and to which the **ASSURED** must submit,   or

    (b) Any other alternative dispute resolution proceeding in which such **BODILY INJURY** is claimed and to which the **ASSURED** submits to with Underwriters' consent.

5.  **WORKERS' COMPENSATION LAW** means the workers' or workmen's compensation law and occupational disease law of each **STATE** of hire, or as covered under **Coverage Section V Other STATES Excess Workers' Compensation** and includes any amendments to those laws which are in effect during the **PERIOD OF INSURANCE**. It does not include provisions of any law that provides non-occupational disability benefits.

**P**kg2016.2

## Coverage Section VI Employee Benefits Liability

### This is a Claims Made Section

### Coverage Section VI Employee Benefits Liability – Insuring Agreement

Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of a **NEGLIGENT ACT**, **ERROR OR OMISSION** committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

This coverage applies only if a **CLAIM** for damages, because of a **NEGLIGENT ACT**, **ERROR OR OMISSION**, is first made against the **ASSURED** during the **PERIOD OF INSURANCE**. The **NEGLIGENT ACT**, **ERROR OR OMISSION** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the **EXTENDED REPORTING PERIOD** applicable to this coverage, if any. All **CLAIMS** based on or arising out of one **NEGLIGENT ACT**, **ERROR OR OMISSION** shall be considered "first made" when the first of such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

### Coverage Section VI Employee Benefits Liability – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **CLAIM** for **Coverage Section VI Employee Benefits Liability** is limited to and not to exceed the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section VI Employee Benefits Liability –  Conditions

1.    **Basic Extended Reporting Period:**

A Basic Extended Reporting Period is automatically provided without additional charge.  This period starts with the end of the **PERIOD OF INSURANCE**, and lasts for sixty (60) consecutive days.

If, however, this Policy and this Coverage Section is immediately succeeded by similar Claims Made insurance coverage, with any insurer, on which the Retroactive Date is the same as or earlier than the Retroactive Date shown in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance** of this Policy, the succeeding Policy shall be deemed to be a renewal of this Policy, and the **ASSURED** shall have no right to an Extended Reporting Period from Underwriters.

The Basic Extended Reporting Period does not apply to **CLAIMS** that are covered under any subsequent insurance applicable to this Coverage Section which the **ASSURED** purchases, or that would have been covered but for exhaustion of the amount of  insurance applicable to such **CLAIMS**.

2. **Supplemental Extended Reporting Period:**

Underwriters will provide an Extended Reporting Period, as described below, if:

(a) This Policy or this Coverage Section of this Policy is canceled or non-renewed;  or

(b) Underwriters renew or replace this Policy, or this Coverage Section of this Policy, with insurance that does not apply to a **NEGLIGENT ACT, ERROR OR OMISSION** on a Claims Made basis.

A Supplemental Extended Reporting Period of one (1) year duration is available but only by endorsement to this Policy and for an additional premium not to exceed 100% of the annual premium for this Coverage Section. This supplemental period starts when the Basic Extended Reporting Period ends.

The **ASSURED** must give Underwriters a written request for the endorsement within thirty (30) consecutive days after the end of the **PERIOD OF INSURANCE**. The Supplemental Extended Reporting Period will not go into effect unless the **ASSURED** pays the additional premium within thirty (30) consecutive days. This endorsement will set forth the terms consistent with the Coverage Section.

Underwriters shall determine the additional premium in accordance with its applicable rules, rates and underwriting practices. Coverage for **CLAIMS** received during such Supplemental Extended Reporting Period is excess over any other valid and collectible insurance available under any other policies.

Extended Reporting Periods do not reinstate or increase the applicable **SELF INSURED RETENTION**, the **LOSS FUND**, the applicable **Specific Excess Limit of Insurance**, or the **Excess Loss Fund Protection**.

Extended Reporting Periods do not extend the **PERIOD OF INSURANCE** or change the scope of coverage provided within this Coverage Section. They apply to **CLAIMS** arising out of a **NEGLIGENT ACT, ERROR OR OMISSION** that take place before the end of the period that this Policy and this Coverage Section are in force.  Once in effect, Extended Reporting Periods may not be canceled.

3. **Reporting to Underwriters:**

For the purposes of compliance with the reporting requirements of this Coverage Section, the **ASSURED'S** reporting of a **CLAIM** to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** shall be considered reporting of the **CLAIM** to Underwriters, provided that:

(a) The **CLAIM** is reported to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** no later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or the applicable Extended Reporting Period, if any; and

(b) The **CLAIM**, if not otherwise reportable to Underwriters pursuant to **GENERAL POLICY CONDITION 7**, appears on the **ASSURED'S** list of **CLAIMS** or loss run, as reported by the **THIRD PARTY CLAIM ADMINISTRATOR** to Underwriters, that includes all **CLAIMS** for the **PERIOD OF INSURANCE** or applicable Extended Reporting Period, if any.

## <u>Coverage Section VI Employee Benefits Liability – Exclusions</u>

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

Pkg2016.2

A.  Any **CLAIM** for damages, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of the Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

B.  Any **NEGLIGENT ACT, ERROR OR OMISSION** by, or at, the direction of the **ASSURED** that are dishonest, fraudulent, criminal or malicious;

C.  **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE**;

D.  Any **CLAIM** based upon the **ASSURED'S** failure to comply with the federal Employee Retirement Income Security Act of 1974 (ERISA), including subsequent amendments or any similar federal, state or local law(s) or regulations;

E.  Any **CLAIM** for failure of performance of a contract by any **ASSURED**, Insurer or Self Insurer;

F.  Any **CLAIM** based upon the **ASSURED'S** failure to comply with any law concerning worker's compensation, unemployment insurance, social security, or disability benefits;

G.  Any **CLAIM** based upon failure of investments, including but not limited to, stocks, bonds, funds, to perform as represented by an **ASSURED**;

H.  Any **CLAIM** based upon advice given by an **ASSURED** to participate or not participate in any stock subscription plans;

I.  Any **CLAIM** arising out of actual or alleged discrimination including but not limited to discrimination based on race or national origin, religion or creed, age, sex, physical disability, military status, or employment practices whether or not any of the foregoing violated any federal, state or local government law(s) or regulation(s) prohibiting such discrimination.

**<u>Coverage Section VI Employee Benefits Liability – Definitions</u>**

1.  **ADMINISTRATION** means:

    (a)  Giving counsel to employees with respect to **EMPLOYEE BENEFIT PROGRAMS**;

    (b)  Interpreting **EMPLOYEE BENEFIT PROGRAMS**;

    (c)  Handling of records in connection with **EMPLOYEE BENEFIT PROGRAMS**; and

    (d)  Effecting enrollment, termination, or cancellation of employees under **EMPLOYEE BENEFIT PROGRAMS**;

    Provided all such acts are authorized by the **NAMED ASSURED**.

2.  **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **NEGLIGENT ACT, ERROR OR OMISSION** or a series of related **NEGLIGENT ACTS, ERRORS OR OMISSIONS** by one or more **ASSUREDS**.

3.  **NEGLIGENT ACT, ERROR OR OMISSION** means the failure to execute required actions, or mistaken actions committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

    All **CLAIMS** based on or arising out of the same **NEGLIGENT ACT, ERROR OR OMISSION** or a series of related **NEGLIGENT ACTS, ERRORS OR OMISSIONS** by one or more **ASSUREDS** shall be deemed one **NEGLIGENT ACT, ERROR OR OMISSION**.  Only one Policy, one **SELF**

Pkg2016.2

**INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **NEGLIGENT ACT, ERROR OR OMISSION**.

Pkg2016.2

## Coverage Section VII Crime

### Coverage Section VII Crime – Insuring Agreement

Coverage is provided for one or more of the coverage options in this Coverage Section only if a **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS** for each Coverage chosen.

Coverage in this Section is for loss or damage caused by the Perils Covered in each Coverage Section.

### Coverage Section VII Crime – Specific Excess of Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section VII – Crime** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance.**

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance.**

In the event more than one Coverage Subsection could apply to a loss for which coverage is provided in this Coverage Section, only the **SELF INSURED RETENTION** for the Coverage Subsection that results in the largest **ULTIMATE NET LOSS** will be applied.

### Coverage Section VII Crime – MONEY and SECURITIES

A.  **MONEY and SECURITIES Coverage:** Underwriters will indemnify the **NAMED ASSURED** for loss of **MONEY** or **SECURITIES** owned by the **NAMED ASSURED** or for which the **ASSURED** is liable as a direct result of loss or damage caused by the Perils insured occurring during the **PERIOD OF INSURANCE** whilst inside the **PREMISES** or in **BANKING PREMISES**.

      1. **PERILS INSURED:**

    (a)  **THEFT**
    (b)  Disappearance
    (c)  Destruction
    (d)  **BURGLARY**
    (e)  **ROBBERY**
    (f)  **COMPUTER THEFT**

B.  **MONEY and SECURITIES Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Coverage Subsection for:

1.  Damage to, a safe, vault, cash register, cash box or cash drawer located inside the **PREMISES** resulting directly from an actual or attempted **THEFT** of; or unlawful entry into such containers;

2.  Loss of **MONEY** or **SECURITIES** outside the **PREMISES** in the care and custody of a **MESSENGER**;

3.  Loss of **MONEY** or **SECURITIES** outside the **PREMISES** in the care and custody of an armored vehicle company. However, the **NAMED ASSURED** will be indemnified only the amount of loss that the **NAMED ASSURED** cannot recover:

Pkg2016.2

    (a)    Under the **NAMED ASSURED'S** contract with the armored motor vehicle company; and

    (b)    From any insurance or indemnity carried by, or for the benefit of customers of the armored motor vehicles company.

**C.**    **Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to, **MONEY** or **SECURITIES** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

### Coverage Section VII Crime – MONEY and SECURITIES Exclusions

In addition to **Coverage Section VII Crime – Exclusions**, and the **General Policy Exclusions**, there is no coverage under **MONEY and SECURITIES** for:

**A.**    Loss of **MONEY** or **SECURITIES** after they have been transferred or surrendered to a person or place outside the **PREMISES** based upon unauthorized instructions or as a result of a threat to do bodily harm or damage to any property;

    But, this exclusion does not apply to loss of **MONEY** or **SECURITIES** while outside the **PREMISES** or in **BANKING PREMISES** or in the care and custody of a **MESSENGER** if the **ASSURED**:

    (a)    Had no knowledge of any threat at the time the conveyance began; or

    (b)    Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

    **1.**    Loss resulting from the giving or surrendering of property in any exchange or purchase;

    **2.**    Loss of property in any **MONEY** operated device unless the amount of **MONEY** deposited in it is recorded by a continuous recording instrument in the device;

    **3.**    Loss resulting from **DISHONEST ACTS** of any of the **NAMED ASSURED'S EMPLOYEES**.

### Coverage Section VII Crime – MONEY and SECURITIES Definitions:

**1.**    **BANKING PREMISES** means the interior of that portion of any building occupied by a banking institution, similar safe depository, automatic teller machine (ATM), or similar banking device.

**2.**    **BURGLARY** means the taking of **MONEY** or **SECURITIES** from inside the **PREMISES** by a person unlawfully entering or leaving the **PREMISES** as evidenced by marks of forcible entry or exit.

**3.**    **COMPUTER THEFT** means **THEFT** of **MONEY** or **SECURITIES** following and directly related to the use of any computer to fraudulently cause a transfer of that **MONEY** or **SECURITIES** from inside the **PREMISES** or **BANKING PREMISES** to a person (other than a **MESSENGER**) outside those **PREMISES** or to a place outside those **PREMISES**.

**4.**    **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

**5.**    **EMPLOYEE(S)** means any person:

(a) While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

(b) Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

6.  **MESSENGER** means the **ASSURED** while having care and custody of the **MONEY** or **SECURITIES** outside the **PREMISES**.

7.  **MONEY** means:

(a) Currency, coins, and bank notes in current use and having a face value; and

(b) Travelers checks, register checks and **MONEY** orders held for sale to the public.

But **MONEY** does not include **SECURITIES**.

8.  **OCCURRENCE** means an act or series of related acts involving one or more persons; or an act or event, or a series of related acts or events not involving any person.

9.  **PREMISES** means the interior of that portion of any building that the **ASSURED'S** occupies in conducting the **ASSURED'S** business.

10. **ROBBERY** means the taking of **MONEY** or **SECURITIES** from the care and custody of a person by one who has:

(a) Caused or threatened to cause that person bodily harm; or

(b) Committed an obviously unlawful act witnessed by that person.

11. **SECURITIES** means negotiable and non-negotiable instruments or contracts representing either **MONEY** or other property and includes:

(a) Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

(b) Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **ASSURED**.

But **SECURITIES** does not include **MONEY**.

12. **THEFT** means any act of stealing.


### Coverage Section VII Crime – Forgery or Alteration


A.  **Forgery or Alteration Coverage:** Underwriters will indemnify the **NAMED ASSURED** for loss involving **INSTRUMENTS** resulting directly from the Perils insured, occurring during the **PERIOD OF INSURANCE**.

1.  **PROPERTY COVERED: INSTRUMENTS**

2.  **Perils Insured:** Forgery or alteration of, on, or in any **INSTRUMENT**.

B.  **Forgery or Alteration Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Section for loss due to the **ASSURED'S** good faith acceptance of:

Pkg2016.2

1.  Any United States or Canadian post office, express company, or national or state (or Canadian) chartered bank money order that is not paid upon presentation to the issuer; or

2.  Counterfeit United States or Canadian paper currency;

3.  In exchange for merchandise, money or services or as part of a normal business transaction.

**C.**   **Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to **PROPERTY COVERED** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

**D.**   **Facsimile Signatures:** Mechanically reproduced facsimile signatures will be treated the same as handwritten signatures.

**E.**   **Proof of Loss:** The **NAMED ASSURED** must include with proof of loss, any covered **INSTRUMENT** involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

### Coverage Section VII Crime – Forgery or Alteration Exclusions

**A.**   Loss resulting from **DISHONEST ACTS** of any of the **NAMED ASSURED'S EMPLOYEES**.

### Coverage Section VII Crime – Forgery or Alteration Definitions

**1.**   **INSTRUMENTS** means checks, drafts, promissory notes, or similar written promises, orders or directions to pay a certain sum in money that are:

(a)  Made or drawn by or drawn upon the **NAMED ASSURED**;

(b)  Made or drawn by one acting as the **NAMED ASSURED'S** agent; or that are purported to have been so made or drawn.

**2.**   **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

**3.**   **EMPLOYEE(S)** means any person:

(a)  While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

(b)  Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

**4.**   **OCCURRENCE** means all loss caused by a person or in which that person is involved, whether the loss involves one or more **covered INSTRUMENTS**.

### Coverage Section VII Crime – EMPLOYEE Dishonesty

**A.**   **EMPLOYEE Dishonesty Coverage:** Underwriters will indemnify the **NAMED ASSURED** for the loss of or damage to Real or business Personal Property, including **MONEY** and **SECURITIES**, and

Pkg2016.2

**INSTRUMENTS** owned or held by the **NAMED ASSURED**, or for which the **NAMED ASSURED** is liable, occurring during the **PERIOD OF INSURANCE**.

1. **PROPERTY COVERED:** Real or business Personal Property, including **MONEY** and **SECURITIES**, and **INSTRUMENTS** owned or held by the **NAMED ASSURED**, or for which the **NAMED ASSURED** is liable.

2. **Perils Covered:** Direct loss of or damage to **PROPERTY COVERED** resulting from **DISHONEST ACTS** committed by any of the **NAMED ASSURED'S EMPLOYEES**, acting alone or in collusion with other persons, which occur within the **PERIOD OF INSURANCE**.

B. **EMPLOYEE Dishonesty Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Coverage Subsection for loss caused to the **NAMED ASSURED** through failure of any of the **NAMED ASSURED'S EMPLOYEES,** acting alone or in collusion with others and occurring during the **PERIOD OF INSURANCE** to perform faithfully his or her duties as prescribed by law or to account properly for all monies and property received by virtue of his or her position of employment when such failure has as its direct and immediate result a loss of **PROPERTY COVERED**.

C. **Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to **PROPERTY COVERED** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

D. **EMPLOYEE Dishonesty Supplemental Coverage:** The Supplemental Coverage applies only if this **EMPLOYEE Dishonesty Coverage** renews prior dishonesty coverage and is effective on the expiration or termination date of the prior coverage.

   Underwriters will indemnify the **ASSURED** for loss that would have been covered by the prior insurance, except that the time to discover the loss had expired, and which would be covered by this Policy had it been in effect when the acts or events causing the loss or damage occurred. This coverage is limited to the lesser of the limits applicable to the prior insurance or the **Specific Excess Limit of Insurance** of this coverage. This Supplemental Coverage is part of, and not in addition to the **Specific Excess Limit of Insurance** for **EMPLOYEE Dishonesty Coverage**.

E. **Loss Payment:** The **Specific Excess Limit of insurance** shown is the most that will be paid for an **OCCURRENCE** even though it may occur over more than one **PERIOD OF INSURANCE**.

**Coverage Section VII Crime –  EMPLOYEE Dishonesty Exclusions**

In addition to **Coverage Section VII Crime – Exclusions**, and the **General Policy Exclusions**, there is no coverage under this Coverage Subsection **EMPLOYEE Dishonesty** for:

A. Damage where the only proof of the loss or amount of the loss is dependent upon an inventory or a profit and loss computation;

B. Any part of a loss involving any **EMPLOYEE** occurring after discovery of any fraudulent or **DISHONEST ACTS** committed by the **EMPLOYEE** whether before or after being employed by the **ASSURED**.  This only includes discovery by an **ASSURED** not in collusion with the **EMPLOYEE**;

C. Loss that is not discovered within one (1) year after the end of the **PERIOD OF INSURANCE**;

D. Legal expenses or any indirect loss.

## Coverage Section VII Crime – EMPLOYEE Dishonesty Definitions:

1. **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

2. **EMPLOYEE(S)** means any person:

   (a) While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

   (b) Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

3. **INSTRUMENTS** means checks, drafts, promissory notes, or similar written promises, orders or directions to pay a certain sum in **MONEY** that are:

   (a) Made or drawn by or drawn upon the **NAMED ASSURED**;

   (b) Made or drawn by one acting as the **NAMED ASSURED'S** agent; or that are purported to have been so made or drawn.

4. **MONEY** means:

   (a) Currency, coins, and bank notes in current use and having a face value; and

   (b) Travelers checks, register checks and **MONEY** orders held for sale to the public.

   But **MONEY** does not include **SECURITIES**.

5. **OCCURRENCE** means all loss or damage caused by **DISHONEST ACTS**, whether involving one or more **EMPLOYEES**, or as the result of a single act or series of acts.

6. **SECURITIES** mean negotiable and non-negotiable **INSTRUMENTS** or contracts   representing either **MONEY** or other property and includes:

   (a) Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   (b) Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **ASSURED**.

   But **SECURITIES** does not include **MONEY**.

## Coverage Section VII Crime – Conditions

Extensions in coverage do not increase, but just form part of, Underwriters' **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

1. **No Benefit to Bailee:** The Insurance afforded herein shall not inure directly or indirectly to the benefit of any carrier or other Bailee for hire.

2. **Valuation:**

   (a) **MONEY:** Face value.

Pkg2016.2

(b) **SECURITIES:** actual cash value at the close of business on the day the loss was discovered.

**3.    Property other than MONEY and SECURITIES:**  actual cash value at the time of loss with deduction for depreciation. The valuation is limited to the cost to repair or replace with property of equivalent kind and quality, to the extent practicable.

<u>**Coverage Section VII Crime –  Exclusions**</u>

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

A.    Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of the Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

B.    Loss resulting from accounting or arithmetical errors or omissions;

C.    Loss resulting from an **ASSURED'S**, or anyone acting on an **ASSURED'S** express or implied authority, being induced by any **DISHONEST ACT** to voluntarily part with title to or possession of any property;

D.    Any loss, caused by order of any civil authority, including seizure, confiscation or destruction of property, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

Pkg2016.2

## Coverage Section VIII Law Enforcement Liability

### Coverage Section VIII Law Enforcement Liability – Insuring Agreements

**A.**   **Law Enforcement Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law for damage, direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY** or **PROPERTY DAMAGE** or the loss of use thereof suffered or alleged to have been suffered by any person(s) or organization(s) resulting from **LAW ENFORCEMENT ACTIVITIES**, including **INCIDENTAL MEDICAL MALPRACTICE** and **MOONLIGHTING** arising out of an **OCCURRENCE** during the **PERIOD OF INSURANCE**.

**B.**   **Reimbursement of DEFENSE COSTS incurred prior to denial or declination of coverage:** With respect only to this Coverage Section and **Insuring Agreement A. Law Enforcement Liability**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any claim or **SUIT** for which coverage is denied based solely upon Coverage Section VIII Law Enforcement Exclusions B, Underwriters will indemnify the **ASSURED** for all reasonable **DEFENSE COSTS** arising out of an **OCCURRENCE** to the extent such **DEFENSE COSTS** are incurred prior to the date on which said declination of coverage is communicated to the **ASSURED**.

**C.**   **SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS** for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, arising out of an **OCCURRENCE** resulting from any actual or alleged acts by past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons of **SEXUAL HARASSMENT** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for any past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL HARASSMENT**; however, with respect only to this **Coverage Section VIII Insuring Agreement C.** Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL HARASSMENT** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED** only, Underwriters will indemnify that law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT**. Coverage only applies if the act of **SEXUAL HARASSMENT** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT Liability** is stated in the **Schedule**

Pkg2016.2

of Specific Excess Limits of Insurance and the Schedule of SELF INSURED RETENTIONS under **Coverage Section VIII LAW ENFORCEMENT ACTIVITIES.**

**D.**   **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS** for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, arising out of an **OCCURRENCE** resulting from any actual or alleged acts by any past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons of **SEXUAL ABUSE** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL ABUSE**; however, with respect only to this **Coverage Section VIII Insuring Agreement D**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL ABUSE** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED** only, Underwriters will indemnify that law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that law enforcement official, officer, auxiliary officer, employee or volunteer committed of the **NAMED ASSURED** an act of **SEXUAL ABUSE**. Coverage only applies if the act of **SEXUAL ABUSE** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons which occurred after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than 120 consecutive days after the initial **DISCOVERY**, and in any event within the **PERIOD OF INSURANCE** or sixty (60) consecutive days after the expiration of the **PERIOD OF INSURANCE** during which the **OCCURRENCE** of **SEXUAL ABUSE** first took place; whichever is later. Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE** claim or claims, irrespective of whether Underwriters have been prejudiced by said failure.

Pkg2016.2

**Coverage Section VIII Law Enforcement Liability – Specific Excess Limits of Insurance**

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section VIII Law Enforcement Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of **Schedule of Specific Excess Limits of Insurance.**

**Coverage Section VIII Law Enforcement Liability – Exclusions**

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.**  Any **CLAIM** for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance;**

**B.**  Any **CLAIM** or **SUIT** for **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY**, including any award of attorney's fees and costs, resulting from:

(a)  Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or

(b)  Any knowing and intentional deprivation of any rights protected under the United  States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or

(c)  Any act which is not reasonably related to the execution and/or enforcement of the law; or

(d)  Any act committed with the knowledge and intent to cause **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY**, or which could reasonably be expected to cause **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

However, Exclusion B. shall not apply to:

i.  Any liability on the part of the **NAMED ASSURED,** including liabilities from negligent hiring, training or supervision, arising out of an act by any other **ASSURED** resulting from **LAW ENFORCEMENT ACTIVITIES** and excluded herein, but this provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an **ASSURED**.

ii.  **Coverage Section VIII Law Enforcement Liability – Insuring Agreement C. SEXUAL HARASSMENT Liability** and **Coverage Section VIII Insuring Agreement D. SEXUAL ABUSE LIABILITY**; but only to the extent that coverage for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** is specifically given, and only if a **SUBLIMIT** for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** coverage is stated in the **Schedule of Specific Excess Limits of Insurance.**

**C.**  Liability arising out of the ownership, maintenance or use, including loading or unloading, of watercraft over 50 feet;

Pkg2016.2

D.   Damage to or destruction of **PROPERTY OF THE ASSURED**;

E.   Liability arising out of the ownership, maintenance, loading or unloading, use or operations of any aircraft including **UNMANNED AIRCRAFT**, airfields, runways, hangars, buildings or other properties in connection with aviation activities;

F.   Any obligation for which the **ASSURED** may be held liable under any Workers' Compensation, unemployment compensation, disability benefits law, employers' liability or under any similar law; or to **BODILY INJURY** to any employee of the **ASSURED**; or to any liability for indemnity or contribution brought by any party against the **ASSURED** for **BODILY INJURY** to any employee of an **ASSURED**;

G.   The cost of any investigation, disciplinary or criminal proceedings against an individual **ASSURED** except that Underwriters may, at their own option and expense, associate counsel in the defense of any such investigation, criminal or disciplinary proceeding. Should Underwriters elect to associate counsel, such elections shall not constitute a waiver or estoppel of any rights Underwriters may have pursuant to the terms, conditions, exclusions and limitations of this Policy;

H.   Any **CLAIM** arising from **WRONGFUL ACTS** except as provided under this Section for Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITIES**;

I.   **CLAIMS**, **SUITS**, proceedings, demands, or actions seeking relief or redress in any form other than monetary damages, including defense of same; or any loss, fees, costs or expenses which the **ASSURED** may be obligated to pay to any third-party as a result of any adverse judgment for declaratory relief or administrative relief or injunctive relief, including **CLAIMS** brought under the federal Fair Labor Standards Act or similar state act or law;

### Coverage Section VIII Law Enforcement Liability – Definitions

1.   **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **OCCURRENCE** or a series of related **OCCURRENCES** by one or more **ASSUREDS**.

2.   **DEFENSE COSTS** mean the expenses incurred for the investigation and defense of a **CLAIM** or **SUIT** alleging **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE, SEXUAL HARASSMENT** or **SEXUAL ABUSE** resulting only from **LAW ENFORCEMENT ACTIVITIES**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

3.   **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

   (a)   Of any lawsuit alleging **SEXUAL ABUSE;** or

   (b)   Of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

   (c)   Of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

   (d)   Of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

Pkg2016.2

(e)   Of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

(f)   That the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

4.   **INCIDENTAL MEDICAL MALPRACTICE** means **BODILY INJURY** or **PERSONAL INJURY** arising out of the rendering of or failure to render emergency and/or first aid medical services which shall be understood to include, but not limited to, the dispensing of medication and/or the administering of inoculations and/or blood tests and the like (i.e.: medicines/tests normally administered by a Healthcare Department that  are preventative in nature and do not require advanced medical diagnosis) but where there are no overnight stays in a medical facility. However, **INCIDENTAL MEDICAL MALPRACTICE** does not include services provided by:

(a)   A hospital or emergency room facility;

(b)   A physician, medical doctor, osteopath, chiropractor, resident, extern, or intern;

(c)   A psychiatrist;

(d)   A pharmacist;

(e)   A dentist, orthodontist, or periodontist.

5.   **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, **PERSONAL INJURY, SEXUAL HARASSMENT** or **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES**, **PERSONAL INJURIES** or **SEXUAL HARASSMENT** or **SEXUAL ABUSE** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

6.   **MOONLIGHTING** means any other employment, or extra-duty assignment that enforces the law or protects persons or property, approved by the **NAMED ASSURED'S** police department, sheriff agency, or other law enforcement organization.

## Coverage Section IX Terrorism

### Coverage Section IX Terrorism – Insuring Agreements

Coverage is provided for one or more of the Coverage Subsections in this Coverage Section only if a corresponding **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS**.

Coverage in this Section is for loss or damage caused by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, as defined herein per coverage section.

### Coverage Section IX Terrorism – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** or claim for **Coverage Section IX Terrorism** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance,** over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any Coverage Subsection under this Coverage Section, the total Aggregate **EXCESS LIMIT OF INSURANCE** for such Coverage Subsection under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Subsection of the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section IX Terrorism – Property Terrorism

**Property Terrorism Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for physical loss or physical damage by an **OCCURRENCE**, **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, as herein defined, occurring during the **PERIOD OF INSURANCE** to all Real and Personal Property, wherever located, and identified in Schedules on file with Underwriters (hereinafter referred to as the "Schedule").

This Policy also covers, within the sum insured, expenses incurred in the removal of debris of property covered hereunder which may be directly destroyed or damaged by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**. The cost of removal of debris shall not be considered in determination of the valuation of the property covered.

### Coverage Section IX – Terrorism – Property Terrorism Conditions

1. **Protection Maintenance:** It is agreed that any protection provided by the **ASSURED** for the safety of the insured property shall be maintained in good order throughout the currency of this Policy and shall be in use at all relevant times, and that such protection shall not be withdrawn or varied to the detriment of the interests of Underwriters without their consent.

2. **Valuation:** It is understood that, in the event of loss or damage, settlement shall be based upon the cost of repairing, replacing or reinstating (whichever is the least) on the same site, or nearest available site (whichever incurs the least cost) with material of like kind and quality without deduction for depreciation, subject to the following provisions: -

   (a) The repairs, replacement or reinstatement (all hereinafter referred to as "replacement") must be executed with due diligence and dispatch;

(b) Until replacement has been effected the amount of liability under this Policy in respect of loss shall be limited to the **ACTUAL CASH VALUE**, as defined under **Coverage Section I Property**, at the time of loss;

(c) If replacement with material of like kind and quality is restricted or prohibited by any by-laws, ordinance or law, any increased cost of replacement due thereto shall not be covered by this Policy.

Underwriters' liability for loss under this Policy including this Condition shall not exceed the smallest of the following amounts: -

(i) The amount of the Policy applicable to the destroyed or damaged property;

(ii) The replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use;

(iii) The amount actually and necessarily expended in replacing said property or any part thereof.

3. **Proof of Loss:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the **OCCURRENCE** of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

## Coverage Section IX Terrorism – Property Terrorism Exclusions

**In addition to General Policy Exclusions, this Coverage subsection does not insure against:**

A. Loss or damage arising directly or indirectly from nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination may have been caused.

B. Loss or damage occasioned directly or indirectly by war, invasion or warlike operations (whether war be declared or not), hostile acts of sovereign or government entities, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power or martial law or confiscation by order of any Government or public authority.

C. Loss by seizure or illegal occupation.

D. Loss or damage caused by confiscation, requisition, detention, legal or illegal occupation, embargo, quarantine, or any result of any order of public or government authority which deprives the **ASSURED** of the use or value of the **PROPERTY OF THE ASSURED**, nor for loss or damage arising from acts of contraband or illegal transportation or illegal trade.

E. Loss or damage directly or indirectly arising from or in consequence of the discharge of pollutants or contaminants, which pollutants and contaminants shall include but not be limited to any solid, liquid, gaseous or thermal irritant, contaminant of toxic or hazardous substance or any substance the presence, existence or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

F. Loss or damage by chemical or biological release or exposure of any kind.

Pkg2016.2

G.  Loss or damage by attacks by electronic means (cyber) including computer hacking or the introduction of any form of computer virus.

H.  Loss or damage caused by vandals or other persons acting maliciously or by way of protest or strikes, riots or civil commotion unless physical loss or damage is caused directly by an Act or series of Acts of Terrorism.

I.  Loss or increased cost occasioned by any Public or Civil Authority's enforcement of any ordinance or law regulating the reconstruction, repair or demolition of any property insured hereunder which was not applicable prior to the Loss.

J.  Any consequential loss or damage caused by any other ensuing cause, except where such ensuing cause is directly caused by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, or where business interruption coverage is provided in addition to this Policy.

K.  Loss of use, delay or loss of markets, however caused or arising, and despite any preceding loss insured hereunder.

L.  Loss or damage caused by cessation, fluctuation or variation in, or insufficiency of, water, gas or electricity supplies and telecommunications of any type or service.

M.  Loss or increased cost as a result of threat or hoax, in the absence of physical damage due to an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**.

N.  Loss or damage caused by or arising out of burglary, house - breaking, theft or larceny or caused by any person taking part therein.

O.  Loss or damage caused to the following property:

   (a)  Land or Land Values.

   (b)  Power Transmission or feeder lines unless such Power Transmission or feeder lines are the responsibility of the **ASSURED**.

   (c)  Aircraft or any other Aerial device, or watercraft.

   (d)  Any land conveyance, including vehicles, locomotives or rolling stock, unless such land conveyance is declared hereon and solely whilst located at the property insured herein at the time of its damage.

   (e)  Animals, plants and living things of all types.

## Coverage Section IX Terrorism –  Property Terrorism Definitions

1.  **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.  **OCCURRENCE** shall mean any one loss and/or series of losses arising out of and directly occasioned by one **ACT** or series of **ACTS OF TERRORISM** for the same purpose or cause. The duration and extent of any one **OCCURRENCE** shall be limited to all losses sustained by the **ASSURED** at the property insured herein during any period of seventy-two (72) consecutive hours arising out of the same purpose or cause. However no such period of seventy-two (72) consecutive hours may extend beyond the expiration of this Policy unless the **ASSURED** shall first sustain direct

Pkg2016.2

physical loss or damage by an **ACT** or series of **ACTS OF TERRORISM** prior to expiration and within said period of seventy-two (72) consecutive hours nor shall any period of seventy-two (72) consecutive hours commence prior to the attachment of this Policy.

<u>**Coverage Section IX Terrorism – Liability Terrorism**</u>

This is a claims made and reported Coverage Subsection. This means that, subject to the terms and conditions of this Coverage Subsection, the coverage provided by this Coverage Subsection only covers claims first made against the **ASSURED** or a circumstance which could reasonably be expected to give rise to a claim during the period of insurance and reported to Underwriters in writing as soon as reasonably possible and in no event longer than sixty (60) consecutive days after the expiry of this Policy. **CLAIMS EXPENSES** that are incurred in defending any claim against the **ASSURED** will reduce, and may completely exhaust, the Limit of Liability available to pay damages. Please review the coverage provided by this Coverage Subsection carefully and discuss the coverage with your insurance agent or broker.

**Liability Terrorism Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for any damages and **CLAIMS EXPENSES** which the **ASSURED** shall become legally liable to pay because of any claim or claims for **BODILY INJURY** and/or **PROPERTY DAMAGE**, first made against the **ASSURED** during the **PERIOD OF INSURANCE** and reported to Underwriters in writing no later than sixty (60) consecutive days after the expiry of this Policy, caused by an **ACT OF TERRORISM** and/or **SABOTAGE** occurring during the **PERIOD OF INSURANCE.** This cover is subject to the terms, conditions and exclusions stated in this Policy.

Multiple **ACTS OF TERRORISM** and/or **SABOTAGE** which occur within a period of seventy-two (72) consecutive hours and which have or appear to have a related purpose or common leadership will be deemed to be one **ACT OF TERRORISM** and/or **SABOTAGE**.

All claims arising out of the same or a continuing **ACT OF TERRORISM** and/or **SABOTAGE**, including **ACTS OF TERRORISM** and/or **SABOTAGE** which have or appear to have a related purpose or common leadership, within a period of seventy-two (72) hours shall be considered a single claim and deemed to have been made at the time the first of such claims is reported to Underwriters and shall be subject to a single **EXCESS LIMIT OF INSURANCE**.

<u>**Coverage Section IX Terrorism – Liability Terrorism Conditions**</u>

1.  **PROOF OF LOSS:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the **OCCURRENCE** of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

    If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

<u>**Coverage Section IX Terrorism – Liability Terrorism Exclusions**</u>

This Policy does not apply to any actual or alleged loss, liability, injury, **CLAIM EXPENSES**, cost and expense arising directly or indirectly:-

A.  from or as a result of nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination may have been caused;

Pkg2016.2

B.  from or as a result of war, invasion or warlike operations (whether war be declared or not), hostile acts of sovereign or government entities, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power or martial law or confiscation by order of any Government or public authority;

C.  from or as a result of seizure or illegal occupation unless caused directly by an insured **ACT OF TERRORISM** and/or **SABOTAGE**;

D.  from or as a result of confiscation, requisition, detention, legal occupation, embargo, quarantine, or any result of any order of public or government authority which deprives the **ASSURED** of the use or value of its property, nor for loss or damage arising from acts of contraband or illegal transportation or illegal trade;

E.  from or as a result of the discharge of **POLLUTANTS** or contaminant, which **POLLUTANTS** and contaminants shall include but not be limited to any solid, liquid, gaseous or thermal irritant, contaminant of toxic or hazardous substance or any substance the presence, existence or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment or loss, injury or damage directly or indirectly arising from chemical or biological release or exposure of any kind;

F.  from or as a result of attacks using electronic means including computer hacking or the introduction of any form of computer virus;

G.  from or as a result of vandals or other persons acting maliciously or by way of protest or strikes, riots or civil commotion unless caused directly by an insured **ACT OF TERRORISM** and/or **ACT OF SABOTAGE**;

H.  from or as a result of consequential loss, delay or loss of markets, failure to supply goods or services, or failure to perform however caused or arising, and despite any preceding loss insured hereunder;

I.  from or as a result of cessation, fluctuation or variation in, or insufficiency of, water, gas or electricity supplies, telecommunications or service of any type;

J.  from or as a result of threat or hoax;

K.  from or as a result of **BODILY INJURY** to employees or contract workers of the **ASSURED** or arising under any workers' compensation, unemployment compensation or disability laws, statutes, or regulation;

L.  from or as a result of **BODILY INJURY** or **PROPERTY DAMAGE** arising out of discrimination or humiliation;

M.  from or as a result of property:

   (1) owned, leased, rented or occupied by the **ASSURED**; or

   (2) in the care, custody or control of the **ASSURED**;

N.  from or as a result of fines, penalties, punitive damages, exemplary damages, or any additional damages resulting from the multiplication of compensatory damages;

O.  from or as a result of mental injury, anguish or shock where no **BODILY INJURY** has occurred to the claimant;

Pkg2016.2

P.   from or as a result of **BODILY INJURY** and/or **PROPERTY DAMAGE** directly or indirectly relating to the actual, alleged or threatened presence of asbestos in any form;

Q.   from or as a result of any claims or circumstances disclosed on the Application for this insurance;

R.   from or as a result of any design, manufacture, assembly, sale trade, distribution or promotion of any product; and

S.   from or as a result of the rendering of or failure to render professional services.

Nothing contained in the above exclusions shall extend this Policy to cover any liability which would not have been covered had these exclusions not been incorporated herein.

### Coverage Section IX Terrorism – Liability Terrorism Definitions

1.   **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.   **ACT OF SABOTAGE** means an act or series of acts of deliberate damage or destruction of property by secret means committed for subversive, political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

3.   **CLAIM EXPENSES** means investigation, adjustment, appraisal, defense and appeal costs and expenses and pre and post judgment interest, paid or incurred by or on behalf of the **ASSURED**. The salaries, expenses or administrative costs of the **ASSURED** or its employees or any insurer shall not be included within the meaning of **CLAIM EXPENSES**.

4.   **OCCURRENCE** means any one loss and/or series of losses arising out of and directly occasioned by one **ACT** or series of related **ACTS OF TERRORISM** and/or **ACTS OF SABOTAGE** for the same purpose or cause. The duration and extent of any one **OCCURRENCE** shall be limited to all losses directly occasioned by one **ACT** or series of **ACTS OF TERRORISM** and/or **ACTS OF SABOTAGE** arising out of the same purpose or cause during any period of seventy-two (72) consecutive hours commencing at the time of the first such act and within a radius of ten (10) miles of the location of the first such **ACT OF TERRORISM** and/or **ACT OF SABOTAGE**.

However for the purposes of this Policy no period of seventy-two (72) consecutive hours shall commence prior to the attachment of this Policy.

### Coverage Section IX Terrorism – Employers' Liability Terrorism

This is a claims made and reported Coverage Subsection. This means that, subject to the terms and conditions of this Coverage Subsection, the coverage provided by this Coverage Subsection only covers claims first made against the **ASSURED** or a circumstance which could reasonably be expected to give rise to a claim during the **PERIOD OF INSURANCE** and reported to Underwriters in writing as soon as reasonably possible and in no event longer than 90 consecutive days after the expiry of this Policy. **CLAIMS EXPENSES** that are incurred in defending any claim against the **ASSURED** will reduce, and may completely exhaust, the Limit of Liability available to pay **DAMAGES**.

**Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for any **DAMAGES** which the **ASSURED** shall become legally liable to pay as compensation for **BODILY INJURY** to an **EMPLOYEE** of the **ASSURED** (other than the perpetrator(s) of the **ACT OF TERRORISM**) during the course of their employment in the business of the **ASSURED**, provided such **BODILY INJURY** is caused solely and directly by an **ACT OF TERRORISM** occurring during the **PERIOD OF INSURANCE** at the location named in the schedule.  Underwriters will also pay **CLAIMS EXPENSES**.

Multiple **ACTS OF TERRORISM** which occur within a period of 72 consecutive hours and which have or appear to have a related purpose or common leadership will be deemed to be one **ACT OF TERRORISM**.

All claims arising out of the same or a continuing **ACT OF TERRORISM**, including **ACTS OF TERRORISM** which have or appear to have a related purpose or common leadership, within a period of 72 hours shall be considered a single claim and deemed to have been made at the time the first of such claims is reported to Underwriters and shall be subject to a single **Specific Excess Limit of Insurance**.

### Coverage Section IX Terrorism – Employers' Liability Terrorism Conditions

1.  **Proof of Loss:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the occurrence of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

    If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

### Coverage Section IX Terrorism – Employers' Liability Terrorism Exclusions

This insurance does not cover **DAMAGES** or **CLAIMS EXPENSES** with respect to any claim directly or indirectly arising from, caused by or due to:

A.  Any **ACT OF TERRORISM** involving the emission, discharge, dispersal, release or escape of any chemical or biological agent;

B.  Any threat or hoax of an **ACT OF TERRORISM**;

C.  Any **ACT OF TERRORISM** by electronic means including computer hacking or the introduction into any computer of any form of corrupting, harmful or otherwise unauthorized instructions or code. This exclusion shall not apply to the detonation of any explosive bomb or missile which is controlled by any remote device or reliant upon electronic means in its launch, guidance or firing systems;

D.  Any **POLLUTANT OR CONTAMINANT**, however such **POLLUTANT OR CONTAMINANT** may have been introduced or arisen;

E.  Vandalism and malicious mischief, strikes, labor unrest, riots or civil commotion;

F.  War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power;

G.  Confiscation, nationalization, requisition or destruction of or damage to property by or under the order of any government or public or local authority;

H.   Nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear reaction, nuclear radiation or radioactive contamination may have been caused;

I.   Injury caused by or resulting from the **ASSURED**'s recklessness or deliberate misconduct;

J.   Injury arising out of any breach of an obligation owed by the **ASSURED** as an employer including but not limited to **EMPLOYEE** claims of wrongful termination of employment, discrimination, harassment, false arrest, slander, invasion of privacy, assault or battery, or mental anguish or humiliation when asserted in connection with an employment related claim;

K.   Mental injury, anguish or shock where no actual physical injury has occurred to the claimant;

L.   Criminal, dishonest, fraudulent or malicious conduct by the **ASSURED**.

This insurance does not cover fines, penalties, punitive or exemplary **DAMAGES**, sanctions or any additional **DAMAGES** resulting from the multiplication of compensatory **DAMAGES**. Nothing contained in the above exclusions shall extend this Policy to cover any liability which would not have been covered had these exclusions not been incorporated herein.

### <u>Coverage Section IX Terrorism – Employers' Liability Terrorism Definitions</u>

1.   **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.   **BODILY INJURY** means, for this coverage only, all physical injury to a third party human being, other than the perpetrator(s) of the **ACT OF TERRORISM**, including death, sickness, disease or disability and all consequent mental injury, anguish or shock to such human suffering such physical injury.

3.   **CLAIMS EXPENSES** means all fees, costs and expenses incurred with the written consent of Underwriters resulting from the investigation, adjustment, appraisal, defense or appeal of a claim, **SUIT** or proceeding relating to a claim. **CLAIMS EXPENSES** do not include the salaries, expenses, overhead or other charges by the **ASSURED** for any time spent in cooperating in the defense, settlement and investigation of any claim.

4.   **DAMAGES** means a monetary judgment, monetary award or monetary settlement made with Underwriters written approval.

5.   **POLLUTANT OR CONTAMINANT** includes but is not limited to any solid, liquid, gaseous or thermal irritant, contaminant or toxic or hazardous substance or any substance the presence, existence, or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

6.   **EMPLOYEE** means the following persons working for the **ASSURED** for the purpose of the **ASSURED**'s business:

(a)   Any person employed by the **ASSURED** under a contract of service or apprenticeship;

(b)   Any person supplied to, hired by or borrowed by the **ASSURED**;

(c)   Labor masters and persons supplied by them;

(d)   Persons employed by labor only sub-contractors;

(e)    Self-employed persons and voluntary helpers;

(f)    Any person attending under a work experience scheme; or

(g)    A prospective **EMPLOYEE** who is undergoing practical work experience while being assessed by the insured as to his or her suitability for employment.

Pkg2016.2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 1

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### NEW & RENEWAL BUSINESS ENDORSEMENT
### (SECTION V EXCESS WORKERS' COMPENSATION & EMPLOYERS' LIABILITY)

*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended, as summarized in the disclosure notice.*

In consideration of an additional premium of USD $750.00 paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA"). The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this Endorsement shall expire at 12:00 midnight December 31, 2027, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.

LMA5389

09 January 2020

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

---

Endorsement No. 2

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### NOT PURCHASED CLAUSE

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5390

09 January 2020

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

---

Endorsement No. 3

### SECTION II – GENERAL LIABILITY – FAILURE TO SUPPLY ENDORSEMENT

It is understood and agreed that **Coverage Section II General Liability** does not apply to **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the failure of any **ASSURED** to adequately supply gas, oil, electricity or steam.

This exclusion does not apply if the failure to supply results from a covered cause of loss under **Coverage Section I Property** caused by Direct Physical Loss or Damage to tangible property owned or used by any **ASSURED** to procure, produce, process or transmit the gas, oil, water, electricity or steam.

Furthermore, this exclusion shall not apply to **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the failure of any **ASSURED** to adequately supply water.  The limit of liability for **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the failure of any **ASSURED** to adequately supply water is $1,000,000 excess of the **ASSURED'S SELF INSURED RETENTION**.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 4

### SECTION VI EMPLOYEE BENEFITS LIABILITY – OCCURRENCE BASIS

It is understood and agreed that **Coverage Section VI Employee Benefits Liability** of the policy is deleted in its entirety and replaced with the following:

#### Coverage Section VI Employee Benefits Liability

#### Coverage Section VI Employee Benefits Liability-Insuring Agreement

Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by term **ULTIMATE NET LOSS**, by reason of a **NEGLIGENT ACT**, **ERROR OR OMISSION** committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

This coverage applies only if a claim for damages arises out of a **NEGLIGENT ACT**, **ERROR OR OMISSION** committed during the **PERIOD OF INSURANCE.** As respects a series of related **NEGLIGENT ACTS**, **ERRORS OR OMISSIONS** by one or more **ASSUREDS**, the **NEGLIGENT ACT**, **ERROR OR OMISSION** shall be deemed to have been committed at the time of the first of such acts or alleged acts. This coverage does not apply to **NEGLIGENT ACTS**, **ERRORS OR OMISSIONS** committed prior to or after the **PERIOD OF INSURANCE**, however as respects a series of related **NEGLIGENT ACTS**, **ERRORS OR OMISSIONS** by one or more **ASSUREDS** taking place over more than one **PERIOD OF INSURANCE**, the **NEGLIGENT ACT**, **ERROR OR OMISSION** shall be deemed to have been committed during the first **PERIOD OF INSURANCE** in which the first of such acts or alleged acts took place and only that policy's **Specific Excess Limits of Insurance** and **SELF INSURED RETENTION** shall apply.

#### Coverage Section VI Employee Benefits Liability- Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section VI Employee Benefits Liability** is limited to and not to exceed the Specific Excess Limits as stated in **Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Specific Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the limit as stated in the applicable Coverage Section of **Schedule of Specific Excess Limits of Insurance**.

#### Coverage Section VI Employee Benefits Liability-Exclusions

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured: Town of Mooresville, NC

Policy Number: PK1027220

Effective Date: February 15, 2020

Authority Ref. No: B0356JA281N20

---

**A.** Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of the policy, whether or not a limit is stated in **Schedule of Specific Excess Limits of Insurance**;

**B.** Any **NEGLIGENT ACT, ERROR OR OMISSION** by, or at, the direction of the **ASSURED** that are dishonest, fraudulent, criminal or malicious;

**C.** **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE**;

**D.** Any claim based upon the **ASSURED'S** failure to comply with the federal Employee Retirement Income Security Act of 1974 (ERISA), including subsequent amendments or any similar federal, state or local law(s) or regulations;

**E.** Any claim for failure of performance of a contract by any **ASSURED**, Insurer or Self Insurer;

**F.** Any claim based upon the **ASSURED'S** failure to comply with any law concerning worker's compensation, unemployment insurance, social security, or disability benefits;

**G.** Any claim based upon failure of investments, including but not limited to, stocks, bonds, funds, to perform as represented by an **ASSURED**;

**H.** Any claim based upon advice given by an **ASSURED** to participate or not participate in any stock subscription plans;

**I.** Any claim arising out of actual or alleged discrimination including but not limited to discrimination based on race or national origin, religion or creed, age, sex, physical disability, military status, or employment practices whether or not any of the foregoing violated any federal, state or local government law(s) or regulation(s) prohibiting such discrimination.

### Coverage Section VI Employee Benefits Liability-Definitions

**1.** **ADMINISTRATION** means:

    (a) Giving counsel to employees with respect to **EMPLOYEE BENEFIT PROGRAMS**;

    (b) Interpreting **EMPLOYEE BENEFIT PROGRAMS**;

    (c) Handling of records in connection with **EMPLOYEE BENEFIT PROGRAMS**; and

    (d) Effecting enrollment, termination, or cancellation of employees under **EMPLOYEE BENEFIT PROGRAMS**;

Provided all such acts are authorized by the **NAMED ASSURED**.

---

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

---

2.      **OCCURRENCE** means a **NEGLIGENT ACT**, **ERROR OR OMISSION** committed during the **PERIOD OF INSURANCE**. All claims for damages based on or arising out of the same **NEGLIGENT ACT**, **ERROR OR OMISSION** or a series of **NEGLIGENT ACTS**, **ERRORS OR OMISSIONS** by one or more **ASSUREDS** shall be deemed one **OCCURRENCE**. Only one policy, one **SELF INSURED RETENTION** and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

3.      **NEGLIGENT ACT, ERROR OR OMISSION** means the failure to execute required actions, or mistaken actions committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

All **CLAIMS** based on or arising out of the same **NEGLIGENT ACT, ERROR OR OMISSION** or a series of related **NEGLIGENT ACTS, ERRORS OR OMISSIONS** by one or more **ASSUREDS** shall be deemed one **NEGLIGENT ACT, ERROR OR OMISSION.** Only one policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **NEGLIGENT ACT, ERROR OR OMISSION**.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 5

### PROCEDURES FOR THIRD PARTY CLAIMS ADMINISTRATORS

As per **General Policy Condition 21. THIRD PARTY CLAIMS ADMINISTRATOR**, the **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIM ADMINISTRATOR**, as agreed upon by the Underwriters prior to the **PERIOD OF INSURANCE.**

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and PMA Companies, the **NAMED ASSURED** must notify Underwriters in writing sixty (60) days prior to the effective date of such cancellation, expiration or revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIMS ADMINISTRATOR** or the revision of the incumbent **THIRD PARTY CLAIMS ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

If the agreement between **NAMED ASSURED** and the **THIRD PARTY CLAIMS ADMINISTRATOR** is terminated for any reason without Underwriters prior written approval, Underwriters reserve the right to deny coverage under this policy for any **CLAIM** or **OCCURRENCES** reported to Underwriters after the termination date of the **ASSURED'S** agreement with the **THIRD PARTY CLAIMS ADMINISTRATOR.**

As such, the **NAMED ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** is:

PMA Companies

### QUARTERLY LOSS REPORTING

The **NAMED ASSURED** shall, by and through its **THIRD PARTY CLAIMS ADMINISTRATOR** provide the Underwriters or their Representatives, no later than the 45th day after the end of each calendar quarter or upon the Underwriters' request, whichever is earlier, a current Loss Run listing all ground up **CLAIMS, SUITS** or **OCCURRENCES**.   The Underwriters may contact the **THIRD PARTY CLAIMS ADMINISTRATOR** to facilitate ground up Loss Run reporting.  The Underwriters may request the **THIRD PARTY CLAIMS ADMINISTRATOR** assist in the transmission of such electronically.  The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate provided no significant development costs are incurred in performing electronic reporting or if the Underwriters agree to incur the development costs on behalf of the **THIRD PARTY CLAIMS ADMINISTRATOR.**  This reporting obligation continues until ninety (90) days after all **CLAIMS, SUITS** or **OCCURRENCES** are handled to their conclusion.

### ADDITIONAL CONDITIONS FOR ASSUREDS WITH EXCESS LOSS FUND PROTECTION

If Excess **LOSS FUND** Protection is provided under this Policy, the **NAMED ASSURED** shall, by and through the **THIRD PARTY CLAIMS ADMINISTRATOR** provide the Underwriters or their Representatives, no later than the 45th day after the end of each calendar quarter or upon the Underwriters' request, whichever is earlier, a current Loss Run listing all ground up **CLAIMS, SUITS** or **OCCURRENCES** and a corresponding **LOSS FUND** Report in a previously agreed format so that Underwriters may assess their

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**JA175**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

---

potential exposure based on **CLAIMS, SUITS** or **OCCURRENCES** with respect to aggregate **LOSS FUND** erosion.   This reporting obligation continues until ninety (90) days after all **CLAIMS, SUITS** or **OCCURRENCES** are handled to their conclusion.  The quarterly Loss Run and **LOSS FUND** Report are to be sent to: Claims.lossruns@britinsurance.com or as directed by the Underwriters.

Once the **LOSS FUND** erosion reaches 50% of the attachment point on an incurred basis, the Underwriters or their Representatives reserve the right to audit all **CLAIMS, SUITS** or **OCCURRENCES** with respect to aggregate **LOSS FUND** erosion. The **NAMED ASSURED** shall, by and through its **THIRD PARTY CLAIMS ADMINISTRATOR** cooperate and facilitate this process.

These conditions shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 6

## COVERAGE SECTION I PROPERTY – AUTOMOBILE PHYSICAL DAMAGE ONLY

It is understood and agreed that coverage under **Coverage Section I Property** of the policy shall be limited to that as afforded under **Insuring Agreements B. AUTOMOBILE PHYSICAL DAMAGE**.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**JA177**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 7

### ADDITIONAL ASSURED ENDORSEMENT

It is hereby understood and agreed that Vacuum Truck Rentals, LLC (P.O. Box 180789, Richland, MS, 39218), its affiliated companies, its coventurers, and their employees, officers and directors are considered Additional **ASSUREDS** and lessors with respects to **Coverage Section II General Liability** and **Coverage Section III Automobile Liability** but only with respect to the **NAMED ASSURED'S** lease of the 2017 Freightliner (VIN# 5VCACDVF9HH223198).

This coverage shall be primary and non-contributory to any insurance held by the above Additional **ASSURED** and lessors.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 8

**GENERAL POLICY CONDITIONS NOTIFICATION OF CLAIMS, OCCURRENCES OR SUITS**

It is hereby understood and agreed that **General Policy Condition 7. CLAIMS**, **OCCURRENCES or SUITS** is amended to read as follows:

7.    **CLAIMS**, **OCCURRENCES or SUITS:**  Underwriters reserves the right to deny coverage under this Policy if there has not been full compliance with the following duties:

The **ASSURED** shall as soon as practical notify Underwriters through the **THIRD PARTY CLAIMS ADMINISTRATOR** of any **CLAIM, OCCURRENCE,** or **SUIT** meeting the following criteria:

(a)    The cost of which is likely to result in payment by Underwriters under this Policy;

(b)    All claims reserved at 50% or more of the **SELF INSURED RETENTION**;

(c)    All claims where there has been a settlement demand above the **SELF INSURED RETENTION** and there is a trial, binding arbitration or binding mediation date within ninety (90) days;

(d)    Catastrophic losses (including Paraplegia, Quadriplegia, Severe Burns, Fatalities, Significant Brain Injury, Amputation of Major Extremity);

(e)    **SEXUAL ABUSE** claims;

(f)    Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(g)    Third-party claims involving **LAW ENFORCEMENT ACTIVITIES**;

(h)    Act or series of **ACTS OF TERRORISM**;

(i)    Any claims where there is a question as to whether there will be coverage under this Policy.

Underwriters shall have the right, but not the obligation, to be associated with the **ASSURED** in, and/or assume charge of, the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved or when the **SELF INSURED RETENTION** has been exhausted; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both. In all other circumstances, Underwriters will have the right, but not the obligation, to assume charge of the defense of any claim or suit relative to an **OCCURRENCE** or **CLAIM** at its own expense.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

The **ASSURED** shall make no commitment to pay or settle any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior written agreement of Underwriters. Underwriters shall not withhold agreement without just cause. Neither shall the **ASSURED** refuse any reasonable opportunity to pay or settle a claim when such refusal will result in Underwriters having liability under this Policy without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. If the **ASSURED** refuses to consent to settlement of any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is potentially involved, and settlement or compromise is recommended by Underwriters and acceptable to the claimant, then calculation of, and Underwriters obligation under **ULTIMATE NET LOSS** with respect to the **CLAIMS, OCCURRENCES** or **SUITS** shall be limited to the amount of damages or payments for which the **CLAIMS, OCCURRENCES** or **SUITS** could have been settled for, plus any expenses payable under **ULTIMATE NET LOSS** incurred until the date of the **ASSURED'S** refusal to settle or compromise the **CLAIMS, OCCURRENCES** or **SUITS** as recommended by Underwriters.

It is also understood and agreed that **General Policy Condition 21. THIRD PARTY CLAIMS ADMINISTRATOR** is amended to read as follows:

21.    **THIRD PARTY CLAIMS ADMINISTRATOR:** It is a condition precedent that this Policy is issued by Underwriters on the express condition that:

(a)    The **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIMS ADMINISTRATOR**, as agreed upon by Underwriters prior to the **PERIOD OF INSURANCE**; and

(b)    All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy must be adjusted and handled by the contracted **THIRD PARTY CLAIMS ADMINISTRATOR**; and

(c)    The duties involved in adjusting and handling **CLAIMS**, **SUITS** or **OCCURRENCES** by the **THIRD PARTY CLAIMS ADMINISTRATOR** include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials; and

(d)    All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy are adjusted and handled by the **THIRD PARTY CLAIMS ADMINISTRATOR** in accordance with all statutory and regulatory standards, all accepted industry standards and practices and the Brit Global Specialty USA Third Party Claims Administrator Claims Handling Guidelines.

Underwriters or their representative shall have the right but not the duty to conduct audits and inspections of the **CLAIMS, SUITS or OCCURRENCES** reported to the **THIRD PARTY CLAIMS ADMINISTRATOR** to better inform Underwriters of the potential liability under this Policy. The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate should the audit or inspection be requested.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

---

The **NAMED ASSURED**, through the **THIRD PARTY CLAIMS ADMINISTRATOR**, may utilize the services of an attorney or lawyer or other specialized party to assist the **THIRD PARTY CLAIMS ADMINISTRATOR** in the disposition of its duties, and defend an **ASSURED**; but only provided that:

(a) The **THIRD PARTY CLAIMS ADMINISTRATOR** retains control of the adjusting process, reserving, settlement activity and documentation of the claims financials including erosion of the **SELF INSURED RETENTION** and;

(b) The **THIRD PARTY CLAIMS ADMINISTRATOR** continues to monitor the actions of these other parties; and

(c) Any control of the adjusting process designated to parties other than the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED** must be approved by Underwriters in writing in advance; and

(d) Any control of the adjusting process retained by the **NAMED ASSURED** (i.e. "self-administering **CLAIMS**") must be approved by Underwriters in writing in advance; and

(e) Payment to these other parties shall be subject to all other terms and conditions of the Policy; specifically, but not limited to, **General Policy Condition 11. Duties** and **General Policy Definition 30. ULTIMATE NET LOSS**.

(f) Further, this Policy of insurance is issued by Underwriters on the express condition that all **CLAIMS**, **SUITS** or **OCCURRENCES,** for which coverage is sought under this Policy and which are being defended by the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED,** are defended by the attorney or lawyer in accordance with all statutory and regulatory standards; and in accordance with all accepted professional standards and practices.

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and the designated **THIRD PARTY CLAIM ADMINISTRATOR**, the **NAMED ASSURED** must notify Underwriters in writing sixty (60) days prior to the effective date of such cancellation, expiration or revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIMS ADMINISTRATOR** or the revision of the incumbent **THIRD PARTY CLAIMS ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

If the agreement between **NAMED ASSURED** and the **THIRD PARTY CLAIM ADMINISTRATOR** is terminated for any reason without Underwriters prior written approval, Underwriters reserve the right to deny coverage under this policy for any **CLAIMS** or **OCCURRENCES** reported to Underwriters after the termination date of the **ASSURED'S** agreement with the **THIRD PARTY CLAIMS ADMINISTRATOR.**

These conditions shall survive the termination of this policy without regard to whether said termination is due to cancellation or natural expiration of this policy.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 9

**COVERAGE SECTION II GENERAL LIABILITY AND COVERAGE SECTION VIII
LAW ENFORCEMENT LIABILITY
UNMANNED AIRCRAFT COVERAGE ENDORSEMENT**

It is understood and agreed that **Coverage Section II General Liability Exclusion E.** and **Coverage Section VIII Law Enforcement Liability Exclusion E.** shall not apply to an **UNMANNED AIRCRAFT** used by an **ASSURED** in the course and scope of their duties on behalf of the **NAMED ASSURED**.

For the purposes of coverage provided under this endorsement, the following Definition apply:

**UNMANNED AIRCRAFT** means an aircraft, either fixed-wing or rotary-wing, without a human pilot on board, weighing 10 pounds or less, controlled by computers in the aircraft or under the remote control of a pilot on the ground.

For **UNMANNED AIRCRAFT** weighing more than 10 pounds, and for which coverage is sought under this policy, prior written agreement from Underwriters must be obtained and the **UNMANNED AIRCRAFT** scheduled by endorsement onto this policy.

It is a condition precedent to coverage under this endorsement that any **UNMANNED AIRCRAFT** must be operated in compliance with any applicable Federal Aviation Administration (FAA) rules and regulations and, if required, a valid Certificate of Authorization (COA) obtained from the FAA in respect of each **UNMANNED AIRCRAFT**.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 10

**COVERAGE SECTION VII CRIME – EMPLOYEE DISHONESTY COVERAGE
EXTENSION – FUNDS TRANSFER FRAUD**

It is understood and agreed that the following Coverage Extension is added under **Coverage Section VII Crime – EMPLOYEE** Dishonesty:

Underwriters will indemnify the **NAMED ASSURED** under this Section for loss of **MONEY** and **SECURITIES** resulting from **FUNDS TRANSFER FRAUD** subject to a $100,000 ground up per **OCCURRENCE** sublimit under **Coverage Section VII Crime** – **EMPLOYEE DISHONESTY** and the corresponding **SELF INSURED RETENTION** shown in the Declarations Page for **Coverage Section VII – EMPLOYEE DISHONESTY**.


In respect of this endorsement, the following Definitions are added:

**FUNDS TRANSFER FRAUD** means the intentional misleading by a person or persons to induce the **NAMED ASSURED** to part with **MONEY** and/or **SECURITIES** by means of a **FRAUDULENT INSTRUCTION.**

**FRAUDULENT INSTRUCTION** means an electronic, telegraphic, telephone or written instruction communicated by the **NAMED ASSURED** or an **EMPLOYEE** based upon an instruction received and relied upon to be genuine by the **NAMED ASSURED** or an **EMPLOYEE** which was transmitted by a purported director, officer, partner, member or sole proprietor of the **NAMED ASSURED** or the **NAMED ASSURED'S VENDOR** or **CLIENT**; or by another **EMPLOYEE** or employee of the **NAMED ASSURED'S VENDOR** or **CLIENT** but which was in fact fraudulently transmitted by someone else without the **EMPLOYEE'S** knowledge.

**VENDOR** means any entity, firm, company, organization or association or individual which has a legitimate pre-existing arrangement or written agreement to provide goods or services to the **NAMED ASSURED.**

**CLIENT** means an entity, firm, company, organization, association or individual which the **NAMED ASSURED** provides goods or services to pursuant to a written contract.

**OCCURRENCE** means all loss caused by **FUNDS TRANSFER FRAUD**, whether involving one or more **EMPLOYEES**, or as the result of a single **FRAUDULENT INSTRUCTION** or a series of **FRAUDULENT**

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Assured:  Town of Mooresville, NC

Policy Number: PK1027220

Effective Date:  February 15, 2020

Authority Ref. No: B0356JA281N20

Endorsement No. 11

## NORTH CAROLINA – GOVERNMENTAL IMMUNITY ENDORSEMENT

This policy is not intended by the **ASSURED** to waive its governmental immunity as allowed by North Carolina General Statutes Section 115C-42, Section 153A-435, Section 115D-24 or Section 160A-485, or any amendments thereof.  Accordingly, subject to this Policy and the **Specific Excess Limits of Insurance** shown on the **Declarations**, this Policy provides coverage only for **OCCURRENCES** or **CLAIMS** for which the defense of governmental immunity is clearly not applicable or for which, after the defense is asserted, a court of competent jurisdiction determines the defense of governmental immunity not to be applicable. This policy does not apply to any amount for which the Insured would not be liable under applicable governmental or sovereign immunity but for the existence of this Policy.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

USCA4 Appeal: 23-1393    Doc: 19    Filed: 08/21/2023    Pg: 190 of 573

Taylor Dunn                                December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 1

```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                  STATESVILLE DIVISION
               Civil Action No. 5:21-cv-174
 3
 4
                                        )
 5    AMY RHINEHARDT CRAVEN, AS          )
      ADMINISTRATRIX OF THE ESTATE OF    )
 6    CHRISTOPHER KIMMONS CRAVEN,        )
                                        )
 7           PLAINTIFF,                  )
                                        )
 8    v.                                 )
                                        )
 9    CHRISTOPHER NOVELLI, INDIVIDUALLY  )
      AND IN HIS OFFICIAL CAPACITY AS    )
10    OFFICER OF THE MOORESVILLE POLICE  )
      DEPARTMENT, ALEXANDER ARNDT,       )
11    INDIVIDUALLY AND IN HIS OFFICIAL   )
      CAPACITY AS OFFICER OF THE         )
12    MOORESVILLE POLICE DEPARTMENT,     )
      AND THE TOWN OF MOORESVILLE,       )
13                                       )
             DEFENDANTS.                 )
14    -----------------------------------
15
16              DEPOSITION OF TAYLOR DUNN
17                (TAKEN by DEFENDANTS)
18              CHARLOTTE, NORTH CAROLINA
19                 DECEMBER 12, 2022
20
21    ALSO PRESENT:      Amy Craven (Via Telephone)
22
23    REPORTED BY:       Meredith R. Schramek
                         Registered Professional Reporter
24                       Notary Public
25
```

Case 5:21-cv-00174-KDB-DSC  Document 20-6  Filed 01/20/23  Page 1 of 12

EXHIBIT
5

JA185

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 14

1        Q    So it sounds like you were relying on your

2   mother for food and rent.  Was there anything else that

3   you relied on her or Chris for at that time?

4        A    At that time, I don't think so besides --

5   well, I'm sorry.  That's incorrect.  My mom is also

6   paying for my phone.

7        Q    And that was then or now?

8        A    She -- then, and she still does now.

9        Q    Okay.  We're obviously here today for the

10  lawsuit filed in relation to the incident that occurred

11  on August 2, 2020.  And I just want to find out a bit

12  about your relationship to each of the folks that we

13  know were there.

14            So what's your relationship to Chris Craven?

15       A    He was my stepfather.

16       Q    And I know the answer to this, but I want to

17  confirm.  And Amy Craven was your mother; is that

18  correct?

19       A    Yes.

20       Q    And Raleigh Craven?

21       A    Is my brother.

22       Q    And do you guys share the same father?

23       A    No.  So he would be my half brother.

24       Q    Okay.  So is he the son of Chris and Amy

25  Craven?

JA186

Taylor Dunn        December 12, 2022
Craven, Amy Rhinehardt Vs. Novelli, Chistopher, Et Al.

Page 28

```
 1    then.
 2         Q    Did you -- was it anything you ever noticed?
 3         A    I never really noticed it too much before,
 4    you know, like I said, when COVID first started.
 5         Q    And you said before that kind of manifested
 6    itself in him being more frustrated and fidgety; is
 7    that right?
 8         A    Mm-hmm.
 9         Q    Is there anything else that let you know that
10    he was dealing with some anxiety?
11         A    Not that I can recall.  Like I said, besides
12    the fact that he, you know, had approached me and asked
13    me if my therapist had anyone to recommend.
14         Q    Do you know if he suffered from depression at
15    any point, either spring of 2020 or before?
16         A    I believe Chris had mentioned depression
17    before, yes.
18         Q    Do you know when that was?
19         A    I didn't really notice it as much before,
20    like I said, COVID started.  I did really notice
21    depression after our next door neighbor had passed
22    away.  His name was Mr. Watley.  And Chris, from what I
23    knew, had known him since he was young.
24         Q    Do you recall about when that was?
25         A    I don't recall exactly besides it was during
```

Taylor Dunn                                          December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 33

1          Q    And as far as you're aware, he wasn't using

2     any illegal drugs; correct?

3          A    Not that I know of, no.

4          Q    Okay.  So you called 911 on August 2, 2020;

5     is that right?

6          A    That's correct.

7          Q    And can you just explain for me why you

8     called 911?

9          A    Yes.  I called 911 that evening because I

10    think I had been home for about an hour from work.  And

11    Chris seemed like he had become increasingly more

12    anxious and frustrated that evening.  And he did

13    mention feelings of not wanting to be alive.  So I was

14    concerned in the sense that I was hoping someone would

15    be able to help calm him down.

16         Q    Is that the first time that you've ever heard

17    him express that he didn't want to be alive?

18         A    Yes.

19         Q    And you mentioned you'd been home for about

20    an hour before you called 911; is that right?

21         A    Yes.

22         Q    What was going on during that hour?

23         A    I would say for the first little bit, I

24    remember being in the living room with Raleigh at some

25    point.  And then I believe Raleigh had made his way

Page 34

1    back to his bedroom.

2            As far as I can recall, I think my mom was

3    watching TV in their room.  And I wasn't near Chris

4    much, but I had heard that it seemed like he had

5    started to become agitated in conversation.

6        Q    Do you know why he became agitated?

7        A    No.  I don't know why he would have been

8    agitated or anxious, but you could tell that he was,

9    you know, upset.

10       Q    How could you tell he was upset?

11       A    Just by his tone and the way that he was

12   speaking.

13       Q    Was he yelling?

14       A    I don't think he was yelling at that point,

15   no.

16       Q    Was he threatening anyone?  Excuse me.  Was

17   he threatening anyone?

18       A    No.  Like I said, he just expressed feelings

19   of not wanting to be alive anymore.  But he didn't

20   threaten anyone else, no.

21       Q    Did he physically threaten anyone or touch

22   anyone?

23       A    Not that I can recall, no.

24       Q    And what made you actually call 911?  Was

25   there any particular instance or incident or action?

JA189

Page 35

1        A    The only thing that I recall, like I said, is

2    Chris being clearly upset and not being able to calm

3    down.

4             I do recall asking my mother, I believe, if

5    she felt like calling 911 would maybe help.  And she

6    told me to go ahead.

7             So I had called 911 in hopes that someone

8    could calm him down or at least my mom might be able to

9    calm him down while I was talking to 911.

10       Q    And what were your brother -- were your

11   brother and sister both home?  I think you mentioned

12   your brother was home at that time.

13       A    Yes.  They were both home.

14       Q    And what were they doing?

15       A    As far as I recall, I believe when everything

16   first started, they had both been in their rooms.  And

17   then they came out because they heard that Chris was

18   upset.

19       Q    And when you called 911, where were you?

20       A    As far as I recall, I was in the hallway

21   from -- sorry.  It would have been in the hallway

22   leading from the living room to where my siblings and

23   my and Chris's room was.

24       Q    And where was your mom and Chris when you

25   first called?

JA190

Taylor Dunn               December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 39

```
 1    that was a direct question for my mother or if it was

 2    to everyone in general.

 3          Q    Did -- while you were on the call, did Chris

 4    stay at -- did his temperament stay about the same, get

 5    better, or get worse?

 6          A    I would say that he became increasingly more

 7    anxious.

 8          Q    And what do you mean by that?

 9          A    I do recall him walking from outside and back

10    inside a lot or, I guess, pacing back and forth

11    frequently.

12          Q    Is that the only thing that made you think he

13    was getting more anxious?

14          A    Well, also the tone in his voice, you could

15    tell that he was upset as well.  He -- I wouldn't --

16    his tone was raised more than it was at the beginning

17    if that makes sense.

18          Q    In volume you mean?

19          A    Yes.

20          Q    What about the things he was saying?

21          A    Well, like I said, he -- I do recall back to

22    when he asked for his cell phone, he said he wanted to

23    call his mother and tell her goodbye and that he didn't

24    want to be alive anymore.  So he was saying things of

25    that nature.
```

JA191

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 43

1    gunshots?

2         A     Correct.

3              (Exhibit 1 Marked for Identification.)

4    BY MR. STEWART:

5         Q     I'm going to show you what I've marked as

6    Exhibit 1.  Do you recognize what this is?

7         A     Yes.  It's the 911 call transcript.

8         Q     And is this the same 911 call transcript that

9    you said you reviewed a week or so ago?

10        A     Yes.

11        Q     And you're more than welcome to read it right

12   now if you'd like.  You can take whatever time you

13   need.  But do you -- I'm just not sure if you remember

14   from a week ago.

15              Do you agree with everything that's in here,

16   or is there anything that you dispute?

17        A     There's not really anything I disagree with,

18   but there are portions that I don't remember fully.

19        Q     Anything -- what don't you remember?

20        A     Sorry.  I'm trying to see where the spots are

21   at now.

22        Q     And if you want to take a minute to read, we

23   can take a quick five- or ten-minute break, that's

24   perfectly fine with me.

25        A     Sure.  Maybe we can do that then just so I

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 5:21-cv-00174-KDB-DSC  Document 20-6  Filed 01/20/23  Page 8 of 12
JA192

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 51

```
 1        Q    And, again, just tell me if you need me to
 2   pause.  Okay?
 3        A    Okay.  Thank you.
 4                  (Audio recording plays.)
 5   BY MR. STEWART:
 6        Q    Do you need a moment quickly?
 7        A    No.  I should be okay.
 8        Q    Are you sure?
 9        A    Mm-hmm.
10             MR. HEROY:  Do you want to mark this as
11   Exhibit 2?
12             MR. STEWART:  Yes.
13   BY MR. STEWART:
14        Q    Would you agree that that was the call that
15   you made to Mooresville or to 911?
16        A    Yes.
17             (Exhibit 2 Marked for Identification.)
18   BY MR. STEWART:
19        Q    And we're going to mark that as Exhibit 2.
20             And after listening to that, do you agree
21   that this transcript is accurate?
22        A    Yes.
23        Q    Or at least the first page, about a page and
24   a quarter or so?
25        A    Yes.
```

Veritext Legal Solutions
800.743.DEPO (3376)    ecalendar-carolinas@veritext.com    www.veritext.com
Case 5:21-cv-00174-KDB-DSC  Document 20-6  Filed 01/20/23  Page 9 of 12
JA193

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt Vs. Novelli, Chistopher, Et Al.

Page 56

 1    hear it?

 2         A    If you could play it one more time just so I

 3    can make sure, please.

 4                    (Audio recording plays.)

 5              THE WITNESS:  I'm not a hundred percent sure

 6    because I feel like I could hear both of them.  It

 7    sounded like Raleigh's voice saying "please," but then

 8    the rest of it sounded like Macie.

 9    BY MR. STEWART:

10         Q    Okay.  And do you agree that this transcript

11    is accurate as to what was said?

12         A    Yes.

13         Q    Do you have any idea what that statement

14    might be referencing?  Do you recall anyone touching

15    anyone?

16         A    The only thing I could honestly think it

17    could relate to is possibly the phone thing.  But I'm

18    not a hundred percent sure.  I know at some point

19    someone dropped -- I think dropped a phone at some

20    point in here in this area, but I don't know if it was

21    Chris's phone or if it was my mom's phone or if I'm not

22    fully remembering correctly.  But I don't remember

23    anyone being touched physically during that time.

24         Q    Okay.  And to be clear, you agree the rest of

25    the transcript is accurate?

Case 3:21-cv-00174-KDB-DSC   Document 26-6   Filed 01/20/23   Page 10 of 12

JA194

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 57

1          A     Yes.

2          Q     Now that you've heard everything, do you

3     agree that -- with the exception of that one "where are

4     my keys" or "he's got my keys," do you agree that this

5     transcript is an accurate representation of the call?

6                MR. HEROY:  Objection.

7                THE WITNESS:  Yes.

8                (Exhibit 3 Marked for Identification.)

9     BY MR. STEWART:

10         Q     We're going to enter this second video as

11    Exhibit 3.

12               And that was my next question.  Did you ever

13    hang up?  Were there two separate calls, or was this

14    one continuous call?

15         A     This was one continuous call.  I only

16    remember being hung up on towards the end.  So this

17    should have all been one phone call.

18         Q     Okay.  That's why I was asking because we got

19    it as two videos.  So I wasn't sure if there was a

20    hangup and a call back.

21               MR. HEROY:  Is there a way that you can,

22    like, identify which one's which?

23               MR. STEWART:  Yeah.  The first one is listed

24    in the SBI file as 0_Console_3, and there's a bunch of

25    other numbers after that.  And the second one is

Taylor Dunn                                    December 12, 2022
Craven, Amy Rhinehardt  Vs. Novelli, Chistopher, Et Al.

Page 61

1      of his body?

2           A    I couldn't fully tell.  But from this angle,

3      I would assume it's closer to the front since I'm

4      looking at his back.

5           Q    Based on your interactions with Chris that

6      night, did you believe that he would harm himself?

7           A    Yes, I did.

8           Q    Did you believe he would harm someone else?

9           A    No.

10          Q    Did you believe he could harm someone else?

11          A    No.

12          Q    Had you ever seen this before today?

13          A    Not that I can recall, no.

14          Q    Okay.  And you never saw -- once Chris left

15     the house, you didn't see him -- you didn't see him at

16     any point while he was outside; is that correct?

17          A    That's correct.

18          Q    And you said you never saw whether or not he

19     had a gun on him?

20          A    Correct.

21          Q    And you never heard any interaction between

22     him and any police officers that night?

23          A    No, I did not.

24          Q    And you didn't see any interaction; right?

25          A    Correct.

Case 3:21-cv-00174-KDB-DSC  Document 26-6  Filed 01/20/23  Page 12 of 12

JA196

USCA4 Appeal: 23-1393     Doc: 19     Filed: 08/21/2023     Pg: 202 of 573

Amy Rhinehardt Craven                January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                  STATESVILLE DIVISION
              CIVIL ACTION NO. 5:21-cv-174
 3
                ~~~~~~~~~~~~~~~~~~~~
 4
 5     AMY RHINEHARDT CRAVEN, as Administratrix
       of the Estate of CHRISTOPHER KIMMONS CRAVEN,
 6
                  Plaintiff,
 7
            vs.
 8
       CHRISTOPHER NOVELLI, individually and in his
 9     official capacity as Offer of the Mooresville
       Police Department, ALEXANDER ARNDT,
10     individually and in his official capacity as
       Officer of the Mooresville Police Department,
11     and the TOWN OF MOORESVILLE,
12                  Defendants.
13              ~~~~~~~~~~~~~~~~~~~~
14
                   Deposition of:
15
               AMY RHINEHARDT CRAVEN
16
                  January 4, 2023
17                   10:00 a.m.
18                   Taken at:
             James, McElroy & Diehl, P.A.
19           525 N. Tryon Street, Suite 700
               Charlotte, North Carolina
20
             Joyce Lynn Shannon, RPR
21
22
23
24
25
```

EXHIBIT 6

JA197

Page 15

```
 1              A.    Yes.

 2              Q.    Was that consecutive?

 3              Did you take any time off?

 4              A.    Other than to have children or

 5         medical things, no.

 6              Q.    And we'll focus on August of 2020,

 7         that time period, 2020.

 8              Where were you working at that

 9         time?

10              A.    The Pines at Davidson.

11              Q.    The Pines at Davidson?

12              A.    Yes.  It's in Davidson, North

13         Carolina.  I was the Director of Nursing.

14              Q.    Can you just briefly tell me,

15         Director of Nursing, what does that mean?

16              A.    I'm responsible for anything in the

17         medical related of that company.  It is a CRCC.

18         It is an independent, assisted living and

19         long-term care facility.  They are all private

20         pay.  So I'm over -- I was over the medical

21         clinic, which would see independent living for

22         different reasons.  I was also over the

23         assisted living and the skilled nursing

24         facility.  That job required me to oversee, you

25         know, the daily aspects of that facility, write
```

Amy Rhinehardt Craven　　　　　January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 16

```
 1     policies, work with the Medical Director, you
 2     know, anything that would come up in the
 3     medical aspect.
 4              It was rough right then because of
 5     COVID, so it was a lot of changing daily
 6     routines, changing normal routines, it changed
 7     daily, writing COVID policies, ensuring safety,
 8     making sure we had all the medical equipment we
 9     needed.  So, yeah, it was a rough time.
10          Q.   Did you work there until August of
11     2020?
12          A.   No.  I worked there until August of
13     '21.
14          Q.   I'm sorry.  That was my mistake.
15              Until August of 2021?
16          A.   August of '21, as the Director of
17     Nursing.  I resigned that position.  And they
18     wanted to keep me on as a consultant, so I
19     worked from home up until October 31.  And then
20     the Director of Nursing that they hired decided
21     that I had too much on my plate, and she let me
22     go.
23          Q.   And when did you start in that
24     position, if you recall?
25          A.   2015.  I think it was like June or
```

Amy Rhinehardt Craven        January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 18

```
 1    the record.
 2              You have three children, correct?
 3         A.    Yes.
 4         Q.    Can you just state their names and
 5    ages so we have that on the record?
 6         A.    My oldest daughter is Taylor Dunn,
 7    and she's 24.  My son is the next, he's Riley
 8    Craven, and he's 15.  And then my youngest is
 9    Laura Craven, she goes by Macie, and she is
10    nine, getting ready to be ten, so we might as
11    well say ten.  She's going to be ten in a
12    month.
13         Q.    Okay.  And you said her -- is her
14    birth name Lauren, and she just goes by Macie?
15         A.    Her birth name is Laura Macie
16    Craven, and her dad wanted to call her Macie,
17    so she's been Macie ever since she's been born.
18         Q.    And Riley and Macie are Chris'
19    children, correct?
20         A.    They're all three Chris' children.
21    And if you would ask him if he had a
22    step-daughter, he would correct you in a
23    heartbeat, he has three children.  He raised
24    Taylor from the time she was eight.  He is her
25    father.  And her biological father really
```

JA200

Page 19

```
 1     didn't support her or raise her.  And he would
 2     correct you in a heartbeat.
 3          Q.    So Taylor's biological father, was
 4     that a prior husband?
 5          A.    Yes.
 6          Q.    Okay.  And what's his name?
 7          A.    James Gavin Dunn.  He goes by
 8     Gavin.
 9          Q.    And when were you married to
10     Mr. Dunn?
11          A.    It's been so long, I can't tell you
12     the years, but around when I was 20, 21.  We
13     were divorced probably by the time I was 22,
14     23.
15          Q.    Okay.
16          A.    I think we were separated by -- we
17     were only together for a year, and then we
18     separated.  And then I think it took a year for
19     the divorce to go through.
20          Q.    And those were the only two
21     marriages, right?
22          A.    No.
23          Q.    Was there a third marriage?
24          A.    Yes.
25          Q.    What marriage was that?
```

Amy Rhinehardt Craven                                January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 20

```
 1           A.    I was married, prior to Chris.  His
 2    name was Brennan Turner.  We actually never
 3    lived together.  He was in the Marine Corps.
 4    It just didn't work out, so we resolved that
 5    marriage.
 6           Q.    And no children as a result of that
 7    marriage, right?
 8           A.    No.
 9           Q.    And do you recall about when that
10    marriage was?
11           A.    No.  It wasn't a long-lasting
12    thing.
13           Q.    Okay.  When did you and Chris get
14    married?
15           A.    April 7 of 2007.  I'm sorry.
16    April 5 of 2007.
17           Q.    And I'm sorry, I'm just trying to
18    do the math in my head.
19                 Was Taylor the only child at that
20    time?
21           A.    Yes.
22           Q.    Okay.  That adds up.  I'm not great
23    with math.
24                 And I believe you said Taylor was
25    living with you all once you got married?
```

Veritext Legal Solutions
800.743.DEPO (3376)       calendar-carolinas@veritext.com       www.veritext.com
Case 5:21-cv-00174-KDB-DSC   Document 20-7   Filed 01/20/23   Page 6 of 18
JA202

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 29

1    know, use her typewriter to write.  That was

2    her things that she liked to do.

3         Q.    And same question, what about with

4    Macie?

5         A.    Macie did dance and gymnastics.  He

6    also would take her to her things, go to her

7    recitals, take them to practices.  There was a

8    time, you know, that they were -- we were all

9    doing martial arts together, trying to do

10   martial arts as a family together.

11        Q.    In August of 2020, what was Chris

12   doing for work?

13        A.    NASCAR shut down.  People forget,

14   that was a tough time for a lot of people.  A

15   lot of people were struggling with that

16   because, you know, he worked, he was used to

17   going to work every day, and all of a sudden he

18   became a stay-at-home mom, a teacher.  He tried

19   to work some from home online.

20             And I was more absent than I

21   thought that I was.  When I was there, my phone

22   was ringing, and I'd have to walk away and take

23   phone calls.  So at that time, he was more

24   active in the home than I could be.

25        Q.    And I guess -- so it sounds like

Case 5:21-cv-00174-KDB-DSC  Document 20-7  Filed 01/20/23  Page 7 of 18

JA203

Amy Rhinehardt Craven
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

January 4, 2023

Page 30

```
1      that was a result of COVID, that he was home a
2      lot more.
3             A.    Oh, yeah.  I think everybody was.
4             Q.    So prior to COVID, what was he
5      doing?
6             A.    He worked at Hendricks Motor Sports
7      the entirety of our marriage.
8             Q.    What did he do there?
9             A.    The last thing he did, he was a
10     parts coordinator.
11            Q.    Parts coordinator, you said?
12            A.    Yeah.  I believe that's what it's
13     called.  I never asked him his official title.
14     He was on the 88-48 team, so anything those two
15     cars needed, top to bottom, he had to make sure
16     it was there.
17            Q.    And those are NASCAR cars?
18            A.    Jimmie Johnson, and it was Junior
19     at that time, I believe.
20            Q.    Okay.  And that was all prior to
21     COVID, that was all offsite, in person, he
22     wasn't working from home at all?
23            A.    No.
24            Q.    And once COVID hit, was he working
25     entirely from home?
```

USCA4 Appeal: 23-1393   Doc: 19   Filed: 08/21/2023   Pg: 210 of 573

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 31

1            Was there some kind of flex
2    schedule; do you recall?
3            A.    For a while, you know, they did not
4    work, nobody worked during COVID.  And I think
5    they tried a flex schedule.  I mean, at that
6    time it was all entirely home.  But I don't
7    think -- I'm not sure if he had to work every
8    day because I wasn't there during the day.  I
9    know sometimes he didn't.  He did all the kids'
10   schoolwork, too.  That was online.
11           Q.    Because they were home, as well?
12           A.    Yeah.  Everybody was home, yeah,
13   except for me.
14           Q.    And did he stay employed with
15   Hendricks up until August of 2020?
16           A.    Yes.
17           Q.    And do you recall -- I know we've
18   got the pay stubs, but do you recall about how
19   much he was making per year at that time?
20           A.    I actually don't recall that.  I'm
21   sorry, I don't.
22           Q.    That's perfectly fine.
23           Would the pay stubs that you all
24   produced in discovery -- would that be an
25   accurate representation?

Amy Rhinehardt Craven                              January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 38

1              A.      Not that I'm aware of.

2              Q.      And I think you testified before

3      that you weren't aware of any treatment that he

4      sought, aside from his primary care physician,

5      for depression or anxiety.

6              A.      I did try two convince him to go to

7      therapy.  It worked well for my oldest daughter

8      when.  We did try to go a couple times.  But he

9      is such a private person that he was not able

10     to give them the information they needed.  And

11     they ask very personal questions about

12     yourself, your marriage and that kind of stuff,

13     and it was not okay with him.  He kept those

14     things -- wanted to keep those things private.

15              And when I say, "things," I mean

16     like normal marriage stuff; do you know what I

17     mean?

18             Q.      Right.  Do you know if he was on

19     any medication for anxiety or depression?

20             A.      Yes.  He had been on Lexapro for

21     quite a while.

22             Q.      Was that pre COVID, as well?

23             A.      That was pre COVID.  I know he was

24     on blood pressure medicine.  He had a

25     prescription for Xanax at one time, but didn't

Case 3:21-cv-00174-KDB-DSC   Document 26-7   Filed 01/20/23   Page 10 of 18

JA206

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 39

1    like the effects of that.  He was started on --

2    they started looking at his ADHD, so he was on

3    medication for that prior to COVID.  And then

4    when this started, I think the doctor added

5    Celexa, I believe.  Don't quote me on that, but

6    I think it was Celexa.  I said the blood

7    pressure medicine.  And that's all I can think

8    of as of right now.

9                 And he took his medication

10   religiously.  He did his pills every day.  He

11   talked to his physician about if it was working

12   or not.  He would ask me questions about his

13   medication.  The doctor suggested, you know --

14   a lot of times he didn't eat breakfast when he

15   was getting up to go to work, this is prior to

16   COVID, so the doctor said, "Well, you need to

17   eat something small for breakfast and then take

18   your medication, and then maybe you won't have

19   side effects with it."  He really stayed in

20   touch with his doctor to make sure the

21   medications were working.

22        Q.    And you're not sure if it was

23   Celexa or not, but I guess my question is,

24   aside from the ADHD medication, the blood

25   pressure medicine, the Lexapro, whether it be

USCA4 Appeal: 23-1393    Doc: 19    Filed: 08/21/2023    Pg: 213 of 573

Amy Rhinehardt Craven                January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 56

```
 1          A.    I can't recall if I did hear at the
 2     time that she -- that I actually knew she had
 3     called, but I became aware at some point.
 4          Q.    So do you recall if you heard the
 5     things that she was saying over the telephone?
 6          A.    Not everything, no.
 7          Q.    Were you able to hear whoever was
 8     on the other line, the dispatcher?
 9          A.    No, I don't believe so.  I don't
10     recall if I had or not.
11          Q.    Let's say in the hour before the
12     call, what was happening in your house?
13          A.    Of course, I worked that day.  I
14     don't recall what time I came home.  But when I
15     came home, everybody was in the yard playing.
16     It was a hot day.  A Police car drove by.  And
17     my husband told my son to go get him a bottle
18     of water, and when they came back by, he was
19     going to give it to them, you know, they
20     weren't being treated the way they should be,
21     and he was going to give them a water.  I went
22     in the house.
23               I recall, you know, everything
24     being fine.  I was actually in bed for the
25     night when Chris had this mental health crisis
```

Case 3:21-cv-00174-KDB-DSC    Document 26-7    Filed 01/20/23    Page 12 of 18

JA208

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 57

```
 1    go on.  The kids were in bed.  And he got up
 2    out of bed and just -- this is going to be hard
 3    for me.
 4            Q.    Do you want to take a quick break
 5    before we go on to this?
 6            A.    No.
 7                  He asked me to sleep with him.  I
 8    was exhausted.  And I told him I was exhausted,
 9    "but you're my husband, I will if you want to."
10    And he lost it.  And he went into this mental
11    health crisis because I had not been there for
12    the family.  I felt like -- he left the room.
13    And it just happened.  I didn't understand what
14    I said wrong.  And then it just started
15    happening.
16                  I remember being shut in the room
17    with him at some point.  He was holding a gun
18    to his head, saying that I was going to watch
19    him kill himself.  I was screaming, just trying
20    to beg him, "Please don't," trying to get out
21    of the room, I needed to go check on my kids.
22    I was scared to what he was going to do to
23    himself.  I was scared what my kids were going
24    to see.  And then I just remember going into my
25    son's room with my kids and staying there and
```

Case 5:21-cv-00174-KDB-DSC   Document 26-7   Filed 01/20/23   Page 13 of 18

JA209

Amy Rhinehardt Craven                          January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 61

1          Q.    Okay.  So did you guys leave the
2    bedroom and go back into the bedroom?
3          A.    I don't believe I ever left the
4    bedroom.  I believe he left the bedroom after
5    he got upset with me.  And then I remember him
6    coming back in there and shutting the door and
7    holding the gun to his head, threatening to
8    kill himself.  I don't recall if I ever left
9    the bedroom or not.  I'm sorry, I don't.
10         Q.    So it sounds like you were either
11   in the bedroom or in Riley's room for the
12   entirety of this incident, would that be
13   accurate, until the Officers came into the
14   home?
15         A.    I believe so.  Now, there's a
16   hallway between the bedrooms that I may have
17   been in, but not for a long period of time, I
18   don't believe.
19         Q.    At some point Chris left the house,
20   right?
21         A.    I believe so, yes.
22         Q.    Do you know if he left the house
23   more than once during this entire incident?
24         A.    I can recall him -- before he came
25   back in and shut the door, when he left the

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 3:21-cv-00174-KDB-DSC    Document 26-7    Filed 01/20/23    Page 14 of 18
JA210

USCA4 Appeal: 23-1393    Doc: 19    Filed: 08/21/2023    Pg: 216 of 573

Page 62

1    bedroom initially, I believe he went outside.
2    And I wasn't expecting to happen what happened
3    when he came back in.  And I think when I got
4    out of there, he might have went back out
5    again.  I can't recall.  He might have done it
6    once while we were in the bedroom, Riley's
7    room.  So I don't know how many times because I
8    didn't see it.  It's just what I thought that I
9    heard was going on.
10            Q.    And when he was outside, were you
11   able to see at all what he was doing outside?
12            A.    No.
13            Q.    At any point?
14            A.    No.
15            Q.    Were you able to hear him say
16   anything while he was outside at any point?
17            A.    We didn't hear anything.
18            Q.    Now, when the shooting occurred,
19   did you all hear the gunshots?
20            A.    We heard the gunshots.
21            Q.    Prior to the gunshots, did you hear
22   anyone say anything, whether it be Chris, the
23   Police Officers, anyone at all outside the
24   house?
25            A.    When he was outside the house?

Case 3:21-cv-00174-KDB-DSC   Document 26-7   Filed 01/20/23   Page 15 of 18

JA211

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 63

1          Q.    Yes.

2          A.    No.

3          Q.    And you said you didn't see

4     anything, right?

5          A.    (Witness shaking head.)

6          Q.    I feel bad going through this, but

7     I just want to make sure that I understand the

8     timeline clearly.

9                So this starts at the bedroom.  At

10    some point he leaves the bedroom and you stay.

11    You think he may have gone outside.  He comes

12    back into the bedroom, and at that point is

13    when he threatens to harm himself.

14                He leaves the bedroom again?

15         A.    I believe he did because I believe

16    I was the first one to leave the bedroom after

17    he held the gun to his head.  I was trying to

18    go to my children and make sure they were okay.

19    I didn't want them to see anything, yeah.

20         Q.    And is that when you and your

21    children went into your son's room?

22         A.    Yes.

23         Q.    And then he went -- do you know

24    what he was doing at that point, once you were

25    in this room?

Amy Rhinehardt Craven                    January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 64

```
 1                    Were you guys closed up in there?
 2          A.     Yes.  And I locked the door.
 3          Q.     Do you recall, aside from him
 4     threatening to harm himself, if he was saying
 5     anything else during this time?
 6          A.     I don't recall anything exactly
 7     that he was saying.  I was in Riley's room
 8     focusing on the kids, trying to calm them.  It
 9     was hard to do.  They were crying.  I know at
10     that time Taylor was on the phone with 911.  I
11     don't recall everything she said.  I know what
12     the -- I've seen the transcripts, but I don't
13     recall anything of what was being said at the
14     time.
15          Q.     Got it.
16                    Did Chris give any indication that
17     he knew the Police were coming?
18          A.     I don't recall.  I don't know.
19          Q.     When you last saw him in the house,
20     did he have his gun on his person?
21          A.     The last time I saw him have his
22     gun is in the bedroom, and he dropped it twice.
23          Q.     He dropped the gun twice?
24          A.     Yes.  During the time I was in the
25     bedroom, he was holding it in his hand and he
```

Amy Rhinehardt Craven                  January 4, 2023
Craven, Amy Rhinehardt v. Novelli, Chistopher, Et Al.

Page 69

1      I did not know."

2            A.    Very top?

3            Q.    Yes, that's the very first line.

4      Because it's not numbered, I want to make sure

5      we're on the same page.

6                  About halfway down, the dispatcher

7      asks, "Ask your mom if she saw a gun."

8            A.    Uh-huh.

9            Q.    And then Taylor says, "Her and my

10     brother both said yes."

11           A.    Uh-huh.

12           Q.    Do you remember that occurring?

13           A.    I believe I do remember Taylor

14     asking me that.  And I believe I did say I saw

15     a gun, and he had his CCW, but I saw the gun

16     when he had it to his head in the bedroom and

17     was dropping it in the bedroom.

18           Q.    Those are all the questions I have

19     specific to this.  You're welcome to hold on to

20     it in case I ask you something that you want to

21     check on.  That's all I wanted to confirm.

22                 Prior to we'll just say the

23     incident, because I know you don't know exactly

24     when the call occurred, do you know if Chris

25     was drinking at all that day?

Case 3:21-cv-00174-KDB-DSC   Document 26-7   Filed 01/20/23   Page 18 of 18

JA214

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
Christopher Novelli on 11/29/2022

```
               IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF NORTH CAROLINA
                     STATESVILLE DIVISION


               Case No. 5:21-CV-174-KDB-DSC


*********************************************************

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

          Plaintiff,

v.


CHRISTOPHER NOVELLI, individually
and in his official capacity as
Officer of the Mooresville Police
Department; ALEXANDER ARNDT, individually
and in his official capacity as Officer
of the Mooresville Police Department,
and the TOWN OF MOORESVILLE,

          Defendants.



*********************************************************



     DEPOSITION of CHRISTOPHER NOVELLI, taken by the
Plaintiff pursuant to Rules 26, 30 and 32 of the North
Carolina Rules of Civil Procedure, in the above-entitled
action, pursuant to notice, before Twyla Donathan,
Registered Professional Reporter and Notary Public, at
the Mooresville Town Hall, 126 North Main Street,
Mooresville, North Carolina, on the 29th day of
November, 2022, beginning at 9:30 a.m.
```

**EXHIBIT 7**

1              So tell me just kind of what was your normal

2   routine at that time?  And I don't mean like, you know,

3   what you did during the day, but did you have a certain

4   shift you worked, and what was your -- what were you

5   doing during your shift?

6       A    So I was on D Squad, which is one of our

7   night shifts.  And I was assigned to Zone 3E, which is

8   a third area of the east side.

9       Q    Okay.  And what did you -- what were your

10  duties at that time?

11      A    Just normal patrol officer.

12      Q    Okay.  And did you have your own patrol car?

13      A    I did.

14      Q    Did anyone ride with you?

15      A    Not --

16      Q    -- Sorry.

17           I think you said no one regularly rode with

18  you at that time?

19      A    Correct.

20      Q    Okay.  All right.  Let's go to August 2nd,

21  2020.  Tell me when you first learned of the call at

22  the Craven residence.

23      A    It was around roughly 9:30 at night.

24      Q    Okay.  What do you remember?

25      A    I was sitting at the Food Lion parking lot in

```
 1  my patrol car, sitting next to Sergeant Glenn.  And the

 2  call came out of a domestic in progress.

 3      Q    When you say next to Sergeant Glenn, was he

 4  in a separate car or was he in your car?

 5      A    Separate car.

 6      Q    And I apologize.  I should have done this at

 7  the beginning.  Can you tell me, what did you do to

 8  prepare for your deposition today?

 9      A    I met with my attorney yesterday.

10      Q    Okay.  And don't tell me anything you

11  discussed at any point with any lawyer that's been

12  retained on your behalf.  Anything else?

13      A    No.

14      Q    Did you review any policies or video?

15      A    We did.

16      Q    Okay.  What did you review?

17      A    At one point we did watch the body camera.

18      Q    Your body camera?

19      A    Yes.

20      Q    Anyone else's?

21      A    No.

22      Q    At any point in time have you seen anyone

23  else's body camera?

24      A    I have.

25      Q    Okay.  Whose have you seen?
```

```
 1      A     Corporal Arndt's and Officer Ramey's.

 2      Q     Is Ramey R-A-M-E-Y?

 3      A     That's correct.

 4      Q     Okay.  Anyone else?

 5      A     Not that I can remember.

 6      Q     Do you know approximately how many times you

 7  have seen your body camera?

 8      A     I'm not too sure.

 9      Q     Is it more or less than five?

10      A     There was one date that Corporal Arndt and

11  myself reviewed all the cameras with Chief Falzone.  We

12  spent a few hours watching video and listening to 911

13  calls.  So I don't know how many times I watched my own

14  video.

15      Q     And when you were at that -- when you met

16  with Arndt and Falzone, did you review any body cameras

17  besides yours, Arndt's, and Ramey's?

18      A     Not that I can remember.

19      Q     Okay.  And you said that was after the SBI

20  interview?

21      A     That's correct.

22      Q     Okay.  Anything else that you -- Did you look

23  at any documents to prepare for your deposition?

24      A     I reviewed use of force policy, things like

25  that.
```

1                    MR. HEROY:  I'm sorry.  I don't have a

2    copy of the iPads to give you.

3                    MR. STEWART:  Unacceptable.

4        Q    First of all, do you recognize what I've put

5    on the iPad in front of you?

6        A    I do.

7        Q    Okay.  Can you tell me just from -- This is a

8    still shot of the very beginning of a video, correct?

9        A    Yep.

10       Q    Can you tell me what it is?

11       A    Looks like the hallway to our sergeant's area

12   in the old police department.

13       Q    Okay.  And can you recognize -- is it --

14   whether this is a body-worn camera footage?

15       A    That's what it looks like.

16       Q    Okay.  Can you tell whose body-worn camera it

17   is?

18       A    No, I can't tell.

19       Q    Okay.  And I think there's some letters and

20   words at the top right.  That's just the date and the

21   time; is that correct?

22       A    That's correct.

23       Q    And you're using military time?

24       A    Yes.

25       Q    Okay.  And then it says "Accident body 3,"

 1  and then it has a bunch of other letters and numbers.

 2  Do you see that?

 3      A    Yes.

 4      Q    Do those have any significance to you?

 5      A    The actual numbers, I don't know what they

 6  are.

 7      Q    Okay.  So you don't know whether that

 8  corresponds to your body camera, for example?

 9      A    No, I don't think that's attached to my

10  camera at all.

11      Q    Okay.  I'm going to hit play on this, and

12  tell me just whenever you can decide whose body camera

13  it is, just tell me to stop.

14          (Counsel began playing video for the witness)

15      A    Now that I've seen it, I think this might be

16  Corporal Arndt's.

17      Q    Okay.  I'm hoping it's yours, but let's play

18  it and let's see.  And if it's not --

19      A    This is going to be Arndt's.

20      Q    This is Arndt's?

21      A    Yeah.  I wasn't at the police department.

22      Q    Okay.  All right.  Let me mark this as

23  Exhibit 7.

24          (Exhibit No. 7 was marked for identification

25  for the record and handed to the witness.)

```
 1            Same question.  Tell me once you can
 2   recognize whose body camera this is.
 3       A     That should be mine.
 4       Q     Okay.  So Exhibit 7 you believe is your
 5   body-worn camera?
 6       A     Correct.
 7       Q     All right.  And I know that you've seen this,
 8   but I'm going to have you watch the critical moment of
 9   the incident.  And let me know if this fairly and
10   accurately represents what you observed.
11       A     Okay.
12            (Counsel plays video for the witness.)
13       Q     Does that accurately depict what you
14   observed?
15       A     For the most part.
16       Q     And there is -- I heard multiple voices from
17   what sounded like officers.  Can you identify one as
18   Colonel Arndt's voice?
19       A     Corporal Arndt's.  Yes.
20       Q     Corporal Arndt.  And who the other officer
21   was?
22       A     Sergeant Glenn.
23       Q     Okay.  And you said for the most part it
24   accurately depicts what you saw.  Tell me how this
25   differs from what you saw?
```

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Alexander Arndt on 11/28/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     STATESVILLE DIVISION
             CIVIL ACTION NO: 5:21-cv-174-KDB-DSC
 3
    AMY RHINEHARDT CRAVEN, as    )
 4  Administratrix of the        )
    Estate of CHRISTOPHER         )
 5  KIMMONS CRAVEN,               )
                                  )
 6                   Plaintiff,   )
                                  )
 7             vs.                )
                                  )
 8  CHRISTOPHER NOVELLI,          )
    individually and in his      )
 9  official capacity as         )
    Officer of the               )
10  Mooresville Police           )
    Department, ALEXANDER         )
11  ARNDT, Individually and      )
    in his official capacity     )
12  as Officer of the            )
    Mooresville Police           )
13  Department, and the TOWN      )
    OF MOORESVILLE,               )
14                                )
                     Defendant.   )
15  _____

16                      -  -  -

17                   Deposition of

18               ALEXANDER ARNDT

19       (Taken on behalf of The Plaintiff)

20          Mooresville, North Carolina

21               November 28, 2022

22


23


24  REPORTED BY:  SHERRY L. MALIA REGISTERED
    PROFESSIONAL REPORTER/NOTARY PUBLIC
25
```

**EXHIBIT 8**

JA222

1   of what happened on August 2nd, 2020, but I

2   would like for you to just walk me through the

3   events of that night in your own words.

4        A.   Of course.  August 2nd, 2020, sometime

5   after 9:00.  I was actually just sitting down at

6   the Mooresville Police Department to eat dinner.

7   I had my trainee with me.  It was Officer

8   Mercado.

9             As we began to eat, I heard I believe

10  it was Dispatcher Whitlow over the radio ask

11  units to start towards a domestic.  Maybe in

12  that first transmission or a second transmission

13  indicated that he thought a shot had been fired,

14  is what it sounded like, and then provided some

15  information.  Again, I'm not sure if it was all

16  one transmission or multiple, that a male was

17  threatening to blow his brains out.

18             I was a west district officer.  The old

19  police department is at 750 West Iredell Avenue,

20  that's in the east district, so we were I'm not

21  going to say the closest to the call but we

22  ended up we were because we arrived first.  But

23  we -- because of the situation, we elected to

24  respond, and so we left dinner and responded.

25             Officer Mercado, I think he was in

# Exhibit 9
Autopsy Report

**MPD Communications 911 Transcript**

**MPD Dispatcher**: (21:30:50) – Mooresville 911, what's the location of your emergency?

**911 Caller**: My stepdad hit my mom in front of me and my siblings and he is threatening to blow his brains out and stuff and he is screaming and getting in her face and he won't stop.

**MPD Dispatcher**: Ok, what's your address?

**911 Caller**:  226 Heritage Place

**MPD Dispatcher**: Ok does, Is your father still there?

**911 Caller**: Yes, he won't leave and go outside.  He is still screaming and yelling in their face.

**MPD Dispatcher**:  Ok, has he been drinkin?

**911 Caller**: Um, I have no idea.  I've been at work all day and then he just started after I got home from work.

**Child in background:** Please

**MPD Dispatcher**: Ok alright. And what's your name?

**911 Caller**:  My name is ▮▮▮▮▮▮▮ (Kids screaming in background)

**Child in background**: I will….Leave me alone….give me a second

**MPD Dispatcher**: Ok, does your father have any weapons?

**911 Caller**:  Um, he has his concealed carries permit, but I don't know if he has anything like on his exact pocket or persons or anything.

**MPD Dispatcher**:  Alright, and what's his name?

**911 Caller**:  Um, Chris Craven

**Child in background**:  Please stop

**MPD Dispatcher**: Ok and he threatened to shoot who?

**911 Caller**: Um, He threatened to shoot his brains out and he hit my mom in front of me.

**Child in background:** you stop fighting, you liar

**MPD Dispatcher**: Ok, how many people are in the house?

**911 Caller**:  Um, it's me, my two siblings, my mom and him.

**MPD Dispatcher**: So, there's uh, three 3 childre, uh, 2 other kids in the house.

**911 Caller**: Um, yes.

**MPD Dispatcher**: How old are the kids?

EXHIBIT
**10**

**911 Caller**:  7 & 13.

**Child in background**:  "you better not" (inaudible)

**911 Caller**: He just locked my mom, he just locked my mom (inaudible kids screaming in the background).

**MPD Dispatcher**:  What happened?

**911 Caller**: (screaming) He just locked my mom in their room (screaming)

**MPD Dispatcher**: He just shot your mom? (inaudible kids in background screaming)

**911 Caller**:   Yes, he just locked my mom by herself in their room (screaming).

**MPD Dispatcher**: ████████████

**911 Caller**:  Yes

**MPD Dispatcher**:  What happened? (inaudible screaming in background)

**911 Caller**: I don't know.  He locked my mom, with him by herself in her room.

**MPD Dispatcher**: He locked her in the room with him?

**Chris Craven**: ██████ called 911 so I'm going out there to do it right now, Thank you

**Kids in background**: Stop

**911 Caller**:  He's saying he's going outside right now to go blow his brains out and I don't know what to do?

**MPD Dispatcher**: He's going..(inaudible kids crying and screaming in background)

**911 Caller**:  He's saying he's going outside right now to shoot himself in the head.

**MPD Dispatcher**: Ok

**MPD Dispatcher 2**: (in background) Does he have a gun?

**MPD Dispatcher**:  Do you see a gun on him?

**911 Caller**: Yes

**MPD Dispatcher**: (to **MPD Dispatcher 2**) yea

(kids in background screaming and crying)

**911 Caller**: Yes

**MPD Dispatcher**:  Ok, uh, ██████, could you do me a favor? Is there any way you can get those children into another room?

(inaudible background noise kids screaming and yelling)

**911 Caller**: They're,  They're with my mom in the living room now.  But he just went outside.  I think he is going to the, our family trailer.

**MPD Dispatcher**:  Ok, you have a trailer outside? I need, I need you to go into, have those kids go into another room, ok.

**911 Caller**: Ok (Kids screaming in the background inaudible)

Chris Craven in the background "Hey that's the one thing I asked y'all not to do?" When they knock on my door of that camper, I'm gone its y'alls fault, goodbye. (kids screaming, NO)

**911 Caller**:  Stop, I don't know what to do (inaudible)

**MPD Dispatcher**: ▮▮▮▮

**911 Caller**:  I'm sorry, I don't know what to do, he keeps coming back. He's in here screaming and stuff and I don't know what to do.

**MPD Dispatcher**: ▮▮▮▮▮▮▮ Listen to me, I need you to put those kids in another room, please.

**911 Caller**:  Ok.  Hold on, hold on one second. (inaudible)

**911 Caller**: She's asking me to put y'all in a bedroom or something so please listen.

**MPD Dispatcher**: Put them in a room, put them in a room, please.

**911 Caller**:  I am, I'm trying to get them both

**MPD Dispatcher**: okay, okay

**911 Caller**:  in the room with um me

**MPD Dispatcher**: It's very hard to hear with them, with them screaming, you know

**911 Caller**: I'm sorry

**MPD Dispatcher**:  but I need to hear what's going on. (inaudible kids crying)

**911 Caller**: I'm sorry, we're both, we're all in my brothers' room now.

**MPD Dispatcher**: Ok, ok, alright let me know if you hear him come back in the house.

**911 Caller**: yes, ma'am

**Child in background**:  I don't want him to do it  (inaudible children in the background)

**MPD Dispatcher**: ok, He's still outside correct?

**911 Caller**: Correct

**MPD Dispatcher**: he's still outside

**MPD Officer**: (heard over the radio) does anybody have a gun?

**MPD Dispatcher**: Did you see the gun on your father?

**911 Caller**: I, I did not, no. But, I'm assuming he has it. Because he said he did.

**MPD Dispatcher**: He said he did, but you haven't seen it?

**911 Caller**: No I didn't see it, cause I was in here trying to talk to you and then he took, he locked my mom in their bedroom.

**MPD Dispatcher**: Right

**911 Caller**: He's got my keys

**911 Dispatcher**: He has a CCW. Ask your mom if she saw it?

**911 Caller**: Hold on one second. Do you feel hurt or anything?

**MPD Dispatcher**: In a trailer?

**Female in background**: do what?

**911 Caller**: Do you feel hurt or anything?

**Female in background**: Do I feel hurt?

**911 Caller**: (inaudible)

**MPD Dispatcher**: Ask your mom, ask your mom if she saw a gun?

**911 Caller**: Um, did you see if he had his gun on him?

**Child in background**: Yes

**911 Caller**: Her and my brother both said yes.

**MPD Dispatcher**: He does have a gun on him?

**911 Caller**: Yes

**MPD Dispatcher**: Ok, and you said there is a trailer outside that he that he went into or that he was going to.

**911 Caller**: Um I don't know if he's in it now, but he usually heads out that way.

**MPD Dispatcher**: Ok, Ok, (inaudible kids in background talking) Alright████, you're doing good. Just stay on the phone with me, ok.

**911 Caller**: Ok

**MPD Dispatcher**: Is there anyway you can see the trailer from where you're at?

**911 Caller**: Um, no I don't think so.

**MPD Dispatcher**: No you don't. Ok.

**911 Dispatcher**: No

**Child in background**: Why does he have to do this?

**MPD Dispatcher**: Alright (inaudible kids in the background crying)

**MPD Dispatcher**: Hey ▮▮▮▮

**911 Caller**: Mmm Hmm

**MPD Dispatcher**: Talk to those, talk to your brother, I think that's him right, that's  talking.

**911 Caller**: Yes.

**MPD Dispatcher**: Try to get him to calm down a little bit.(inaudible Kids screaming in the background)

**911 Caller**: Ok hold on one second.

**MPD Dispatcher**: I know he's upset, but it's not gonna help (inaudible kids in the background)

**Amy Craven**: it's hard to calm down when you have to go through this

**MPD Dispatcher**: I know ma'am I know, it is very hard. I know

**MPD Dispatcher**: Just takes some deep breaths.

**911 Caller**:  (inaudible) I know it's hard.

**MPD Dispatcher**:  Just deep breaths. I know this is a horrible situation. Especially for them to see it.

**911 Caller**: I think he's coming back in the house.

**MPD Dispatcher**: He's coming back in?

**911 Caller**: Yes

**MPD Dispatcher**: Ok. Are you guys still in the bedroom

**Chris Craven**: I want my phone.

**Chris Craven**:  I want my phone (inaudible) tell mom goodbye

**Child**:  We gave you your phone, your phone is with you, we got it for you, I gave it to you

**Chris Craven**: When the police show up here, Thank ▮▮▮▮ because (inaudible)

**Child**: "please, I love you, please don't do it"

**Chris Craven**: You won't have a fucking daddy no more (Inaudible)

**Child**: "Please, I love you"

**Chris Craven**: (inaudible) You can ask your god damn sister about that, your piece of shit sister.

**Child**: (inaudible) Please!  Don't touch her like that!  You're the worst father in the world!

**MPD Dispatcher**: Ok, ▮▮▮▮

**911 Caller**: Yes.

**MPD Dispatcher**: Are they all out of the bedroom now? (inaudible child in the background screaming)

**911 Caller**: Um no me and my mom and my brother and sister are in my brother's room together, but he's out in the hallway. (inaudible male in the background)

**MPD Dispatcher**: Ok.  It's not gonna help him, him saying that to his son

**911 Caller**: I know, but he, he, he doesn't care

**Child in background**:  Don't do it, Don't, I love you. I do, I swear on my life.

**MPD Dispatcher**: I understand, I understand that.

**911 Caller**: ▓▓▓▓ honey, you've got to stop yelling at him, don't acknowledge him the best you can

**MPD Dispatcher**: Right that's what...(shots fired in background)

**911 Caller**: " I hear Gunshots" (screaming in background)

**MPD Dispatcher**:▓▓▓▓▓▓▓▓

**911 Caller**: Yes

**MPD Dispatcher**: ▓▓▓▓ do me a favor. Do me a favor,  You listen, now listen, you gotta listen to me. Take those children put them in a bedroom and shut the door with them, please.

**Female in the background yelling:** "What was that, what was that?"

**MPD Dispatcher**:  Please. Just get back in the bedroom.

**911 Caller**: Please don't, please mom (inaudible screaming in the background)

Officers have made entry and telling everyone to get on the ground.

**MPD Dispatcher**:  Listen, Listen (yelling in background)

**911 Caller**: (inaudible) he's, he went outside

**Female in background:** Did you shoot my husband? Did you shoot my husband?

**911 Caller**: I don't know what to do

**MPD Dispatcher**: ▓▓▓▓▓▓

**911 Caller**: I can't move,  They're telling me to go in the living room and they won't let us move.

**MPD Dispatcher**:  Where is your father?

**911 Caller**:  I don't know

Officers are telling them to get on the ground.

**MPD Dispatcher**:  Who is that, who is that man screamin?

**911 Caller**:  I don't know, he has a police uniform on but I don't know where he's at.

**MPD Dispatcher**:  Okay, alright, alright, if he has a uniform on, go talk to him.

**MPD Dispatcher**: Calls ECOM, hey we need Fire and EMS.

**ECOM**:  Where at?

**MPD Dispatcher**:  226 Heritage Pl.

**ECOM**: What's going on there?

**MPD Dispatcher**:  I think a father just killed himself in front of his kids

**ECOM**: Oh okay, we'll send them out there

**MPD Dispatcher**: yes, please.  Scene secure

**ECOM**. Okay, thank you

# <u>Exhibit 11</u>
# Recording of 911 Call

# Exhibit 12
Alexander Arndt Body Camera Footage

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | **CONSENT MOTION TO SEAL EXHIBIT** |

Pursuant to L. Civ. R. 6.1, Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff"), moves the Court to allow Plaintiff to file under seal certain confidential documents referenced in the Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. Said documents are contained in the North Carolina State Bureau of Investigation file which was produced to the parties pursuant to this Court's Protective Order, [DE # 9]. Specifically, Plaintiff requests that she be allowed to seal the body camera footage of Defendant Officer Christopher Novelli she intends to introduce as Exhibit C to her Memorandum of Law. The exhibit will continue to be confidential after this litigation's conclusion, thus this Motion seeks permanent sealing. There is good cause to seal this document as the competing interests for public access are outweighed by the strong public policy favoring confidentiality of such records. Defendants consent to this Motion.

**JA234**

Wherefore, Plaintiff respectfully requests that this Motion be granted and that the Court allow the Plaintiff to file the document under seal.

This the 7th day of February, 2023.

<div align="right">

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
          jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

</div>

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **CONSENT MOTION TO SEAL EXHIBIT** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

Patrick H. Flanagan
Jake W. Stewary
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

This the 7th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
            jhouti@jmdlaw.com
            Fax: 704-333-5508
*Attorneys for Plaintiff*

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>       Plaintiff,<br><br>    v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>    Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF CONSENT MOTION TO SEAL EXHIBIT** |

Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff"), respectfully submits this Memorandum of Law in Support of Consent Motion to Seal Exhibit.

## INTRODUCTION

Plaintiff, with Defendants' consent, seeks to file under seal video footage from the body worn camera of Defendant Christopher Novelli ("Officer Novelli") from the incident at issue in this action which was designated as "confidential" pursuant to this Court's Consent Protective Order entered January 19, 2022 (the "Protective Order"), (DE # 9). For all the reasons cited herein, this Court should grant the Motion and allow Plaintiff to file its intended Exhibits under seal.

## PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

This Court entered the Protective Order on January 19, 2022, which governs the production

and use of information contained in the investigative file of the North Carolina State Bureau of Investigation ("SBI"). (DE #9). The video contains footage from the body worn camera of Officer Novelli of the incident on August 2, 2022 in which Corporal Arndt and Officer Novelli shot and killed Craven.

On January 20, 2023, Defendants Town of Mooresville, Officer Novelli, and Corporal Alexander Arndt filed a Motion for Summary Judgment and accompanying Memorandum. [DE # 19 and 20]. In connection with Plaintiff's impending Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Plaintiff intends to file a confidential exhibit to the to-be-filed Declaration of J. Alexander Heroy. Specifically, Plaintiff seeks to file video footage from the body worn camera of Officer Novelli seal.

Plaintiff seeks leave of Court to file the video footage under seal. Defendants <u>consent</u> to Plaintiff's seal request.

## **ARGUMENT**

A party seeking to file material under seal must comply with LCvR 6.1. <u>L.B. v. Wells Fargo & Co. Health Plan</u>, 2013 U.S. Dist. LEXIS 128548, at *1 (W.D.N.C. Sep. 4, 2013) (Cogburn, J.). In particular, a movant must show:

> (1) A non-confidential description of the material sought to be sealed;
>
> (2) A statement indicating why sealing is necessary and why there are no alternatives to filing under seal;
>
> (3) Unless permanent sealing is sought, a statement indicating how long the party seeks to have the material maintained under seal and how the matter is to be handled upon unsealing; and
>
> (4) Supporting statutes, case law, or other authority.

LCvR 7.1(c)(1)-(4). Here, all such elements are satisfied.

Plaintiff seeks to file under seal a video that has already been made confidential pursuant

to the Court's Protective Order. The video is from the body worn camera of Officer Novelli, and depicts the fatal police shooting of Craven, the minutes leading up to it, and the aftermath. This video is part of the SBI's criminal investigative file, which itself is legally privileged and not subject to public disclosure, and for which there is no common law or First Amendment presumption of access. N.C.G.S. § 132-1.4(a).

There is no alternative to filing the document under seal, given that the entirety of the video is confidential and not subject to disclosure.

## **CONCLUSION**

For all the reasons cited above, this Court should grant Plaintiff's Motion and allow Plaintiff to file the intended exhibit under seal.

This the 7th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
         jhouti@jmdlaw.com
         Fax: 704-333-5508
*Attorneys for Plaintiff*

3

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF CONSENT MOTION TO SEAL EXHIBIT** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

<div align="center">

Patrick H. Flanagan
Jake W. Stewary
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

</div>

This the 7th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
          jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>        Plaintiff,<br><br>    v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>        Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff" or "Craven"), respectfully submits the following memorandum of law in opposition to Defendants Christopher Novelli, Alexander Arndt, and the Town of Mooresville's Motion for Summary Judgment [DE # 19].

## PRELIMINARY STATEMENT

This case arises from Defendants' fatal mishandling of a man's mental health crisis. Instead of following policy in dealing with a citizen in crisis, Officers choose to shoot first and ask questions later.

Police were called to Christopher Craven's home on August 2, 2020, for a domestic disturbance and assistance with his mental health crisis; indeed Defendants knew that Craven threatened suicide. Rather than approaching calmly and attempting to deescalate the situation and

facilitate Craven receiving the help he needed, Corporal Arndt and Officer Novelli fatally shot Craven just *three seconds* after laying eyes on him. The justification they give for firing on Craven as he walked down the sidewalk in front of his own home is that Corporal Arndt and Officer Novelli purportedly saw Craven reach for a holster at his waistband and brandish a handgun. Yet their self-serving testimony is not born out by their body worn camera footage, and is not corroborated by any other officer on the scene at the time. Craven's actions did not pose a serious threat of substantial physical harm to the officers or any other person on the scene that night, such that Corporal Arndt's and Officer Novelli's use of deadly force was unconstitutionally excessive in violation of Craven's Constitutional rights.

Because genuine issues of material fact exist as to Craven's conduct and movements at the time of the shooting, and the Town's deliberate indifference to the rights of Craven and others by failing to adequately train its officers, Defendants' Motion should be denied in its entirety.

## FACTUAL BACKGROUND

On August 2, 2020, Christopher Kimmons Craven ("Craven") was at his home at 226 Heritage Place in Mooresville, North Carolina. Craven was experiencing a mental health crisis as a result of ongoing issues with depression and anxiety, for which he had been approved for FMLA leave just two days before. At approximately 9:30 p.m., Chris's oldest daughter placed a 911 call to Iredell County Emergency Communications. See (DE # 20-11, Defs.' Exhibit 10).

Defendants Corporal Alexander Arndt ("Corporal Arndt") and Officer Christopher Novelli ("Officer Novelli") were (and remain) employed by Defendant Town of Mooresville ("Town") as police officers with the Mooresville Police Department. (DE # 20-3, Affidavit of Alexander Arndt ("Arndt Aff."), ¶ 2); (DE # 20-2, Affidavit of Christopher Novelli ("Novelli Aff."), ¶ 2.) Corporal Arndt and Officer Novelli responded to the Craven house along with other officers of the

2

Mooresville Police Department. Arndt Aff. ¶ 4; Novelli Aff. ¶ 4. The dispatcher reported to the responding officers that Craven was suicidal and may have a gun in his possession. Novelli Aff. ¶¶ 3-4. Dispatch also notified officers as they approached the house – including Officers Novelli and Arndt – that no shots had been fired. Arndt Aff. ¶ 4. After parking down the street, at least half a dozen officers approached Craven's house, long guns drawn. Arndt Aff. ¶¶ 5-6.

As the officers approached, they saw Craven outside by his front steps, with his family still inside the home. Pltf's. Exhibit A, Excerpts from Alexander Arndt Deposition Transcript ("Arndt Dep. Tr.") 137:24-137:9; Pltf's. Exhibit B, Excerpts from Christopher Novelli Deposition Transcript ("Novelli Dep. Tr.") 49:15-18, 59:4-14. Craven, shoeless and shirtless, was walking down his sidewalk, in the general direction of the officers' approach. Arndt Dep. Tr. 106:16-107:3, 114:12-21, 125:8-125:24. Craven did not verbally threaten the officers. Arndt Dep. Tr. 127:1-6; Novelli Dep. Tr. 70:14-22. Prior to any Mooresville Police Department officer announcing their presence or speaking, Corporal Arndt and Officer Novelli testified that Craven made a comment that they were unsure of, but reportedly interpreted as something to the effect of "you are going to have to shoot me" or "what are you going to do" as the officers approached. Arndt Dep. Tr. 93:5-18; Novelli Dep. Tr. 50:22-25; but see (DE # 20-13, "Defs.' Exhibit 12" at 6:27) (the audio in the video footage is not clear, but can reasonably be interpreted as Craven saying nothing, or "Ya'll know you *don't* have to shoot me."). Regardless of what Craven said, or didn't say, Officer Novelli testified that it was not threatening: "Q: Would you describe the comments – Mr. Craven's comments as threatening toward you or Corporal Arndt? A: No." Novelli Dep. Tr. 71:3-6.

As soon as Craven came into view, Corporal Arndt yelled "Mooresville Police Department" and commanded Craven to "let me see your fucking hands, let me see your hands."

Defs.' Exhibit 12 at 6:29-6:30; Arndt Aff. ¶ 9.  Craven immediately complied "and did in fact show his hands." Novelli Aff. ¶ 12; Defs.' Exhibit 12 at 6:30.  Corporal Arndt then issued a command to "get on the fucking ground," at the same time another officer yelled a different command. Craven lowered both arms to his side and  Corporal Arndt and Officer Novelli began to fire. Defs.' Exhibit 12 at 6:33.  In total, Corporal Arndt and Officer Novelli shot Craven at least twenty times, while other rounds penetrated the house where Plaintiff and her three children were. (DE # 20-10 ("Defs'. Exhibit 9")).  No other officer at the scene discharged their weapon.  Novelli Dep. Tr. 110:6-24.  A total of three seconds elapsed from the time Corporal Arndt instructed Craven to show his hands and when Corporal Arndt and Officer Novelli began firing their weapons. Defs.' Exhibit 12 at 6:29-6:33.

Corporal Arndt and Officer Novelli claim that they fired in response to Craven reaching towards his waistband and brandishing a handgun, although he did not point the gun at either. Arndt Aff. ¶ 10; Novelli Aff. ¶¶ 12-13; Arndt Dep. Tr. 131:15-25; Novelli Dep. Tr. 53:25-54:4, 54:10-55:14.  However, the video footage from the scene does not show a weapon of any kind in Craven's hand, or even near his hand.  Defs.' Exhibit 12 at 6:33; Pltf's. Exhibit C, Video from Body Worn Camera of Christopher Novelli ("Novelli BWC") 6:40.  In fact, the video shows Craven lower his arms arguably in compliance with the command to get on the ground, but it is impossible to view his hands or any further movement from his right arm.  Id.  Craven's right arm does not go backwards as if reaching to pull a gun from a holster or waistband.  Defs.' Exhibit 12 at 6:33; Novelli BWC at 6:40.  Nor did any other  officer see Craven reach for his waistband or brandish a firearm.  Novelli Dep. Tr. 110:6-24.

Craven died at the scene.  Arndt Aff. ¶ 12.

Plaintiff is Craven's widow, and she commenced this action by filing a Complaint in Superior Court in Iredell County on September 7, 2021 against Corporal Arndt, Officer Novelli, and the Town, which action was removed by Defendants to this Court on December 3, 2021. (DE #1). Plaintiff asserts claims for violation of 42 U.S.C. § 1983, wrongful death, assault and battery, negligence/gross negligence, and punitive damages. On January 20, 2023, Defendants timely filed a Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims. (DE # 19).

## ARGUMENT

Plaintiff has forecasted evidence sufficient to make out a *prima facie* case against Defendants, and raise genuine issues of fact as to the tortious nature of Defendants' conduct, and their Motion for Summary Judgment should be denied.

### I.    Standard on Summary Judgment.

Summary judgment may be granted only when, construing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; see also Equal Employment Opportunity Comm'n v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). Regardless of which party ultimately bears the burden of proof, the movant bears the initial burden of showing the lack of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To survive summary judgment on punitive damages, a plaintiff need only forecast evidence demonstrating their ability to "make out at least a prima facie case at trial." Smith v. Am. Honda Motor Co., 2016 U.S. Dist. LEXIS 45100, *7-8 (M.D.N.C. Apr. 4, 2016).

"If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489-490 (4th Cir. 2005). When the credibility of a party or

witness is in issue, there are conflicting versions of events giving rise to the claims, or the reasonableness or legal significance of events needs to be weighed, summary judgment is inappropriate.  Blue Ridge Pub. Safety, Inc. v. Ashe, 712 F. Supp. 2d 440, 446-447 (W.D.N.C. 2010); Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568-69 (4th Cir. 2015) (noting that the court "cannot weigh the evidence or make credibility determinations" on summary judgment).

Finally, as the Fourth Circuit has observed:

'[S]pecial difficulties can arise during summary judgment' in use of deadly force cases like this one because [the officer] 'has killed the only other potential witness' that can directly refute his account of what happened on the porch.  Without [decedent's] account, it can 'be easy to overvalue the narrative testimony of [the officer] and to undervalue potentially contradictory physical evidence.'  We are therefore mindful of Rule 56's demand 'to avoid simply accepting [the officer's] self-serving statements and . . . consider all contradictory evidence.'

Knibbs v. Momphard, 30 F.4th 200, 216 (Mar. 30, 2022) (internal citations omitted) (noting that the record reflected a "genuinely disputed and material fact[]" as to whether decedent "aimed his gun at [the officer]").

## II.  Novelli and Arndt Violated Craven's Fourth Amendment Rights

"The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest."  Harris v. Pittman, 927 F.3d 266, 272 (4th Cir. 2019).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989) ("[N]or will an officer's good intentions make an objectively unreasonable use of force constitutional.").  Courts "view [the force used] in full

6

context, with an eye toward proportionality of the force in light of all the circumstances," such that "[u]ltimately, the question to be decided is 'whether the totality of the circumstances justifie[s]'' the officer's conduct.  Livingston v. Kehagias, 803 Fed. App'x 673, 683 (4th Cir. Feb. 25, 2020) (internal citations omitted).

### 1. Apart from Purportedly Brandishing a Gun, Defendants Do Not Argue that Craven Ever Posed a Threat of Serious Physical Harm.

The Officers point to Craven allegedly reaching towards his waistband and potentially brandishing a firearm as justification for the use of deadly force against Craven.  No other conduct by Craven contributed to him being a perceived threat to the Officers.  .

Relying upon Officers Novelli's and Arndt's testimony that they observed a handgun in Craven's hand, Defendants argue that this case is governed by Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991), and Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), two cases in which the Fourth Circuit found officers' use of deadly force to be reasonable even though the suspects turned out not to possess weapons.  Defs.' Br. at p. 11.  This is precisely the argument made to, and rejected by, the Fourth Circuit in Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013): "Instead of supporting the Officers' contentions, however, those decisions emphasize why the use of deadly force against Cooper was not constitutionally permissible: in each of the above scenarios, the objective basis for the threat was real, but the gun was not.  Here, the shotgun was real, but — taking the facts as the district court viewed them — the threat was not."  Because the decedent in Cooper "made no sudden moves," "made no threats," and "ignored no commands," a reasonable officer in that case would not have had "probable cause to feel threatened by Cooper's actions." Id.

Thus, the Fourth Circuit has held:

7

A reasonable officer is entitled to use deadly force "[w]here the officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." Nevertheless, . . . the mere possession of a firearm by a suspect is not enough to permit the use of deadly force. Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is <u>threatened</u> with the weapon.

<u>Cooper</u>, 735 F.3d at 159 (internal citations omitted) (emphasis in original).

Accordingly, the Fourth Circuit has repeatedly held that "a police officer used unconstitutionally excessive force in shooting a man holding a firearm on his own property who was neither pointing the weapon at the officer nor giving some other indicator of an immediate intent to harm." <u>Knibbs v. Momphard</u>, 30 F.4th 200, 217 (Mar. 30, 2022). Thus, where a plaintiff's evidence could lead a jury to "conclude that the [officers] shot [decedent] only because he was holding a gun, although he never raised the gun to threaten the [officers] . . . [or] pointed the gun at *anyone*," the use of deadly force was unreasonable. <u>Hensley on behalf of N. Carolina v. Price</u>, 876 F.3d 573, 589 (4th Cir. 2017) (emphasis in original).

The same holds true here, as Craven did not pose any serious risk of injury to Officers Novelli or Arndt at the time they shot him. The events leading up to Corporal Arndt and Novelli shooting Craven have "little bearing on whether [Craven] was prepared to take the substantial step of escalating a domestic disturbance into a potentially deadly confrontation with two armed police officers." <u>Hensley</u>, 876 F.3d at 584 (alteration added) ("Thus, under the plaintiffs' version of the facts, no reasonable officer could have believed that Hensley posed a threat of serious physical harm to the Deputies at the time they used deadly force against him.").

To the extent Defendants rely on a concern over the safety of Craven's family inside his residence, that concern cannot support the decision to exercise deadly force. Hensley, 876 F.3d at 584 ("Nor are we persuaded that Hensley's attack on Ferguson made the Deputies' use of deadly force imperative to protect her from serious physical injury. When the Deputies fired on Hensley, his physical conflict with Ferguson had ended. Hensley had ventured off the porch, away from Ferguson, and out into the yard," though Ferguson remained on the porch). Both officers acknowledge that Craven was outside the residence and his family remained inside the house. Arndt Dep. Tr. 137:24-137:9; Novelli Dep. Tr. 49:15-18, 59:4-14. Prior to shooting Craven, Corporal Arndt and Officer Novelli both were behind some amount of cover or concealment. Arndt Dep. Tr. 119:9-120:21; Novelli Dep. Tr. 51:18-24. Thus, no one was in immediate, unprotected danger from Craven.

The Officers testified that Craven did not verbally threaten them. Arndt Dep. Tr. 127:1-6; Novelli Dep. Tr. 70:14-22. Defendants make much of Craven's reported statement to the effect of "you're going to have to fucking kill me" or "you are going to have to shoot me" as the officers approached, Defs. Br. at p. 9, but gloss over that neither Corporal Arndt nor Novelli were certain what Craven said. Arndt Dep. Tr. 93:5-18; Novelli Dep. Tr. 50:22-25 ("I thought it was maybe 'What are you going to do . . .").[1] The audio in the video footage is not clear, but can reasonably be interpreted as Craven saying: "Ya'll know you *don't* have to shoot me." Defs.' Exhibit 12 at

---

[1] As set forth in greater detail in Plaintiff's accompanying Motion *In Limine* to Exclude Exhibits, Corporal Arndt and Officer Novelli cannot rely upon the statements on the 911 call as justification for their excessive use of force, as they did not participate in the call and knew only what dispatch relayed to them. Defendants' argument that Craven's statements on the 911 recording are "consistent" with Corporal Arndt's and Novelli's recollection of what Craven may have said is thus irrelevant. Defs. Br. p. 9. By the same logic Defendants argue, the more important context gleaned from the 911 recording and Craven's statements to his family are that he was suffering a mental health crisis and was suicidal – not homicidal. See, e.g., Novelli Dep. Tr. 43:5-22.

6:27 (emphasis added).  Most importantly, even interpreting Craven's statement the way he did, Officer Novelli testified that it was not threatening: "Q: Would you describe the comments – Mr. Craven's comments as threatening toward you or Corporal Arndt?  A: No." Novelli Dep. Tr. 71:3-6.

The body cam footage also shows Craven was complying with the orders of several officers to show his hands and get them up "when he raised both hands in the air and away from his waistband area." Pltf's Exhibit D, Expert Report of Howard Jordan ("Jordan Report"), p. 9, 11; Defs.' Exhibit 12 at 6:30.

As for Craven's further behavior, Corporal Arndt testified:

```
 9       Q.   At any point did Mr. Craven lunge or
10   make a sudden movement in your direction?
11       A.   As in like physically like stepping
12   towards me?
13       Q.   Yes.
14       A.   No, I don't remember that.
15       Q.   And at any point did Mr. Craven, I
16   guess, make any sort of gesture towards you?
17          MR.  STEWART:  Object to the form.
18          THE WITNESS:  I'm not sure what you
19       mean by "gesture."
20   BY MS. HOUTI:
21       Q.   Other than what you have described as
22   him reaching towards his waistband, did he make
23   any other sort of gesture or movement that you
24   observed?
25       A.   Not that I observed.
```

Arndt Dep. Tr. 126:9-25.

Finally, Craven did not point a firearm at Corporal Arndt or Novelli – indeed, Corporal Arndt could not affirmatively say that Craven even raised the firearm up. Arndt Dep. Tr. 131:15-25; Novelli Dep. Tr. 53:25-54:4, 54:10-55:14.  Craven "did [not] threaten to harm any of the officers as they approached his home. BWC footage . . . did not show [Craven] pointing or attempting to point his firearm at the officers."  The body cam footage also confirms that Craven

10

"did not attempt to flee or otherwise resist the officers" orders.  <u>Jordan Report</u>, p. 11.  In fact, Officer Novelli's private texts with Corporal Arndt, Officer Novelli observed that the public statement from the District Attorney was incorrect: "Have you read that response from Sharon Crawford? [. . . I]t states multiple times he pointed his gun at us…not accurate."  <u>Pltf's. Exhibit E</u>, Exhibit 3 from the Deposition of Alexander Arndt ("<u>Arndt Dep. Exhibit 3</u>"), p. 14.

In short, "other than Mr. Craven allegedly pulling out a firearm" – which is belied by the bodycam footage – Craven did not take any  "other action . . .  to threaten [Officer Novelli] or Corporate Arndt."  <u>See, e.g</u>, <u>Novelli Dep. Tr.</u> 70:23-71:2 ("A. No.").

### 2. There Is a Genuine Issue of Material Fact as to Whether Craven Ever Reached for His Waistband or Brandished a Gun.

Though Defendants cite as a foregone conclusion that Craven brandished a gun in a fashion that justified the use of deadly force, they cite only to the testimony of Corporal Arndt and Officer Novelli themselves, and ignore blatantly contradictory evidence.

The Fourth Circuit has previously reversed summary judgment where evidence existed – contrary to the testimony of the officer involved in a fatal shooting – pursuant to which "a jury reasonably could find that [decedent] did not appear to be violent, resisting, or attempting to flee in the moments leading up to the shooting."  <u>Littleton v. Swonger</u>, 502 Fed. App'x 271, 277 (4th Cir. 2012).  In <u>Littleton</u>, the officer involved testified that he responded to a reported assault and saw the decedent standing above a purported victim laying on the ground, and that decedent had his hands on the victim; that when the officer approached the decedent began walking the victim to a parked car;  and that when the officer ordered them to stop and put their hands up, decedent pushed down the victim, "reach[ed] behind himself into his waistband with his right hand, and pull[ed] out an object" that the officer believed was a weapon, but ultimately proved to be a wallet.  <u>Id.</u> at 273.  In contrast, the purported victim testified that the officer approached her and decedent

with his gun pointed at them as they stood, with decedent's arm around the victim's neck, but that when they attempted to comply with the officer's orders to put their hands up, the officer shot decedent in the chest.  Id.  Due to this conflicting testimony, the Fourth Circuit held that "the trial record reveals disputed facts material to whether a reasonable officer in Swonger's position would have perceived that [decedent] posed a 'threat of serious physical harm' justifying Swonger's use of deadly force," such that "the district court erred in granting summary judgment for Swonger." Id. at 277.

The Ninth Circuit Court of Appeals addressed this issue in an even more analogous case in Cruz v. City of Anaheim, 765 F.3d 1076, 1078 (9th Cir. 2014), where the decedent attempted to escape a traffic stop and backed his vehicle into a marked police car, eventually stopped and opened his door, and then was shot as he was emerging from his vehicle when four officers testified that they saw him reach for his waistband where they had been informed that he carried a gun. The Ninth Circuit held that that "[t]o decide this case a jury would have to answer just one simple question: Did the police see [decedent] reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't.  [. . .]  But for a judge ruling on the officers' motion for summary judgment, this translates to a different question: Could any reasonable jury find it more likely than not that [decedent] didn't reach for his waistband?"  Id. at 1079.  The Court noted that the only evidence that decedent had made a sudden movement towards his waistband was the testimony of the four officers, but that it could not "'simply accept what may be a self-serving account by the police officer,'" but instead "'must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" Id. ("This includes 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'") (internal citations omitted).  Because circumstantial evidence in that case could

allow a jury to conclude that decedent reached for his waistband, but "could also reasonably conclude that the officers lied" and "didn't wait for [decedent] to exit his car—or reach for his waistband—and simply opened fire on a man who was trying to comply with their instructions to '[g]et down on the ground,'" the Ninth Circuit reversed the trial court's grant of summary judgment to defendants.  Id. at 1080.

Similarly, here the only evidence that Craven reached for his waistband, much less brandished a handgun, is the testimony of the two officers who shot him, Corporal Arndt and Officer Novelli.  Novelli Aff. ¶ 12; Arndt Aff. ¶ 10.  As Defendants acknowledge, however, that is not what the body worn camera of either officer shows, Defs. Br. at p. 10, and, of course, Craven is not alive to testify as to his movements.

In the approximately three seconds from the time either officer's body worn camera first depicts Craven until the first shot is fired, the video shows a shirtless Craven walking down his sidewalk, "away from the front of the residence" but not "directly towards" the officers.  Arndt Dep. Tr. 106:16-107:3, 114:12-21, 125:8-125:24 (testifying he cannot remember if Craven was walking "aggressive").  Though Corporal Arndt and Officer Novelli testified that they either did not see Craven put his hands up in compliance with commands, or could not remember whether he did, the video clearly shows otherwise.  Compare Arndt Dep. Tr. 128:2-20, Novelli Dep. Tr. 52:8.  As soon as Corporal Arndt commanded Craven to "let me see your fucking hands, let me see your hands" Craven raised his hands into the air.  Defs.' Exhibit 12 at 6:30.  As Corporal Arndt issued a command to "get on the fucking ground," Craven lowered both arms to his side, and Corporal Arndt almost immediately began to fire.  Defs.' Exhibit 12 at 6:33.  No video footage from the scene ever shows a weapon of any kind in Craven's hand, or even near his hand.  Defs.' Exhibit 12 at 6:33; Novelli BWC 6:40.  In fact, the video shows Craven lowering his arms and

13

then getting shot; no "furtive move" towards his waist or brandishing a weapon is depicted, nor does he bring his right arm backwards to potentially retrieve a weapon or begin to raise his right arm.  .  Id.  There certainly is no visual evidence that Craven made any movement towards his waistband, much less brandished a gun.  Id.

In addition, no other officer on the scene that night saw Craven in possession of a gun prior to the shooting.  Novelli Dep. Tr. 110:6-24.  Further, following the shooting, Craven's firearm was located several feet behind him on the steps to the front porch of his home, with a large flowerpot between Craven and the gun.  Defs.' Exhibit 12 at 6:49-58.  Defendants have not offered any explanation as to how the handgun came to rest there, particularly with no body worn camera footage depicting any weapon falling or flying through the air around Craven.

As the only evidence that Craven brandished a weapon is Officers Arndt's and Novelli's testimony, and as the only unbiased evidence calls that testimony question, a jury could reasonably disbelieve Corporal Arndt and Novelli and find that Craven did not reach for his waistband, much less brandish a firearm, and that the use of deadly force against him was therefore unreasonable. Summary judgment for Defendants is not appropriate.

### 3. There Is a Genuine Issue as to Whether Craven Even Made a "Furtive" Movement.

Finally, Defendants' argue that "[e]ven if he did not pull a gun out of his waistband, . . . Novelli and Arndt were reasonable in fearing for their lives since Craven had been ordered to show his hands and he made a clear furtive movement to his waist where at the very least he had a holster."  Defs'. Br. at p. 11.  Defendants' argument thus hinges on the characterization of Craven's arm movement as "furtive," a description that is simply not borne out by Fourth Circuit precedent or the body cam footage.

14

"Furtive" is defined as "done in a quiet and secretive way to avoid being noticed." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/furtive (accessed January 31, 2023). In the use of force context, the Fourth Circuit recently shed light on what constitutes a furtive movement, holding that "the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person. If a jury finds that [decedent] *was not aiming or otherwise directing his gun at* [officer]--the only fact that would have given him probable cause to fear for his life considering the totality of the [plaintiff's] evidence," then deadly force was unreasonable. Knibbs, 30 F.4th at 225 (emphasis added).

The body cam footage does not depict Craven making any furtive, secretive motion towards his waistband, much less aiming or otherwise directing a gun at any officer. Defendants acknowledge as much. Arndt Dep. Tr. 132:15-19 ("Q. But do you agree having watched just the video that it's difficult to see, at least on the video, what, if anything, Mr. Craven may have been doing with his hands? A. Yeah."); Novelli Dep. Tr. 78:6-14 ("A: Because he pulled his gun out of the waistband. Q: Okay. And do you see him do that in this video? A: No. The light – the flashlight kind of whitewashes it. Q: Same question for your body camera. Can you see him pull out the gun in your video? A: No.").

As with whether Craven actually reached for his waistband or brandished a weapon, the only evidence in support of Defendants' position is the testimony of Officer's Arndt and Novelli, which is contradicted by video and other evidence before the Court. A reasonable jury could easily

15

find that Craven did not in fact engage in any threatening conduct, such that Officers "Arndt's and Novelli's use of deadly force was unreasonable . . . ." Jordan Report, p. 9.

**III.     Corporal Arndt and Officer Novelli Are Not Entitled to Qualified Immunity.**

Corporal Arndt and Officer Novelli go on to mistakenly argue that even were their conduct to have been unreasonable and excessive, they cannot be held liable because they are entitled to qualified immunity.

In analyzing whether an officer is entitled to qualified immunity, courts generally "'determine first whether the plaintiff has alleged a deprivation of a constitutional right,'" and second "'whether that right was clearly established at the time of the alleged violation.'" E.W. v. Dolgos, 884 F.3d 172, 178-179 (4th Cir. Feb. 12, 2018). As set forth above, Corporal Arndt and Officer Novelli engaged in an excessive use of force in violation of Craven's Fourth Amendment rights when they used deadly force in the absence of reasonable fear that Craven posed any substantial threat.

Defendants argue that regardless of whether Craven was deprived of his constitutional rights, there is no Fourth Circuit precedent ruling "that an officer is not allowed to defend themselves where they order an armed suspect to show his hands and that suspect instead reaches for and pulls a firearm out of his holster." Defs'. Br. at p. 12. This is not accurate.

"A right is 'clearly established' if 'the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." E.W. v. Dolgos, 884 F.3d 172, 185 (4th Cir. Feb. 12, 2018). As an initial matter, the Supreme Court has clarified that "even 'cases involving "fundamentally similar"' or 'materially similar' facts are not prerequisites for concluding that a constitutional right is 'clearly established.'" Knibbs, 30 F.4th at 226 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Thus a right is clearly established where only a "few factual differences" exist and "it would not have taken more than [the officer's]

16

'drawing logical inferences, reasoning by analogy, or exercising common sense" from the prior cases "to realize that his use of deadly force" was unreasonable, then the "contours of [the decedent's] constitutional right were 'beyond debate.'" Knibbs, 30 F.4th at 225.

Again, the Fourth Circuit has long held that "it is unreasonable for an officer to believe 'that a suspect poses a threat of serious physical harm, either to [himself] or to others,' merely because that suspect *possesses* a firearm." Hensley, 876 F.3d at 583. Numerous decisions confirm that "a police officer used unconstitutionally excessive force in shooting a man holding a firearm on his own property who was neither pointing the weapon at the officer nor giving some other indicator of an immediate intent to harm." Knibbs, 30 F.4th at 217.

In Cooper, for example, officers were dispatched to plaintiff's home in response to a neighbor's about a heated argument. 735 F.3d at 155. Officers did not announce themselves but tapped on a window; in response, plaintiff retrieved his shotgun and ventured outside, carrying the shotgun in his firearm with its muzzle pointed toward the ground. Id. As soon as officers saw the plaintiff with his shotgun, they opened fire. Id. at 155-156. The Fourth Circuit held that:"[w]hen the Officers fired on Cooper, he stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands. The Officers had no other information suggesting that Cooper might harm them. Thus, the facts fail to support the proposition that a reasonable officer would have had probable cause to feel threatened by Cooper's actions." Id. at 159.

Similarly, in Hensley, deputies responded to a domestic disturbance call at decedent's home. 876 F.3d at 578. When the deputies arrived, they remained in their cars and watched decedent emerge from the home with his two daughters and struggle over a handgun, and as decedent actually struck one daughter with the gun, before decedent walked off his porch into the

yard and toward the deputies.  Id.  The muzzle of decedent's gun was pointed down and decedent never raised his gun towards the deputies or "made any overt threats toward them," but the deputies shot and killed decedent as he approached them.  Id.

The circumstances of Craven's death are similar to those in Cooper and Hensley.  Corporal Arndt and Officer Novelli responded to Craven's home for a domestic disturbance call.  When they first observed Craven, he was outside his own home and walking down his sidewalk away from his home, and in the general direction of the officers.  Arndt Dep. Tr. 106:16-107:3, 114:12-21, 125:8-125:24.  Craven never made an overt threat to the Officers and did not raise his guns towards them.  Arndt Dep. Tr. 127:1-6, 131:15-25; Novelli Dep. Tr. 53:25-54:4, 54:10-55:14, 70:14-22, 71:3-6; Arndt Dep. Exhibit 3, p. 14.  In fact, it is unclear from the evidence whether Craven even had a gun on him at the time he was killed.

In fact, the Officers had even less reason to shoot Craven than did the law enforcement in Cooper and Hensley, as prior to arriving at the house the Officers had already been informed that Craven possessed a firearm and a concealed carry permit, Arndt Dep. Tr. 116:7-20, and thus had no reason to suspect that Craven may have armed himself in response to police presence.  Compare Cooper, 735 F.3d at 155 (decedent did not arm himself until after police arrived), and Hensley, 876 F.3d at 578 (prior to arriving, deputies "had no specific information about the situation" or knowledge of any firearm).

Corporal Arndt and Officer Novelli are not entitled to qualified immunity.

### IV.    The Town Is Liable for Violating 42 U.S.C. § 1983.

Plaintiff has forecasted evidence that the Town violated § 1983 by failing to adequately train and instruct its officers on how to interact with and respond to citizens experiencing a mental health crisis.

### A.  Standard for Monell Claim of Deliberate Indifference.

18

A municipality may be liable under § 1983 where the municipality itself causes a constitutional violation.  Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694-695 (1978).  A Monell claim can be established, among other ways: "(3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens.'"  Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

Thus, "a local governing body's failure to adequately train . . . can be so egregious as to warrant a finding that it amounts to a policy or custom for which the municipality should be held responsible."  Hall v. Burney, 454 Fed. App'x 149, 151 (4th Cir. 2011) (vacating trial court's dismissal of § 1983 claim).  A Monell claim lies where a municipality fails to have a policy or training that is so obviously necessary that it amounts to deliberate indifference for the rights and safety of the municipality's citizens.  City of Canton v. Harris, 489 U.S. 378, 389 (1989).  In other words, a municipality will be liable under § 1983 where a "failure to train reflects such a deliberate or consciously indifferent 'policy,'" that the "failure can fairly be said to be the 'moving force [behind] the constitutional violation.'"  Estate of Jones v. City of Martinsburg, 961 F.3d 661, 671-672 (4th Cir. 2020) (internal citations omitted).  The Supreme Court has also "left open the possibility that 'in light of the duties assigned to specific officers or employees the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need'—the so-called Canton exception."  Id.

In Canton, the Supreme Court indicated "that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations."  Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 409 (1997).  Thus:

[A] violation of federal rights may be a highly predictable consequence of a failure

to equip law enforcement officers with specific tools to handle recurring situations.

The likelihood that the situation will recur and the predictability that an officer

lacking specific tools to handle that situation will violate citizens' rights could

justify a finding that policymakers' decision not to train the officer reflected

"deliberate indifference" to the obvious consequence of the policymakers' choice-

-namely, a violation of a specific constitutional or statutory right. The high degree

of predictability may also support an inference of causation--that the municipality's

indifference led directly to the very consequence that was so predictable.

Id. at 409-410.  The Supreme Court gave an example in Canton: the certainty that police officers

will be required to arrest fleeing felons, and that because officers have been provided firearms to

accomplish that task, "the need to train officers in the constitutional limitations on the use of deadly

force can be said to be 'so obvious,' that failure to do so could properly be characterized as

'deliberate indifference' to constitutional rights."  489 U.S. at 390, n. 10 (internal citation omitted).

### B. The City Was Deliberately Indifferent in Failing to Train Its Officers on Responding to Citizens Experiencing Mental Health Crisis.

This situation is analogous to the example of deliberate indifference set forth in Canton: it

is a "moral certainty" that officers will respond to domestic disturbance calls where a homeowner

is in possession of a firearm and experiencing a mental health crisis, and that the need to train

officers on the constitutional limitations of the use of force on students is "so obvious" that the

failure to do so is deliberately indifferent to the constitutional rights of those citizens.  See 489

U.S. at 390, n. 10.

Indeed, other courts around the country have recognized that a municipality's failure "to

train their officers on the use of deadly force in situations involving mentally-disabled people" is

"so obvious[] that failure to do so could properly be characterized as deliberate indifference to constitutional rights." Estate of Chivrell v. City of Arcata, 2022 U.S. Dist. LEXIS 153466, *9-10 (N.D. Ca. Aug. 25, 2022) (holding plaintiff had stated claim based on single incident of fatal police shooting of a mentally-ill man with a holstered firearm).

That Mooresville Police Officers would regularly encounter people in the midst of a mental health crisis was obvious. As Officer Novelli stated, "it's pretty frequent" for an officer to respond to a call or interact with someone in a mental health crisis. Novelli Dep. Tr. 22:6-18. A mental health crisis, as Officer Novelli acknowledged, could affect an individual's perception of guns being pointed at them, even by police officers. Novelli Dep. Tr. 124:8-13. As the Mooresville Police Department's policy interacting with person in a mental health crisis states, in such cases officers are instructed to "not threaten the individual with arrest or in any other manner as this may create additional fright, stress, and potential aggression." Pltf's. Exhibit F, Exhibit 2 from the Deposition of Alexander Arndt ("Arndt Dep. Exhibit 2"), p. 4.

Yet Corporal Arndt testified that the only training he could recall for interacting with people with mental illness or behavioral health was a CIT course he took in 2018. Arndt. Dep. Tr. 59:7-23, 63:10-19 (no training through the Mooresville Police Department "specifically relating to like response to mentally ill people"). However, as of August 2, 2020, not every Mooresville Police Officer was required to take CIT. Arndt Dep. Tr. 58:6-58:14. Officer Novelli had not had any CIT training at the time of the shooting. Novelli Dep. Tr. 19:6-22. Officer Novelli testified that prior to the incident the only mental health training he had was what was covered in BLET. Novelli Dep. Tr. 20:5-21:23, 26:13-27:2, 31:14-25. With respect to the Mooresville Police Department policy addressing interactions with people experiencing mental health issues, Corporal Arndt testified that while he would have signed off on having read a copy of the policy,

21

he could not recall whether he had any training on the policy. Arndt Dep. Tr. 62:5-20. Similarly, Officer Novelli testified only that he had "to sign and go over" the policy with his field training officer. Novelli Dep. Tr. 21:24-22:5. This, despite the fact that the policy itself specifies that "[s]pecific guidelines for dealing with individuals who are suspected of suffering from mental illness will be provided in employee training." Arndt. Dep. Exhibit 2, pp. 3-4.

Plaintiff has produced evidence that there was a high predictability of Constitutional violations by officers interacting with persons in the midst of a mental health crisis. Had the Town properly trained and instructed Corporal Arndt and Officer Novelli on how to respond on such occasions – including training them on its own policy, Craven would not have been fatally shot by them when he experienced a mental health crisis of his own. The Town's failures establish a deliberate indifference to the Constitutional rights, and the safety, of citizens like Craven undergoing a mental health crisis.

**V.** **Plaintiff Has Forecasted Evidence of Officers Novelli's and Arndt's Liability on Her State Law Claims and for Punitive Damages.**

    **1.** **Corporal Arndt and Officer Novelli Are Not Entitled to Public Official Immunity.**

Corporal Arndt and Officer Novelli argue that they are a public officer immune from suit for negligence/gross negligence and wrongful death, unless Plaintiff has shown he acted maliciously or outside the scope of his duties. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Showalter v. N.C. Dep't of Crime Control & Pub. Safety, 183 N.C. App. 132, 136, 643 S.E.2d 649, 652 (N.C. Ct. App. 2007). As the Court in Showalter held, where an officer's actions bely his own protestations of innocent intentions, and the facts are viewed in the light most favorable to the plaintiff, a genuine issue of material fact exists as to the officer's malice such that summary judgment is not appropriate. 183 N.C. App. at

176-137, 643 S.E.2d at 652 (denying summary judgment on public officer's immunity where state trooper stated he did not act maliciously but trooper's actions in macing plaintiff and dragging him from car during traffic stop created a genuine issue of fact as to malice).

Defendants argue that there is no evidence of malice on the part of Corporal Arndt or Novelli. Defs.' Br. at p. 16. Officers Arndt's and Novelli's text messages in the aftermath of the shooting, however, suggest otherwise. Corporal Arndt's idea of "dark humor" was to joke "Dang, we going to prison," to which Officer Novelli responded: "Im [sic] already in canada." Arndt Dep. Tr. 161:3-11; Arndt. Dep. Exhibit 3, p12. Officer Novelli appears to have taken the "joke" further, writing to Arndt of the autopsy report: "U get the autopsy yet!?!? THERE'S SO MANY GUNSHOTS" followed by "We shot him in the neck lol." Arndt Dep. Exhibit 3, p. 10. Officer Novelli testified that his comment was "just making light of the situation." Novelli Dep. Tr. 93:12-25. When asked about yet another text, in which Officer Novelli stated "Yeah, what an asshole. All we did was kill someone," Officer Novlli again described it as "just some form of dark humor, making light of the situation." Novelli Dep. Tr. 109:2-7.

Accordingly, there is sufficient evidence for a jury to find that Corporal Arndt and Officer Novelli acted with malice when they used deadly force against Craven.

For the same reason, summary judgment is likewise inappropriate on Plaintiff's claims for punitive damages. See Thompson v. Town of Dallas, 142 N.C. App. 651, 656, 543 S.E.2d 901, 905 (N.C. Ct. App. 2001) (finding genuine issue of material fact as to whether officer acted with malice in arresting motorist precludes summary judgment on punitive damages claim).

**2. Plaintiff Has Stated Claims for Assault and Battery Against the Officers.**

23

Finally, because Plaintiff has stated claims under Section 1983 for Officers Arndt's and Novelli's use of excessive force in violation of Craven's Fourth Amendment rights, she has also sufficiently alleged state law claims for assault and battery.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied in its entirety.

This the __ day of February, 2023.

<div align="center" style="margin-left:40%">

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
         jhouti@jmdlaw.com
         Fax: 704-333-5508
*Attorneys for Plaintiff*

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

<div align="center">

Patrick H. Flanagan

Jake W. Stewary

Cranfill Sumner LLP

PO Box 30787

2907 Providence Road, Ste. 200

Charlotte, North Carolina 28211

Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

</div>

This the __ day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
        jhouti@jmdlaw.com
        Fax: 704-333-5508
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>Defendants. | INDEX FOR BRIEF IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

INDEX

Excerpts from the November 28, 2022 deposition of Alexander Arndt ............................Exhibit A

Excerpts from the November 29, 2022 deposition of Christopher Novelli ......................Exhibit B

[1]Novelli body cam video (CONFIDENTIAL) .................................................................Exhibit C

Expert Report of Howard Jordan ......................................................................................Exhibit D

Exhibit 3 from the November 28, 2022 Deposition of Alexander Arndt .........................Exhibit E

Exhibit 2 from the November 28, 2022 Deposition of Alexander Arndt .........................Exhibit F

---

[1] The Novelli body cam video is to be filed under seal.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | **DECLARATION OF J. ALEXANDER HEROY IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, J. Alexander Heroy, hereby declare the following:

1.     I am over 18 years of age and am competent to testify about the matters set forth herein.  I have personal knowledge of the facts set forth below, which are true and correct.

2.     I am an attorney admitted to practice in this Court.  I represent Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff") in the above-captioned action, and submit this Declaration in support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. [Doc. Nos. 19].

3.     Attached hereto as **Exhibit** A is a true and correct copy of Excerpts from the November 28, 2022 deposition of Alexander Arndt.

4.      Attached hereto as **Exhibit** B is a true and correct copy of Excerpts from the November 29, 2022 deposition of Christopher Novelli.

5.      Attached hereto as **Exhibit C** is a true and correct copy of video footage from Officer Novelli's body worn camera, which has been designated "CONFIDENTIAL" and is being filed under seal.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the Expert Report of Howard Jordan.

7.      Attached hereto as **Exhibit E** is a true and correct copy of Exhibit 3 from the November 28, 2022 Deposition of Alexander Arndt, a compilation of Text Messages.

8.      Attached hereto as **Exhibit F** is a true and correct copy of Exhibit 2 from the November 28, 2022 Deposition of Alexander Arndt, the Mooresville Police Department General Order 400.13 on Mentally Ill/Intoxicated Persons.

9.      I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

This the 10th day of February, 2023.

_____
J. Alexander Heroy

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **DECLARATION OF J. ALEXANDER HEROY IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

<div align="center">

Patrick H. Flanagan

Jake W. Stewart

Cranfill Sumner LLP

PO Box 30787

2907 Providence Road, Ste. 200

Charlotte, North Carolina 28211

Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

</div>

This the 10th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy

J. Alexander Heroy, NC Bar # 39752

Jennifer M. Houti, NC Bar # 45442

525 North Tryon Street, Ste. 700

Charlotte, North Carolina 28202

Email: aheroy@jmdlaw.com

jhouti@jmdlaw.com

Fax: 704-333-5508

*Attorneys for Plaintiff*

3

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     STATESVILLE DIVISION
               CIVIL ACTION NO: 5:21-cv-174-KDB-DSC
 3
      AMY RHINEHARDT CRAVEN, as    )
 4    Administratrix of the        )
      Estate of CHRISTOPHER        )
 5    KIMMONS CRAVEN,              )
                                   )
 6                    Plaintiff,   )
                                   )
 7            vs.                  )
                                   )
 8    CHRISTOPHER NOVELLI,         )
      individually and in his     )
 9    official capacity as        )
      Officer of the              )
10    Mooresville Police          )
      Department, ALEXANDER        )
11    ARNDT, Individually and     )
      in his official capacity    )
12    as Officer of the           )
      Mooresville Police          )
13    Department, and the TOWN     )
      OF MOORESVILLE,             )
14                                 )
                      Defendant.   )
15    _____

16                       -  -  -

17                   Deposition of

18                 ALEXANDER ARNDT

19       (Taken on behalf of The Plaintiff)

20           Mooresville, North Carolina

21               November 28, 2022

22

23

24    REPORTED BY:  SHERRY L. MALIA REGISTERED
      PROFESSIONAL REPORTER/NOTARY PUBLIC
25
```

1    actually saw Mr. Craven, did you know where the

2    other members of the family were at that time?

3         A.   I presumed they were in the house.

4    That's the information that we were given, that

5    they were inside and he was coming back in, so I

6    presumed they were in the house.

7         Q.   Do you know anything -- any other

8    details about their location inside the house?

9         A.   No.

10        Q.   Do you know whether any shots fired

11   actually did penetrate the Cravens' house?

12        A.   I think I had heard maybe two did, but

13   I never went inside, so . . .

14        Q.   What's the normal -- well, let me ask

15   this.  Does Mooresville Police Department have

16   any sort of policy or standard protocol for what

17   is supposed to happen after an officer involved

18   shooting?

19        A.   There is a policy, yes.

20        Q.   Could you briefly describe what that

21   policy requires?

22        A.   You know, I think it goes over

23   contacting the correct agencies to investigate.

24   It's been a while since I looked at the policy.

25   I think it talks about putting officers on

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Christopher Novelli on 11/29/2022**

```
             IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF NORTH CAROLINA
                   STATESVILLE DIVISION


            Case No. 5:21-CV-174-KDB-DSC


*********************************************************

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

          Plaintiff,

v.


CHRISTOPHER NOVELLI, individually
and in his official capacity as
Officer of the Mooresville Police
Department; ALEXANDER ARNDT, individually
and in his official capacity as Officer
of the Mooresville Police Department,
and the TOWN OF MOORESVILLE,

          Defendants.



*********************************************************



     DEPOSITION of CHRISTOPHER NOVELLI, taken by the
Plaintiff pursuant to Rules 26, 30 and 32 of the North
Carolina Rules of Civil Procedure, in the above-entitled
action, pursuant to notice, before Twyla Donathan,
Registered Professional Reporter and Notary Public, at
the Mooresville Town Hall, 126 North Main Street,
Mooresville, North Carolina, on the 29th day of
November, 2022, beginning at 9:30 a.m.
```

 1    A    Correct.  I think they followed.

 2    **Q    Okay.  And do you know who followed you?**

 3    A    I don't know the order, but I know Officer

 4  Ramey, Sergeant Glenn, and Officer Dias were present.

 5    **Q    Okay.  And tell me what happened next.**

 6    A    We approached, started walking down Heritage

 7  towards 226.  I think we used the house before 226's

 8  lawn, to kind of cut across it.  Saw the camper in the

 9  driveway and another vehicle.  And as I approached the

10  house, or got right to the driveway, that's when I saw

11  Mr. Craven.

12    **Q    Okay.  And just walk me through kind of**

13  **the -- those -- the interaction with Mr. Craven.**

14    A    So I was walking what seemed to be almost

15  directly behind Corporal Arndt.  I saw Mr. Craven near

16  the front door.  I know there was a step or two near

17  the door.  I don't know if he was up at the door or

18  before the steps, I'm not too sure.  But when he saw

19  us, he said something to us before we even said

20  anything.  I don't remember exactly what was said.

21         I did notice that he did not have a shirt on.

22  I think he was wearing some form of khaki pants or

23  shorts, and he had a black handgun in his waistband of

24  his pants, slightly off to the right, near like his

25  appendix side.

 1  residence to make sure there was no one else inside the

 2  house that was injured or hiding in the house for any

 3  reason.

 4      **Q    Was there any concern that the backdrop of,**

 5  **you know, your shots towards Mr. Craven were -- was his**

 6  **house, where you knew people were inside?**

 7      A    That's correct.

 8      **Q    And were you concerned about that?**

 9      A    I was.

10      **Q    Okay.  And what did you do to -- in relation**

11  **to those concerns?**

12      A    Unfortunately, with the threat that was

13  presented to me, I had to fire my rifle despite the

14  backdrop being the home.

15      **Q    And when you went inside, did you observe any**

16  **evidence that the home had been the backdrop?**

17      A    I didn't see any bullet holes or anything in

18  the house, no.

19      **Q    Okay.  Did you see whether like -- you didn't**

20  **see whether any bullet holes had pierced the home?**

21      A    I did not.

22      **Q    Did you see whether a fire extinguisher had**

23  **been hit inside the home?**

24      A    I did not.

25      **Q    Do you know whether that's true or false, or**

NOTICE OF SEALED EXHIBIT

EXHIBIT C

Video from Body Worn Camera of Christopher Novelli



Howard A. Jordan- Chief of Police (Ret)
MPA, FBINA, SMIP
*POLICE PRACTICE EXPERT*
P.O. Box 23646
Pleasant Hill, CA. 94523
Email Howard@jordanci.com

WDNC Civil Action No. 5:21-cv-174
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

AMY RHINEHART CRAVEN AS ADMINISTRATRIX OF THE
ESTATE OF CHRISTOPHER KIMMONS CRAVEN
v.
CHRISTOPHER NOVELLI, ALEXANDER ARNDT AND THE
MORESVILLE POLICE DEPARTMENT, ET AL.

# REPORT OF PLAINTIFF'S POLICE PRACTICE EXPERT
## Federal Rule 26 (a)(2)(B)

**August 23, 2022**

## I.    BACKGROUND

My name is Howard A. Jordan and I make this report on behalf of Amy Rhinehart Craven, as Administratrix of the Estate of Christopher Kimmons Craven, Plaintiff in the United States District Court for the Western District of North Carolina – Civil Action No. 5:21-cv-174.

My Law Enforcement career spans over 25 years of experience with the Oakland, California Police Department. I served as the Police Chief for the City of Oakland during the final 2 years of active service (2011-2013). Prior to retiring, I was retained as a Defense Expert witness in the City of Richmond, CA Jury Trial – Treats, et al. vs City of Richmond (2011-2012). Since retiring, I have served as a Police Practice and Procedures Expert in the following Court cases:

- Brown v. City of New York Police Department (Plaintiff's Expert)

- Blackson v. LIH- 2017 (Defendant's expert – tenant/rental practices)

- Vexler v. City of Fremont, CA (City's expert regarding hiring practices)

- Hall v. City of Fremont, CA

- Caldwell v. City and County of San Francisco, CA

- Notter v. City of Pleasant Hill, CA

- Slusher v. City of Napa, CA

- Gilliland v. City of Pleasanton, CA

- Lawson v. City of Arcata, CA

- Zoellner v. City of Arcata, CA

- People v. Thorson (Criminal Defense Expert)

- Washington v. City of Raleigh, NC (Plaintiff's Expert )

- Expert witness in Police Use of Force – City of Oakland, CA – 2014-2015

- I was retained as a Police Practice and Procedures Expert for the following Use of Force Civil Cases:

    1. Rodriguez v. City of Alameda, CA

    2. Bobbitt v. City of San Leandro, CA

    3. Petre v. City of San Leandro, CA

4. Hill v. City of Fairfield, CA

5. Adamako v. City of Fremont, CA

6. City of Rocklin, CA v. Officer Brad Alford

7. Gomez v. City of Vacaville, et al.

8. Moore v. City and County of San Francisco, CA

9. Sandoval v. City and County of San Francisco, CA

10. Dyer v City and County of San Francisco, CA

11. Young v. Broward County Sheriff Deputy Peraza, et al. (Plaintiff's expert)

12. Mondragon v. City of Fremont

13. Molina v. City of Napa

## II.    MY QUALIFICATIONS – POLICE PRACTICE AND PROCUDURES EXPERT

a) My areas of expertise, based on relevant education, training and experience, include, but are not limited to, police administration, patrol procedures, critical incident management, use of force, criminal investigations, internal affairs investigations, risk management, training and police practices and procedures. I served in a wide range of assignments as an officer, sergeant, lieutenant, captain, deputy chief, assistant chief and chief, including Patrol, Criminal Investigations, Special Operations Division, SWAT, Training, Bureau of Services, Internal Affairs Division and Office of Chief of Police. The City of Oakland encompasses over 78 square miles with a population of over 413,000.

b) The Oakland Police Department had over 700 sworn police officers and over 350 civilian employees during my employment with the department (1988-2013). I have extensive experience conducting internal administrative investigations on a wide range of issues, including use of force, officer misconduct and criminal investigations. I have experience as an expert on matters involving police investigative procedures, misconduct, corruption, promotions, search and seizure and use of force incidents.

c) In my capacity as a Supervisor, Command Officer and Chief of Police, I have made disciplinary determinations in approximately over 150 disciplinary cases, including those cases that have resulted in suspensions, demotions, and terminations.

d) In my capacity as a Command Officer, I have served as the Incident Commander during critical incidents.

e) As the Chief of Police for the Oakland Police Department, I reviewed and approved numerous administrative investigations related to whether officers performed their duties pursuant to proper policies and department procedures.

f) While serving as a Chief of Police and later a Consultant, I have been retained in approximately 25 civil and police arbitration cases as an expert witness for both plaintiff and defense, involving allegations of improper uses of force by police officers in California, New York, and Florida.

g) I have used force during my career as a Police Officer.

h) I was a Peace Officer Standard and Training (POST) certified Baton Instructor (1996-2001).

i) In my capacity as a Police Officer, Supervisor, and Command Officer, I participated in numerous critical incidents where police officers used lethal force.

j) In my capacity as a Police Officer, Supervisor, and Command Officer, I participated in numerous calls for service where officers encountered persons suffering from mental illness and who were threatening to commit suicide.

k) In my capacity as a Police Officer, Supervisor, and Command Officer, I participated in numerous calls for services involving persons with disabilities.

l) In my capacity of a Command Officer with Oakland Police Department, I oversaw the training and development of the Department's Crisis Intervention Training.

m) In my capacity as a Command Officer with Oakland Police Department, I have reviewed and approved the Department's policy regarding Police Response to Mentally Ill persons.

n) In 2016, I was hired by the City of Sunnyvale, California to review their Police Department's Internal Affairs procedures.

o) In 2016/17, I was part of a team of Police Practice and Procedures Experts that assessed the Madison, WI Police Department. I was tasked with reviewing the Department's Internal Affairs procedures.

p) In 2018, I was hired by the City of Rohnert Park, California to assess the Rohnert Park Department of Public Safety's Marijuana Interdiction Team's operations.

q) In 2018, I was hired by the City of Santa Clara, California to assess the police department's deployment strategies at Levi's Stadium.

r)  In January 2020, I was part of a team of experts that was retained by the Santa Clara County Board of Supervisors to oversee reforms in the Santa Clara County Sheriff's Office.

s)  I am a current Adjunct Faculty member in the Administration of Justice Department at Diablo Valley College in Pleasant Hill, California.

t)  I am a current Adjunct Faculty member in the Administration of Justice Department at Merritt College in Oakland, California.

## III.    ENGAGEMENT WITH DEFENDANTS

a)  Plaintiff's Attorney retained my services to review the facts and circumstances of this matter which involved the Defendant officers' response to a call for services at Plaintiff's home on August 2, 2020, which resulted in Defendant officer's use of lethal force.

b)  My compensation is not dependent on the outcome of this litigation. I am being compensated at a rate of $200.00 per hour for consulting. I am being compensated at a rate of $300.00 per hour for court proceedings and for deposition testimony.

c)  I have been found qualified as an expert in use of force/ Police Practices and Procedures in Federal and State Courts and Arbitration hearings. I have been deposed as an expert in use of force.

d)  I have never been rejected as an expert in any court proceedings or arbitrations.

e)  This is a preliminary expert report and is based on materials reviewed to date. Should any subsequent information cause me to expand upon or revise any of my opinions, I will supplement this report.

f)  My opinions were made within a reasonable degree of certainty, based on the materials that were available to me at the time.

## IV.    DOCUMENTS REVIEWED

1.  Plaintiff's Complaint

2.  Stipulated Protective Order for NCSBI File No. 2020-02140

3.  NCSBI Case No. 2020-02140 (0001-0050)

4.  NCSBI Case No. 2020-02140 – Case Identification Report

5.  Crime Scene Photographs

6. Mooresville Police Department 2020 Policy Manual

7. Body Worn Camera Video Footages (000083, 000085,000086, 000088, 000089, 000090)

8. Defendant Arndt's Response to Plaintiff's first set of Interrogatories and Request for Production

9. Defendant Novelli's Response to Plaintiff's first set Interrogatories and Request for Production

10. Defendant Town of Mooresville's Response to Plaintiff's first set Interrogatories and Request for Production

11. Arndt's Response to Discovery – 4859-9835-3194 (Text messages and emails)

12. Town's Response to Discovery – 4893-1954-3849

13. Mooresville PD 911 Transcripts

14. US Department of Homeland Security – National Incident Management System – Incident Command System – Best Practices

15. Greensboro Police Department – Handling Special Tactical Problems

16. Charlotte- Mecklenburg Police Department – Chris Intervention Team SOP

17. International Association of Chief of Police Model Policy – Responding to Persons Experiencing a Mental Health Crisis

18. Oakland, California Police Department – Training Bulletin III-N – Police Contact with Mentally Ill Persons

19. San Francisco Police Department – General Order 5.21 – The Crisis Intervention Team Response to Person in Crisis Calls for Service

20. American Academy of Psychiatry and the Law

21. Police Executive Research Forum (PERF) – Suicide by Cop: Protocol and Training Guide – https://www.policeforum.org/suicidebycop#RespondingOfficers

## V.  BRIEF FACTUAL OVERVIEW OF EVENTS[1]

a)  Incident occurred on Sunday, August 2, 2020, at approximately 9:30 p.m. at 226

---

[1] Information received from SBI Investigative Report-2020-032140-0036 SBI11.

Heritage Place.

b) On August 2, 2020, at approximately 9:30 p.m., Taylor Dunn (Chris Craven's daughter) called the Iredell County Emergency Communications Department and reported a domestic assault. The call was later transferred to Mooresville Police Dispatch once it was determined that the incident occurred in their jurisdiction.

c) Dunn told dispatch that her father, Cristopher Craven ("Chris"), had assaulted her mother, may have been armed and was going outside to "blow his brains out." Craven had a Concealed Carry Weapons permit and was going in and out of his residence.

d) Approximately seven Mooresville officers, including Captain Goodale and Sergeant Taylor, responded to the scene. The officers parked away from the Craven's home and staged while waiting for additional officers to arrive. Dispatched told the officers that Chris had returned back into the house, which prompted them to walk towards the house.

e) Corporal Alexander Arndt ("Arndt") lead the team of officers up Heritage towards the Craven's home. Officer Christopher Novelli ("Novelli") followed closely behind Arndt. Both officers were armed with their department-issued Smith & Wesson .223 caliber (MP15 and MP4) rifles.

f) There were multiple vehicles parked on the Craven's property, including a camper that Chris was reportedly walking to when Dunn spoke to the dispatchers.

g) According to Special Agent W.J. Waugh's investigative summary (page iv), the following transpired:

> Corporal Arndt heard a male voice say something like, "You're going to have to shoot me," "Shoot me," or, "Are you going to shoot me?" as he approached the rear of one vehicle in the driveway. Officer Novelli continued into the front yard of the property and was positioned near a tree.
>
> Corporal Arndt and Officer Novelli saw a male, later identified as Craven, standing on the sidewalk near the front porch of the residence. Craven was not wearing a shirt and had shorts on. Corporal Arndt and Officer Novelli saw a holster with a black in color pistol on Craven's right side in the waistband of his shorts.
>
> Corporal Arndt gave the following commands to Craven: "Police Department, let me see your fucking hands," "Let me see your hands," and, "Get on the fucking ground." On Corporal Arndt's body-worn camera (BWC) footage, the male raises his hands before dropping his hands down towards his waist. The male was walking towards the driveway from the front porch of the residence.

*Corporal Arndt and Officer Novelli said they saw Craven retrieve the pistol from his waistband. Both Corporal Arndt and Officer Novelli began discharging their MPD department-issued rifles at Craven. After a string of gunfire, Corporal Arndt yelled, "Cease fire," and the gunfire stopped.*

*Officers approached Craven, who was lying on the sidewalk near the front porch of the residence. Craven's head appeared to be moving in Corporal Arndt's BWC footage. Corporal Arndt held cover on Craven and asked, "Where'd the handgun go?" He shined his rifle light towards the steps leading to the front porch and said, "Right there." A black in color pistol was laying on the step leading up to the front porch.*

h)  Arndt moved the pistol that was seen on the front of the step to the grass area next to the sidewalk. Shortly afterwards, Arndt and Morris rendered first aid to Chris. Chris suffered multiple gunshot wounds to his body and was pronounced dead at the scene at 9:49 p.m. by Iredell Emergency Medical Services personnel.

i)  Arndt and Novelli discharged a total of approximately 32 rounds at Chris in less than 6 seconds.

## VI.  MY OPINIONS THUS FAR

It is my opinion that a reasonable Mooresville Police Officer with similar training and experience would have immediately established a perimeter around the Craven's house, established an Incident Command System and use a more tactically sound approach to engage with Chris before resorting to deadly force against someone who was obviously suffering from a mental health crisis. It is my opinion that Arndt's, Novell's, and the other five Mooresville Police Department officers' action were inconsistent with standard police practices when encountering a person who is experiencing a mental health crisis. It is my further opinion that Arndt and Novelli acted hastily when they approached the Craven's home and discharged approximately 32 rounds from their firearms in succession (approximately 4 seconds) at Chris. My opinions are based on my training, professional experience and education, and my review of the documents provided to me in this case. My opinions are further summarized below:

Based on the Arndt's and Novelli's BWC video footage, once the officers arrived on the scene, they gathered approximately three houses away and approached the Craven's house within minutes before discharging their firearm killing Chris. There were no attempts made to develop a tactical plan to approach the Craven's home and attempt to safely resolve this incident, even though they were aware that Chris was armed with his licensed handgun and was in the midst of a mental health crisis by threatening to "blow his brains out."

Body Worn Camera video footages obtained from Arndt and Novelli showed that they arrived on Heritage Place simultaneously and waited a short period of time for other officers to arrive.

Approximately 02:54 after additional units arrived on the scene, Arndt, Novelli, Mercado, Ramey, Sergeants Glenn and Taylor approached the Craven's home. As they approached the Craven's home and observed Chris on the sidewalk walking towards his camper, which was parked on the driveway, Arndt and Novelli gave Chris multiple conflicting orders, *"show me your fucking hands" and "get on the ground."*

During his interview with NCSBI Investigators, Arndt described Chris's actions before Arndt discharged his firearm 10-15 times at Chris (Arndt's summary statement pg. 5):

> *Corporal Arndt gave Craven a command to "show me your fucking hands," and told him to get on the ground. Corporal Arndt thought Craven had something in his hands, but then made a movement toward his waistline and then raised his hands back up. Corporal Arndt saw a black in color handgun in what Corporal Arndt thought was Craven's right hand when he raised his hands back up from his waistline.*

Arndt was aware from Dispatch that Chris was entering and exiting his home when they arrived on the scene. Arndt described his reaction to this information as follow: "The information alarmed Corporal Arndt, based on the fact Craven was possibly armed and suicidal and was going back into a residence where at least one other person was located." (Arndt's summary statement, pg. 4). Yet Arndt and Novelli made no tactical plans to safely approach Chris's home to preserve life, knowing that he was suicidal. Instead, they hastily moved forward and encountered Chris outside his home and opened fire on Chris after he attempted to comply with their orders to surrender.

It is my opinion that Arndt's and Noveli's use of deadly force was unreasonable and inconsistent with police practices as outlined below.

The MPD use of force policy specifically requires that officers should consider certain circumstances prior to using force. There were no indications that any of the officers on the scene that night considered other options available to them, such as establishing a perimeter around the Craven's home and attempt to contact the family to determine where Chris was located prior to approaching their home.

## MPD's Use of Force Policy – 400.06 (2020)

**D. Need to Use Force**

1. Nothing in this policy shall be construed to permit, excuse, or justify the use of unreasonable or excessive force. When assessing the need to use force, officers should consider the nature and extent of any threat posed by the subject, as well as all other circumstances of the encounter, including but not limited to the following:

   a) The severity of the crime;

   b) The degree to which the subject resists arrest or detention;

    c) Attempt made by the subject to actively resist or to evade the officer by flight.

MPD's Use of Force Policy denotes certain circumstances that an officer should consider when assessing the need to use force.

4. Uses of force confrontations are dynamic situations and there are variables that affect the force continuum. When assessing the need to use force and the level of force to be employed, officers should consider all circumstances of the encounter, including but not limited to:

    a) Size.

    b) Gender and skill level of the officer and the suspect.

    c) Environmental conditions.

    d) Reaction time.

    e) Presence of multiple suspects.

    f) ***Availability of other options.***

    g) Injury or exhaustion.

    h) Proximity of a weapon.

    i) Totality of the circumstances.



***Still photo taken from Arndt's BWC – Chris complying with Arndt's order to raise his hands.***

It is my opinion that Novelli and Arndt should have used a more measured approach toward Chris, who they knew was in the midst of a mental health crisis. Chris did not discharge his firearm at any point, nor did he threaten to harm any of the officers as they approached his home. BWC footage reviewed did not show Chris pointing or attempting to point his firearm at the officers.

A review of Arndt's and Noveli's BWC video footage showed that Chris did not attempt to flee or otherwise resist the officers' orders. In fact, one can argue that Chris was complying with Arndt's order to "*show me your fucking hands*" when he raised both hands in the air and away from his waistband area (see above picture).

According to Ramey's BWC video footage (000088) at the 0:06:52 to 0:06:56 point, several officers ordered Chris to "let me see your hands, get your hands up." There is no evidence to suggest that Chris was armed at this point or prior to Arndt and Novelli opening fire on Chris for approximately 4 seconds (32 rounds). Furthermore, Novelli admitted to NCSBI investigator that he continued to fire his rifle at Chris as he was falling to the ground (clearly, Chris was no longer a threat to any of the officers at that point either). *"Officer Novelli fired multiple shots because Craven remained upright and standing, and he continued to fire as he began falling to the ground, before ceasing firing his rifle."* (NCSBI Investigative Report-2020-02140 – Novelli's Summary statement, pg. 7.)

## **MPD Policy – Mentally Ill/Intoxicated Persons – General Order 400.13**

**PROCUDURES**

Responding to the Mentally Ill (CALEA 41.2.7c)

1. When responding to individuals who exhibit symptoms of mental illness, employees should gather as much information as possible to assess and stabilize the situation. Specific guidelines for dealing with individuals who are suspected of suffering from mental illness ***will be provided in employee training***.

2. If an officer determines that an individual may be mentally ill and a potential threat to himself or herself, the officer, or others or may otherwise require law enforcement intervention for humanitarian reasons as prescribed by statute, the following responses may be taken:

   a. Request a backup officer, and always do so in cases where the individual will be taken into custody. If it is known through prior contacts or knowledge or information is developed prior to officer contact that a subject suffers from mental illness, then communications should dispatch two officers to the scene unless otherwise directed by a supervisor.

   b. Take steps to calm the situation. When applicable, eliminate emergency lights and sirens, disperse crowds, and assume a quiet non-threatening manner when

approaching or conversing with the individual. Where violence or destructive acts have not occurred, avoid physical contact, and take time to assess the situation.

c.  Move slowly and do not excite the disturbed person. Provide reassurance that the officers are there to help and that he or she will be provided with appropriate care.

d.  Communicate with the individual in an attempt to determine what is bothering him or her. Relate your concern for their feelings and allow them to express their feelings in accordance with officer safety protocol. If possible, gather information on the subject from acquaintances or family members and/or request professional assistance if available and appropriate to assist in communicating with and calming the person.

e.  Do not threaten the individual with arrest or in any other manner as this may create additional fright, stress, and potential aggression.

f.  Avoid topics that may agitate the person and guide the conversation toward subject(s) that help bring the individual back to reality.

g.  Always attempt to be truthful with a mentally ill individual. If the subject becomes aware of a deception, he or she may withdraw from the contact due to mistrust and may become hypersensitive or retaliate in anger.

h.  No individual will be arrested for behavioral manifestations of mental illness that are not criminal in nature. Taking a mentally ill individual into custody can occur only when the individual: 1) Has committed a crime. 2) Presents a danger to the safety of him/herself or others and meets the criteria for involuntary emergency or non-emergency mental commitment.

**Contemporary Practices for dealing with the Mentally Ill**

The International Association of Chiefs of Police Model Policy – Responding to Persons Experiencing a Mental Health Crisis recommends that officer take more measured approach to dealing with persons in crisis (pic) and request an officer who has been trained in Crisis Intervention Techniques respond to the scene.

*Where there is reason to believe that the individual is in a crisis situation, such as threatening suicide or involved in a hostage and/or barricade situation, officers should request any specialized crisis intervention assistance available while taking initial steps necessary to moderate or defuse the situation. This may include summoning officers with special training in crisis negotiations, such as Crisis Intervention Team (CIT) trained officers, or crisis negotiators.*

*At the scene of an incident involving a PIC, officers should first take time, if possible, to assess the situation and gather necessary information, avoiding hasty and potentially counterproductive decisions and actions. Such calls usually have a better outcome if time is used to an officer's advantage. While circumstances may preclude such inquiries, where time permits, family members or friends of the individual can often lend some insight into the person's background and specifics about their behavior. Friends or*

*acquaintances may be able to provide some information regarding the person's present behavior. Pinpointing the cause of the behavior, as perceived by the individual, can provide officers with a basis for discussion and possible moderation of the person's distress and behavior. It can also help the officer decide if the problem is the result of a disability.*

## Crisis Intervention Training

Crisis Intervention Training is a widely implemented police-based program designed to improve officers' responses to individuals with behavioral disorders, such as suicide.  According to the American Academy of Psychiatry and the Law,

> *Approximately 1,000 people in the United States were fatally shot by police officers during 2018, and people with mental illness (PMI) were involved in approximately 25 percent of those fatalities.[1] This rate has remained roughly constant between 2015 and 2018.[2] Police are often the first responders to PMI in acute distress, and sometimes they are the only responders.[3] Over the last two decades, a diversion program known as the Crisis Intervention Team (CIT) model for police interactions in crisis situations involving persons in the community with mental, emotional, or developmental challenges has become one of the dominant paradigms in the United States for police–PMI interaction.*

Arndt is a seasoned officer of approximately 5 years of experience with Mooresville Police Department. Records revealed that he received 40 hours of Crisis Intervention Training in 2018 from Partners Behavioral Health Management. Novelli received training in Verbal Judo-de-escalation techniques from NCJA Edneyville. Neither officer used their CIT and Verbal Judo training to de-escalate this incident by attempting to communicate with Chris prior to walking up to the Craven's house and engaging with him.

## No Effort to Utilize the Incident Command System

The ICS is a hierarchical management system used by governmental agencies, fire, and police to respond to an emergency. It is primarily a field response system. ICS is a tool that relies heavily on the concept of Management by Objectives (MBO). Response objectives are set by the senior responder and delegated to the subordinate positions after agreement that the objectives can be met. The senior responder is referred to as the incident commander. By using this approach, the incident commander can coordinate the response to complex and technical incidents without unreasonable expectations. The use of the Incident Command System is one of the nationally recognized tactics utilize by police agencies to manage critical incidents such as the one that unfolded on August 2, 2020, in Mooresville, North Carolina.

In this incident, seven officers, including a captain and two sergeants, responded to the scene within minutes of each other. Yet, none of the senior ranking officers (captain and sergeants) on the scene took command and control of the incident. It has been my experience, based on my 25 years of active law enforcement services, that sergeants in particular have a key role in handling critical incidents and many other types of calls that involves persons with a mental illness, drug or alcohol dependance, or other conditions that can cause them to behave erratically or

dangerously. The Police Executive Research Forum (PERF) describes the critical role that a sergeant plays in managing an incident involving a person in crisis who might be suicidal as follows:

- The presence and direction of a supervisor on scene can have a stabilizing effect on officers who may be uncertain about how to respond to difficult situations they have not faced before.

- Sergeants also have a key role in telling officers that they should slow down or take whatever time they need to handle a potential suicidal person.

- When multiple officers respond to an incident, sergeants are responsible for:

    1. assign roles,

    2. establish a perimeter,

    3. establish a staging area,

    4. request an ambulance to respond and wait nearby but not directly at the scene,

    5. consider requesting additional resources, such as K-9, that may be needed if the incident changes and the suicidal person becomes a threat to others, and

    6. coordinate the entire response.

This was a chaotic scene that unfolded very quickly. It is my opinion that the lack of command and control of this incident by a supervisor or command officer significantly contributed to some of the chaos and fell short of standard police practices. It is my further opinion that Arndt and Novelli were reckless when they discharged multiple rounds towards Chris as he was walking away from his home. The officers knew that Chris' family (wife and three children) were inside the house and may have been seriously injured from gunfire. Evidence showed that several rounds struck Chris' home and one round struck a fire extinguisher, which exploded. Arndt and Novelli failed to consider their "back drop" as they opened fire on Chris.

The 911 communications call showed that MPD dispatchers were actively communicating with Chris' daughter while Chris was still inside their home. Yet they did not ask to speak to Chris and attempt to deescalate this incident/and or offer Chris assistance for his obvious mental health crisis.

In reviewing BWC footage from this incident, Arndt appeared to take control of the scene despite the presence of Captain Goodale and Sergeant Glenn. For example, Arndt performed the following actions shortly after discharging his firearm at Chris:

- Direct Novelli to enter the Craven's home to "secure the residence" (NCSBI Investigative Report – Novelli's summary statement, pg. 5) immediately after he shot and killed Chris.

- After walking out of the Craven's house with Captain Goodale, Arndt directed Novelli to stand guard over Chris's weapon which was on the ground next to him.

- Removed Chris's firearm and placed it away from him before the scene was processed by Crime Scene personnel.

BWC video footage 000089 shows Captain Goodale interviewing Novelli inside the Craven's home as the family is in obvious disbelief over what just transpired with Chris outside their home.

It is my opinion that either Captain Goodale or Sergeant Glenn should have implemented the Incident Command System and asserted command and control of this incident. This would have allowed them to act as the Incident Commander to perform the following duties and possibly resolve this incident peacefully:

a) Establish a Command Post in a safe location away from the Craven's home.

b) Establish an inner and outer perimeter to contain the scene.

c) Establish communications with the family and receive real-time information about Chris's whereabouts and direct on-scene resources in a manner that respects the sanctity of life.

d) Determine if Chris needed help and ensure he received the appropriate help for his crisis.

e) Request additional officers if necessary.

f) Request Fire/EMS to respond to the scene and standby.

g) Ensure that evidence was not handled by officers who were directly involved in the incident.

h) Ensure that the involved officer(s) were properly sequestered, and their weapons were collected immediately or as soon as practical.

I am prepared to testify at trial if called upon to do so.

Howard Jordan
Police Practice and Procedures Expert
Jordan Consulting and Investigations

## Arndt, Alexander

| | |
|---|---|
| **From:** | Arndt, Alexander |
| **Sent:** | Friday, June 10, 2022 2:44 AM |
| **To:** | Arndt, Alexander |
| **Subject:** | Screenshots |
| **Attachments:** | Screenshot_20220603-140856_Messages.jpg; Screenshot_20220603-140643_Messages.jpg; Screenshot_20220603-123040_Messages.jpg; Screenshot_20220603-140629_Messages.jpg; Screenshot_20220603-140001_Messages.jpg; Screenshot_20220603-135526_Messages.jpg; Screenshot_20220603-135404_Messages.jpg; Screenshot_20220603-135401_Messages.jpg; Screenshot_20220603-135207_Messages.jpg; Screenshot_20220603-135121_Messages.jpg; Screenshot_20220603-135028_Messages.jpg; Screenshot_20220603-134721_Messages.jpg; Screenshot_20220603-134435_Messages.jpg; Screenshot_20220603-134248_Messages.jpg; Screenshot_20220603-134242_Messages.jpg; Screenshot_20220603-134230_Messages.jpg; Screenshot_20220603-134008_Messages.jpg; Screenshot_20220603-133656_Messages.jpg; Screenshot_20220603-133650_Messages.jpg; Screenshot_20220603-133427_Messages.jpg; Screenshot_20220603-133111_Messages.jpg; Screenshot_20220603-132434_Messages.jpg; Screenshot_20220603-131955_Messages.jpg; Screenshot_20220603-131845_Messages.jpg; Screenshot_20220603-131349_Messages.jpg; Screenshot_20220603-131027_Messages.jpg; Screenshot_20220603-125904_Messages.jpg; Screenshot_20220603-125852_Messages.jpg; Screenshot_20220603-125826_Messages.jpg; Screenshot_20220603-125317_Messages.jpg; Screenshot_20220603-125309_Messages.jpg; Screenshot_20220603-125226_Messages.jpg; Screenshot_20220603-125222_Messages.jpg; Screenshot_20220603-125218_Messages.jpg; Screenshot_20220603-124949_Messages.jpg; Screenshot_20220603-124937_Messages.jpg; Screenshot_20220603-124926_Messages.jpg; Screenshot_20220603-124921_Messages.jpg; Screenshot_20220603-123532_Messages.jpg; Screenshot_20220603-123516_Messages.jpg; Screenshot_20220603-123450_Messages.jpg; Screenshot_20220603-123423_Messages.jpg; Screenshot_20220603-123353_Messages.jpg; Screenshot_20220603-123305_Messages.jpg; Screenshot_20220603-123053_Messages.jpg; Screenshot_20220603-122924_Messages.jpg |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android




**Alexander Arndt**
*Police Corporal*
750 W. Iredell Avenue Mooresville, NC 28115
Office: 704-664-3311
www.mooresvillepd.com




Please be aware that email sent to and/or from this email address is subject to North Carolina Public Records Law and may be disclosed to third parties. This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited.

EXHIBIT

3

EXHIBIT E

1

JA291

## Arndt, Alexander

| | |
|---|---|
| **From:** | Arndt, Alexander |
| **Sent:** | Friday, June 10, 2022 3:49 AM |
| **To:** | Arndt, Alexander |
| **Attachments:** | Screenshot_20220610-034813_Messages.jpg |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

 

**Alexander Arndt**
*Police Corporal*
750 W. Iredell Avenue Mooresville, NC 28115
Office: 704-664-3311
www.mooresvillepd.com



Please be aware that email sent to and/or from this email address is subject to North Carolina Public Records Law and may be disclosed to third parties. This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited.



**JA293**





**JA295**





**JA297**





**JA299**



**JA300**



**JA301**





**JA303**



JA304



**JA305**







**JA308**



**JA309**



**JA310**





**JA312**



**JA313**



JA314



**JA315**



**JA316**

# Mooresville Police Department

General Order:     400.13

Subject:     Mentally Ill/Intoxicated Persons

Distribution:     All Peronnel

Effective Date:     01/08/2018

Last Revision:     06/01/2014

Rescinds/Amends:     400 O-1, 01/15/2001

By Order Of:     Damon D. Williams, Chief of Police



## Purpose

To provide guidelines for police department employees interacting with mentally ill individuals and how to restrain and transport persons in need of emergency mental commitment and those named in involuntary commitment orders to an appropriate mental health facility for evaluation. The Department will provide transportation, when manpower permits, for individuals who wish to commit themselves to a mental facility. A sworn officer will perform all mental commitments.

## Policy

The Americans with Disabilities Act (ADA) entitles people with mental illnesses or disabilities to the same services and protections that law enforcement agencies provide to those without disabilities.  They may not be excluded from services or otherwise be provided with lesser services or protection that is provided to others.  Employees with the Mooresville Police Department shall provide individuals suspected of suffering from mental illness with the same high level of service and protection provided to all other persons.  Reasonable procedural adjustments may be made to accommodate an individual's needs as required.  Individuals will not be taken involuntarily into custody by reason of mental illness alone, but may be taken into custody if they have committed an arrestable offense or have demonstrated by their actions to be a threat to the life or safety of themselves or others.



EXHIBIT F

Page **1** of **8**
GO 400.13

## Definitions

<u>Mental illness:</u>  For the purpose of this order, an illness that lessens the capacity of an individual to exercise self-control, judgment, and discretion in the conduct of his or her affairs and social relations to the degree that it is necessary or advisable for the person to be under treatment, care, supervision, guidance, or control.

<u>Mental commitment:</u>  For the purpose of this order, taking custody of and transporting an individual in need of mental health evaluation and treatment.

<u>Involuntary emergency commitment:</u>  Mental commitment executed by an officer without a commitment order on file.

<u>Involuntary non-emergency commitment:</u>  Mental commitment executed by an officer in accordance with an involuntary commitment order issued by a magistrate.

<u>Voluntary commitment:</u>  Mental commitment of a person who independently and personally decides to be admitted to a treatment facility

## Procedures

**A.  Training**

1.  Officers must be aware that mental disorders are health conditions that are characterized by alterations in thinking, mood, or behavior.  Officers are trained as part of their basic law enforcement curriculum and during in-service training in recognizing possible verbal, behavioral, or environmental cues that could suggest the existence of a mental illness. Entry-level personnel will receive documented training during new employee field training.  (CALEA 41.2.7d) Refresher training will be provided to all employees at least every three years. (CALEA 41.2.7e) All sworn officers, Public Safety Officers and telecommunicators are encouraged to attend Crisis Intervention Team (CIT) training when staffing levels and scheduling allow.

**B.  Recognizing Mental Illness** (CALEA 41.2.7a)

1.  When called upon to interact with an individual exhibiting abnormal behavior that is suspected of being symptomatic of mental illness, recognition of the characteristics of mental illness may help employees decide on an appropriate response.  Symptomatic behavior should be evaluated within the total context of the situation when attempting to determine an individual's

mental state and the need for intervention.  The following factors may be considered when determining an individual's mental state:

a.  **Degree of Reactions-**  Mentally ill persons may show signs of strong and unrelenting fear of persons, places, or things.  The fear of people or crowds, for example, may make the individual extremely reclusive or aggressive without apparent provocation.

b.  **Appropriateness of Behavior-** An individual who demonstrates extremely inappropriate behavior for a given context may be emotionally ill.  For example, a motorist who vents his frustration in a traffic jam by physically attacking another motorist may be emotionally unstable.

c.  **Extreme Rigidity or Inflexibility-** Emotionally ill persons may be easily frustrated in new or unforeseen circumstances and may demonstrate inappropriate or aggressive behavior in dealing with the situation.

d.  In addition to the above, a mentally ill person may exhibit one or more of the following characteristics:

1)  Abnormal memory loss related to such common facts as name, home address, (although these may be signs of other physical ailments such as injury or Alzheimer's disease);

2)  Delusions, the belief in thoughts or ideas that are false, such as delusions of grandeur ("I am Christ.") or paranoid delusions ("Everyone is out to get me.");

3)  Hallucinations of any of the five senses (e.g. hearing voices commanding the person to act, feeling one's skin crawl, smelling strange odors, etc);

4)  The belief that one suffers from extraordinary physical maladies that are not possible, such as persons who are convinced that their heart has stopped beating for extended periods of time; and/or

5)  Extreme fright or depression.

## C.  Responding to the Mentally Ill (CALEA 41.2.7c)

1.  When responding to individuals who exhibit symptoms of mental illness, employees should gather as much information as possible to assess and stabilize the situation.  Specific guidelines for dealing with individuals who are

suspected of suffering from mental illness will be provided in employee training.

2. If an officer determines that an individual may be mentally ill and a potential threat to himself or herself, the officer , or others or may otherwise require law enforcement intervention for humanitarian reasons as prescribed by statute, the following responses may be taken:

   a. Request a backup officer , and always do so in cases where the individual will be taken into custody.  If it is known through prior contacts or knowledge or information is developed prior to officer contact that a subject suffers from mental illness, then communications should dispatch two officers to the scene unless otherwise directed by a supervisor.

   b. Take steps to calm the situation.  When applicable, eliminate emergency lights and sirens, disperse crowds, and assume a quiet non-threatening manner when approaching or conversing with the individual.  Where violence or destructive acts have not occurred, avoid physical contact, and take time to assess the situation.

   c. Move slowly and do not excite the disturbed person.  Provide reassurance that the officers are there to help and that he or she will be provided with appropriate care.

   d. Communicate with the individual in an attempt to determine what is bothering him or her.  Relate your concern for their feelings and allow them to express their feelings in accordance with officer safety protocol.  If possible, gather information on the subject from acquaintances or family members and/or request professional assistance if available and appropriate to assist in communicating with and calming the person.

   e. Do not threaten the individual with arrest or in any other manner as this may create additional fright, stress, and potential aggression.

   f. Avoid topics that may agitate the person and guide the conversation toward subject(s) that help bring the individual back to reality.

   g. Always attempt to be truthful with a mentally ill individual.  If the subject becomes aware of a deception, he or she may withdraw from the contact due to mistrust and may become hypersensitive or retaliate in anger.

h.  No individual will be arrested for behavioral manifestations of mental illness that are not criminal in nature.  Taking a mentally ill individual into custody can occur only when the individual:

1)  Has committed a crime.
2)  Presents a danger to the safety of him/herself or others and meets the criteria for involuntary emergency or non-emergency mental commitment.

**D. Referrals** (CALEA 41.2.7b)

1.  All Department personnel will have ready access to referral information for available community mental health resources and authorized emergency evaluation facilities and will, upon request, provide this information to employees or citizens. During training, employees will be provided with a information on local resources that may be helpful in situations involving the mentally ill or those in crisis.

**E. Involuntary Emergency Commitment** (CALEA 41.2.7c)

1.  Involuntary emergency commitments may be made on any person who requires immediate hospitalization to prevent harm to him/herself or others, or if the person is unable to care for him/herself due to mental illness.  These persons should be taken into immediate custody and restrained in an appropriate manner consistent with their behavior.  Involuntary emergency commitments should only be used in the most unusual and extreme circumstances.  When feasible, officers should confer with their immediate supervisor prior to taking a person into emergency custody.

2.  Individuals taken into involuntary emergency custody shall be promptly transported to the appropriate medical facility for evaluation.  When available the transporting officer should be the same sex as the patient.  When unavailable the officer should log the time and the beginning and ending mileage of transport.

3.  If the examining health care professional finds that the person requires inpatient treatment, the officer will transfer custody to hospital personnel.  If the examining psychiatrist recommends outpatient treatment, the officer will

transport the person back to his or her residence or to the home of a consenting individual, if needed.

4. In the event that the examining health care professional finds no evidence of mental illness, the person will be released and the proceedings terminated.

**F. Involuntary Non-Emergency Commitment** (CALEA 41.2.7c)

1. Once the officer has verified that an order for involuntary commitment is on file, the officer will take the subject of that order into custody and restrain in an appropriate manner with reasonable force.

2. Once an officer has obtained the necessary paperwork and transports a subject to an appropriate medical facility for an involuntary commitment, the officer will remain with the patient and deliver the paperwork to the charge nurse. The officer and the charge nurse will make the determination if the officer needs to stay. If the patient is not a threat the determination can be made for the officer to leave with the possibility to be recalled if the patient's behavior changes. If the patient poses a threat, the officer will stay for a maximum of two (2) hours unless otherwise directed by the on-duty supervisor. The hospital will be responsible for coordinating relief through the Iredell County Sheriff's Office. Based on the circumstances, including the reason for the commitment, the patient's demeanor, and any other factors, the supervisor may allow the officer to return to other duties. The officer and supervisor must be able to articulate the reasons upon which that determination is based.

3. If the decision is made that the officer should remain with the patient, the on-duty supervisor will periodically re-evaluate the situation to determine if the officer may be allowed to leave.

4. If the determination is made that the officer will be allowed to leave, the officer shall notify appropriate hospital staff.

5. The Iredell County Sheriff's Office is responsible for transport of all mental commitments outside the Town limits of Mooresville.

**G. Voluntary Commitment** (CALEA 41.2.7c)

1. There is no duty requirement for the Department to transport individuals who voluntarily seek hospital admission. Since some hospitals may try to require officers to remain at their facilities with a voluntary commitment, police officers should make every reasonable effort to assist the individual in locating an alternative source of transportation thereby avoiding an unnecessary assignment at a healthcare facility.

**H. Interview and Interrogation of the Mentally Ill** (CALEA 41.2.7c)

1. Interviews and interrogations will be conducted in compliance with constitutional rights granted to all. If the officer has reason to believe that the subject, due to mental illness, is incapable of understanding and waiving the constitutional rights no in custody interviews or interrogations will be done.

**I. Intoxicated Persons**

1. Officers will at times be called upon to provide public assistance for intoxicated persons. Officers will, if at all possible, escort the intoxicated person to his/her residence. If however, the intoxicated person does not live in the Town limits, and qualifies for shelter at the county's detention facility and/or Fifth Street Ministries, contact should be made for availability of space.

2. If the intoxicated person is in need of medical assistance due to prior injury or illness, officers may escort the injured person to a medical facility or call for an ambulance. If the person is unconscious, Emergency Medical Services (EMS) will be requested so qualified medical professionals can attend to the subject. General Statute 122C-301(a)(4) states that the law enforcement officer providing transportation for an intoxicated person is not liable for payment of the medical expense. Officers will not make any statement or promise that the Department or the Town of Mooresville will be held responsible for the payment on behalf of the intoxicated subject.

3. Officers should be alert to any medical alert bracelets, necklaces, tags, etc. indicating the subject may be suffering from a preexisting medical condition. If a medical alert ID is located, officers shall request EMS respond to the scene.

| Index As: | Reference: |
|---|---|
| Mentally Ill | CALEA   41.2.7 |
| Commitments | |
| Intoxicated Persons | |

By Order Of:

Damon D. Williams, Chief of Police

<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

</div>

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>       Plaintiff,<br><br>    v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>      Defendants. | **PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EXHIBITS AND MOTION TO STRIKE** |

Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff" or "Craven"), respectfully moves *in limine* to exclude from evidence and consideration in connection with Defendants Christopher Novelli, Alexander Arndt, and the Town of Mooresville's Motion for Summary Judgment, [DE # 19], and to strike from the record, the following exhibits submitted by Defendants: (a) 911 Transcript, Taylor Dunn Deposition Exhibit 1, filed under seal at DE # 11; and (b) the recording of the 911 call, Taylor Dunn Deposition Exhibits 2 and 3, filed under seal at DE # 20-12; and (c) those portions of the transcripts from the deposition of Taylor Dunn or Amy Rhinehardt Craven in which they discuss the 911 call recording or transcript. In support of the Motion, Plaintiff shows the Court as follows:

1.      On August 2, 2020, Craven's step-daughter called 911 to report a domestic disturbance.

2.      Defendants Alexander Arndt ("Corporal Arndt") and Christopher Novelli ("Officer Novelli") responded to Plaintiff's residence and fatally shot Craven.

3.      In support of their Motion for Summary Judgment, Defendants filed under seal a copy of the 911 recorded call, [DE # 20-11], and the transcript of the 911 call, [DE # 20-12] (the "911 Exhibits").

4.      Defendants also filed excerpts from the deposition of Taylor Dunn and Amy Rhinehardt Craven which discuss one or more of the 911 Exhibits and their contents, [DE #20-6, ("Dunn Dep. Tr."), 43:5-25, 51:1-25, 56:1-57:25], [DE # 20-7, ("Craven Dep. Tr."), 69:1-25] ("the 911 Testimony").

5.      Pursuant to Rule 403 of the Federal Rules of Evidence, the 911 Exhibits and 911 Testimony should be excluded because any probative value they may have is far outweighed by the significant risk of prejudice and confusion.

6.      Corporal Arndt and Officer Novelli cannot rely upon the statements in the 911 Exhibits as justification for their excessive use of force or the reasonableness of their conduct on August 2, 2022, as they did not participate in the call and knew only what dispatch relayed to them.

7.      As Corporal Arndt confirmed: "Most calls for service are routed through 911 or come directly to the police department, so the dispatcher asks them the who, what, when, where, why, how questions.  So that's primarily where most of our information we gather."  See **Exhibit 1**, Excerpts from Alexander Arndt Deposition ("Arndt Dep. Tr.") 85:4-10.  Indeed, the information relayed to officers on August 2, 2020, likely did not even come from the person who was speaking directly with Craven's step-daughter.  Arndt Dep. Tr. 85:25-86:5 ("[M]ost of the time we have two dispatchers working, so usually . . . [o]ne of them is going to be on the phone and then the other

2

one is involved with communicating with officers via radio . . . ."), 47:14-22 ("we got more information through dispatch"), 83:1-5, 90:15-21.

8.      Officer Novelli testified that the information he received from the situation came in "over the radio" from dispatch.  **Exhibit 2**, Excerpts from Christopher Novelli Deposition ("Novelli Dep. Tr.") 41:14-42:2, 42:19-43:15 (recounting information that "our dispatchers said they either heard him – they either heard him or the caller" state).

9.      The body worn camera footage from both Corporal Arndt and Officer Novelli confirms that no 911 audio was available to them in their police vehicles or on their radios in the minutes leading up to the shooting.  [DE # 20-13, Defs.' Exhibit 12], [DE # 25-5, Pltf's. Exhibit C].

10.     In sum, neither Corporal Arndt nor Officer Novelli knew the information contained in the 911 Exhibits at the time they used force against Craven and fatally shot him, and those 911 Exhibits should be excluded.


WHEREFORE, Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven, respectfully moves *in limine* to exclude from evidence at summary judgment, and to strike from the record, the following exhibits submitted by Defendants: (a) 911 Transcript, Taylor Dunn Deposition Exhibit 1, [DE # 11]; (b) the recording of the 911 call, Taylor Dunn Deposition Exhibits 2 and 3 [DE # 20-12]; and (c) those portions of the transcripts from the deposition of Taylor Dunn or Amy Rhinehardt Craven in which they discuss the 911 call recording or transcript [DE # 20-6, 20-7].

This the 10th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
       jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EXHIBITS AND MOTION TO STRIKE** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

Patrick H. Flanagan
Jake W. Stewart
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

This the 10th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
        jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

# EXHIBIT 1

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Alexander Arndt on 11/28/2022**

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                    STATESVILLE DIVISION
              CIVIL ACTION NO: 5:21-cv-174-KDB-DSC
 3
     AMY RHINEHARDT CRAVEN, as    )
 4   Administratrix of the        )
     Estate of CHRISTOPHER        )
 5   KIMMONS CRAVEN,              )
                                  )
 6                Plaintiff,      )
                                  )
 7            vs.                 )
                                  )
 8   CHRISTOPHER NOVELLI,         )
     individually and in his      )
 9   official capacity as        )
     Officer of the              )
10   Mooresville Police          )
     Department, ALEXANDER        )
11   ARNDT, Individually and     )
     in his official capacity     )
12   as Officer of the           )
     Mooresville Police          )
13   Department, and the TOWN     )
     OF MOORESVILLE,             )
14                               )
                  Defendant.     )
15   _____

16                    -  -  -

17                 Deposition of

18              ALEXANDER ARNDT

19       (Taken on behalf of The Plaintiff)

20          Mooresville, North Carolina

21              November 28, 2022

22


23


24   REPORTED BY:  SHERRY L. MALIA REGISTERED
     PROFESSIONAL REPORTER/NOTARY PUBLIC
25
```

```
 1   necessary?

 2       A.   Yeah, I believe that's what it says in

 3   the policy.  So any force that's more than --

 4   excessive is not reasonable, right?  So we are

 5   going to use reasonable force.

 6       Q.   And what does "reasonable force" mean

 7   to you?

 8            MR. STEWART:  Object to the form.

 9            THE WITNESS:  Kind of goes back to

10       the objective reasonable standards.  So,

11       you know, an officer with similar

12       training and experience that was

13       presented with the same information in

14       that same scenario would act the same

15       way.

16   BY MS. HOUTI:

17       Q.   And practically speaking, when you're,

18   you know, boots on the ground responding to a

19   call, what's going through your head as you're

20   trying to determine whether force is reasonable

21   or not?

22            MR. STEWART:  Object to form.  You

23       can still answer.

24            THE WITNESS:  Everything.  Like I

25       said, I kind of hinted at it briefly,
```

1      Q.   And what information did you have at
2   the time that led you to believe that?
3      A.   So it was radioed out that there was a
4   domestic, possibly a shot had been fired, but
5   then stated that a man was there threatening to
6   blow his brains out, so that would indicate to
7   me we have some sort of mental health crises
8   going on.
9      Q.   Okay.  So this policy would definitely
10  apply to this incident, correct?
11     A.   I would say every policy would be
12  applicable when I'm working, and even when I'm
13  not working.
14     Q.   Okay.  If you will turn to page 3.
15  Down at the bottom there is Subsection C.  Do
16  you see that?
17     A.   I do.
18     Q.   "Responding to the mentally ill."  If
19  you could, please -- actually, am I correct in
20  understanding that this Subsection C, and please
21  feel free to continue reading it, but that this
22  Subsection C contains the Mooresville Police
23  Department policies on specific steps that
24  should be taken when responding to a mentally
25  ill person?

```
 1  information, but it's not always possible.
 2      Q.   What ways would an officer gather
 3  information about a situation?
 4      A.   Like primary knowledge to an officer or
 5  maybe what's provided to the dispatch.  Most
 6  calls for service are routed through 911 or come
 7  directly to the police department, so the
 8  dispatcher asks them the who, what, when, where,
 9  why, how questions.  So that's primarily where
10  most of our information we gather.  And then
11  obviously when an officer would arrive on scene,
12  that's when they get the primary firsthand
13  knowledge.
14           So there is a distinction there.  A lot
15  of times we are provided with information, maybe
16  sometimes it's not true and maybe sometimes it
17  is true.  I mean, there's a difference, yeah.
18      Q.   Are you able to communicate with
19  dispatch to ask specific questions or to get
20  more information?
21      A.   Yes, yeah.
22      Q.   Have you ever done that in the course
23  of responding to a call?
24      A.   Yeah.  It really starts to highlight
25  the limitations, though, because most of the
```

1    time we have two dispatchers working, so usually

2    like let's say they have a 911 call, right?  One

3    of them is going to be on the phone and then the

4    other one is involved with communicating with

5    officers via radio, so you kind of get into a

6    bottleneck, if you will, right?

7              So, yes, I could call dispatch on the

8    radio and say, "Hey, did you ask this question?"

9    That dispatcher then has to try to interrupt the

10   dispatcher/telecommunicator that's talking to

11   the person and say, "Hey, ask this."  So it's

12   not a perfect system, but, yeah, you do have the

13   ability to ask questions.  Now, are they going

14   to be answered quickly?  Maybe not.  It depends

15   on the cooperation of the reporting party.

16       **Q.   And have you had a situation where you**

17   **did request additional information from dispatch**

18   **or asked them to ask the reporting person for**

19   **information?**

20       A.   Sometimes, yes.

21       **Q.   In what type of situations have you**

22   **done that?**

23       A.   Maybe like suspect descriptions.  Like,

24   for instance, we're going to a larceny at

25   Walmart and we see a while male just go from the

```
 1   department was going there because of the

 2   seriousness of the issue.

 3           As we were responding, we were given

 4   information that the male did have a gun on them

 5   but then maybe that a shot hadn't been fired.

 6   But still, there's some cloudiness, right?  Not

 7   complete clarification.  We're never going to

 8   have all the information provided to us.

 9           When we responded, the male had -- it

10   was indicated to us that the male had gone

11   outside the residence.  That's perfect, time and

12   space, right?  That would be perfect.  But then

13   as we are there and we're trying to make a hasty

14   game plan we hear information that he is going

15   back into the residence.  So now I'm

16   responsible, and everybody else there was

17   responsible, with trying to diffuse this

18   situation, and I have an armed -- possibly

19   armed, possibly suicidal man who may have

20   already assaulted someone going into a residence

21   where there's at least another person.

22           That's a scenario in which I'm duty

23   bound to act and we acted.  We had to go up

24   there at the time we did.  We didn't have

25   anymore time to plan.
```

<u>**EXHIBIT 2**</u>

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Christopher Novelli on 11/29/2022**

```
            IN THE UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF NORTH CAROLINA
                  STATESVILLE DIVISION


            Case No. 5:21-CV-174-KDB-DSC


********************************************************

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

            Plaintiff,

v.


CHRISTOPHER NOVELLI, individually
and in his official capacity as
Officer of the Mooresville Police
Department; ALEXANDER ARNDT, individually
and in his official capacity as Officer
of the Mooresville Police Department,
and the TOWN OF MOORESVILLE,

            Defendants.



********************************************************



     DEPOSITION of CHRISTOPHER NOVELLI, taken by the
Plaintiff pursuant to Rules 26, 30 and 32 of the North
Carolina Rules of Civil Procedure, in the above-entitled
action, pursuant to notice, before Twyla Donathan,
Registered Professional Reporter and Notary Public, at
the Mooresville Town Hall, 126 North Main Street,
Mooresville, North Carolina, on the 29th day of
November, 2022, beginning at 9:30 a.m.
```

1      Q      Anything besides use of force policy?

2      A      Just the files that my attorney sent me.

3      Q      Okay.  Anything else to prepare for today?
4  Talk to anyone besides your lawyer?

5      A      No.

6      Q      Okay.  No one at work?

7      A      They're aware of the deposition, but I didn't
8  review anything with them.

9      Q      Right.  Didn't talk about --

10     A      Correct.

11     Q      -- what is going on in the case or anything
12 like that?

13     A      Correct.

14     Q      Okay.  Now, back to August 2nd.  So you
15 were in the Food Lion parking lot next to Sergeant
16 Glenn, and you heard a call come over dispatch?

17     A      That's correct.

18     Q      And what do you recall hearing?

19     A      They gave the address of 226 Heritage Place.
20 Said that a female caller is calling because her, I
21 think, father or stepfather had assaulted her mother.
22 His name was Chris Craven.  And that he possibly had a
23 gun.

24     Q      And do you remember that, or are you just --
25 recall it because you watched the video recently?

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
Christopher Novelli on 11/29/2022                                    Page 42

```
 1      A    No, I remember information like that coming

 2   over the radio.

 3      Q    Okay.  And so what did you do next?

 4      A    I checked en route to the call through my

 5   computer, and then started heading that way with

 6   emergency lights and sirens.

 7      Q    Okay.  Did you talk about the call at all

 8   with Glenn?

 9      A    Prior to going?

10      Q    Yes, sir.

11      A    No, I think I just went.

12      Q    Okay.  And do you know whether he went as

13   well?

14      A    He did go.

15      Q    Okay.  And tell me what happened next.

16      A    When I was arriving, Corporal Arndt and his

17   trainee, Officer Mercado, arrived almost immediately

18   before me.

19      Q    Let me interrupt you.  Going back to when you

20   were en route, did you recall receiving any additional

21   information about the call?

22      A    Yes.

23      Q    Okay.  What additional information?

24      A    I think we got information that a possible

25   shot was fired, and then they later confirmed that no
```

1  shot was fired.  And then got information that an

2  assault had occurred and that Mr. Craven was leaving

3  the residence and possibly near a camper on the

4  driveway.

5      Q    Okay.  Did you receive any information about

6  whether Mr. Craven wanted to hurt himself?

7      A    Yeah, our dispatchers said that they either

8  heard him -- they either heard him or the caller advise

9  them that he was going to blow his brains out.

10     Q    Other than the information about potentially

11  committing suicide, or the potential assault inside the

12  residence, any other information about assaultive or

13  threatening behavior?

14     A    Just that the assault had occurred, and he

15  threatened himself, and then I think that was it.

16     Q    Okay.  And what I mean by that, there wasn't

17  any information over the radio that he said, oh, I want

18  to go harm some other person, my neighbor or --

19     A    That's correct.

20     Q    -- the president or, you know, nothing like

21  that?

22     A    No.

23     Q    Okay.  Did you -- Do you recall asking any

24  information from dispatch?

25     A    I don't believe I did, no.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | **PLAINTIFF'S MEMORANDUM IN SUPORT OF MOTION *IN LIMINE* TO EXCLUDE EXHIBITS AND MOTION TO STRIKE** |

Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven ("Plaintiff"), respectfully submits the following brief in support of her Motion *in Limine* to Exclude Exhibits and Motion to Strike.

## PRELIMINARY STATEMENT

This action arises from Defendants' fatal mishandling of a man's mental health crisis. Defendants Alexander Arndt ("Corporal Arndt") and Christopher Novelli ("Officer Novelli") responded to a domestic disturbance call to Plaintiff's residence on August 2, 2020. Within seconds of laying eyes on decedent Christopher Kimmons Craven ("Craven"), Corporal Arndt and Officer Novelli opened fire and fatally shot Craven in front of his home.

In support of Defendants' Motion for Summary Judgment, [DE # 19], Defendants filed under seal a copy of the 911 recorded call, [DE # 20-11], and the transcript of the 911 call, [DE # 20-12] (the "911 Exhibits"), as well as excerpts from the deposition of Taylor Dunn and Amy Rhinehardt

Craven which discuss one or more of the 911 Exhibits and their contents, [DE #20-6, ("Dunn Dep. Tr."), 43:5-25, 51:1-25, 56:1-57:25], [DE # 20-7, ("Craven Dep. Tr."), 69:1-25] ("the 911 Testimony").

However, because Corporal Arndt and Officer Novelli did not hear any portion of the 911 call prior to using deadly force against Craven, the 911 Exhibits and 911 Testimony are entirely irrelevant, and should be excluded.

## LEGAL ARGUMENT

### I.    Legal Standard.

"Irrelevant evidence is not admissible" at trial.  Fed. R. Evid. 402.  Evidence is relevant only if it has the "tendency to make a fact more or less probable than it would be without the evidence," and then only if that "fact is of consequence in determining the action."  Fed. R. Evid. 401.  Even where arguably relevant, evidence may be excluded "if its probative value is substantially outweighed" by its prejudicial value.  Fed. R. Evid. 403.  Evidence is unfairly prejudicial where there is "the possibility that the evidence will excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it."  United States v. Simpson, 910 F.2d 154, 158 (4th Cir. 1990).

Because the 911 Exhibits and 911 Testimony are irrelevant, they should be excluded from consideration on summary judgment, and stricken from the record.

### II.   The 911 Exhibits and 911 Testimony Are Irrelevant and Prejudicial.

The reasonableness of an officer's use of deadly force is "based on the information available to the [officers] 'immediately prior to and at the very moment they fired the fatal shots.'" Hensley v. Price, 876 F.3d 573, 582 (4th Cir. 2017); accord Estate of Rodgers v. Smith, 188 Fed. App'x 175, 183 (4th Cir. 2006) ("[T]he reasonableness of an officer's actions rests on the information possessed by the officer at the moment that force is employed.").

For example, in <u>Harris v. City of Circleville</u>, 2010 U.S. Dist. LEXIS 29386, at *9 (S.D. Oh. Mar. 5, 2010), the plaintiff filed a claim for excessive use of force based on the conduct of officers at the jail where he was taken. Because those officers "did not know what had transpired during the course of the traffic stop" preceding the plaintiff being taken to jail, the Court excluded as irrelevant all "evidence related to Plaintiff's conduct prior to arriving at the Circleville jail," including the video recordings from the Highway Patrol cruiser of the traffic stop. <u>Id.</u> at *9-*10. Notably, the Court in Harris did not address the issue of the probative value of the evidence leading up to the use of force, but excluded it pursuant to Rule 402 as plainly irrelevant. <u>Id.</u>

Here, Corporal Arndt and Officer Novelli had not heard the 911 call captured in the 911 Exhibits, rather all of the information they had about the situation at the Craven residence was relayed to them through dispatch. As Corporal Arndt confirmed: "Most calls for service are routed through 911 or come directly to the police department, so the dispatcher asks them the who, what, when, where, why, how questions. So that's primarily where most of our information we gather." <u>See</u> **Exhibit 1**, Excerpts from Alexander Arndt Deposition ("<u>Arndt Dep. Tr.</u>") 85:4-10. Indeed, the information relayed to officers on August 2, 2020, likely did not even come from the person who was speaking directly with Craven's step-daughter. <u>Arndt Dep. Tr.</u> 85:25-86:5 ("[M]ost of the time we have two dispatchers working, so usually . . . [o]ne of them is going to be on the phone and then the other one is involved with communicating with officers via radio . . . ."), 47:14-22 ("we got more information through dispatch"), 83:1-5, 90:15-21.

Officer Novelli testified that the information he received from the situation on August 2, 2020, came in "over the radio" from dispatch. **Exhibit 2**, Excerpts from Christopher Novelli Deposition ("<u>Novelli Dep. Tr.</u>") 41:14-42:2, 42:19-43:15 (recounting information that "our dispatchers said they either heard him – they either heard him or the caller" state).

3

The body worn camera footage from both Corporal Arndt and Officer Novelli confirms that no 911 audio was available to them in their police vehicles or on their radios in the minutes leading up to the shooting. [DE # 20-13, <u>Defs.' Exhibit 12</u>], [DE # ▆, <u>Pltf's. Exhibit C</u>].

In sum, the 911 Exhibits were not information known to either Corporal Arndt or Officer Novellia the time they shot Craven, and those 911 Exhibits should be excluded as completely irrelevant to the ultimate issue in this matter: whether Corporal Arndt's and Officer Novelli's use of deadly force was reasonable. For the same reason the 911 Testimony is likewise irrelevant and should be excluded.

Even were the Court to consider the 911 Exhibits and 911 Testimony as potentially relevant, their prejudicial value vastly outweighs any probative value they may hold, given that this information could not have played a role in Officer Novelli's and Corporal Arndt's decision to use deadly force.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court exclude the 911 Exhibits and 911 Testimony from evidence, including from consideration on summary judgment, and that the Court strike them from the record.

This the 10th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

<u>/s/ J. Alexander Heroy</u>
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com; jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE EXHIBITS AND MOTION TO STRIKE** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

<div align="center">

Patrick H. Flanagan
Jake W. Stewart
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

</div>

This the 10th day of February, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
        jhouti@jmdlaw.com
        Fax: 704-333-5508
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXHIBITS AND MOTION TO STRIKE** |
| CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

NOW COME Defendants, through undersigned counsel, and respectfully submit this Response to Plaintiff's Motion *In Limine* to Exclude Exhibits and Motion to Strike. On February 10, 2023, Plaintiff moved to strike from the record (1) the 911 transcript (D.E. 20-11), (2) the recording of the 911 call (D.E. 20-12), and (3) portions of the deposition transcripts of Amy Craven or Taylor Dunn where the 911 call is discussed. Defendants will address only the matters raised in Plaintiff's Motion and will explain why Plaintiff's Motion *In Limine* to Exclude and Strike should be DENIED.

## **BACKGROUND**

This claim arises out of an incident that occurred on August 2, 2020, when Chris Craven ("Craven") was shot and killed by Corporal Alexander Arndt ("Arndt") and Officer Christopher Novelli ("Novelli"). (D.E. 1 ¶¶ 29, 33). Arndt and Novelli responded to the Craven residence because they received a call from dispatch regarding a domestic dispute. (D.E. 20-2 ¶ 4; D.E.

20-3 ¶ 4). The call from dispatch was the result of a call from Craven's step-daughter, Taylor Dunn ("Dunn"), who reported a domestic dispute. (D.E. 20-6, pp. 43, 51, 56-57). During the call, Dunn gave information to dispatch about what was occurring in the home. (D.E. 20-11). In addition, Craven could be heard on the call. (D.E. 20-11 p. 5-6; D.E. 20-12 at 05:32-05:42).

Plaintiff's Motion argues that the 911 transcript, 911 calls, and testimony regarding the 911 call (collectively "911 evidence") are irrelevant and should be excluded from consideration on summary judgment because Arndt and Novelli did not hear the call prior to using deadly force. (D.E. 29).

## ARGUMENT

### A. The 911 Call, Transcript, and Testimony Regarding the Call is Relevant Admissible Evidence.

Pursuant to the Rule 402 of the Federal Rules of Evidence, relevant evidence is admissible. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

In her Motion, Plaintiff argued that the 911 evidence was not relevant because Arndt and Novelli were unaware of the contents of the call at the time they used deadly force. While it is admitted that Arndt and Novelli did not hear the 911 call or review the 911 transcript prior to their use of deadly force, the 911 evidence is still relevant for a number of reasons.

First, the 911 evidence is relevant because it is the most reliable evidence as to why the police were called to the Craven residence and provides the information that was conveyed to the

2

police about the situation at the Craven residence. Without the 911 evidence, the parties can only rely upon testimony from Dunn and Amy Craven, which was taken nearly three years after the incident occurred. The 911 evidence provides a much more accurate picture of what occurred in the moments leading up to Craven's death and what was reported by his family to the police. The basis of this lawsuit is the force used by officers in responding to this 911 call, so clearly, the contents of that call is relevant to this claim. Moreover, Plaintiff has continuously characterized this event as an improper response to an individual in the midst of a mental health crisis. While Defendants deny Plaintiff's characterization of the incident, the 911 evidence provides the best evidence of Craven's state of mind in the moments leading up to the shooting.

Furthermore, the 911 evidence is important in determining what information the Town had and whether the Town responded appropriately based upon the information obtained. In her Response to Defendants' Motion for Summary Judgment, Plaintiff argues that Novelli and Arndt were not properly trained on how to deal with individuals going through mental health crises. (D.E. 25). In addition, Plaintiff's expert prepared a report indicating, among other things, that Defendants did not appropriately respond to the call at the Craven residence. His opinion was based in part upon the 911 call. The contents of the 911 call show what information the Town had and is relevant to the determination as to whether the response to the call was proper.

Most importantly, the 911 evidence is relevant because it is evidence of Craven's state of mind in the moments leading up to the shooting. Specifically, Craven states "When the police show up here, thank Taylor because (inaudible)" and "You won't have a fucking daddy no more (inaudible). (D.E. 20-11 p. 5; D.E. 20-12 at 005:32-05:42). These statements are not just relevant, they are critical pieces of evidence in this claim. The first statement shows that Craven was aware that the police were outside. On multiple occasions the Fourth Circuit has noted the

importance of an officer identifying themselves as police or the suspect being aware that they were dealing with a police officer in analyzing whether the officer's use of force was reasonable. See *Cooper v. Sheehan,* 735 F.3d 153, 159-60 (4th Cir. 2013)*; See Pena v. Porter,* 316 Fed.Appx. 303 (4th Cir.2009).  This call shows that Craven knew he was walking outside to confront police officers.

In addition, the second statement is relevant as to Craven's intent.  The biggest question in contention in this claim is whether Craven reached into his waistband and produced a gun. His statement that once he goes outside, his children won't have a father anymore serves as circumstantial evidence that his intent was to die when he walked outside and supports the testimony of Novelli and Arndt that he pulled a gun on them.  It further supports Novelli and Arndt's testimony that Craven said something to the effect of "you are going to have to shoot me." (D.E. 20-2 ¶ 9; D.E. 20-23 ¶ 8).  While "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait" Fed. R. Evid. 404, but such evidence is admissible "to show a relevant state of mind such as intent, motive, plan or opportunity.  *Wade,* 155 N.C.App. at 17-18, 573 S.E.2d at 654 (quoting *Boyd,* 321 N.C. at 577, 364 S.E .2d at 119).  Here, the 911 evidence clearly shows Craven's state of mind and intent.

The 911 evidence is certainly relevant and is critical to show Craven's intent and state of mind in the moments before his confrontation with the police.  His statements lend credibility to the testimony from Arndt and Novelli and are the last words said before stepping out of his home.  Based on the above, there is clearly probative value in the 911 evidence, but it is unclear how there is any prejudicial value.  Plaintiff does not identify any prejudicial value in her Motion and instead focuses her argument on the fact that Arndt and Novelli did not hear the call.

4

## **CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that Plaintiff's Motion *In Limine* to Exclude Evidence and Motion to Strike be DENIED.

This the 24<sup>th</sup> day of February, 2023.

/s/ Jake W. Stewart
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com

5

**JA349**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE AND MOTION TO STRIKE** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

> J. Alexander Heroy
> Jennifer M. Houti
> Counsel for Plaintiff
> aheroy@jmdlaw.com
> jhouti@jmdlaw.com

This the 24th day of February, 2023.

> /s/ Jake W. Stewart
> Jake W. Stewart
> N.C. Bar No. 51157
> Patrick H. Flanagan
> N.C. Bar No. 17407
> CRANFILL SUMNER, LLP
> P.O. Box 30787
> Charlotte, NC 28230
> Telephone: (704) 332-8300
> Facsimile: (704) 332-9994
> jstewart@cshlaw.com
> phf@cshlaw.com

6

JA350

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
WDNC Civil Action No. 5:21-cv-174

| | | |
|---|---|---|
| AMY RHINEHART CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

NOW COME Defendants, through undersigned counsel, and respectfully submit this Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment.  Defendants address only matters newly raised by Plaintiff's Response to Defendants' Motion for Summary Judgment and will explain why Defendants' Motion for Summary Judgment should be GRANTED.

## ARGUMENT

### I.    Plaintiff Failed to Identify a Genuine Issue of Material Fact Precluding Summary Judgment for the Defendants.

In an effort to create an issue of fact, Plaintiff argues there is a genuine issue of fact as to whether Craven ever reached for his waistband or brandished a gun.  Both Novelli and Arndt testified that Craven reached into his waistband with his right hand, pulled his gun out of the holster, and quickly brought the gun up. (D.E. 20-2 ¶ 12; D.E. 20-3 ¶ 10).  Plaintiff cited to body camera footage from Novelli and Arndt as the basis to argue there is evidence Craven never

reached for his gun. (D.E. 20-13 at 6:32; Pl. Ex. C at 6:40). Admittedly, the body camera footage does not definitively show Craven pulling a gun from his waistband, but it also does not definitively show Craven did not pull a gun from his waistband. Rather, due to the lighting, the body camera footage does not depict whether Craven did or did not pull a gun from his waistband. In other words, the body camera footage does not definitively confirm or refute Novelli and Arndt's testimony with regard to Craven's production of a firearm. Therefore, there is no evidence to rebut Arndt and Novelli's testimony and Plaintiff is relying wholly upon her pleadings and speculation to create a disputed material fact. The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, (1986). The non-movant must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial. *Id.*

In addition, the video footage blatantly contradicts Plaintiff's account of the facts and when a video "quite clearly contradicts the version of the story told by [Plaintiff]    so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Plaintiff contends the body camera footage does not show Craven reaching or his waistband. While the footage does not show what Craven pulls from his waistband, it clearly shows him reaching for his waistband. (D.E. 20-13 at 6:31-6:32). Similarly, the footage clearly shows Craven reached down to his waistband before any command to get on the ground was given, which contradicts Plaintiff's contention that the command and reaching down to his waistband occurred at the same time. (*Id.*).

Notably, Plaintiff has offered no testimony or evidence to rebut the testimony from Novelli and Arndt. Instead, Plaintiff has cited to a 9th Circuit decision where the Court found summary judgment was not warranted where the only evidence of the decedent reaching to his waistband for a weapon was testimony from the officers on scene. See *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014). In *Cruz*, the Court noted that there was circumstantial evidence that could give a reasonable jury pause, such as the fact that Plaintiff did not have a gun on him so why would he be reaching for a gun. *Id.* In this claim, a gun was found next to Craven's body, he had a holster on his person where the officers said they saw him reach for a gun, and his wife testified he had a gun on him when she saw him in the home. (D.E. 20-7 p. 69; D.E. 20-2 ¶ 14; D.E. 20-3 ¶ 11). Furthermore, approximately one minute before the shooting, Craven told his children they won't have a father anymore once the police arrive. (D.E. 20-12 at 05:32-05:42). While not evidence of the officer's reasonableness, such a comment serves as circumstantial evidence supporting the notion that Craven went outside with the intent to draw on the officers. In short, the circumstantial evidence supports the testimony that Craven had a gun and there are no facts to lead a jury to find that Craven did not reach for a gun in his waistband. Moreover, Defendants are unaware of any 4th Circuit decision to follow the holding in *Cruz*.

Plaintiff also argued there is a genuine issue of fact as to whether Craven made a "furtive" movement. Plaintiff erroneously contends that Defendants' argument hinges upon the characterization of Craven's arm movement as "furtive." Once an officer gives a suspect a command to show his hands, "the suspect's continued movement will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 585 (4th Cir. 2017). In such situations, the Court has not required a finding of a furtive movement in order to find that an officer reasonably feared for his

life. See *Slattery v. Rizzo,* 939 F.2d 213, 215-216 (4th Cir. 1991) (holding an officer reasonably feared for his life when he ordered a suspect to put his hands up twice but he suspect ignored the officer's commands and reached down to an area out of the officer's sight to grab an object that turned out to be a bottle); *Anderson v. Russell*, 247 F.3d 125, 128, 131 (4th Cir. 2001) (holding an officer was reasonable in fearing for his life when he ordered a man he thought was armed to get on his knees and put his hands up, but the man reached into his pocket for what turned out to be a radio). Here, Craven reached down towards his waistband after an order was given to show his hands which would cause a reasonable officer to fear for his life, regardless of whether or not the movement was "furtive."

## II.   Novelli and Arndt are Entitled to Qualified Immunity

In her Response, Plaintiff argued the decisions in *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) and *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017) support denial of qualified immunity for Novelli and Arndt. The facts in *Cooper* and *Hensley* are significantly different than those here.

In *Cooper,* the Court found that a reasonable officer would not have probable cause to feel threatened where the suspect "stood in the threshold of his home, holding his shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands." 735 F.3d at 159. The Court went on to note that it was important the officers never identified themselves and that if the officers had identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* See *Elliot v. Leavitt,* 99 F.3d 640, 644 (4th Cir. 1996) ("No citizen can fairly expect to draw a gun on police without risking tragic consequences."). Here, Novelli and Arndt identified themselves as officers and Craven clearly heard them as he initially complied with commands by

4

4882-   2-6226, v. 1
**JA354**

raising his hands. (D.E. 20-2 ¶ 12; D.E. 20-13 at 06:31). In addition, Craven ignored commands when he reached for his gun instead of putting his hands in the air or getting on the ground. (D.E. 20-2 ¶ 12; D.E. 20-3 ¶ 10). In *Cooper*, the suspect walked out of the home with his shotgun and there was no contact or warning issued by the police beforehand. *Cooper*, 735 F.3d at 155-56. This case is distinctly different in that the officers made contact with Craven, issued lawful commands, which he initially complied with, and then Craven reached for his waistband to grab a gun.

In *Hensley*, the suspect had a gun when the officers arrived on scene and then walked off his porch with the weapon pointed down. 876 F.3d at 584. The Court found there was no reason for the officers to suspect an immediate threat because none was offered and "no command to stop, drop the gun, or raise his hands" was issued. 876 F.3d at 585. This claim is easily distinguishable from *Hensley* in that the officers issued commands to Craven to show his hands and get on the ground, and he instead grabbed for a gun in his waistband. (D.E. 20-2 ¶ 12; D.E. 20-3 ¶ 10).

The facts of this claim are much more similar to those in *Slattery* and *Anderson.* "In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Hensley*, 876 F.3d at 585. Notably, even if Craven did not have a gun, Novelli and Arndt would be entitled to qualified immunity since the officers "can reasonably expect the worst at the split-second when he acts." *Id.*[1]

### III.    Plaintiff's § 1983 Claims Against the Town Fails

---

[1] See *Slattery* 939 F.2d at 215-216, where an officer reasonably feared for his life when a suspect ignored the officer's commands and reached down to grab an object that turned out to be a bottle; *Anderson*, 247 F.3d at 128, 131, where an officer was reasonable in fearing for his life when he ordered a man to get on his knees and put his hands up, but the man reached into his pocket for what turned out to be a radio.

In her Response, Plaintiff argues that the Town is liable to her under a *Monell* theory of liability because the Town failed to train their officers on the use of deadly force in situations involving people experiencing mental health crises. Plaintiff cites to a North Carolina District Court decision to support her argument. *Estate of Chivrell v. City of Arcata*, 2022 U.S. Dist. LEXIS 153466, *9-10 (N.D. Ca. Aug. 25, 2022). First, such a decision is not binding here and should not be considered persuasive authority as Defendants are not aware of any North Carolina or 4th Circuit Courts who have reached a similar holding. Additionally, there is no evidence in our case that Craven was mentally ill at the time of the shooting. Defendants have not been made aware of any medical professional who has opined that Craven was suffering from mental illness at the time of his shooting and neither his family members or the police officers on scene are qualified to make such a diagnosis.

A City can only be liable under §1983 for inadequate training where the failure to train amounts to deliberate indifference to the rights of persons who the officers come into contact with. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.ed.2d 412 (1989). Further, the alleged training deficiency "must be closely related to the ultimate injury," meaning it must cause the injury. *Id.* at 391, 109 S.Ct. 1197. Here, there is no evidence of any inadequate training that amounts to deliberate indifference that caused an injury.

It is undeniable that the Town had a use of force policy and that the Town had a policy for officers interacting with persons in mental health crises. (Pl. Ex. F; Novelli dep. p. 26; Arndt dep. p. 62). In addition, officers received mental health crisis training in Basic Law Enforcement Training. (Novelli dep. pp. 20-21; Arndt dep. p. 59). Importantly, Plaintiff has focused only on use of force training as it pertains to people suffering mental health crises. She has not produced any evidence, nor has she alleged, that the Town does not adequately train its officers in use of

6

force.  The alleged constitutional violations in this claim pertain to use of force, not use of force against someone suffering from a mental illness.  Plaintiff's attempt to classify the constitutional violation in this claim as excessive force against someone suffering a mental health crisis is far too specific and is unsupported by case law.  The Town has provided adequate use of force training, and to hold that they open themselves up to liability under *Monell* unless they also provide use of force training for every specific instance they may encounter is unreasonable.  Allowing liability under such specific instances could result in *Monell* liability in almost every scenario.  While it is admittedly an extreme example, such reasoning would require specific training outside of just general use of force training as to minorities, women, children, intoxicated persons, people with emotional conditions, people with physical impairments, people with mental impairments, etc.

Moreover, "[a]t its core, the strict *Monell* test asks for some level of notice." *Estate of Jones by Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661, 672 (4th Cir. 2020).  Here, there is no evidence that the Town was put on notice that they needed to better train its officers as to their use of force.  Similarly, there is no evidence of any past issues within the Town as it relates to use of force by officers.  There can be no liability found under *Monell* because there is no deficiency in training to "reflect a deliberate or conscious choice by a municipality    " *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000).

Finally, there is no evidence that any inadequate training caused the injury in this claim.  While there is a disagreement as to the reasonableness of the amount of force used on Craven, Plaintiff has not alleged that additional use of force training would have prevented Craven's injury.  To say that inadequate training was the cause of Craven's injury would be wholly speculative and unsupported by the evidence.

**IV.    There is no Evidence of Malice by Arndt or Novelli**

7

4882-    2-6226, v. 1

**JA357**

Plaintiff argues Arndt and Novelli are not entitled to public official immunity because there is evidence of malice on their behalf. Specifically, Plaintiff argued that text messages between Novelli and Arndt from December, March, and April of 2021 are evidence of malice. (Pl. Ex. E). The text messages Plaintiff's attorney has cited to are primarily from Novelli, who testified that those text messages were a way of making light of the situation and that those messages do not reflect how he felt about the shooting. (Novelli dep. p. 117). If those text messages do not represent the way he felt about the shooting, then they cannot be used as evidence of his state of mind.

More importantly, these text messages were sent seven to sixteen months after the shooting occurred. "[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." *Wilcox v. City of Asheville,* 222 N.C.App. 285, 730 S.E.2d 226, 230 (2012). Plaintiff has not put forth any evidence or made any argument that Novelli or Arndt acted wantonly or with an intent to injury another. Instead, Plaintiff has relied entirely upon text messages sent months after the incident which do not contain any information about Novelli or Arndt's state of mind or intent at the time of the shooting.

A joke made seven to sixteen months after an act occurred does not support that the act was done wantonly or with the intent to injure another. A bad sense of humor months after a shooting is not evidence of the shooter's state of mind during the incident. To find that those texts are evidence of malice would require speculation, which is insufficient to pierce public official immunity. See *Khan v. Worcester County,* 24 Fex.Appx. 183, 188-89 (4th Cir. 2001) (where the Court found that mere speculation of malice based on inferences from an officer's actions without further evidence is not sufficient to find malice.) In instances where Courts have found an officer is not entitled to public official immunity due to potential malice, the Courts have looked to the

actual facts of the incident, not messages exchanged months later. See *Knibbs v. Momphard,* 30 F.4th 200, 227-29 (4th Cir. 2022); See *Hensley*, 876 F.3d at 587-88.

V.    **Plaintiff's Assault and Battery Claims are Subject to Dismissal**

Since Arndt and Novelli reasonably believed Craven posed an imminent deadly threat, their use of force was justified and reasonable, thus the assault and battery claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that Defendants' Motion for Summary Judgment be GRANTED.

This the 21st day of February, 2023.

<div style="text-align:right">

*/s/ Jake W. Stewart*
Jake W. Stewart
N.C. Bar No. 51157
Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
jstewart@cshlaw.com
phf@cshlaw.com

</div>

9

4882-    2-6226, v. 1

**JA359**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

> J. Alexander Heroy
> Jennifer M. Houti
> Counsel for Plaintiff
> aheroy@jmdlaw.com
> jhouti@jmdlaw.com

This the 21st day of February, 2023.

> */s/ Jake W. Stewart*
> Jake W. Stewart
> N.C. Bar No. 51157
> Patrick H. Flanagan
> N.C. Bar No. 17407
> CRANFILL SUMNER, LLP
> P.O. Box 30787
> Charlotte, NC 28230
> Telephone: (704) 332-8300
> Facsimile: (704) 332-9994
> jstewart@cshlaw.com
> phf@cshlaw.com

10

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Christopher Novelli on 11/29/2022**

```
             IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF NORTH CAROLINA
                   STATESVILLE DIVISION


             Case No. 5:21-CV-174-KDB-DSC


*********************************************************

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

          Plaintiff,

v.


CHRISTOPHER NOVELLI, individually
and in his official capacity as
Officer of the Mooresville Police
Department; ALEXANDER ARNDT, individually
and in his official capacity as Officer
of the Mooresville Police Department,
and the TOWN OF MOORESVILLE,

          Defendants.



*********************************************************



     DEPOSITION of CHRISTOPHER NOVELLI, taken by the
Plaintiff pursuant to Rules 26, 30 and 32 of the North
Carolina Rules of Civil Procedure, in the above-entitled
action, pursuant to notice, before Twyla Donathan,
Registered Professional Reporter and Notary Public, at
the Mooresville Town Hall, 126 North Main Street,
Mooresville, North Carolina, on the 29th day of
November, 2022, beginning at 9:30 a.m.
```

```
 1     A    That one I went through Mitchell Community
 2  College.
 3     Q    Okay.  Right over there.
 4     A    Yep.  This one was the one in Statesville.
 5     Q    Oh, okay.  Prior to this incident, had you
 6  had any mental health training?
 7     A    In basic law enforcement training, there is a
 8  subject, topic of dealing with people with mental
 9  illness.  I don't remember the exact verbiage of it,
10  but...
11     Q    Can you tell me about that?  Is it an entire
12  course?
13     A    It's a -- I think it was a one- or two-day
14  block of instruction.
15     Q    Okay.  I'm going to guess if it's only one or
16  two days, and correct me if I'm wrong, that it's fairly
17  general and high level?
18     A    What exactly do you mean by that?
19     Q    I mean, you're not getting into different
20  diagnoses and different symptoms of various mental
21  health disorders?
22     A    They touch on the different types of mental
23  illness, and then you do a lot of role-playing type
24  stuff.
25     Q    Okay.  Do they talk about how -- kind of the
```

 1  intersection between mental health and law enforcement?

 2      A    They teach us somewhat how to respond, and

 3  then you do role-playing scenarios where you're

 4  responding to a call.

 5      Q    Okay.  And what do they teach you?  How is it

 6  different than a normal call when you're responding to

 7  somebody with -- I don't know if -- you called it

 8  somebody in a mental health crisis or with some sort of

 9  mental health diagnosis?

10      A    In the academy they taught us, you know, try

11  to calm them down if you can and talk with them, be

12  soft-spoken, and things like that.

13      Q    Anything else?

14      A    I'm sure.  This was four years ago, so I'm

15  sure there was, but I don't remember exactly.

16      Q    That's all right.  Does it differentiate

17  between people with some, you know, like a behavioral

18  or disorder like, for example, autism versus somebody

19  who is just, you know, having a mental breakdown?  Are

20  you taught that there is a different way to handle

21  those individuals?

22      A    There can be.  It just depends on the

23  totality of that situation and circumstances.

24      Q    Okay.  So prior to this incident, anything

25  else besides the one or two-day block during BLET where

1  deal with someone, and then we think they need it, we

2  then call Mobile Crisis, and then they may come out or

3  they may not.

4      Q    Okay.  Can you say how long it generally

5  takes them to respond when you do call, or does it

6  vary?

7      A    PreCOVID it seemed like it was maybe 40

8  minutes, and then since it was -- sometimes they refuse

9  to come out because they were three hours away.

10     Q    Okay.  Do you know how many people they have

11  on staff to respond?

12     A    I don't know.

13     Q    So outside of the Mooresville Police

14  Department mental health policy and then the BLET

15  training block, any other mental health training you've

16  received as a Mooresville police officer prior to the

17  incident with Mr. Craven?

18     A    Not that I can remember.

19     Q    Okay.  What about -- Would your answer be the

20  same if I had said suicide response versus a mental

21  health crisis?

22     A    What was the question?  I'm sorry.

23     Q    Other training you received.  Are you --

24  would your answer differ if we were talking about

25  training in suicide versus mental health?

1  issues?

2      A    No, I did not.

3      Q    During that same time period, from when you

4  received the call until the end of the incident, did

5  you know whether Mr. Craven was having a mental health

6  crisis?

7      A    I did not.

8      Q    In reference to these text messages we've

9  been talking about, I believe you testified that it was

10 you kind of making light of the situation; is that

11 accurate?

12     A    That's correct.

13     Q    Do these text messages reflect how you feel

14 about the shooting of Mr. Craven?

15     A    No.

16     Q    Do you believe that it's a serious issue?

17     A    I do.

18     Q    And before Plaintiff's attorney was asking

19 you a bit about the order of commands, and I know you

20 watched the video two or three or however many times

21 you watched it, and I believe you testified that

22 Corporal Arndt ordered him to put his hands up --

23 Mr. Craven to put his hands up; is that correct?

24     A    That's correct.

25     Q    And then Mr. Craven complied for some period

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Alexander Arndt on 11/28/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     STATESVILLE DIVISION
             CIVIL ACTION NO: 5:21-cv-174-KDB-DSC
 3
     AMY RHINEHARDT CRAVEN, as    )
 4   Administratrix of the        )
     Estate of CHRISTOPHER        )
 5   KIMMONS CRAVEN,              )
                                  )
 6                  Plaintiff,    )
                                  )
 7             vs.                )
                                  )
 8   CHRISTOPHER NOVELLI,         )
     individually and in his      )
 9   official capacity as         )
     Officer of the               )
10   Mooresville Police           )
     Department, ALEXANDER        )
11   ARNDT, Individually and      )
     in his official capacity     )
12   as Officer of the            )
     Mooresville Police           )
13   Department, and the TOWN     )
     OF MOORESVILLE,              )
14                                )
                    Defendant.    )
15   _____

16                    -   -   -

17                 Deposition of

18              ALEXANDER ARNDT

19       (Taken on behalf of The Plaintiff)

20         Mooresville, North Carolina

21              November 28, 2022

22

23

24   REPORTED BY:  SHERRY L. MALIA REGISTERED
     PROFESSIONAL REPORTER/NOTARY PUBLIC
25
```

JA366

```
1      time, I couldn't even tell you what I
2      took -- but I don't know if there was
3      information that covered how to deal
4      with people with mental illness but it
5      certainly covered mental illness.
6   BY MS. HOUTI:
7      Q.   And after you joined the Mooresville
8   Police Department, any other training on
9   interacting with people with mental illness or
10  behavioral health other than the CIT training
11  that you just discussed?
12     A.   Nothing is really sticking out to me.
13     Q.   Prior to joining the Mooresville Police
14  Department, did you have any training with
15  respect to responding to individuals who were
16  threatening self harm or suicide?
17     A.   Prior to?
18     Q.   (Nods head.)
19     A.   No.  In BLET maybe it's covered, I'm
20  assuming.  Something, I think.  I think there's
21  a mental illness block in BLET, but I can't tell
22  you what's covered in that.  It's been a long
23  time and curriculum changes all the time.
24     Q.   What about after you joined the
25  Mooresville Police Department?
```

1    Mooresville Police Department have at that time?

2        A.   Well, there's about -- I think last

3    count is 115, so there's policies covering every

4    aspect of the job.

5        Q.   As of August 2nd, 2020, was there a

6    Mooresville Police Department policy that

7    addressed interacting with people experiencing

8    mental health issues?

9        A.   Yeah, yes.

10       Q.   Did you have any training on that

11   particular policy at any time?

12       A.   Yeah, most certainly would have had to

13   read it and sign off indicating I understood it,

14   yes.

15       Q.   Anything other than simply having to

16   review the policy itself and sign off on it?

17       A.   I'm not sure.  I mean, for all I know

18   we could have had a training day on it.  I'm not

19   sure.  I don't want to say yes or no.  I'm just

20   not sure.

21       Q.   When you first joined the Mooresville

22   Police Department, were you provided with copies

23   of all of the policies at the time?

24       A.   Yes, correct.  And, again, they are all

25   online, so they are all immediately accessible

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of CHRISTOPHER
KIMMONS CRAVEN,

        Plaintiff,

v.

CHRISTOPHER NOVELLI, individually and in
his official capacity as Officer of the Mooresville
Police Department, ALEXANDER ARNDT,
individually and in his official capacity as Officer
of the Mooresville Police Department, and the
TOWN OF MOORESVILLE,

        Defendants.

**NOTICE OF FILING
OF CORRECTED EXHIBITS**

Please take notice that Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of

Christopher Kimmons Craven ("Plaintiff" or "Craven"), hereby submits corrected exhibits to the

Declaration of J. Alexander Heroy, [DE # 26 ("Heroy Declaration")], filed on February 10, 2023.

Specifically, Plaintiff hereby files the following corrected exhibits:

1.  Attached hereto as **<u>Exhibit A</u>** is a corrected copy of Exhibit A to the Heroy Declaration,

    consisting of excerpts from the November 28, 2022 deposition of Alexander Arndt,

    previously filed as DE # 26-2.

2.  Attached hereto as **<u>Exhibit B</u>** is a corrected copy of Exhibit B to the Heroy Declaration,

    consisting of excerpts from the November 29, 2022 deposition of Christopher Novelli,

    previously filed as DE # 26-3.

3. Attached hereto as **<u>Exhibit E</u>** is a corrected copy of Exhibit E to the Heroy Declaration, consisting of Exhibit 3 from the November 28, 2022 deposition of Alexander Arndt, a compilation of text messages, previously filed as DE # 26-5.

Counsel for Defendants consent to the submission of these corrected exhibits to the Heroy Declaration.

This the 1$^{st}$ day of March, 2023.

<div align="right">

**JAMES, McELROY & DIEHL, P.A.**

/s/ Jennifer M. Houti
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
      jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

</div>

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **NOTICE OF FILING OF CORRECTED EXHIBITS** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

Patrick H. Flanagan
Jake W. Stewart
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

This the 1st day of March, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ Jennifer M. Houti
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
          jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

3

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
**Alexander Arndt on 11/28/2022**

```
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                  STATESVILLE DIVISION
            CIVIL ACTION NO: 5:21-cv-174-KDB-DSC
 3
     AMY RHINEHARDT CRAVEN, as    )
 4   Administratrix of the        )
     Estate of CHRISTOPHER        )
 5   KIMMONS CRAVEN,              )
                                  )
 6                   Plaintiff,   )
                                  )
 7           vs.                  )
                                  )
 8   CHRISTOPHER NOVELLI,         )
     individually and in his      )
 9   official capacity as         )
     Officer of the              )
10   Mooresville Police           )
     Department, ALEXANDER        )
11   ARNDT, Individually and      )
     in his official capacity     )
12   as Officer of the            )
     Mooresville Police           )
13   Department, and the TOWN     )
     OF MOORESVILLE,              )
14                                )
                     Defendant.   )
15   _____
16                    -  -  -
17                Deposition of
18             ALEXANDER ARNDT
19        (Taken on behalf of The Plaintiff)
20         Mooresville, North Carolina
21             November 28, 2022
22
23
24   REPORTED BY:  SHERRY L. MALIA REGISTERED
     PROFESSIONAL REPORTER/NOTARY PUBLIC
25
```

```
 1   APPEARANCES OF COUNSEL:

 2   On Behalf of the Plaintiff:

 3       J. ALEXANDER HEROY, ESQ.
         JENNIFER M. HOUTI, ESQ.
 4       James, McElroy & Diehl, P.A.
         525 North Tryon Street
 5       Suite 700
         Charlotte, North Carolina 28202
 6       Telephone: 704.372.9870
         Email:     aheroy@jmdlaw.com
 7                  jhouti@jmdlaw.com

 8   On Behalf of the Defendants:

 9       JAKE W. STEWART, ESQ.
         Cranfill Sumner, LLP
10       2907 Providence Road
         Suite 200
11       Charlotte, North Carolina 28211
         Telephone: 704.940.3441
12       Email:     jstewart@cshlaw.com
             AND
13        SHARON T. CRAWFORD, ESQ.
          Town of Mooresville
14        413 North Main Street
          Mooresville, North Carolina 28115
15        Telephone:  704.799.4162
          Email:      scrawford@mooresvillenc.gov
16

17   Also Present:  Amy Craven, Plaintiff

18                    -  -  -

19          Deposition of ALEXANDER ARNDT, taken on

20   behalf of the The Plaintiff, at Mooresville Town

21   Hall, 413 North Main Street, Mooresville, North

22   Carolina, on the 28th day of November 2022 at

23   1:19 p.m., before Sherry L. Malia, Registered

24   Professional Reporter and Notary Public.

25
```

 1    calls for people who may be experiencing a
 2    mental illness or health crises?
 3        A.   It's been a while, but I'm sure it's
 4    covered in CIT.  Exact verbiage, I couldn't give
 5    you specifics.
 6        Q.   Is every patrol officer required to
 7    take that CIT training?
 8        A.   I think it's something our department
 9    likes to do.  I think now it is a required
10    class, something that you have to go to.  At the
11    time I don't believe it was.  I don't think so.
12    I think it's kind of newer within the last
13    couple of months, like we want to send everybody
14    to CIT.
15        Q.   Prior to joining the Mooresville Police
16    Department, did you have any sort of training at
17    all dealing with people who had mental illness
18    or behavioral health issues?
19            MR.  STEWART:  Object to the form.
20        You can still answer.
21            THE WITNESS:  Maybe not dealing
22        with but, like I said, I was a
23        psychology minor so I kind of did have
24        some classes on psychology.  But in
25        those classes -- and it's been a long

1     time, I couldn't even tell you what I

2     took -- but I don't know if there was

3     information that covered how to deal

4     with people with mental illness but it

5     certainly covered mental illness.

6   BY MS. HOUTI:

7        **Q.   And after you joined the Mooresville**

8   **Police Department, any other training on**

9   **interacting with people with mental illness or**

10  **behavioral health other than the CIT training**

11  **that you just discussed?**

12       A.   Nothing is really sticking out to me.

13       **Q.   Prior to joining the Mooresville Police**

14  **Department, did you have any training with**

15  **respect to responding to individuals who were**

16  **threatening self harm or suicide?**

17       A.   Prior to?

18       **Q.   (Nods head.)**

19       A.   No.  In BLET maybe it's covered, I'm

20  assuming.  Something, I think.  I think there's

21  a mental illness block in BLET, but I can't tell

22  you what's covered in that.  It's been a long

23  time and curriculum changes all the time.

24       **Q.   What about after you joined the**

25  **Mooresville Police Department?**

1    Mooresville Police Department have at that time?

2        A.    Well, there's about -- I think last

3    count is 115, so there's policies covering every

4    aspect of the job.

5        Q.    As of August 2nd, 2020, was there a

6    Mooresville Police Department policy that

7    addressed interacting with people experiencing

8    mental health issues?

9        A.    Yeah, yes.

10       Q.    Did you have any training on that

11   particular policy at any time?

12       A.    Yeah, most certainly would have had to

13   read it and sign off indicating I understood it,

14   yes.

15       Q.    Anything other than simply having to

16   review the policy itself and sign off on it?

17       A.    I'm not sure.  I mean, for all I know

18   we could have had a training day on it.  I'm not

19   sure.  I don't want to say yes or no.  I'm just

20   not sure.

21       Q.    When you first joined the Mooresville

22   Police Department, were you provided with copies

23   of all of the policies at the time?

24       A.    Yes, correct.  And, again, they are all

25   online, so they are all immediately accessible

1   by any officer, any employee.  And so they have

2   to go on there and read them and sign them

3   indicating they understand them, so, yes, I was

4   provided with them.

5       **Q.   When you first joined the Mooresville**

6   **Police Department, did you also go through some**

7   **sort of 12-week new officer training program?**

8       A.   Yeah, that's correct.  Same field

9   training program.

10      **Q.   Other than the field training, was**

11  **there any other training that you received when**

12  **you first joined the Mooresville Police**

13  **Department?**

14      A.   I mean, yes.  So when you go throughout

15  your career, you obviously attend trainings.  So

16  I've been to a lot of training, but if your

17  question is specifically relating to like

18  response to mentally ill people, I can't think

19  of any off the top of my head.

20      **Q.   I guess my question is a little more**

21  **general than that.  It's basically when you**

22  **first became a Mooresville Police Department**

23  **officer, obviously you had this field**

24  **training --**

25      A.   Uh-huh, yes.

1   are not going to stage on something like that,

2   right?  That's an emergent scenario and we have

3   to intervene immediately.

4          You know, so it's all dependent on the

5   circumstances.  There may be a circumstance

6   where officers may stage for an improperly

7   parked vehicle call.  Who knows.  I mean, it's

8   all dependent on the information that we have at

9   the time of the call for service.  If we think

10  it would be beneficial, whether it be for the

11  safety of us or others or whoever, to where we

12  meet first and try to have some game plan then,

13  yeah, we will.

14      **Q.   And who decides whether to stage?**

15      A.   Could be a specific officer; it could

16  be supervision.  It doesn't really matter.

17      **Q.   So it's kind of all circumstantial?**

18      A.   Everything in this job is

19  circumstantial.

20      **Q.   When multiple officers respond to a**

21  **call, who is in command of the particular call?**

22      A.   I mean, ultimately, if it's just

23  officers there, then sure, I mean, it could be

24  said maybe the senior officer would be kind of

25  in charge, but not necessarily.  When you have

 1    Mr. Craven?

 2        A.    Because I was approaching his

 3    residence, the residence where there was a

 4    possibly armed suicidal man who had possibly

 5    assaulted someone.  As I was approaching the

 6    residence I could hear someone say, I heard a

 7    male voice say, "Just shoot me."  "You are going

 8    to have to shoot me."  Something of that nature,

 9    which immediately kind of made me think

10    something is going to happen, right?

11            We talked about that kind of escalating

12    level of uncommonness, if you will, best way to

13    put it.  Yeah, we were already responding to a

14    scenario where we had all these things

15    happening, and before I even see the guy I hear

16    "Just shoot me" or "You are going to have to

17    shoot me" or "Fucking shoot me."  Whatever it

18    was.  And then I see the male and I start giving

19    commands, lawful commands, and he didn't follow

20    them.

21        Q.    We'll get into that in a second, but

22    you mentioned -- so we talked earlier about the

23    types of calls that you've responded to and how

24    common or not common they are.  Was this

25    particular call as you were arriving to the

1   residence, which I was heading towards.

2          And again, the male voice said

3   something to the effect of "Shoot me."  "Are you

4   going to shoot me?"  "You're going to have to

5   shoot me."  Maybe an expletive in there,

6   something of that nature.

7          So, again, with all the information I

8   had been provided from dispatch and then that,

9   yeah, I guess the best way to put it were alarm

10  bells were going off in my head.  So I have,

11  again, been provided that someone is suicidal,

12  possibly assaulted someone, possibly fired a

13  shot.  And then before I even make contact with

14  them they said something to the effect of

15  "You're going to have to shoot me."

16         So I then see Mr. Craven, later

17  identified as Mr. Craven.  He was shirtless, I

18  think wearing shorts, and he was on the sidewalk

19  that was in front of the house and the sidewalk

20  ran to the driveway that I was in.  And he was

21  walking down the sidewalk towards the driveway,

22  as I recall.  He wasn't -- it was kind of, you

23  know, you think about a triangle.  He wasn't

24  walking, to my knowledge, directly towards me;

25  he was walking down the sidewalk to the driveway

 1    that I was in.  So it wasn't like he was

 2    beelining directly toward me but he was walking

 3    toward the driveway.

 4            So again, I gave commands.  Still to

 5    this day, I've seen it on video, I can't recall

 6    myself saying "Mooresville Police Department,"

 7    but on video I did.  I just remember the two

 8    commands, something to the effect of "Show me

 9    your fucking hands" and "Get on the ground,"

10    those two commands; but on the video I

11    identified myself as Mooresville Police

12    Department.  So I gave those commands as I

13    illuminated him with the light that was attached

14    to my patrol rifle.  Again, he's shirtless.

15            I guess human memory is kind of a weird

16    thing.  Directly afterwards, I'm sure you've

17    seen my statement, I thought he originally had

18    something in his hand, but, again, it's just

19    kind of fuzzy.  But ultimately, after I gave him

20    those commands, instead of complying he reached

21    down to his waist area and he produced a

22    handgun.  So -- and, again, human memory is kind

23    of a fickle thing.  It's kind of hard for me to

24    visualize this now, but I do, you know, the

25    statement I wrote and the statement I gave the

1  going to have to shoot me," or whatever the

2  verbiage was.  Nothing to alleviate my concerns.

3      **Q.   Is it safe to say that when Mr. Craven**

4  **was outside when you first saw him that he did**

5  **not pose an immediate threat to anyone who may**

6  **have been inside the house?**

7      A.   I wouldn't -- no, I mean.  The

8  situation can change in an instant.  Just

9  because he's outside he could immediately run

10  back into the house and that wouldn't alleviate

11  my concerns.

12      **Q.   But is it accurate that at least in the**

13  **split second when you first saw him he was**

14  **outside and walking away from the house,**

15  **correct?**

16      A.   So, again, before I even saw him is

17  when I heard that statement.  So, yeah, I was

18  very concerned about his behavior.  And then I

19  saw him, and that's when I began to give him

20  verbal commands.  Yes, he was walking away from

21  the front of the residence, but, again, I had

22  just heard those statements, the statement that

23  he made, "Are you going to shoot me," or

24  whatever he stated, so my concerns were not

25  alleviated.

1    had you received any information from dispatch

2    that anyone inside had been harmed other than

3    the initial assault on the mother?

4        A.    I don't believe so.

5        Q.    As you approached the house -- well,

6    back up.

7              Prior to approaching the house, do you

8    recall dispatch giving you any information about

9    any permits that Mr. Craven may have had for the

10   weapon that he owned?

11       A.    Yeah.  I've seen the call notes, and

12   this is just going specifically off that, I

13   can't say if I remember hearing it or not, but I

14   think there was mention of him possibly having a

15   concealed weapons permit.  But, again, like I

16   said, human memory is kind of fickle, so I can't

17   specifically think of that in my mind and say,

18   "Yes, I remember hearing that."  It was in the

19   call notes, so I would imagine it was broadcast

20   over the radio so I would have heard it.

21       Q.    As you approached the house, the Craven

22   residence, am I correct you did not have any

23   flashlight or source of illumination

24   continuously illuminating?

25       A.    Yeah, that wouldn't be best practice,

1   responding to an emergent scenario like this,

2   where we have a domestic, possibly an armed,

3   suicidal man, maybe had just fired a gun but

4   maybe not.  Probably don't want to announce

5   ourselves or, you know, shine our lights onto

6   ourselves so they know exactly where we are.

7   That could be walking into an ambush.  Again,

8   that's not best officer practice, no.

9        Q.   When you approached Mr. Craven, did you

10  have any cover between you and Mr. Craven?

11       A.   It kind of depends on what you call

12  cover.  So I was at the back right of a, I think

13  it was a truck, but you could get into an

14  argument of cover versus concealment on vehicles

15  all day.  They don't really stop bullets unless

16  you hit like a pillar.  I mean, I don't want to

17  get too far into the weeds with it, but it's

18  concealment.  But it was kind of, even with

19  concealment, I was at the back right edge of the

20  truck.  So obviously if I was hiding behind the

21  truck I wouldn't have been able to see him.  I

22  was kind of positioned at the back right of it.

23       Q.   But you hadn't sort of fully stepped

24  away from the truck so that you were completely

25  visible to Mr. Craven?

1     A.    Not to my knowledge. We're kind of

2   talking about angles here. So if I'm at the

3   back of a truck and he's over here and walking

4   this way, then, yeah, he's going to be able to

5   see me, yeah. Most certainly.

6     **Q.   And did you deliberately keep some**

7   **amount of cover between you and Mr. Craven as**

8   **you approached?**

9     A.    Again, "cover" is not the operative

10   word. It would kind of be concealment; maybe

11   cover. But, yeah, I mean, you kind of always, I

12   already -- again, the totality of the

13   circumstances: This person may be armed; may

14   have already fired a weapon. Yeah, so I

15   obviously need to be able to see him to see

16   where he's going to give commands; but, yeah, I

17   might want to stay close to cover/concealment if

18   he possibly started shooting at me I would have

19   somewhere to go. I wouldn't want to be standing

20   in the middle of the road and then someone start

21   shooting at me and I have no where to go.

22     **Q.   Is the only reason -- well, is a reason**

23   **that you kept some level of cover or concealment**

24   **between yourself and Mr. Craven because you had**

25   **been told by dispatch that he was armed?**

 1   in his hand, but it was kind of a high stress

 2   scenario or situation, so the memory, I'm not

 3   going to say it's the first thing to go, but

 4   it's cloudy to this day.  Specifically to this

 5   day, because it was a long time ago.  I don't

 6   want to give you a specific answer because it's

 7   kind of hard for me to remember.

 8       Q.   Can you describe Mr. Craven's demeanor

 9   when you first saw him?

10       A.   I think the -- at some point I think I

11   characterized his walking as aggressive.  I

12   reviewed the SBI report and that's what the

13   synopsis said.  But, again, he was walking.  I

14   can't remember if it was aggressive or not, but

15   I know that terminology was used in the SBI

16   report so maybe I indicated that.  I'm not sure,

17   but he was walking down the sidewalk.

18       Q.   Walking not running?

19       A.   Yeah, walking.

20       Q.   And is it correct that sitting here

21   today you don't remember one way or the other

22   whether you would describe his walking as

23   aggressive?

24       A.   Yeah, that's correct, yeah.

25       Q.   After you heard Mr. Craven make that

1    comment before you saw him, did he say anything

2    else to you or at all?

3         A.   Not to my knowledge.  Not that I can

4    recall.  I know I heard that, saw him.  I wish I

5    had a time frame I could give you but to my

6    knowledge it was directly afterwards, saw him

7    and gave the commands.  I don't think he said

8    anything else.

9         Q.   At any point did Mr. Craven lunge or

10   make a sudden movement in your direction?

11        A.   As in like physically like stepping

12   towards me?

13        Q.   Yes.

14        A.   No, I don't remember that.

15        Q.   And at any point did Mr. Craven, I

16   guess, make any sort of gesture towards you?

17             MR. STEWART:  Object to the form.

18             THE WITNESS:  I'm not sure what you

19        mean by "gesture."

20   BY MS. HOUTI:

21        Q.   Other than what you have described as

22   him reaching towards his waistband, did he make

23   any other sort of gesture or movement that you

24   observed?

25        A.   Not that I observed.

1      Q.   And it's correct that Mr. Craven never

2   said anything specifically threatening to you,

3   correct?

4           MR.  STEWART:  Object to the form.

5           THE WITNESS:  No, just the

6       statement we've already covered.

7   BY MS. HOUTI:

8      Q.   I'm curious as to why the first command

9   you issued contained a curse word?

10     A.   Yeah, it's not common I cuss at people.

11   I think the culmination of all the information I

12   had received, right, we've already gone over it,

13   but then the statement that "Are you going to

14   shoot me" -- the question or statement, however

15   you want to say it, "Are you going to shoot me?"

16   "You're going to have to shoot me."  Whatever

17   that was.  Usually I would say curse words and

18   like commands are kind of, I guess -- I'm trying

19   to think the best way to put it -- convey more

20   of an importance, if you will, so that's

21   probably why I included it.  Yeah, I would say.

22   To say this needs to occur, you need to do this

23   now.  Yeah, I would probably say.

24     Q.   Is it fair to say that you were pretty

25   tense at that moment?

1      A.   Yeah.   We've already gone over it.

2   Most certainly.   I was -- yeah, I think I

3   categorized it as alarm bells were going off in

4   my head.   Most certainly, yeah.

5      **Q.   I believe you said that Mr. Craven did**

6   **not respond to your commands.   Did he make any**

7   **movement to raise his hands after you told him**

8   **to?**

9      A.   Again, maybe; maybe not.   Not that I

10   can recall.   Again, you kind of have a -- my

11   recollection of the incident, me viewing the

12   camera of the incident, me talking to other

13   officers on the scene about the incident, it

14   kind of all just molds together, so just

15   specifically off memory it's hard to say.   It's

16   kind of hard to say.   I know that after he's

17   given the commands, that we've already covered,

18   he produced a firearm out of his waistband.

19      **Q.   So sitting here today, having recently**

20   **reviewed your body cam footage, do you believe**

21   **that Mr. Craven made any gesture or movement**

22   **suggesting he was attempting to comply with your**

23   **command to show his hands?**

24      A.   I don't think he was complying, no.

25   Complying would not be producing a firearm out

1   way to word it.

2          I think directly after the incident I
3   even thought that it was in his hand and he had
4   tried to rack the slide back.  I'm not going to
5   say in the absence of information your mind does
6   something, right, but a gun was in his hand.  In
7   my SBI statement I said I believed it was in his
8   right hand.  Again, I just saw a gun in his
9   hand.  I don't -- to my knowledge, again,
10  directly after the incident.  The more I had
11  time to process, I don't think that he had
12  racked the firearm.  Like I said, it happened
13  very quickly, but I know I saw a firearm.
14  That's what I saw.  It was in his hand.

15      **Q.   Did Mr. Craven actually raise the**
16  **firearm up?**

17      A.   At this point, like I said, I can't --
18  I can't recall.  It was in his hand.  I don't
19  know if he raised it to point at me.  I'm not
20  sure.

21      **Q.   Do you remember whether Mr. Craven did**
22  **point the firearm at you?**

23      A.   I don't think he pointed it directly at
24  me.  I don't believe so.

25      **Q.   Do you recall Mr. Craven pointing the**

1   firearm at anyone else?

2       A.   That would be me requiring -- like

3   knowing where all the other officers were on

4   scene.  I don't know where everybody was on

5   scene; I know where I was.

6       Q.   And I think you've already alluded to

7   the fact that your body worn camera footage is

8   difficult to see because of the illumination

9   from your rifle, correct?

10      A.   Yeah, I believe that's what the main

11  issue with it was.  He was illuminated with the

12  light on my rifle and it kind of floods, I

13  guess, if you want to say that, kind of washes

14  the footage.

15      Q.   But do you agree having watched just

16  the video that it's difficult to see, at least

17  on the video, what, if anything, Mr. Craven may

18  have been doing with his hands?

19      A.   Yeah.  I mean, like I say, it washes it

20  out so it's hard to see.  I've watched it in two

21  settings.  I mean, like I say, I sat there for

22  three hours watching it.  When I watched it the

23  other day, I watched it once.  It's not like we

24  were rewinding it.  It was one time.

25      Q.   And sitting here today, you don't

1    actually saw Mr. Craven, did you know where the

2    other members of the family were at that time?

3        A.   I presumed they were in the house.

4    That's the information that we were given, that

5    they were inside and he was coming back in, so I

6    presumed they were in the house.

7        Q.   Do you know anything -- any other

8    details about their location inside the house?

9        A.   No.

10       Q.   Do you know whether any shots fired

11   actually did penetrate the Cravens' house?

12       A.   I think I had heard maybe two did, but

13   I never went inside, so . . .

14       Q.   What's the normal -- well, let me ask

15   this.  Does Mooresville Police Department have

16   any sort of policy or standard protocol for what

17   is supposed to happen after an officer involved

18   shooting?

19       A.   There is a policy, yes.

20       Q.   Could you briefly describe what that

21   policy requires?

22       A.   You know, I think it goes over

23   contacting the correct agencies to investigate.

24   It's been a while since I looked at the policy.

25   I think it talks about putting officers on

 1      A.   Okay.  And he responded, "No idea man."
 2   I mean, do you want me to read that?
 3      Q.   No.  Here's what I'm getting at.  So a
 4   little further down on that text chain, you, at
 5   15:27, say, "Dang, we going to prison."  What do
 6   you mean by that?
 7      A.   That was me just dark humor, if you
 8   will.  So saying because Sara Kirkman was
 9   delaying her decision we were going to prison.
10   It was sort of a dark joke, I guess, if you
11   will.
12      Q.   Were you suggesting that her delay
13   might mean that you were going to be criminally
14   charged?
15      A.   That's what I would assume based off of
16   that.
17      Q.   Did you think you were going to be
18   criminally charged at that point?
19      A.   I didn't, no.  But we were all --
20   myself, I was wondering what was taking her so
21   long to announce it, which is what we were
22   talking about.
23      Q.   If you look at your next message to
24   Officer Novelli you say, "Dang, with Morris on
25   Crazy Woman Creek Road."  What is that

```
          IN THE UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF NORTH CAROLINA
              STATESVILLE DIVISION


          Case No. 5:21-CV-174-KDB-DSC


*********************************************************

AMY RHINEHARDT CRAVEN, as
Administratrix of the Estate of
CHRISTOPHER KIMMONS CRAVEN,

          Plaintiff,

v.


CHRISTOPHER NOVELLI, individually
and in his official capacity as
Officer of the Mooresville Police
Department; ALEXANDER ARNDT, individually
and in his official capacity as Officer
of the Mooresville Police Department,
and the TOWN OF MOORESVILLE,

          Defendants.



*********************************************************



     DEPOSITION of CHRISTOPHER NOVELLI, taken by the
Plaintiff pursuant to Rules 26, 30 and 32 of the North
Carolina Rules of Civil Procedure, in the above-entitled
action, pursuant to notice, before Twyla Donathan,
Registered Professional Reporter and Notary Public, at
the Mooresville Town Hall, 126 North Main Street,
Mooresville, North Carolina, on the 29th day of
November, 2022, beginning at 9:30 a.m.
```

**AMY RHINEHARDT CRAVEN vs CHRISTOPHER NOVELLI, ET AL.**
Christopher Novelli on 11/29/2022                                    Page 2

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

J. ALEXANDER HEROY, ESQUIRE
JENNIFER M. HOUTI, ESQUIRE            (by telephone)
JAMES, MCELROY & DIEHL, P.A.
525 North Tryon Street, Suite 700
Charlotte, North Carolina  28202
(704)-372-9870
aheroy@imdlaw.com


APPEARING FOR DEFENDANTS:

JAKE W. STEWART, ESQUIRE
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, North Carolina  28230
(704)332-8300
jstewart@cshlaw.com


APPEARING FOR DEFENDANT TOWN OF MOORESVILLE:

SHARON T. CRAWFORD, ESQUIRE
TOWN OF MOORESVILLE
413 North Main Street
P.O. Box 878
Mooresville, North Carolina  28115
(704)799-4162
scrawford@mooresvillenc.gov


ALSO PRESENT:  Amy Rhinehardt Craven

1    Q    When deciding whether, you know, there is

2    imminent fear to your safety or a third person's

3    safety, are there factors that the policy discusses?

4    A    There may be, but I'm not sure without

5    looking at it.

6    Q    Okay.  Are there -- Okay.  Do you receive any

7    crisis intervention training?  Have you ever received

8    any crisis intervention training?

9    A    I have.

10   Q    So are you -- I guess is it CIT certified?

11   A    That's correct.

12   Q    And when did you get that?

13   A    October of last year, I believe.

14   Q    2021?

15   A    Yes.

16   Q    So at the time of this incident, you were not

17   CIT certified?

18   A    That's correct.

19   Q    Okay.  And tell me what is the crisis

20   intervention training?

21   A    They teach you how to deal with people

22   suffering from mental illness to substance abuse.

23   Q    Okay.  And how long is that course?

24   A    Forty hours.

25   Q    Okay.  And who puts it on?

 1    A    That one I went through Mitchell Community
 2  College.
 3    **Q    Okay.  Right over there.**
 4    A    Yep.  This one was the one in Statesville.
 5    **Q    Oh, okay.  Prior to this incident, had you**
 6  **had any mental health training?**
 7    A    In basic law enforcement training, there is a
 8  subject, topic of dealing with people with mental
 9  illness.  I don't remember the exact verbiage of it,
10  but...
11    **Q    Can you tell me about that?  Is it an entire**
12  **course?**
13    A    It's a -- I think it was a one- or two-day
14  block of instruction.
15    **Q    Okay.  I'm going to guess if it's only one or**
16  **two days, and correct me if I'm wrong, that it's fairly**
17  **general and high level?**
18    A    What exactly do you mean by that?
19    **Q    I mean, you're not getting into different**
20  **diagnoses and different symptoms of various mental**
21  **health disorders?**
22    A    They touch on the different types of mental
23  illness, and then you do a lot of role-playing type
24  stuff.
25    **Q    Okay.  Do they talk about how -- kind of the**

1  intersection between mental health and law enforcement?

2    A    They teach us somewhat how to respond, and

3  then you do role-playing scenarios where you're

4  responding to a call.

5    Q    Okay.  And what do they teach you?  How is it

6  different than a normal call when you're responding to

7  somebody with -- I don't know if -- you called it

8  somebody in a mental health crisis or with some sort of

9  mental health diagnosis?

10    A    In the academy they taught us, you know, try

11  to calm them down if you can and talk with them, be

12  soft-spoken, and things like that.

13    Q    Anything else?

14    A    I'm sure.  This was four years ago, so I'm

15  sure there was, but I don't remember exactly.

16    Q    That's all right.  Does it differentiate

17  between people with some, you know, like a behavioral

18  or disorder like, for example, autism versus somebody

19  who is just, you know, having a mental breakdown?  Are

20  you taught that there is a different way to handle

21  those individuals?

22    A    There can be.  It just depends on the

23  totality of that situation and circumstances.

24    Q    Okay.  So prior to this incident, anything

25  else besides the one or two-day block during BLET where

```
 1   you were instructed on dealing with people in mental

 2   health crisis?

 3        A    We do have a policy at Mooresville PD for

 4   dealing with mentally ill subjects.  So that is one

 5   that we had to sign and go over with our FTO.

 6        Q    When you were going through your field

 7   training, do you recall any incidents where you respond

 8   to a call or had an interaction with somebody with --

 9        A    I do.

10        Q    -- in a mental health crisis?

11        A    I do.

12        Q    How frequently did that happen when you were

13   in training?

14        A    That, I don't know.

15        Q    How often does it happen, you know, after

16   your field training, is that a frequent thing or is it

17   infrequent?

18        A    I would say it's pretty frequent.

19        Q    And does Mooresville Police Department, are

20   you -- do you have anyone outside of law enforcement

21   that you can call to aid in a situation, like an

22   emergency mental health worker who can come and assist?

23        A    Mobile Crisis is an option.  So they help or

24   they don't, depending on the situation.

25        Q    How often have you called Mobile Crisis?
```

1  deal with someone, and then we think they need it, we

2  then call Mobile Crisis, and then they may come out or

3  they may not.

4      **Q**   **Okay.  Can you say how long it generally**

5  **takes them to respond when you do call, or does it**

6  **vary?**

7      A   PreCOVID it seemed like it was maybe 40

8  minutes, and then since it was -- sometimes they refuse

9  to come out because they were three hours away.

10      **Q**   **Okay.  Do you know how many people they have**

11  **on staff to respond?**

12      A   I don't know.

13      **Q**   **So outside of the Mooresville Police**

14  **Department mental health policy and then the BLET**

15  **training block, any other mental health training you've**

16  **received as a Mooresville police officer prior to the**

17  **incident with Mr. Craven?**

18      A   Not that I can remember.

19      **Q**   **Okay.  What about -- Would your answer be the**

20  **same if I had said suicide response versus a mental**

21  **health crisis?**

22      A   What was the question?  I'm sorry.

23      **Q**   **Other training you received.  Are you --**

24  **would your answer differ if we were talking about**

25  **training in suicide versus mental health?**

 1      A    It's all kind of categorized into one in the

 2  realm of training.

 3      Q    Okay.  So just to recap your training at

 4  Mooresville PD and make sure I'm kind of getting

 5  everything, is you -- when you're first hired, you do

 6  field training for 12 weeks, and you do that with

 7  Sergeant Glenn and Officer Beebe, and that's just

 8  on-the-job training out in the field responding to

 9  calls together?

10      A    That's correct.

11      Q    And then you receive an annual firearm

12  certification?

13      A    That's correct.

14      Q    And when you first got hired, you reviewed

15  all the policies and signed off on them?

16      A    That's correct.

17      Q    And if there is any amendments or changes to

18  those documents, you have to review those and sign off

19  on them?

20      A    That's correct.

21      Q    Anything else I've missed?

22      A    Nope.

23      Q    Do you ever have incidents where you respond

24  to a call and then afterwards all you guys -- or not

25  all of you guys, that you and other officers of varying

1  time, I got that before I was even eligible to be a

2  corporal.

3       Q     Okay.  Do you know approximately when you got

4  that?

5       A     Might have been the beginning of last year.

6       Q     Okay.  You mentioned gunshot wound training?

7       A     Yes.  It was an online course.

8       Q     And did you receive a certificate for it?

9       A     Yes.

10       Q     Okay.  And when did you do that, to the best

11  of your recollection?

12       A     Sometime in maybe -- it's tough.  Might be

13  two years ago at this point.

14       Q     Okay.  I understand you have had a lot of

15  training and it's going to be hard to go through

16  everything and say here is, you know, here's everything

17  I've done.  But with respect to mental health,

18  responding to a mental health crisis, any other

19  training that you received that would be relevant to

20  that?

21       A     Not that I can recall.

22       Q     Okay.  Same for -- would your answer be the

23  same if I categorized it as a suicide response?

24       A     Yeah, I would categorize it all together,

25  yes.

1      A      Correct.  I think they followed.

2      **Q      Okay.  And do you know who followed you?**

3      A      I don't know the order, but I know Officer

4  Ramey, Sergeant Glenn, and Officer Dias were present.

5      **Q      Okay.  And tell me what happened next.**

6      A      We approached, started walking down Heritage

7  towards 226.  I think we used the house before 226's

8  lawn, to kind of cut across it.  Saw the camper in the

9  driveway and another vehicle.  And as I approached the

10  house, or got right to the driveway, that's when I saw

11  Mr. Craven.

12      **Q      Okay.  And just walk me through kind of**

13  **the -- those -- the interaction with Mr. Craven.**

14      A      So I was walking what seemed to be almost

15  directly behind Corporal Arndt.  I saw Mr. Craven near

16  the front door.  I know there was a step or two near

17  the door.  I don't know if he was up at the door or

18  before the steps, I'm not too sure.  But when he saw

19  us, he said something to us before we even said

20  anything.  I don't remember exactly what was said.

21          I did notice that he did not have a shirt on.

22  I think he was wearing some form of khaki pants or

23  shorts, and he had a black handgun in his waistband of

24  his pants, slightly off to the right, near like his

25  appendix side.

1    Q    All right.  Let me ask a couple of questions

2  about that before we continue.  You said he said

3  something when he noticed -- Mr. Craven said something

4  when he noticed you and Arndt?

5    A    That's correct.

6    Q    Did he -- Did you guys make eye contact?

7    A    No, I never made eye contact with him.

8    Q    Okay.  How do you know that Mr. Craven

9  noticed you?  I mean, why do you say it that way?

10  That's what I'm trying to find out.

11    A    He was walking towards us from the front door

12  on the walkway when he said whatever he said.

13    Q    Okay.  So it's your opinion that he

14  recognized that there were people coming towards him,

15  and he said something?

16    A    That's correct.

17    Q    Do you know -- You would not be able to tell

18  whether he knew that you were police officers or not at

19  that time when he said something?

20    A    At that exact moment, I'm not sure if he

21  knew.

22    Q    Okay.  And any idea what he said?

23    A    I thought it was maybe "What are you going to

24  do," or "you're going to have to fucking kill me,"

25  something along those lines.

1    Q    Okay.  And is that something that you
2  remember, or is it just something that you read in
3  preparation for your deposition?

4    A    It's nothing that I read, no.  So it's from a
5  memory.

6    Q    Okay.  Okay.  And then you said you noticed
7  he had a black handgun in his waistband, slightly to
8  the right?

9    A    That's correct.

10   Q    Correct?  Did you actually see the handgun or
11 did you just see a holster?

12   A    I saw a handgun.

13   Q    Okay.  And you said it was slightly to his
14 right?

15   A    That's correct.

16   Q    Okay.  All right.  And then tell me what
17 happened next.

18   A    After he said whatever statement he made,
19 Corporal Arndt started giving commands.  I realized I
20 was right behind Corporal Arndt, which wasn't a good
21 spot to be in, so I walked around the rear of a vehicle
22 that was in the driveway and towards a tree in the
23 front lawn.  And then when I got to the tree,
24 Mr. Craven brandished the handgun.

25   Q    Okay.  And do you know what commands Corporal

 1  Arndt gave?

 2      A    I don't remember the order, but I know he

 3  said, "Police.  Show me your hands and get on the

 4  ground."

 5      Q    Do you know whether Mr. Craven complied with

 6  any of those complaints -- any commands from Corporal

 7  Arndt?

 8      A    I never saw him put his hands up or get on

 9  the ground.

10      Q    Okay.  How long did that interaction take?

11      A    Seconds.

12      Q    Okay.  And you say you saw him brandish a

13  handgun?

14      A    That's correct.

15      Q    Okay.  And tell me in as much detail as you

16  can what you observed.

17      A    So when he was walking towards us, Corporal

18  Arndt started giving commands, "Police Department.

19  Show me your hands."  Mr. Craven said something back to

20  Corporal Arndt --

21      Q    Let me interrupt.  After -- Mr. Craven said

22  something to Corporal Arndt after Corporal Arndt spoke?

23      A    I believe so.

24      Q    Okay.

25      A    As Corporal Arndt was giving commands, if I'm

 1  not mistaken, I believe Mr. Craven said something back

 2  to him, at which point Corporal Arndt then said "Get on

 3  the fucking ground."  And that's when Mr. Craven pulled

 4  the handgun out, and in a very quick maneuver, at which

 5  point I started shooting my rifle.

 6      **Q    Okay.  And limiting it to just Mr. Craven**

 7  **pulling out the gun, can you tell me in as much detail**

 8  **what you observed about him pulling the gun and where**

 9  **the gun was?**

10      A    He reached down with his right hand into his

11  waistband, grabbed the pistol, pulled it out of the

12  holster.

13      **Q    Okay.  And so was the gun, to your knowledge,**

14  **in a waistband or in a holster, or is there a**

15  **difference?**

16      A    I believe it was in a holster in his

17  waistband.  I don't know if that's per my memory or if

18  that's just from what I've read and things like that.

19  But I know there was a gun in his waistband.

20      **Q    Okay.  And how high -- When he pulled it out,**

21  **what's your recollection of where -- How was he holding**

22  **the gun?**

23      A    He pulled it out with his right hand and

24  pulled it up quickly, probably to his mid-torso.

25      **Q    Okay.  And how was he holding it?**

1    A    With his right hand.  I don't know if his

2  finger was on the trigger, but it was pointing down to

3  the ground because he had just pulled it out of his

4  waistband.

5    **Q    Was he holding it by the butt of the gun or**

6  **in a kind of more normal fashion as if he were going to**

7  **fire?**

8    A    I would say normal fashion.  He was holding

9  it by the handle of the gun.

10    **Q    Okay.  But he had it pointed down to the best**

11  **of your knowledge?**

12    A    I don't know exactly where the muzzle was

13  pointing, but I know the gun in his waistband was

14  originally pointing down.  And when he pulled it up out

15  of the waistband, I think that was still the same

16  direction it was facing.

17    **Q    So do you know who fired first, you or**

18  **Corporal Arndt?**

19    A    I don't know.

20    **Q    So would it be your testimony that shots were**

21  **fired by you or Corporal Arndt prior to the muzzle of**

22  **the gun ever coming, I guess, parallel with the ground?**

23    A    I know the gun was never pointed directly at

24  me.  That's all I can testify to.  I'm not sure if it

25  was parallel or not.  I'm not too sure.

1    Q    Okay.  Was the gun ever pointed at Arndt?

2    A    That I'm not too sure.

3    Q    And can you tell me -- I'm going to push you

4 a little bit.  Can you tell me why you're not sure?  Is

5 it because you couldn't see, or is it because it's

6 been, you know, several years or -- you know, why don't

7 you know, I guess?

8    A    He pulled the gun out of his waistband, and I

9 started shooting at that point.  He never extended his

10 arm and pointed the gun directly at me.  I don't know

11 if you break down the video very slowly, if it ever --

12 if he ever tilts it towards us or anything like that.

13 But from what I remember, I believe it was pointing

14 down.

15    Q    Okay.  And did you have a --

16           Well, let me show you.  Corporal, I'm going

17 to show you what I've marked as Exhibit 5.  Take a

18 second, and let me know if you recognize this document.

19           (Exhibit No. 5 was identified and handed to

20 the witness.)

21    A    I do.

22    Q    And tell me what it is.

23    A    It looks like my interview with the SBI.

24    Q    And can you tell me the date?

25    A    This was August 11, 2020.

1  residence to make sure there was no one else inside the

2  house that was injured or hiding in the house for any

3  reason.

4      Q    Was there any concern that the backdrop of,

5  you know, your shots towards Mr. Craven were -- was his

6  house, where you knew people were inside?

7      A    That's correct.

8      Q    And were you concerned about that?

9      A    I was.

10     Q    Okay.  And what did you do to -- in relation

11 to those concerns?

12     A    Unfortunately, with the threat that was

13 presented to me, I had to fire my rifle despite the

14 backdrop being the home.

15     Q    And when you went inside, did you observe any

16 evidence that the home had been the backdrop?

17     A    I didn't see any bullet holes or anything in

18 the house, no.

19     Q    Okay.  Did you see whether like -- you didn't

20 see whether any bullet holes had pierced the home?

21     A    I did not.

22     Q    Did you see whether a fire extinguisher had

23 been hit inside the home?

24     A    I did not.

25     Q    Do you know whether that's true or false, or

1    Q    And do you recall whether he took the

2  cigarette out of his mouth?

3    A    I don't remember.

4    Q    Okay.  The whole time that you saw him, was

5  he standing?

6    A    Yes.

7    Q    Or walking?

8    A    Yes.

9    Q    Fair to say, he was walking away from the

10  residence?

11    A    Yes.

12    Q    During your interaction?

13    A    That's correct.

14    Q    Okay.  At any point during your interaction,

15  did he ever make any gestures or comments about -- that

16  would indicate that he was going back into the house?

17    A    Not that I can recall, no.

18    Q    Okay.  What about threatening any civilians?

19  Excluding you and Corporal Arndt from that question.

20    A    At the time that we were --

21    Q    At the time you interacted with him.

22    A    No.

23    Q    Okay.  May sound like a dumb question, but

24  other than Mr. Craven allegedly pulling out a firearm,

25  any other action that he did to threaten you or

 1  Corporal Arndt?

 2      A    No.

 3      Q    Okay.  Would you describe the comments --

 4  Mr. Craven's comments as threatening toward you or

 5  Corporal Arndt?

 6      A    No.

 7      Q    Okay.  Potentially threatening to himself?

 8      A    Possibly, yeah.

 9      Q    Okay.  Did you have enough of an interaction

10  with Mr. Craven to form an opinion whether his threats

11  of suicide were genuine or not?

12      A    No, I never was able to confirm that or not.

13      Q    Okay.  And just to be clear, you never gave

14  any commands or said anything to Mr. Craven?

15      A    That's correct.

16      Q    Okay.  At some point do you recall stating

17  that there was no talking to that guy, meaning

18  Mr. Craven?  Do you recall ever saying that?

19      A    Possibly.

20      Q    Okay.  If you said that, do you know what you

21  would mean by that?

22      A    Are you referring to the text messages at

23  this point?

24      Q    Yes, sir.

25      A    Yeah.  So in my opinion, Mr. Craven had his

1  him to get on the ground?

2      A    I did.

3      Q    Okay.  And how do you know that he was

4  reaching for a gun and not just putting his hands on

5  the ground?

6      A    Because he pulled his gun out of the

7  waistband.

8      Q    Okay.  And do you see him do that in this

9  video?

10     A    No.  The light -- the flashlight kind of

11 whitewashes it.

12     Q    Okay.  Same question for your body camera.

13 Can you see him pull out the gun in your video?

14     A    No.

15     Q    Okay.  How far away do you believe you were

16 at the time you shot Mr. Craven?

17     A    I think my statement said I was about 20,

18 30 feet.

19     Q    And do you still believe that to be accurate?

20     A    Yeah, I would say so.

21     Q    Okay.  Since you testified that Mr. Craven

22 did not point the gun at you, and you're not aware

23 whether he pointed it at Corporal Arndt, was it simply

24 the fact that he pulled it out and in the manner when

25 he pulled it out, that led you to believe that there

1       A     What do you mean by "not sensitive"?

2       Q     Well, I'll go to the page before the one we

3   were just looking at, at the top.  The time stamp is

4   12:33, 82 percent battery.  First text is:  "iiiiight"?

5       A     Okay.  I see it.

6       Q     And I think it's your -- correct me if I'm

7   wrong, this is you texting on the left, right?

8       A     Yes.

9       Q     And so you say:  "George got autopsy .17 BAC

10  and amphetamines."

11            And then you say:  "You get the autopsy yet?"

12            And then in all caps:  "THERE'S SO MANY

13  GUNSHOTS.  We shot him in the neck.  LOL."

14      A     That's correct.

15      Q     Would you agree that writing "LOL" after

16  shooting someone in the neck is not maybe the most

17  sensitive way?

18      A     No.  It's just making light of the situation.

19  LOL is not to be taken seriously.

20      Q     And there's some text in here about going to

21  prison and you're already in Canada?

22      A     Yeah, something like that.

23      Q     Okay.  And why did you say that?

24      A     Again, we're making light of a terrible

25  situation.

1    A    Right.

2    Q    And then you say:  "Yeah, what an asshole.

3  All we did was kill someone."

4    A    Correct.

5    Q    Why did you say that?

6    A    Again, just some form of dark humor, making

7  light of the situation.

8    Q    And you used the word "kill someone."  Does

9  that have any -- Why did you use that word?

10    A    That is what happened, unfortunately.  If it

11  sounds blunt, it's not meant to come off that way, but

12  that is what happened.

13    Q    And when you're talking about somebody being

14  an asshole, you're talking about Dias?  You're

15  responding to Glenn's message?

16    A    Yeah, I think so.  This is a sarcastic text,

17  so.

18              MR. HEROY:  Right.

19              Give me just a minute.  I might be

20  done.

21              MR. STEWART:  Sure.

22        (A recess was taken from 12:12 to 12:18 p.m.)

23  BY MR. HEROY:

24    Q    I just have a couple more.

25              Have you talked to any of the other

1  responding officers about what they have seen and

2  heard?  And I know you talked about there was a

3  meeting.  Outside of that meeting, have you talked to

4  any other responding officers?

5      A    I'm sure I have, but nothing I can remember.

6      Q    Do you know whether any other officer has

7  said -- other than Arndt, has said they saw a gun

8  possessed by Mr. Craven prior to the shooting?

9      A    I don't remember anyone saying that to me.

10     Q    Do you know whether anybody said they didn't

11 see it?

12     A    No, not that I'm aware of.

13     Q    Okay.  You don't know whether Sergeant Glenn,

14 for example, said "I never saw that he had a gun"?

15     A    No, I don't remember him ever saying that.

16     Q    Okay.  Do you know whether anybody purported

17 to have heard anything Mr. Craven may have said?

18     A    No.

19     Q    Has anybody said they didn't hear him say

20 anything?

21     A    They might have.  I don't know.  I know Arndt

22 and I were the first to -- ahead of kind of the rest.

23 So if they didn't hear him, it wouldn't have been a

24 surprise.

25     Q    Do you know whether Glenn has made any

1    Q    I mean, as a police officer, you approach

2    somebody with your gun drawn, pointed at them, I mean,

3    is it reasonable that that person could feel

4    threatened?

5                MR. STEWART:  Object to form.

6    A    I could see why they would be uncomfortable,

7    but I don't think they would feel threatened.

8    Q    What about somebody who is potentially going

9    through a mental health crisis, could that from your

10   understanding and training, could that affect their

11   perception of guns being pointed at them, even by

12   police officers?

13   A    It could.

14               MR. HEROY:  I don't have anything else.

15               MR. STEWART:  I've got nothing further.

16               MR. HEROY:  Thanks.  You're all done.

17               THE STENOGRAPHER:  Are you both ordering

18   today, and if so, is E-Tran --

19               MR. STEWART:  Yes.  E-tran, please.

20               THE STENOGRAPHER:  For both of you?

21               MR. HEROY:  Yes, ma'am.

22               MR. STEWART:  And he'll read and sign.

23               (Signature having not been waived, the

24   deposition of CHRISTOPHER NOVELLI was concluded at

25   12:38 p.m.)

## Arndt, Alexander

| | |
|---|---|
| **From:** | Arndt, Alexander |
| **Sent:** | Friday, June 10, 2022 2:44 AM |
| **To:** | Arndt, Alexander |
| **Subject:** | Screenshots |
| **Attachments:** | Screenshot_20220603-140856_Messages.jpg; Screenshot_20220603-140643_Messages.jpg; Screenshot_20220603-123040_Messages.jpg; Screenshot_20220603-140629_Messages.jpg; Screenshot_20220603-140001_Messages.jpg; Screenshot_20220603-135526_Messages.jpg; Screenshot_20220603-135404_Messages.jpg; Screenshot_20220603-135401_Messages.jpg; Screenshot_20220603-135207_Messages.jpg; Screenshot_20220603-135121_Messages.jpg; Screenshot_20220603-135028_Messages.jpg; Screenshot_20220603-134721_Messages.jpg; Screenshot_20220603-134435_Messages.jpg; Screenshot_20220603-134248_Messages.jpg; Screenshot_20220603-134242_Messages.jpg; Screenshot_20220603-134230_Messages.jpg; Screenshot_20220603-134008_Messages.jpg; Screenshot_20220603-133656_Messages.jpg; Screenshot_20220603-133650_Messages.jpg; Screenshot_20220603-133427_Messages.jpg; Screenshot_20220603-133111_Messages.jpg; Screenshot_20220603-132434_Messages.jpg; Screenshot_20220603-131955_Messages.jpg; Screenshot_20220603-131845_Messages.jpg; Screenshot_20220603-131349_Messages.jpg; Screenshot_20220603-131027_Messages.jpg; Screenshot_20220603-125904_Messages.jpg; Screenshot_20220603-125852_Messages.jpg; Screenshot_20220603-125826_Messages.jpg; Screenshot_20220603-125317_Messages.jpg; Screenshot_20220603-125309_Messages.jpg; Screenshot_20220603-125226_Messages.jpg; Screenshot_20220603-125222_Messages.jpg; Screenshot_20220603-125218_Messages.jpg; Screenshot_20220603-124949_Messages.jpg; Screenshot_20220603-124937_Messages.jpg; Screenshot_20220603-124926_Messages.jpg; Screenshot_20220603-124921_Messages.jpg; Screenshot_20220603-123532_Messages.jpg; Screenshot_20220603-123516_Messages.jpg; Screenshot_20220603-123450_Messages.jpg; Screenshot_20220603-123423_Messages.jpg; Screenshot_20220603-123353_Messages.jpg; Screenshot_20220603-123305_Messages.jpg; Screenshot_20220603-123053_Messages.jpg; Screenshot_20220603-122924_Messages.jpg |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

 

**Alexander Arndt**
*Police Corporal*
750 W. Iredell Avenue Mooresville, NC 28115
Office: 704-664-3311
www.mooresvillepd.com



Please be aware that email sent to and/or from this email address is subject to North Carolina Public Records Law and may be disclosed to third parties. This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited.

1

**EXHIBIT**
3

JA418

## Arndt, Alexander

| | |
|---|---|
| **From:** | Arndt, Alexander |
| **Sent:** | Friday, June 10, 2022 3:43 AM |
| **To:** | Arndt, Alexander |
| **Attachments:** | Screenshot_20220610-034043_Messages.jpg |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

 

**Alexander Arndt**
*Police Corporal*
750 W. Iredell Avenue Mooresville, NC 28115
Office: 704-664-3311
www.mooresvillepd.com



Please be aware that email sent to and/or from this email address is subject to North Carolina Public Records Law and may be disclosed to third parties. This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited.

## Arndt, Alexander

| | |
|---|---|
| **From:** | Arndt, Alexander |
| **Sent:** | Friday, June 10, 2022 3:49 AM |
| **To:** | Arndt, Alexander |
| **Attachments:** | Screenshot_20220610-034813_Messages.jpg |

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

 

**Alexander Arndt**
*Police Corporal*
750 W. Iredell Avenue Mooresville, NC 28115
Office: 704-664-3311
www.mooresvillepd.com

f in 🐦 ▶

Please be aware that email sent to and/or from this email address is subject to North Carolina Public Records Law and may be disclosed to third parties. This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited.



**JA421**



**JA422**



JA423



JA424



JA425



**JA426**



JA427









JA431



**JA432**

JA433

13:34

**Clark**

Tuesday, August 4, 2020

Hey bud. It's clark. Just wanted to check in on you.
15:14

Hey man. I'm doing alright. Appreciate the text and you checking up on me.
15:20

Sure thing. If you need anything you call me. I'll do my best to answer any question or just listen if you need me to. You did a the right thing. Dont doubt that. It's tough but necessary sometimes.
15:23

Will do. Yeah its unfortunate but he had his mind made up before we got there.
15:37

That's right.
15:38

14:00

< C **Cooke** ⌄                    ⋮

Wednesday, August 5, 2020

Hey Chief. My SBI interview got scheduled for 9am on Tuesday at the PD. My psych appointment is at 11am. I think the SBI interview may possibly last 1.5 hours. Do you think there is anyway possible that the psych appointment can be moved back 30 mintues to 1 hour so I can get down there in time?
09:25

You guys need to keep dr appointment and move SBI
09:26

Yes sir. Attorney is the one who set up the SBI time. Waiting on a call back from him to have him reschedule.
09:42

Told Chris same in email
09:43

Let me have your attorney contact info
09:44

George Laughrun
Office number is 7043722770
His email is not listed on his business card
09:49

Got it
09:49

**JA435**







**JA439**



**JA440**



12:52

(828) 850-7991

Wednesday, September 30, 2020

Hi Alex, David Call, I wanted to reach out to you, I am sorry you had ti go through a shooting, I understand, I have had some similar situations in my career. You are a good man, I have a lot of respect for you, please know I have been thinking about you, please stay safe, very proud of you, stay sa

View all

19:10

Hey there David. I appreciate the text and thoughts. I'm doing well with it. The guy had his mind made up before we even got there and it kind of is what it is. I hope you are doing well. I ask Ruffin about how you are doing every now and again to check up on you. If you need anything let me know as

View all

19:49

Yes Sir Brother, I worked a lot of these cases with SBI, all that matters is going home, You Are A Good Man!!!!! Stay safe, I miss working with Men like you, please let me know if I can ever help you, Always, David Call

19:54

**JA442**



JA443

12:52 📞 📷                    ⏰ 📶 79%⬛

< **Me**
  19:49, Sep 30

Hey there David. I appreciate the text and thoughts. I'm doing
well with it. The guy had his mind made up before we even
got there and it kind of is what it is. I hope you are doing well.
I ask Ruffin about how you are doing every now and again to
check up on you. If you need anything let me know as well.

Copy text          Share          More

**JA444**

13:18

**Kristina** ∨

Wednesday, August 5, 2020

Been thinking of you guys. Glad you guys are safe.
21:03

Hello. Thanks for the thoughts and text. We are doing alright!
21:04

Good deal! I'm glad to know who had your back. And vice versa.
21:05

**JA445**

**JA446**



JA447



12:49     80%

**Novelli, Falzone**
20:12, Aug 16

(No subject)

Gentlemen, I hope this texts finds you relaxing and doing well. I'm thankful for the progress of "the process" and look forward to seeing you both soon! Don't mean to bother, but I want to ensure you recieve information on the scheduled Critical Incident Debrief we have planned for Tuesday. Please check your email for the details. Will talk soon

Copy text     Share     More

**JA449**

12:49 📞 ⚙                    ⏰ 📶 📶 80% 🔋

‹  NF  **Mass text** 2 ⌄                    ⋮

MMS
20:13    Yes sir. Got it and I will be there.

Falzone

Good to go, looking forward to seeing you
both.                                    MMS
                                         20:18

Tuesday, August 18, 2020

Falzone

Good evening gentlemen. I am available to
view the videos on Thursday; will 9:30/1000
work ok for you. Other options are available if
not.                                     MMS
                                         18:47

Novelli

That works    MMS
              18:48

MMS    That works for me as well.
18:49

Falzone

Great. See you then    MMS
                       18:49

Friday, June 18, 2021

Falzone

Gentlemen- It's been a long 10 months since
you were forced to defend yourselves AND
the Craven family from the actions of Chris
Craven. I am proud, and thankful, for your
professionalism that night, and the way you've
conducted yourselves during the grueling
aftermath. As I know you have been made

**View all**                          ›    MMS
                                           12:29

🖼  📷  ➕  [                    ]  ☺  〰

**JA450**



03:48

5G 52%

**Novelli, Falzone**
12:29, Jun 18

(No subject)

Gentlemen- It's been a long 10 months since you were forced to defend yourselves AND the Craven family from the actions of Chris Craven. I am proud, and thankful, for your professionalism that night, and the way you've conducted yourselves during the grueling aftermath. As I know you have been made aware, we are now in posession of the very thorough Press Release issued by Randolph County District Attorney Andrew Gregson. I am confident his Release will provide each of you the long overdue public vindication we've waited so patiently for. Stay safe, see you soon!

Copy text          Share          More





JA453

13:51

**Wes Bumgardner** ⌄

Monday, August 3, 2020

Hey man. I just wanted to reach out and see how you're doing. I understand if you don't want to talk but you're in my prayers. Let me know if I can do anything for you.
16:40

Hey bud. I'm doing alright. I appreciate the text and offer. Ill let you know if I need anything.
16:45

Sounds good. I'm glad everyone is okay.
16:45

Yep. Me too.
16:55

JA454





**JA456**



**JA457**



JA458



**JA459**



**JA460**



**JA461**



**JA463**



JA464

13:42

Morris

Doing good. ? Clear you yet. Heh
19:56

Yeah wished I could have been there. Yeah I'm doing alright. Just hanging out. SBI interview looks like it will be next week sometime. I have to meet with the psychologist next Tuesday and then have the department internal interview after that.
19:57

Yea. I gotta go to the shrink too. They said our entire squad as protocol
19:58

Im like bro! Im good. I dont need a shrink.
19:59

Oh gotcha. Thought it was going to be just me and Novelli.
19:59

They want the entire squad to go
19:59

Gotcha. Yeah I should hopefully be back to work fairly soon.
20:02

You have a glitch? Sorry jumping in shower...

You have a glitch? Sorry jumping in shower...
20:39

Nah just calling to say hey
20:39

Ill call u back. Im naked getting in shower. Just put the tyrsnts down to bed
20:39

20:40    4





JA468

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

AMY RHINEHART CRAVEN,          )
                               )
            Plaintiff,         )     No. 5:21-CV-174
                               )
      vs.                      )
                               )
CHRISTOPHER NOVELLI, ET AL     )
                               )
            Defendants.        )
_____)


TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MARCH 1, 2023


APPEARANCES:

On Behalf of the Plaintiff:

     JOHN ALEXANDER HEROY, ESQ.
     James, McElroy & Diehl, PA
     600 South College Street
     Charlotte, North Carolina 28202

On Behalf of the Defendants:

     JAKE WILLIAM STEWART, ESQ
     PATRICK HOUGHTON FLANAGAN, ESQ.
     Cranfill, Sumner & Hartzog, LLP
     2907 Providence Road, Suite 200
     Charlotte, North Carolina 28211


                 Cheryl A. Nuccio, RMR-CRR
                   Official Court Reporter
                 United States District Court
                  Charlotte, North Carolina

P R O C E E D I N G S

1
2        (Court called to order at 9:59 AM.)
3        THE COURT:  Good morning.
4        ALL COUNSEL:  Good morning.
5        THE COURT:  All right.  We're here this morning in
6  the matter of Craven versus Novelli, et al, docket number
7  5:21-CV-174 on several motions; first and foremost, perhaps,
8  the motion for summary judgment by defendants.
9        Let me hear from defense counsel on that motion,
10  please.
11        MR. STEWART:  Yes.  Good morning, Your Honor.  Jake
12  Stewart for the defendants.  I'm assuming that you've reviewed
13  all the items so if you have any specific questions, I'm happy
14  to answer.  Otherwise, I'll just kind of dive into my
15  argument.
16        This case originated from a domestic dispute
17  occurring at the Craven residence.  And the call that was
18  received from dispatch is that the father had assaulted or
19  struck the mother, and that's the same call that went out to
20  the officers.  That's the information that they had.
21        THE COURT:  Well, I want to be clear on that.
22  Exactly what did each of the officers know before they arrived
23  at the home?
24        MR. STEWART:  What they knew is that there was a
25  domestic dispute at the residence.  That there had been a

1  reported assault by the father on the mother.  And at some

2  point during their ride over to the residence, there had been

3  a report that he was armed and had a gun and was threatening

4  to blow his brains out.  At some point there was a call that

5  shots had been fired, but that was later corrected and they

6  said shots had not been fired.

7  So at the time that they arrived at the residence,

8  what they knew is that the father had assaulted the mother,

9  had a weapon, was threatening to kill himself, and that there

10  were at least one or two children in the home.  I'm not sure

11  if they knew exactly how many were in the home at that time.

12  THE COURT:  Well, let me be clear on this.

13  Mr. Arndt -- am I saying that correctly?

14  MR. STEWART:  Yes.

15  THE COURT:  A-r-n-d-t.

16  MR. STEWART:  Yes, Your Honor.

17  THE COURT:  His affidavit indicates similar to what

18  you're saying.  And Mr. Novelli's or Officer Novelli's

19  affidavit is similar except that he says that he learned of

20  Mr. Craven's threat to kill himself as he was driving to the

21  scene, which isn't apparent from listening to his body cam

22  audio.

23  MR. STEWART:  And that was based on his testimony,

24  Your Honor, that he believed that what he heard over the radio

25  is that Mr. Craven was threatening to blow his brains out.

1        THE COURT:  Is there anything to be taken from the

2   Court's inability to confirm that statement in the affidavit

3   from the audio?

4        MR. STEWART:  I thought that it -- I thought that I

5   heard it in the audio, Your Honor.  And I'm not disagreeing

6   with you.

7        THE COURT:  Well, it may be our speakers aren't as

8   good as yours because there are several places where certain

9   representations are being made of either something being said

10  or something being reasonably believed to be something and we

11  can't hear it at all.  But go ahead, I'm sorry.

12       MR. STEWART:  And I'll represent as well, it's not

13  in either of our briefs, but there was a third officer that

14  was deposed, Officer Glenn, and he also testified that he

15  heard over dispatch that Mr. Craven was threatening to harm

16  himself.  And I believe the term that all three officers used

17  was "blow his brains out," was the exact term that they had

18  heard over audio, and that's what all three of them testified

19  to, Your Honor, as to what they knew prior to arriving on

20  scene.

21       THE COURT:  And that third officer is the trainee

22  that's referred to in some of the pleadings?

23       MR. STEWART:  That third officer, he was the

24  commanding officer on scene, Sergeant Glenn.

25       THE COURT:  All right.

1          MR. STEWART:  Officer Arndt was actually training --

2    no, the trainee was Officer Mercado and he was with Officer

3    Arndt.  Sergeant Glenn was in a separate car and he arrived on

4    the scene with Novelli and Arndt and approached the house with

5    them.  There were -- I think there were five officers that

6    arrived at approximately the same time.

7          THE COURT:  And the only body cam video worthy of

8    consideration are the two, Novelli and Arndt?

9          MR. STEWART:  I believe so.  The one of Arndt, I

10   think, best shows Mr. Craven walking out of the house.  The

11   other body cam footage you can't really see -- you don't see

12   Mr. Craven until after the shooting has already been completed

13   so you don't really see a whole lot.

14         THE COURT:  And nothing on the audio worth note.

15         MR. STEWART:  I don't believe so.  Mr. Heroy may

16   think differently, but I think those are probably the two most

17   relevant body cam footages.

18         THE COURT:  All right.  Sorry to have interrupted

19   you.

20         MR. STEWART:  No, no.

21         So they arrive on scene.  They park a few houses

22   down.  And the plan is to kind of gather up and then approach

23   the house from there.  Like I said, I believe there were five

24   officers that arrived at approximately the same time.

25         They pulled out their long guns, which they do

1 typically when there's an armed individual and when there's a

2 concern for safety.  So they pull out their long guns and then

3 they hear over dispatch that Mr. Craven is going back into the

4 home.  And at that point there's a concern.  They already know

5 he's potentially assaulted the wife at some point.  They know

6 he's armed.  They know he's threatening to harm at least

7 himself so they want to get up to the house, and that's when

8 they start moving up to the house.  And Arndt and Novelli were

9 the first two, the closest to the home as they approached, and

10 that's probably why their body cam footage is the most

11 helpful.

12          When they got to the house, they both testified that

13 they heard something to the effect of "you are going to have

14 to shoot me" or "just shoot me" or "you're going to have to

15 kill me," something to that effect.  Neither of them could

16 remember exactly what was said.  And it can't be heard

17 incredibly clearly on the audio.  You kind of hear some

18 mumbling.  I haven't been able to make it loud enough and

19 clear enough to hear exactly what's being said.

20          Then they see him --

21          THE COURT:  Let me stop you there --

22          MR. STEWART:  Yes, Your Honor.

23          THE COURT:  -- because I know that it was said in

24 the affidavit along the lines that you're saying what

25 Mr. Craven said.  But if you watch the video camera all the

1  way through, Officer Arndt is -- let me make sure I get these

2  right.  Officer Novelli was asked if he remembered what

3  Mr. Craven had said to him and he said, "I do not" at the end

4  of the video.  So there's an inconsistency between the audio

5  and his affidavit, correct?

6          MR. STEWART:  There -- there is a -- and what he

7  said in his testimony is kind of along those lines as well,

8  that he can't remember exactly what was said; but what he

9  thinks it was was that he said something to the effect of

10  "you're going to have to shoot me" or, you know, kind of

11  whatever phraseology it was.  So during his testimony he kind

12  of testified consistent with that, that he didn't remember

13  exactly what it was, but he thought that he did say something

14  along those lines.  So I would agree there is a little bit of

15  an inconsistency there.  He seems to think he heard something,

16  but he's not sure exactly what it might be.

17          THE COURT:  All right.

18          MR. STEWART:  And Arndt has been pretty clear

19  throughout it that he believes that he heard something along

20  those lines and he was a little bit closer, I believe.  And

21  his body cam footage, you can hear something.  Now, there's an

22  argument is that Mr. Craven?  Is that someone else?  You can

23  hear someone say something before Corporal Arndt first makes

24  visual contact with Mr. Craven.

25          Now, once they make --

1          THE COURT:  I think the only thing we could hear
2    with any certainty was the word "shoot."

3          MR. STEWART:  And I would agree, Your Honor.  That's
4    the only word I could really actually confirm that that's what
5    was said.  The rest of it I don't know.  But I think it does
6    support the fact that something was said by someone and it's
7    not inconsistent with what the officers are testifying to,
8    that it could have been something along those lines of "you're
9    going to have to shoot me."  But I agree, it's a little
10   unclear exactly what was said.

11         So the officers made contact with Mr. Craven.
12   Officer Novelli testified that before any commands were given,
13   he saw a gun in Mr. Craven's front waistband kind of off to
14   the right near the appendix, which is ultimately where his
15   holster was found after the shooting, right in the waistband
16   here.

17         And Corporal Arndt testified he doesn't remember
18   seeing a gun before any type of command was given.  He gave
19   the command to show his hands.  Clearly Mr. Craven heard him.
20   He was aware they were officers.  He also announced that they
21   were Mooresville police.  And he did show his hands.  He
22   raised his hands initially.  So I think the fact that he
23   complied with the order certainly shows that he was able to
24   hear it, understand it, knew that they were officers.

25         His hands then start to come down.  And I think it's

1  important to note that, at least from my perspective, his

2  hands start to come down before any second order is given.

3  There is a second order given to get on the ground, but the

4  way I see -- the way I view the video is that that's not given

5  until his hands have already come down.  And at that point, as

6  you know, you can't really see what his right hand is doing.

7  We know that it came down.

8       The officers testify that he pulled -- he then

9  produced the gun from his waistband.  It's a little unclear

10  how far it came up.  Arndt testified he's not sure how far it

11  came up.  Novelli said it came up to about mid torso or so.

12  Both of them confirmed it was not pointed.  They don't

13  remember it being pointed at any of the officers.  But at that

14  point, once he drew the gun, the officers decided to fire.

15       And at that point we would contend they were

16  reasonable in their decision to fire because Mr. Craven had

17  been given a lawful command to show his hands, which he did

18  initially do.  And then he ignored that command and lowered

19  his hands to his waist, made -- I guess there's a question

20  whether or not it's a furtive movement, but I think this kind

21  of falls in the line of the *Slattery* and the *Anderson* cases

22  and the *Green Ridge* case where there's contact made by the

23  officer.  The officer gives a command.  Those commands are not

24  followed.  And at that point he's reaching for -- now, they

25  both testified it's a gun.  There's no evidence that there

1  wasn't a gun aside from the video that doesn't show anything.

2  You know, it doesn't really confirm or deny.  I think the

3  video is at least consistent with their testimony.  It doesn't

4  contradict their testimony.

5       THE COURT:  Is it necessary that the gun was

6  actually drawn for their defense?

7       MR. STEWART:  I don't think so, Your Honor.  I don't

8  think it's necessary.  I think it certainly helps their

9  defense, but in *Anderson* and *Slattery*, in the one they said

10 show me your hands and the guy reached behind his back for

11 what ended up being a radio or a walkie-talkie.  And qualified

12 immunity was granted in that case because they had

13 reasonable -- it was reasonable for them to have probable

14 cause to believe that there was an imminent threat of danger

15 or bodily harm because commands had been given, they

16 identified themselves as officers, and those commands were

17 specifically ignored.  I think that was *Anderson*.

18       And *Slattery*, kind of similar.  He wouldn't take his

19 hand out.  The officer couldn't see his hand.  He had his hand

20 on a beer bottle or soda bottle or something.  And the same

21 thing, it wasn't even a weapon, nothing was drawn, and they

22 found qualified immunity.

23       And *Green Ridge*, same type of thing.  They grabbed a

24 stick, I think it was a night stick, and the officer didn't

25 know what it was, and qualified immunity was granted.

1         So I don't think the gun necessarily had to be

2  drawn.  I think it was in this case.  The officers testified

3  it was.  The gun was found next to Mr. Craven's body once

4  officers walked up.  And that's the first thing they said when

5  they got up there, "Where's the gun?  Where's the gun?"  And

6  it was right next to the body.  Now, I understand a lot of

7  that is kind of circumstantial evidence, but I think it kind

8  of feeds into the whole premise that he did, in fact, draw a

9  gun.

10         But to answer your question, at the end of the day,

11  I don't think the drawing of the gun is absolutely necessary.

12  I think that based on the case law, the shooting -- the use of

13  force would have been justified even if he had just reached

14  quickly to his waistband.

15         And then I know there's a motion in limine on it and

16  I don't want to specifically talk about the 911 recording if

17  that's not something you want to discuss before ruling on the

18  motion for limine, but I think that's relevant to this as

19  well.

20         THE COURT:  You can talk about it now.  I intended

21  to talk about it later, but...

22         MR. STEWART:  Okay.  Thank you, Your Honor.

23         So I think that kind of supports what the officers

24  have testified to as well.  About a minute before the shooting

25  occurs, you can hear Mr. Craven make three separate statements

1  and those statements are:  That he wants his phone to call his

2  mom to tell her good-bye; that "once the police get here, you

3  can thank your sister"; and then "you're not going to have a

4  father anymore."  Now, there's some kind of jumbled, you're

5  not sure what he's saying in between there, but I think those

6  three statements show, one, he knew the police were coming.

7  He knew he was going outside to confront the police.  Again, a

8  lot of courts have found that whether the police identify

9  themselves is a crucial fact, and I think that that's present

10 here.  And two, it shows his intent that unfortunately he

11 wanted to die that night based on those statements.  And it

12 supports that when he went out there, he likely did -- he

13 likely -- I understand it's circumstantial evidence, but it

14 kind of feeds into the, you know, he did draw a gun.  This

15 supports what the officers said.  This supports the body cam

16 footage showing his hands dropping down.  This supports the

17 gun being found next to his head -- next to his body after the

18 shooting occurred.

19        So I think that 911 call is important for those

20 reasons because it helps to kind of support all the testimony

21 and the arguments that our folks have.

22        THE COURT:  Anything else you wanted to say?

23        MR. STEWART:  I'm happy to address the -- I think

24 the qualified immunity and the Fourth Amendment violation is

25 probably the biggest issue here.  I'm happy to go into the

1  *Monell* argument and public official immunity if you would like

2  me to at this time or if you would prefer to just focus on

3  this initial issue.

4          THE COURT:  You can stop there.  Let me do ask you,

5  though, about what your response is to the officers' text

6  messages with respect to the allegation of malice, the text

7  messages that occurred sometime well after the incident.

8          MR. STEWART:  Well, Your Honor, I don't --

9  admittedly, those text messages are not in good taste, right?

10 They're not -- they don't look great.  But I don't think

11 that's evidence of malice at the time of the shooting.  Those

12 messages were sent months later.  Some of the messages

13 referenced were sent over a year later.  As poor of an excuse

14 as it may be, I think that serves as -- it's a coping

15 mechanism.  It's dark humor.  It's certainly inappropriate

16 humor.  But I don't think that that shows that a year and a

17 half earlier, 18 months earlier, that those officers went out

18 there with any type of malice.

19          And I think what's important to note is those texts

20 don't say anything like, man, I'm glad we shot him, or

21 anything that suggests intent or their state of mind.  It's

22 just making light of the situation in an inappropriate manner.

23 And I think without those texts showing any type of intent,

24 any type of state of mind, all it is is it's an unfortunate

25 thing that was sent months later.  I don't think that that

1   should have a bearing on whether or not there was malice on

2   the night of the actual incident.

3            THE COURT:  Let me hear from Mr. Heroy.

4            MR. HEROY:  Your Honor, I'll just kind of go in the

5   order of Mr. Stewart and in line with your questions.

6            I think on the Novelli body camera, we would agree

7   it's hard to make out.  That body camera also does not begin

8   until later.  So I think he's in the vehicle and then there's

9   some period of silence before that.  So I don't believe it is

10  in the body camera, but he did testify to it.  I believe

11  Mr. Stewart is right about that.

12           I think Mr. Stewart is largely correct on the facts;

13  but as we have already talked about this morning, there's some

14  important inconsistencies in particularly Novelli's testimony

15  and what's shown on the video, and I think that's important.

16  And I'll get to the summary judgment standard in just a

17  second.

18           But first is the contention that Mr. Craven knew

19  that police were there.  Mr. Novelli, Officer Novelli, on page

20  50 of the submitted transcript, we asked, "Did he make -- did

21  you guys make eye contact?"

22           "No, I never made eye contact with him."

23           Line 17, "Do you know -- would you not be able to

24  tell whether he knew that you were police officers or not at

25  the time -- when he said something?"

1          "At that exact moment I'm not sure if he knew."

2          So I do think there's a dispute in the evidence as

3    to whether Mr. Craven knew that police were there.  And of

4    course, as the case law we submitted --

5          THE COURT:  Well, he knew they were coming, right?

6          MR. HEROY:  Yes.  Yes, he knew they were coming.

7    But whether he knows that these were police officers -- you

8    know, right now we're at a summary judgment standard.  Could a

9    reasonable jury find that he did not know?  It's dark.  They

10   didn't have flashlights on.  They didn't activate their blue

11   lights.  In some of the case law we submitted, that was enough

12   to say they don't know if these people were officers even if

13   they knew police were coming.  I can point to that case.  I

14   believe it's a very, very recent case.

15         THE COURT:  Well, they yelled pretty loudly and

16   pretty profanely on the audio tape.  Is there some reasonable

17   inference that Mr. Craven didn't hear them?  Or are you saying

18   that he doesn't have to believe their announcement so he

19   doesn't have to act accordingly?

20         MR. HEROY:  Well, I mean, he's experiencing this

21   mental health crisis.  You know, for all we know, this comment

22   that was made before -- before the announcement of police, you

23   know, "you're going to have to kill me" or "you don't have to

24   shoot" as we've put in our brief.  It's very, very unclear.

25   He could have been --

1        THE COURT:  Yeah.  Well, you put in your brief that
2   it could reasonably be inferred that he's saying "you don't
3   have to shoot me."  Unless you've got better speakers than I
4   do, I don't know how a reasonable jury could infer that.
5        MR. HEROY:  I think that a jury can infer -- I mean,
6   it's not clear either way, that "you don't" -- "you're going
7   to have to shoot me" or "you don't have to shoot me."  I think
8   a jury is going to say, like we've all said, we don't know
9   what that is.
10        THE COURT:  I agree with that, which is why I
11   reacted when I read in your response that a reasonable jury
12   could have heard the words "you don't have to shoot me."  A
13   reasonable jury couldn't have -- couldn't infer that.
14        MR. HEROY:  There's a statement with the word
15   "shoot," and then what they conclude -- I mean, this is
16   summary judgment standard so all the evidence is taken in the
17   light most favorable to the plaintiff.  And if there's a
18   statement with the word "shoot" prior to the officers being
19   identified, a jury can infer what they want about the rest of
20   the words in the sentence.
21        THE COURT:  They can't make stuff up.
22        MR. HEROY:  They can't make stuff up, there's no
23   question.
24        THE COURT:  They have nothing to go on, other than
25   hearing the word "shoot," to come up with a reasonable

1    inference for either party.  There's nothing to infer from the

2    word "shoot."

3         MR. HEROY:  That's why I think that statement is not

4    that powerful either way because we don't know.  There's so

5    much unknown there.  But I don't think it suggests that you

6    knew that these were officers there.  I just don't think

7    that's clear.  Of course, as the case law makes clear, you

8    know, the only person who can tell us that is no longer here.

9    The only other witness to that is no longer here.

10        More importantly is in Novelli's testimony.  "I

11   don't remember the order, but I know he said, 'Police.  Show

12   me your hands and get on the ground.'"

13        "Do you know whether Mr. Craven complied with any of

14   those complaints -- any commands from Corporal Arndt?"

15        "I never saw him put his hands up or get on the

16   ground.  And so when he was walking towards us, Corporal Arndt

17   started giving commands, 'Police department.  Show me your

18   hands.'  Mr. Craven said something back to Corporal Arndt."

19        "Let me interrupt.  After Mr. Craven said something

20   to Corporal Arndt, after that -- after Corporal Arndt spoke."

21        "Yes, I believe so."

22        Of course, we know both of those are untrue from the

23   video, that Mr. Craven did comply and put his hands up and did

24   not say anything after Corporal Arndt said, "Get your hands

25   up."

18

1          And then it talks about how high -- he reached and
2   produced a pistol.  And he reached it out with his right hand
3   and pulled it up quickly, probably to his mid torso.

4          We know from the video that he never brought it to
5   his mid torso.

6          THE COURT:  Can you tell that from the video?

7          MR. HEROY:  I believe so.  I don't think you can see
8   his hand come up.  You see -- in my view of it, you see it go
9   down simultaneous with the command of "get on the ground."  I
10  don't think that -- I've watched it many times -- many, many
11  times, slowed it down, put it in black and white, and I cannot
12  say that the command was given before he starts putting his
13  hands -- I mean, I think it's the command and then his hands
14  go down, but it's very, very, very close.

15         THE COURT:  What I was getting at is you can't tell
16  from the video whether or not he drew the weapon, right?

17         MR. HEROY:  You can -- I think you can conclusively
18  show that his hand does not go back up certainly to a waist
19  level.  I think you can tell enough of that.

20         THE COURT:  Let me back you up just a second since
21  we were talking about this earlier.  What is the evidence
22  about how much the officers knew of an ongoing mental crisis
23  when they arrived?

24         MR. HEROY:  Let me say one last thing about this gun
25  issue and then I'll answer that, is Corporal Arndt also says

1  he believed he saw him rack the gun or pull the slide.  Also,

2  that is not evidenced by the video.  And so I think the

3  officer's testimony is certainly subject to close examination.

4        And then your question about what the officers knew

5  going into the scene, they knew what we've talked about.  They

6  knew this was a domestic disturbance.  There was a man -- at

7  least Arndt knew there was a man threatening suicide.  And

8  that they -- there was a firearm.  I think that's -- that's

9  relevant and we can't say it's not relevant.  The officers are

10  going to the scene and they know that information.

11        But just because -- there's ample case law, you

12  know, *Cooper* and -- *Cooper* and I think it's *Hensley*.  In both

13  of those cases the decedent has a gun and the police know

14  about it.  And the court says you can have a gun on your

15  property.  That's perfectly reasonable.  Having a gun alone is

16  not sufficient to use deadly force.  It's what you do with it.

17        So they knew at the time of the call that Mr. Craven

18  had a firearm.  You know, they don't know where that firearm

19  was at the time.  They testified that it was in his holster,

20  but, you know, we don't see it.  We don't see it come out.  We

21  don't see it raised in his hand.

22        THE COURT:  Is there any dispute he had a gun?

23        MR. HEROY:  No.  Well, at the time of the shooting?

24  Yes.  Absolutely.  Absolutely.

25        THE COURT:  From whence do you discern this material

1  dispute of fact as to whether he had a gun?

2         MR. HEROY:  You do not see it in the video until

3  after Mr. Craven has been killed and then it's on the other

4  side of a flower pot.  You don't ever see it fly out of his

5  hand.  We don't know how it got there.  He could have placed

6  it there.  He could have known police were coming and placed

7  it there.

8         THE COURT:  Well, here's what I can discern from the

9  video, which is when he was on the front there before the

10 shooting, there was not a gun where it was found after the

11 shooting.

12        MR. HEROY:  In the video -- I don't think I've been

13 able to see that there's --

14        THE COURT:  Take a look at it.  Go take a look at it

15 again.  I know you've looked at it more times than we have.

16 But I'm pretty firmly convinced that before the shooting there

17 is not a gun where it was found after the shooting.

18        MR. HEROY:  I would respectfully disagree.  I've

19 looked at it many times.  I could not tell.  I mean, maybe you

20 have better computers than what we have or video, but I could

21 not tell, I mean, truthfully.

22        THE COURT:  All right.  But if that's --

23        MR. HEROY:  It's not up to me.  I mean, it's -- you

24 know, ultimately what we're saying is, you know, could a jury

25 conclude it and, you know, we believe they could.  I certainly

1  don't ever see it fly out of his hand.  I don't ever see it
2  raised.  You just don't ever see the gun in the video until
3  it's too late.  I think we can all conclusively agree --
4  Novelli and Arndt agree with that.  You can't see it in the
5  video until he's been killed.

6         THE COURT:  No, I agree with that.

7         MR. HEROY:  And I think -- there's a couple cases I
8  want to go over that I think that are really on point.

9         First is the *Littlejohn versus Swonger* case.  This
10 is one where the court of appeals reversed summary judgment in
11 favor of the officers because a genuine issue of fact existed
12 about the reasonableness of the officers' conduct.

13        This is the case where police responded to a
14 domestic disturbance.  It's at night.  And there's a couple on
15 the front porch or kind of front sidewalk.  And there's
16 conflicting testimony about the male decedent.  He has his
17 arms around the female.  And under one set of facts, the
18 officers come up and it's dark and they shoot and kill the
19 man.  On the officers' version of events, they come up and the
20 man has his arm around the woman and then throws her to the
21 ground and reaches back and starts to pull out what he
22 believes to be a gun and they shoot.

23        And the Court in that case, in reversing on summary
24 judgment, says we have to take everything in light of the
25 plaintiff.  So we have to take the plaintiff's story that he

1  was standing there.  And the court says, "I can understand

2  that small discrepancies, as the *Anderson* case points out,

3  always would permit the officer's testimony to prevail.  But

4  here the divergence is radical.  If Borden's version," the

5  plaintiff's version, "is believed, this officer totally

6  unprovoked shot these people."

7          And so if a jury believes that Mr. Craven did not

8  pull the gun, then it's unprovoked and Arndt and Novelli shot

9  him completely innocently and without reason.

10          THE COURT:  So are you saying that the officers were

11  not and could not have been justified until the weapon is

12  drawn?  Is that your argument?

13          MR. HEROY:  Not necessarily.  I think --

14          THE COURT:  It could be enough to be reaching for a

15  weapon, right?

16          MR. HEROY:  It could be enough to be reaching for a

17  weapon, yes.

18          THE COURT:  And do you dispute that the video

19  clearly shows his hands coming down towards his waist?

20          MR. HEROY:  I agree that there's a command given to

21  get on the ground and the hands are coming down.  And so it's

22  impossible to tell whether Mr. Craven is complying with the

23  command or reaching for a weapon.  I don't see, for example,

24  his arm go -- if you're reaching for a holster, your elbow has

25  to come up to get it.  I mean, it's high up here.  You don't

1  ever see his arm come back like that.  And of course, the
2  video is not perfect.  We all understand that, the lighting.
3  But I think you can see that it never comes up like this.

4      And so I think it's more consistent with him getting
5  on the ground versus reaching for a weapon.  And we absolutely
6  know that the gun was not pulled up to a waist level,
7  absolutely.  I just don't think he was -- that we can tell at
8  this phase conclusively, undisputed that he was reaching for a
9  gun.  I just absolutely don't think that that's what we can
10 tell.  I think you have to draw all reasonable inferences on
11 the side of the plaintiff to say a jury could conclude that
12 he's complying with the order or he's not reaching for his
13 gun.  I think that's -- I think the video tells it.

14      And I think the case of -- and it's not from this
15 circuit, it's from the Ninth Circuit, the *Cruz versus City of*
16 *Anaheim* case.  There's no differences in the substantive law,
17 but the court's analysis I found to be very, very probative in
18 this case.

19      And in that case there was a group of officers who
20 were responding to a man who they believed was a drug dealer
21 and they circle him in a parking lot and order him to get out
22 of the vehicle.  He opens the driver side door and the -- on
23 one version of events, the police say, "Police, police, put
24 your hands up," and he doesn't do it and maybe reaches and
25 they shoot and kill him.

1          But then afterwards, curiously, there's -- and they

2     knew he was armed.  Afterwards the officers have to cut him

3     from his seat belt.  He was tangled -- the body was tangled in

4     the seat belt, and the firearm was in the passenger seat.

5          And after noting -- the problem in these cases is

6     that, you know, one of the witnesses is no longer with us.

7     The court begins by saying, "Nobody likes a game of 'he said,

8     she said,' but far worse is the game of 'we said, he's dead.'

9     Sadly, this is too often what we face in police shooting cases

10    like this one."

11         But the court's analysis is in a little bit longer

12    quote; but if you'll indulge me, I think the court's reasoning

13    is perfectly on par with this case.

14         "Usually when you're deciding whether to grant

15    summary judgment for the police in deadly force cases, we must

16    wade through the 'factbound morass of reasonableness.'  Not so

17    here:  It would be unquestionably reasonable for police to

18    shoot a suspect in Cruz's position if he reaches for a gun in

19    his waistband, or even if he reaches there for some other

20    reason.  Given Cruz's dangerous and erratic behavior up to

21    that point, the police would doubtless be justified in

22    responding to such a threatening gesture by opening fire.

23    Conversely, if the suspect doesn't reach for his waistband or

24    make some similar threatening gesture, it would clearly be

25    unreasonable for the officers to shoot him after he stopped

1  his vehicle and opened the door.  At that point, the suspect

2  no longer poses an immediate threat to the police or the

3  public, so deadly force is not justified.

4         "Thus, we need not worry about the intricacies of

5  police procedure or nuanced questions of force

6  proportionality.  To decide this case a jury would have to

7  answer just one simple question:  Did the police see Cruz

8  reach for his waistband?  If they did, they were entitled to

9  shoot; if they didn't, they weren't.

10        "But for a judge ruling on the officers' motion for

11 summary judgment, this translates to a different question:

12 Could any reasonable jury find it more likely than not that

13 Cruz didn't reach for his waistband?  In ruling for the

14 officers, the district court answered this question 'No.'  The

15 evidence that is relied on in reaching this conclusion --

16 indeed, the only evidence that suggests this is what

17 happened -- is the testimony of the officers, four of whom say

18 they saw Cruz make the fateful reach.

19        "But in the deadly force context, we cannot 'simply

20 accept what may be a self-serving account by the police

21 officer.'  Because the person most likely to rebut the

22 officer's version of events -- the one killed -- can't

23 testify, 'the judge must carefully examine all the evidence in

24 the record to determine whether the officer's story is

25 internally consistent and consistent with other known facts."

1      Dropping down one sentence.  "In this case, there's
2  circumstantial evidence that could give a reasonable jury
3  pause.  Most obvious is the fact that Cruz didn't have a gun
4  on him, so why would he have reached for his waistband?  Cruz
5  probably saw that he was surrounded by officers with guns
6  drawn.  In that circumstance, it would have been foolish --
7  but not wholly implausible -- for him to have tried to
8  fast-draw his weapon in an attempt to shoot his way out.  But
9  for him to make such a gesture when no gun is there makes no
10  sense whatsoever.  A jury may doubt that Cruz did this.  Of
11  course, a jury could reach the opposite conclusion.  It might
12  believe that Cruz thought he had the gun there, or maybe he
13  had a death wish, or perhaps his pants were falling down at
14  the worst possible moment.  But the jury could also reasonably
15  conclude that the officers lied."
16      I think that's important here and why I kind of
17  started with Novelli's testimony about he doesn't remember the
18  facts of this case at all.  Very important facts.  Complying
19  with the officers' orders to put his hands up.  He doesn't
20  remember that and he said he never saw it.
21      THE COURT:  Well, it's on the video, right?
22      MR. HEROY:  It's on the video and it absolutely
23  happened.
24      So I think we have to take a very close look at --
25  we can't just take what he says -- what Novelli and Arndt say

1  for granted because they got key pieces wrong and that matters
2  here.  It matters that maybe Chris didn't pull a gun.  Maybe
3  he didn't reach for a gun.  Maybe he was complying with the
4  officers' orders.
5          THE COURT:  All right.  So let's go over this.  The
6  officers have testified that they both saw a gun, right?
7          MR. HEROY:  Correct.
8          THE COURT:  In the holster.
9          MR. HEROY:  Correct.
10         THE COURT:  All right.  And is there any contrary
11  evidence to that testimony?
12         MR. HEROY:  The video.
13         THE COURT:  Well, in the video you can't tell
14  whether he does or doesn't.  That's not contrary.  It may not
15  be corroborative, but it's not contrary.
16         MR. HEROY:  You're correct.  You're correct.
17         THE COURT:  And then my point is, before -- and I'm
18  going to look at it again.  I'm sure you all will too.  I
19  think on the porch where the gun was found, you can see before
20  the shooting it's not there and after the shooting it is.  So
21  what is the contrary evidence that he possessed a gun?  And we
22  certainly know he had a gun earlier.  And he said all the
23  things he said that he was going to get the police to do to
24  him.  So what is the contrary evidence that he had a gun in
25  his waist area?  From what could a reasonable jury conclude

1  that he did not?

2          MR. HEROY:  That they don't see it in the video.

3  That the officers cannot be believed because they don't

4  remember it well and the video contradicts what they said they

5  saw.  And we don't see it on the video.  We don't see his

6  hands come up.  We don't see this furtive movement.  I mean,

7  his hands are coming down at the same time.  His hand does not

8  come up.

9          THE COURT:  So it's not in dispute that his hands

10 are moving towards his waist area because you can see that on

11 the video.

12         MR. HEROY:  Yeah.  No, absolutely.  But it's also

13 consistent with the order to get on the ground.  I mean, we

14 can't know.  And so taking the evidence in the light most

15 favorable to the plaintiff, he's complying with the officers

16 and he's getting on the ground.

17         THE COURT:  Well, Mr. Stewart says that the order to

18 get on the ground occurred in a different order than you say

19 the video shows.

20         MR. HEROY:  I think it's -- I've watched it many

21 times for that.  I don't see it.  I think it's simultaneous at

22 best.

23         THE COURT:  All right.

24         MR. HEROY:  And of course, you know, we're looking

25 at the hindsight of being able to pause the video, slow it

1  down, we've put it in black and white, and can't.  And so for
2  the officers in that moment to have said -- say it's a
3  millisecond before, for the officers to have appreciated that
4  I think is implausible.  I mean, I think it's him putting his
5  hands down.
6          THE COURT:  Well, the officers are -- whatever the
7  ultimate ruling on this is, the officers were in a tough spot
8  too because, you know, unfortunately Mr. Craven was a danger
9  to himself and his family and the officers and so they either
10 react the way they do, or I think about what if he had turned
11 around and started going back into the house with all of the
12 lead up to this, all the threats, all the surety that he
13 showed that he wanted to get himself shot?  Things could have
14 gone -- as tragic as this is, things could have gone a whole
15 lot worse.
16         MR. HEROY:  They could have gone a whole lot better.
17         THE COURT:  Oh, yeah, things could have gone better
18 for sure, but.
19         MR. HEROY:  Our expert talks about that.
20         THE COURT:  You would be representing a different
21 set of plaintiffs if the officers let him go back into the
22 house and he committed violence in there.  I mean, it's a --
23         MR. HEROY:  It's a tragedy, there's just no
24 question.  But I do think it's relevant in -- in thinking
25 about that holistically is -- you know, we put in our papers

1    that the mistakes that led up to this is that -- and it gets
2    more into the *Monell*, *City of Canton* argument --
3             THE COURT:  I was about to move on to that.
4             MR. HEROY:  -- about that, you know, an officer  --
5    they had this policy that says you're supposed to deescalate
6    and treat people differently who are in a mental health
7    crisis.  But the town's training on that, the officers'
8    training on that is so lax.  I mean, they just say, well, we
9    had to sign the policy.  Neither of them remember anything
10   about it.
11            And they certainly did not follow through on it.
12   Absolutely.  They never made a single effort to deescalate the
13   situation.  The very, very first words that came out of
14   Corporal Arndt's mouth were hostile.  "Get on the fucking
15   ground."  It was not, Okay, we're here.  We're the police.  We
16   need to calm down.
17            They had time and space.  Novelli and Arndt
18   testified they had time and space.  That's what the officers
19   wanted.  Mr. Craven was outside the home so the threat of
20   injury to his family had abated at that point and so you have
21   time and space.  It's an ideal moment for Novelli and Arndt.
22   And that's their testimony.  And I think that's what our
23   expert says as well is common police practice.
24            And so they did not -- there was no exigent need to
25   approach the situation as they did.  They could have used the

1   deescalation techniques, but they frankly weren't trained on

2   them and certainly didn't care about them.  And I think their

3   testimony supports that because they just say, yeah, we had

4   all these policies and we had to sign them.  I don't remember

5   any separate training.

6        I believe it's Novelli -- it's either Novelli or

7   Arndt that had CIT training at the time which would be the

8   only other -- in BLET there's a small, one to two day block,

9   they testified, that goes into mental health and they do some

10   scenarios, but neither of them can remember anything about

11   that.  And then they have to sign off on some policies at the

12   Mooresville Police Department.  And then one of them had the

13   CIT training, which is the Crisis Intervention Training, that

14   is just completely ignored.  And I think they admit that they

15   didn't attempt whatsoever to deescalate or anything like that.

16        And they say there wasn't time, but I think that a

17   reasonable jury could conclude that there was time.  There

18   wasn't this exigent circumstances because Mr. Craven was not

19   going back into the house.  In fact, he was walking away from

20   the house.  And so there was not -- there was time to do that.

21        And so I think that's -- that's the basis for our

22   *Monell* claim is that there's this failure to train.  You have

23   a policy, but you don't give any training whatsoever on it.

24   And the policy is really just kind of very high level, but

25   then you just -- they just don't give any training on it.  And

1   the policy actually says you will be trained on it, on the

2   techniques for it; but then they both testified they weren't

3   trained on the techniques, and so that's a problem.

4           And in the one case -- there's one case that we

5   found that's directly on point that's not in this circuit that

6   says -- and I can pull it out in just a second.  But it says

7   that -- it's undoubtedly that officers will face people in

8   mental health crisis and it is a failure -- it supports a

9   *Monell* or *City of Canton* claim when you do not get trained

10  officers on dealing in use of force cases with those

11  experiencing mental health crisis.  I think that was -- give

12  me just a second, I can pull that out.

13          That's the *Estate of Chivrell versus City of Arcata*,

14  which is a district court case from the Northern District of

15  California, but it's the only one that we found that -- I

16  mean, it's very specific to this and says, yeah, officers, you

17  know, they're going to deal with people with mental health and

18  you've got to train them on it.  And they're pretty clear in

19  that case that that met the standard for *Monell*.

20          THE COURT:  Talk to me about the official capacity

21  claims.  Aren't those redundant to where the town is also a

22  defendant?

23          MR. HEROY:  Yes.  I mean, when you sue an officer in

24  their official capacity, it's the same as suing the town, yes,

25  that's correct.  I think we -- I don't know that we argue it

1  in our brief to the contrary so I think that that's -- I mean,
2  that's accurate.

3           THE COURT:  Just confirming.

4           MR. HEROY:  Yeah, that's right.

5           THE COURT:  So what's your evidence of malice to
6  avoid the state law public official immunity?

7           MR. HEROY:  Well, in the two cases -- mainly the
8  main case on this is the *Knibbs* case that says that the
9  unreasonable use of force in violation of 1983, that can be
10 malice.  Moreover, here I think that the --

11          THE COURT:  Let me make sure I understand that.
12 You're saying that if there's unreasonable use of force, that
13 can be malice.

14          MR. HEROY:  I think that's what the *Knibbs* case does
15 say is the unreasonable use of force because to reach that
16 threshold you have to say that an officer would know that that
17 violates his duty.  Therefore, it is wanton or reckless
18 indifference to the life of another in fatal cases.  It's
19 different if it's arresting somebody for a citation, but in
20 fatal cases it can be enough.  That's what the *Knibbs* case
21 says.

22          But here I think on top of that we have the text
23 messages which are relevant to whether they cared about this
24 at all.  I mean, I think it shows that even, you know, 6, 9,
25 12 months later they still don't have the remorse because

1    they're laughing about it.  "Oh, ha, ha, ha.  We shot him in

2    the neck LOL."  All caps, "There were so many gunshots.  We're

3    going to jail.  I'm already in Canada."  And then the town's

4    own statement that Craven pointed his weapon at the officers

5    several times, they admit it's inaccurate and they don't care.

6    They don't do anything about it.  They don't go try and

7    correct the record and say, well, this is incorrect.  No, they

8    just leave it.

9            So I think it does matter that they do not have

10    remorse throughout this.

11            THE COURT:  I don't know what that shows about their

12    state of mind at the time of the incident, though.

13            MR. HEROY:  I think that's right.  I mean, I

14    don't -- you can't say that a year later that, you know, a

15    highly inappropriate text message necessarily say that at that

16    moment I didn't care, but it certainly says after the fact I

17    don't care.  And I think that's -- that's relevant

18    information.  If you don't have remorse afterwards, that's

19    relevant.  We talk about -- in this courtroom all the time

20    about remorse and you give credit for it in criminal

21    sentencing, but here they don't have remorse.

22            THE COURT:  But I still don't see a connection

23    between lack of remorse or respect, frankly, and whether they

24    acted with malice at the time of the event.  I'm not making a

25    connection there.

1          MR. HEROY:  I think that it goes back to -- I mean,

2    the text messages are really -- that's it.  I mean, other

3    than, you know, them saying, well, I -- I had the best of

4    intentions when I shot him, which they're clearly not going to

5    say, I mean, that's it.  We have to infer, you know, what

6    their intent is at the time.

7          And I think the *Knibbs* case says in fatal cases,

8    when you've reached that point, you've already made a

9    determination that a reasonable, objective officer would know

10   that this is contrary to duty and did it anyway, and that can

11   meet the malice standard.  That's what the *Knibbs* case says.

12   And that's very recent.  I think it's 2022.  Very recent to

13   say that meets it in fatal cases.  It even says in that case

14   it does not necessarily meet it in a citation case.  I think

15   that was a case -- referenced a case with juveniles and doing

16   something, so it doesn't there.  But in fatal cases it does

17   because it's a reckless indifference for life.  That's the

18   standard for wanton conduct.  And when you're using deadly

19   force, that's what we're talking about.  So the *Knibbs* case

20   says that that's sufficient in my understanding.

21         THE COURT:  All right.  Anything else you'd like to

22   address?

23         MR. HEROY:  I don't know if Your Honor has any

24   questions about whether the rights had been clearly

25   established in 2018, but I think there's two cases on that.

1  The *Cooper* case says in upholding the denial of summary

2  judgment, that individuals -- citizens have the right to be

3  free from unreasonable use of deadly force.  That was clearly

4  established at the time of the shooting.  That's 2018.

5          And then in -- and then I apologize.  There's one

6  other case that's even more on point that talks about this.

7  Oh, I think it's the one we talked about earlier, the City of

8  Chivrell -- the *Estate of Chivrell versus City of Arcata* said

9  that it was clearly established.

10          So if Your Honor has questions about that, I can get

11  into it.  And I can pull out -- make sure I'm telling you the

12  right case cite, but there is a case that we submitted -- and

13  I can get it while Mr. Stewart is talking -- that says that on

14  these facts that it was determined as of 2018 and even on a

15  more specific level than *Cooper*.  So if Your Honor needs that,

16  I can pull that up.

17          THE COURT:  All right.  Mr. Stewart, would you like

18  to respond to any of that?

19          MR. STEWART:  Yes, Your Honor.  Thank you.

20          Quickly, just to touch on a couple of the Fourth

21  Amendment violation issues.  A couple cases where it talks

22  about the Little -- I think it's *Littleton* or *Littlejohn*.  I

23  wrote Littlejohn, but I seem to remember it being Littleton.

24  I think that case is incredibly different than this case.  In

25  that case you had conflicting testimony.  You had witnesses

saying this did not happen, whereas officers said, yes, it did.

Here there's no such conflicting testimony. You've got testimony from the officers which is consistent with each other and you've got body camera footage which is consistent with what the officers are testifying to. It just doesn't a hundred percent corroborate because there's parts you can't see. And I believe that the body camera footage just doesn't show one way or another whether he pulls a gun, how far he pulls it up. I think it's possible he brings it up to his mid torso, but it really -- I think it doesn't show one way or another and I don't think that's sufficient to be conflicting testimony, which is what we had in the *LittleJohn* case.

The *Cruz* case that was discussed, that's the Ninth Circuit case out in, I think it was California, but I could be mistaken. Yeah, City of Anaheim. Part of the quote that was read is that the court there considered circumstantial evidence that the gun was not on the individual. If he didn't have a gun on him, why would he have been reaching into his waistband. And I think that's critical -- a critical distinction aside from the fact that it's a Ninth Circuit case.

Here, all the circumstantial evidence supports the testimony of Officers Arndt and Novelli. The statements made before Mr. Craven walks out the door, the fact that he does

1  reach down -- he clearly lowers his arms down -- the fact that
2  a gun was found next to his body afterwards, and the fact
3  that -- I agree with you, I didn't see a gun on the steps
4  before the shooting occurred.  So if it was on his person --
5  and again, I know this is circumstantial, but how would it
6  have popped out of his holster if he didn't -- you know, if he
7  didn't draw it?  So I think that's why *Cruz* and that
8  *Littlejohn* case are significantly different than what we have
9  here.
10        And just to quickly touch on a couple of the other
11  things mentioned by Mr. Heroy.  He discussed that it wasn't a
12  furtive movement, it was a slow lowering of the hands.  In
13  *Anderson* there was a witness that testified he slowly lowered
14  his hands to grab whatever he ended up grabbing.  I couldn't
15  remember if that was the bottle or the walkie-talkie.  And the
16  court didn't find that persuasive.  Now, admittedly, it's
17  because the guy didn't have as good of a view, but the fact
18  that he moved slowly to grab whatever he wanted to grab didn't
19  seem to influence the court one way or another whether or not
20  that provided reasonable suspicion -- or probable cause to use
21  deadly force.  So I don't think how fast he moves -- I think
22  the fact that he reached for a weapon is a furtive movement
23  without talking about how fast it was done.
24        And then finally, and then I'll move on to the
25  public official immunity and the *Monell* stuff.  The case law

39

1   that was discussed about blue lights and flashlights and

2   announcing whether or not there was an officer present, I

3   think here it's pretty clear that Mr. Craven knew that there

4   were officers.  He knew that officers were coming.  I don't

5   think that's in dispute.  He went outside.  The officers

6   immediately announced Mooresville Police Department and then

7   they said, "Show me your hands," which he did as soon as they

8   said it.  To me that's enough to show that he knew these were

9   police officers.  I'm not sure that -- I'm not aware of any

10   evidence that he did not know they were police officers.  And

11   I don't -- I don't see how a jury could infer that he was

12   unaware they were police officers when he's complying with

13   orders.  They clearly announced.  They gave the kind of

14   commands an officer would give.  And he knew officers were

15   arriving on scene.  So I'm not sure that there can really be

16   much dispute about that.

17         To move on to the *Monell* and the public official

18   immunity, so I disagree.  I think *Knibbs* has a little bit of a

19   different holding.  I think what the *Knibbs* case held is that

20   malice can be shown -- sorry, bear with me for a second.

21         Malice can be shown through wanton acts contrary to

22   the actor's duty with the intent to injure.  So there's three

23   separate elements.  And the one element that Mr. Heroy

24   discussed, the excessive use of force, that goes to contrary

25   to the actor's duty.  And for purposes of summary judgment, I

1    understand that that's not really something we can argue.  We

2    have to, you know, see things on their side and assume that

3    that could be met.

4         The other two elements, whether there was wanton and

5    intent to injure, I think, is where they fall short here in

6    the -- in proving that there was malice.  Wanton can be shown

7    through reckless indifference.  Here there's no evidence of

8    any reckless indifference.  In that *Knibbs* case, you had

9    expert testimony saying that the officer was recklessly

10   indifferent to the rights and safety of Mr. Knibbs.  You had

11   them going through a litany of issues that the officer did

12   approaching the home.  And then there was expert testimony and

13   accident reconstructionists came in and said that the weapon

14   was not pointed at the officer, that it was pointing straight

15   up in the air.  So him firing that weapon at Mr. Knibbs was

16   recklessly indifferent if the gun wasn't pointed at him.

17        Here there's no such evidence.  There's no accident

18   reconstruction.  There's no actual evidence to dispute what

19   the officers said.  There's just the absence of body camera

20   footage a hundred percent confirming what they said, which I

21   don't think is sufficient to show reckless indifference and

22   meet that first wanton element.

23        That third element is intent to injure.  Here

24   there's no actual intent.  Now, it can be shown

25   constructively.  But again, what the *Knibbs* case held is that

1  that has to be shown through evidence.  What the court said

2  there is that a jury may find -- if the jury finds that these

3  experts are right, that the gun was pointed in the air, that

4  this officer was doing everything to confront this -- confront

5  Mr. Knibbs with a disregard for anyone's safety, then they

6  could find that there is evidence of constructive intent.

7        Here there's no such evidence.  The evidence here is

8  that the officers approached Mr. Craven, gave him lawful

9  commands, and in response Mr. Craven reached for a weapon in

10  his waistband.  I don't see any constructive intent there.  I

11  haven't see any evidence of constructive intent.  I haven't

12  seen any evidence of wanton reckless disregard for

13  Mr. Craven -- for his rights.  So I think that's where they

14  fall short in the public official immunity argument.

15        THE COURT:  What's the testimony about why they

16  decided to approach the residence the way they did rather than

17  driving up with or without blue lights showing?

18        MR. STEWART:  So the testimony was that with these

19  domestic disputes, they'll often form what they call a staging

20  area where they'll meet at some houses down the road and then

21  they'll approach the house.  And I can't recall if they

22  testified to this effect specifically, but with these domestic

23  disputes, they don't want to rush in.  What they know is that

24  there's a man who assaulted a woman, had a weapon, and is

25  threatening to harm at least himself.  So it's a volatile

situation.  In their minds it's an emergent circumstance and
they're not going to rush in with blue lights on.  They want
to approach quietly and try and figure out what happened
because they don't want to agitate the situation further by
rushing in with lights.

Now, that changed a bit once they heard that he was
going back into the home.  At that point they didn't know that
he was having -- this has been characterized as a mental
health crisis, and I'm not going to say whether it was or
wasn't.  But what these officers -- they didn't know if it was
a mental health crisis or just an abusive husband.  From the
information that they received, it really could have been
either.  And what they testified to, and Mr. Heroy can correct
me if I'm mistaken, is that once they heard he was going back
into the house, there was a concern for the safety of all
involved.  It became an emergent circumstance.  They needed to
get up there and put a stop to whatever was happening.

Now, looking back, 20/20 vision, right, we can all
come up with things that could have been done better to avoid
what happened.  No one is happy with what happened.  But at
that time it was an emergent situation that they feel they
needed to respond to immediately and that's why they -- you
can see on the body cam they run up that street to get there
as quickly as they can.  And that's why they did what they
did.

1          And I think this kind of bleeds well into the *Monell*
2    argument.  Now, there's no dispute that there's a use of force
3    policy.  And I haven't heard any argument that that policy is
4    inadequate or that policy by itself violates any
5    constitutional right.  And there's no dispute that there is a
6    policy for dealing with folks going through mental health
7    crisis.  And again, I haven't heard any argument that that's
8    an inadequate policy or that that policy violates rights.  It
9    seems like the argument is that these officers weren't
10   sufficiently trained in those policies -- or at least
11   specifically in use of force as it relates to mental health
12   individuals or folks going through mental health crises.  And
13   I'm not sure there's enough evidence to support that.  I mean,
14   they had a policy.  They both testified that they were -- it
15   was touched on during BLET.  One of these officers was a CIT
16   trained officer so he had an extra level of mental health
17   crisis training, so to say.

18          But I think the important elements in order to meet
19   this high standard that is *Monell* is there has to be notice
20   for the city.  There has to be notice of inadequate training
21   and notice of some faulty policy.  This is the only instance
22   that -- there's no prior instance where there's been some use
23   of force against someone going through a mental health crisis
24   and some argument of inadequate training.  The town is not
25   aware of any type of inadequate training as it relates to

1  mental health folks.  So without that notice element, I don't
2  think they can prove a *Monell* claim.
3         Another part of that is causation.  Now, even if
4  they had all the mental health training in the world, I don't
5  think that changes the fact that once a gun is pulled on them,
6  they're going to fire.
7         And I struggle to see -- you know, could they have
8  said different words or approached quiet?  You know, I don't
9  know.  I don't know sitting here today.  But I don't see how
10 any further training in mental health crisis handling would
11 have changed what happened.
12        And also, like I said before, it's not clear that
13 these officers knew that there was a mental health crisis.
14 The information that they received -- again, they never talked
15 to anyone in the home.  The only interaction they had with
16 Mr. Craven lasted for three seconds, two seconds, whatever the
17 video shows.  It's a very brief time.  Based on that short
18 time frame, they certainly weren't able to determine he was
19 going through some sort of mental health crisis.  The
20 information they had was that a man had assaulted his wife,
21 had a weapon, was threatening to hurt himself.  I don't think
22 that that -- could there be a mental health crisis?  Sure.
23 But is the average lay officer supposed to be able to diagnose
24 this person based on those three pieces of information that
25 this person is going through a mental health crisis?  These

1  people aren't a -- you know, his family is not a danger.  We

2  should approach him differently.  I think that's hard to say,

3  especially in this case.

4         I think the fact that they've had training and these

5  policies are in place and there wasn't causation and there

6  wasn't notice, I don't see how -- that's why we think the

7  *Monell* claim should be dismissed.

8         THE COURT:  Mr. Heroy, let me ask you this just so

9  I'm sure of your position.  From what I can tell, what at

10 least Officer Arndt, but I think both of them, knew before

11 they got there on this mental health crisis issue was that a

12 man had assaulted his wife and was threatening to blow his

13 brains out.  That he had a gun.  You can get that from the

14 dispatcher saying mother and son both confirming that he does

15 have a gun.  That he's back in the house.  I can hear him

16 yelling in the background.  And that's about all they know of

17 the situation, unless I'm missing something.

18        MR. HEROY:  No, I think that's right.  But I

19 would --

20        THE COURT:  So is it fair to say, now, they should

21 have known and acted accordingly; that this is a mental health

22 crisis; this is not a domestic violence threat to himself and

23 others kind of case?  That's asking a lot of the officers to

24 draw the conclusion you now say they should have obviously

25 known and acted accordingly.

1          MR. HEROY:  I think it can be both, that it's a

2    domestic and a mental health.  So I'm not saying it's

3    either/or.  But yeah, I think when an officer says this is a

4    suicide call and the husband in front of his wife is saying

5    he's going to blow his brains out, I think, yeah, the

6    implication is that's a -- there's some sort of mental health

7    issue going on.  I mean, I don't think that people that aren't

8    in crisis are committing suicide.  I mean -- and I think that

9    Novelli and Arndt agree with that in what we talked about.

10          And in the *Hensley* case, that's, you know, arguably

11    a lot worse facts.  The police -- it's dark at night.  And the

12    father emerges from the house with his one daughter who's a

13    minor and one who's over the age of 18 because they identify

14    her.  And the man pistol whips one of the daughters and then

15    keeps walking.  And the police -- and his handgun is pointed

16    downward and the police shoot him.  And they do not announce

17    that they're police.  That's an important difference,

18    obviously.

19          But the court says that the assault had ended, that

20    threat had ended.  And officers are charged with that.  I

21    mean, if Craven is outside his house, that threat has ended.

22    And yes, if they're going from the staging area -- and I'll

23    tell you what Novelli says about -- or sorry, Corporal Arndt

24    says about the testimony, about the lead up to it.

25          He says, "We probably don't want to announce

1  ourselves or, you know, shine our lights onto ourselves so

2  they know exactly where we are." So it's intentional by the

3  officers to not let Mr. Craven know that they are officers at

4  that point in time. Obviously, later they announce it. I'm

5  not saying they weren't. But in the lead up, in the staging,

6  they stage a couple houses down. They don't turn their lights

7  on, they don't put their flashlights on so that they don't

8  announce their presence. That is the intent. That's what he

9  said.

10         So when they get up and they see Craven walking away

11  from the house, I think under *Hensley* we all have to agree

12  that the assault, the alleged assault, clearly ended and so

13  now it's, okay, what situation are we dealing with now? He's

14  not an immediate danger to his family.

15         And the officers testified he didn't threaten --

16  other than their testimony that he pulled the gun, he didn't

17  threaten the officers. He didn't make any threatening

18  statements to them. They testified that they don't interpret

19  whatever Craven said that we can't decipher, you know, the

20  sentence with the word "shoot," that it was nonthreatening to

21  them. So I think that's important.

22         Going back to kind of before I sat down last time,

23  the case that I couldn't remember, it actually is the *Knibbs*

24  case so it's this circuit, that says it was beyond debate that

25  in April of 2018 that this was -- these rights had been

1    established.  And so I think that case is squarely on point in
2    terms of whether the right had been established.
3              And in *Knibbs*, this is a case where --
4              THE COURT:  Well, let me ask Mr. Stewart.  Do you
5    dispute that the right, at least as asserted by plaintiffs, is
6    clearly established?
7              MR. STEWART:  I would dispute it, Your Honor,
8    because I think what we're talking about here is very -- it's
9    the *Anderson* and it's the *Slattery* and it's the *Green Ridge*
10   cases that the situation changes drastically once contact is
11   made between the officers and the suspect and once lawful
12   commands are given and those commands aren't followed; and
13   instead, the suspect reaches for whether it be a gun or
14   whether it be a bottle of soda, qualified immunity has been
15   found in those instances.  And I think that this is -- this is
16   a case right on point with those.
17             THE COURT:  Okay.  Unless somebody is really anxious
18   to talk about something else, let's move on to the motions to
19   seal various things.  If you want to talk some more about
20   summary judgment, we can do that, but I'm satisfied that I
21   understand the arguments of counsel.
22             MR. HEROY:  I just didn't know if you wanted -- the
23   only other thing I was going to do is just go through the
24   facts of *Knibbs*.
25             THE COURT:  I can read the case.

1          MR. HEROY:  Okay.  That was the only thing I would

2     do.

3          I think on the motions to seal, I think those were

4     by consent and so I don't think we have any issue.

5          THE COURT:  Well, it doesn't matter.  I mean consent

6     doesn't matter.  There's laws about what can and can't be

7     sealed.  You could consent to sealing the *Charlotte Observer*

8     and it wouldn't make any difference, of course.

9          So that the parts of the body cam video and audio,

10    to the extent the Court relies on parts of those audios for

11    summary judgment purposes, those can't be sealed.  Now, we're

12    not going to unseal the entire video of those things.  There's

13    absolutely no need for that.  But the portions of those body

14    cams that the Court relies on in its summary judgment order

15    are going to have to be unsealed.  And of course, we'll be

16    very specific about, you know, from this minute/second to this

17    minute/second are unsealed and the rest of it will remain

18    sealed.

19         The autopsy report -- and I can't imagine the Court

20    is going to rely on that in any way in its summary judgment

21    ruling, so that is likely to be granted to be sealed.

22         And then let's talk about the 911 call which is also

23    not only for a motion to seal but a motion in limine.  It

24    seems to me that the 911 call can certainly be relevant in

25    several respects; but I'll hear from you, Mr. Heroy, about how

50

1   you say it's not irrelevant.  But the most obvious thing to me
2   is when the officers say I saw a weapon in a holster and I saw
3   him reach for it, that's corroborated to a certain extent by
4   what the 911 call is saying, that he has a gun and that he's
5   going to essentially -- these are not the words used -- commit
6   suicide by cop.  I mean, it's certainly corroborative of the
7   officers' version of events.  I don't see how it could just be
8   called irrelevant.
9              MR. HEROY:  Well, on the question -- I guess it's
10  two different analyses.
11             On the question of whether the officers' conduct in
12  that time, in that moment, whether it was reasonable, I think
13  it's clearly not relevant because the officers did not hear
14  it.  They did not know, they did not have that information.
15  So under that first analysis, I think that's pretty clear and
16  the cases say it's only what the officers knew.
17             THE COURT:  Well, yes, for those purposes.  But for
18  a jury or for this Court to come to a conclusion as to whether
19  what the officers say they saw and what happened is true, it
20  seems like any corroborating information would be important to
21  the fact finder.  And they say, I saw a gun.  Well, the 911
22  call has reports of gun.  They say he made a reach for as if
23  to maybe even invoke police response.  Well, there's support
24  for that on the 911 call.  So it's not just what the officers
25  knew, and that is important for certain purposes, but that's

51

1    not the entirety of the case.

2          MR. HEROY:  I agree.  That's what I was going to say

3    is I think under analysis one, I think it's clearly relevant.

4          Analysis two is the trickier one that you've just

5    illuminated which is, is it relevant to his mental state?

6          Well, one, it's not a disputed fact that he had a

7    gun inside the house.  That's just not disputed.  So I don't

8    think it -- relevancy comes into play at that point.

9          The second is his stated intent to commit suicide,

10   you know, by cop or not.  Again, I don't know that --

11   certainly, suicide by himself is not contested.  Ms. Craven

12   testified to those facts, that he threatened to do those

13   things.  So I think we're gleaning a lot to say --

14         THE COURT:  Well, when he predicts "when the cops

15   get here, I'll be dead," a reasonable jury could infer that

16   that's exactly what he made happen.

17         MR. HEROY:  I think for that limited purpose, then I

18   think I'd be misleading the Court if I said that that's not

19   part of the analysis.  I would say it's also -- you know, it's

20   very prejudicial in saying that.  And so we would say that the

21   prejudicial value outweighs that probative value because we

22   can certainly agree that he was threatening to commit suicide.

23   They can ask Amy Craven, you know, what he said.  But the 911

24   transcript, I think, has -- it goes further.  There are

25   comments in there that do not relate to an intent to commit

1   suicide or an intent to commit suicide by cop.  So I think, if
2   anything, we can strike those.  And I think that's maybe an
3   argument for if we get to a jury, we can talk about the
4   nuances.
5         So I think it's -- you've got several different
6   analyses.  And so for summary judgment on whether -- the main
7   thing I think that we're focusing on today is whether it was
8   reasonable in that moment to shoot, and I think it's
9   irrelevant to that question.
10        And then the question of relevancy to a jury for
11   limited purposes, I mean, I think that's -- we have to see if
12   we get to a jury and then we can have it at that time.  But
13   there are parts that might be relevant as Your Honor has
14   talked about and there are parts that may not be and we could
15   go line by line, but unless -- I don't know that we have to do
16   that today.  I'm certainly happy to, but I don't know that
17   it's relevant today to the motions for summary judgment.
18        But we just wanted to be clear that, you know, on
19   the record for summary judgment, that it does not matter.
20   What's in the 911 tape does not matter for what the officers
21   knew in the split second of when they decided to use force.  I
22   think we all agree that they did not know it and did not have
23   that information and so they don't get the benefit of
24   saying -- using that and saying, well, this makes their
25   conduct more reasonable because it's -- they didn't know it.

1  They don't get to make that decision.  It's a reasonable
2  officer in their position.  Their position, they didn't know
3  it.
4          THE COURT:  But if that's going to be admissible
5  evidence, and the Court's burden at summary judgment stage is
6  to determine whether a reasonable jury could find for the
7  plaintiff, and so among the things the Court has to consider
8  there is the 911 tape in the context that we've been talking
9  about.  So I raise that to this extent.  That to the extent --
10 and the statements made therein on the 911 call, those will
11 have to be unsealed as well.  I mean, the public is entitled
12 to know the evidence upon which the Court based its ruling.
13 Now, that may not be the entirety of the call, but whatever I
14 rely on is going to have to be unsealed.
15         MR. HEROY:  And I'll tell you for the record, from
16 the plaintiff's perspective, we are in favor of unsealing it;
17 but we felt constrained by prior matters that at this point in
18 time we had to seal them.  But we'd be in favor of unsealing,
19 absolutely.
20         THE COURT:  The whole 911 call?
21         MR. HEROY:  And the -- or the body camera.  And I
22 think for the 911 call, I haven't had that specific
23 conversation with my client.  I can certainly do that.  But
24 there are limited portions that I would say would not be
25 probative on the questions of summary judgment, that we would

1  not want -- you know, without talking to my client about it,

2  that may not be relevant and may not be unsealed, but...

3       THE COURT:  Mr. Stewart, what's your position on the

4  sealing of any of those things?  I know that you felt

5  constrained because of the source of those exhibits, but...

6       MR. STEWART:  Yes, Your Honor, and that's why we

7  filed the motion to seal, just because it was produced under a

8  protective order from the SBI and we just -- I've always just

9  kind of taken that approach, that if it's produced under a

10 protective order, I'd rather file under motion to seal.  But

11 that being said, we don't object to Your Honor unsealing the

12 portions that you consider in your motion for summary judgment

13 if you think that's proper.  No objection from us.

14      THE COURT:  Anything else that either of you would

15 like to address while we're here?

16      MR. STEWART:  If you'd like, I'm happy to be heard

17 on the motion in limine argument for the 911 evidence if

18 that's something you're considering today as well.

19      THE COURT:  Well, it may be premature.  I guess I

20 won't be definitive about anything.  If we get to trial, we

21 can talk about it more then.  But the Court's pretty well

22 persuaded that at least some of that 911 call is going to be

23 permitted for the jury.  And then if we get to that point, we

24 can talk about if there's any part of it that shouldn't get to

25 the jury.  But generally speaking, the motion in limine will

1  be denied without prejudice to be revisited prior to trial, if
2  we get there.

3          All right.

4          MR. HEROY:  Your Honor, if you'll give me one second
5  just to confirm with my client that she doesn't have anything.

6          THE COURT:  Sure.

7          (Counsel and plaintiff conferred.)

8          MR. HEROY:  Your Honor, the only concern is on
9  portions of the 911 tape, I do -- I mean, she does have her
10 minor children on there and her kids.  And so we would ask the
11 Court to be conservative in unsealing that to the protection
12 of these minors and how that may affect them.  And so that's
13 what we'd say, is just be -- that we'd ask the Court to be
14 mindful of that effect.

15         THE COURT:  All right.  Certainly will.

16         MR. HEROY:  Thank you, Your Honor.

17         THE COURT:  And again, with the body camera stuff,
18 there's a whole lot of what's on the body cameras that are not
19 going to be released to the public.  It's not relevant to the
20 question before the Court, now or at trial.  It's just not
21 going to be shown.

22         All right.  I'll try to get an order out as soon as
23 we're able because folks are entitled to know whether we're
24 moving forward or not; and if we are moving forward, to move
25 forward.

1          Just for my own curiosity, what would be the length
2  of a trial if you've thought about that?
3          MR. HEROY:  Four or five days.
4          MR. STEWART:  Yeah.
5          THE COURT:  Any answer short of 12 to 14 days makes
6  me happy because that was the most recent information I got on
7  one of my trials and I was not happy to hear that.
8          MR. HEROY:  Was it the one that we're involved in
9  that settled the week before?
10         THE COURT:  No.
11         MR. HEROY:  Because I think that's what we predicted
12  in that one.
13         THE COURT:  No, this is a criminal trial.
14         All right.  Thank you very much for your
15  presentations.  The Court will be in recess until 9:30
16  tomorrow morning.
17              (End of proceedings at 11:18 AM.)
18                          *****
19
20
21
22
23
24
25

```
1   UNITED STATES DISTRICT COURT
2   WESTERN DISTRICT OF NORTH CAROLINA
3   CERTIFICATE OF REPORTER
4
5
6         I, Cheryl A. Nuccio, Federal Official Realtime Court
7   Reporter, in and for the United States District Court for the
8   Western District of North Carolina, do hereby certify that
9   pursuant to Section 753, Title 28, United States Code, that
10  the foregoing is a true and correct transcript of the
11  stenographically reported proceedings held in the
12  above-entitled matter and that the transcript page format is
13  in conformance with the regulations of the Judicial Conference
14  of the United States.
15
16        Dated this 19t day of June 2023.
17
18
19                      s/Cheryl A. Nuccio
20                      Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:21-CV-00174-KDB-DSC

| | |
|---|---|
| **AMY RHINEHART CRAVEN,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **CHRISTOPHER NOVELLI, ALEXANDER ARNDT AND THE TOWN OF MOORESVILLE,** | |
| **Defendants.** | |

Amy Craven, Chris Craven's widow, filed this action against two Mooresville, North Carolina police officers and the Town of Mooresville ("Town") claiming that police misconduct led to his death. On August 2, 2020, Alexander Arndt and Christopher Novelli ("Officers") responded to a "911" emergency call saying that Mr. Craven had assaulted his wife and threatened to "blow his brains out." On the way to the Craven residence, they were told by the dispatcher that he was armed with a gun and yelling. When the Officers arrived, Mr. Craven was shot and killed by the Officers after he (at a minimum) reached towards his handgun after being instructed by the Officers to keep his hands raised. Now before the Court are Defendants' Motion for Summary Judgment (Doc. No. 19), Plaintiff's Motion in Limine and Motion to Strike (Doc. No. 28) and the Parties' respective Motions to Seal (Doc. Nos. 17, 23).

Most simply put, Chris Craven died tragically, but not unlawfully. The Court has carefully reviewed all the evidence in detail, including the Officers' body camera videos and the 911 call. In light of the limited information that the Officers knew as they approached the residence and Mr.

1

Craven's actions in the few seconds after the Officers saw him in front of his house, no jury could reasonably find that the Officers used unconstitutionally excessive force in responding to Mr. Craven's immediate threat to their safety. Therefore, the Court will grant summary judgment for the Defendants. The Court will also deny Plaintiff's Motion in Limine and Motion to Strike because the 911 call evidence that Plaintiff seeks to exclude is relevant to Plaintiff's claims. Finally, the Court will grant in part and deny in part the Parties' Motions to Seal, unsealing only that portion of the submitted evidence that the Court relies on in ruling on the Motion for Summary Judgment and sealing the remainder to honor Plaintiff's appropriate request for privacy.

## I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*., (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential

2

element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the

3

end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.    FACTS AND PROCEDURAL HISTORY

During the summer of 2020, Chris and Amy Craven lived in Mooresville, North Carolina with Taylor Dunn, Ms. Craven's twenty-one year old daughter from a previous marriage (who had lived with the Cravens since they married in 2007), and the Cravens' biological son and daughter, who were thirteen and seven. It was a stressful time for the Craven family (as it was for many in the first six months of the COVID-19 pandemic). Chris had worked for Hendricks Motor Sports as a parts coordinator throughout the marriage, while Amy had been employed as the Director of Nursing at The Pines at Davidson since 2015. The pandemic forced Chris to work from home, while Amy continued to go into work for her nursing job. Consequently, Chris assumed more at-home parent duties and responsibilities.

Amy Craven and Dunn testified that because of the COVID-19 pandemic Chris struggled with depression and his pre-existing anxiety was exacerbated. (*See* Doc. No. 20-7 at 38-39; Doc. No. 20-6 at 28). On August 2, 2020, Amy went into work and Chris remained at home. That evening, Chris "went into [a] mental health crisis," (Doc. No. 20-7 at 57) during which he became increasingly anxious and frustrated and began expressing feelings that he did not want to live. (Doc. No. 20-6 at 14, 33-34). Ms. Craven and Dunn decided to call "911," and Dunn called at approximately 9:30 pm. (*Id*. at 33, 35).

Dunn's 911 call is chaotic and chilling, punctuated with loud screaming, children pleading with their father not to kill himself and ultimately the sound of gunshots after Mr. Craven goes

4

outside to meet the police. *See* Doc. No. 20-11.[1] The first thing Dunn said to the 911 operator was, "My stepdad hit my mom in front of me and my siblings and he is threatening to blow his brains out and he is screaming and getting in her face and he won't stop." (*Id*. at 1; Doc. No. 20-6 at 53). Ms. Craven testified that Chris first left their bedroom then returned, shut the door with her still inside, and held a gun to his head, threatening to kill himself. (Doc. No. 20-7 at 61). At the same time, on the 911 call, Dunn was screaming at the operator that Mr. Craven had locked her mom in their room. (Doc. No. 20-11 at 2). Then, Mr. Craven came out of the bedroom and said, "Taylor called 911 so I'm going out there to do it right now, thank you." (*Id*.) This prompted more "kids crying and screaming in the background," as the children pleaded with their father not to end his life. (*Id*.). Also, at that point, Dunn responds "yes" to the operator's question, "Do you see a gun on him?" (although she then says that she just assumes he has a gun). The existence of the gun is later confirmed by both Ms. Craven and the Cravens' son. (*Id*. at 4; Doc. No. 20-7 at 69.).

At the time, Dunn also reported Mr. Craven had left the residence but she was unable to see what he was doing. (Doc. No. 20-11 at 4). Then, he came back into the house and asked for his phone, (Doc. No. 20-6 at 39; Doc. No. 20-11 at 5), saying that he wanted his phone so he could call his mother to tell her goodbye. (*Id*.). Seconds later, Mr. Craven can be heard saying, "When the police show up here, thank Taylor because (inaudible)" … "You won't have a (expletive) daddy no more (inaudible). (Doc. No. 20-11 at 5). Shortly after Mr. Craven makes those comments, he went outside and shots can be heard in the background, followed immediately by Dunn reporting to the operator amid screaming that she hears gunshots. (Doc. No. 20-11 at 6).

---

[1] There is no dispute that the transcript and recording of the 911 call which have been filed as exhibits are accurate. (*See* Doc. No. 20-6 at 43, 51, 56-57).

5

When Mooresville Police Department ("MPD") officers Arndt and Novelli received a dispatch call at approximately 9:30 p.m. that evening, they knew none of the Craven family's history and few of the details of Dunn's frantic 911 call (which they did not hear). What little they knew came from the dispatcher. In the initial call,  Novelli, who was sitting in a grocery store parking lot in his patrol car, and Arndt, who was at the MPD, were told that a man had assaulted his wife and was threatening to "blow his brains out."  (*See* Doc. Nos. 20-2, 20-3). Both officers immediately began driving (with their sirens and flashing lights on) to the Craven residence.

It took Arndt and Novelli a little over three and a half minutes to arrive. While they drove, they learned a bit more: (1:00)[2] "Male subject outside near a trailer or shed," (2:06) "Units heading towards Heritage, there hasn't been a shot discharged yet," (2:11) "Male subject is still outside at this time," (2:15) Someone asks, "Does anybody have a gun?" (2:34) "Caller assuming he has a gun – still trying to determine," and (3:11) "Mother and Son both confirming that he does have a gun on him."

Arndt and Novelli and the other MPD officers who were dispatched met down the street from the Cravens' house to ready themselves and approach on foot. While they were gathering, they were told (3:38) "Subject is outside – he may or may not be in the out-building or trailer. They don't have eyes on him, but he is outside" then (5:01) "Caller says that he may be coming back into the house" and finally (5:25) "He is back in the house. I can hear him yelling in the background." Knowing that Mr. Craven's wife (who had already been hit) and children were inside, the Officers immediately (5:34) started walking to the house.

---

[2] All times refer to officer Arndt's  body camera video, a portion of which will be unsealed as discussed below.

6

Less than a minute later (6:21) the Officers, with Arndt in the lead, identified the house. As the Officers walk towards the driveway (where there is a trailer parked), but before Mr. Craven is seen, something appears to have been said from the direction of the house. (6:26-27). Neither Arndt nor Novelli (who was a number of feet behind Arndt) is clear about what was said.[3] Arndt says that he heard something like "just shoot me," "you are going to have to shoot me" or "(expletive) shoot me." (Doc. No. 20-3 at ¶8). Novelli, who shortly after the shooting said that he did not remember what was said, testified he thought he heard something like "what are you going to do" or "you're going to have to (expletive) kill me." (Doc. No. 20-2 at ¶ 9).

A second later (6:28-29), Mr. Craven comes into view and Arndt says "Police department. Let me see your (expletive) hands." At that point (6:30), Mr. Craven can be seen moving on the walk just in front of the low stairs that lead up to the porch. He is shirtless and a black holster can be seen near his right waistband. Hearing Arndt's command, which he repeated ("Let me see your hands"), Mr. Craven raises his hands (6:31), but then brings his hands down towards his waist, his right hand lowering more quickly than his left hand (6:32). After Mr. Craven's hands are coming down, Arndt yells for Mr. Craven to "get on the (expletive) ground." (6:32-33). Both Arndt and Novelli testified that after lowering his hands, Mr. Craven pulled out a handgun with his right hand, and they began firing their rifles until Mr. Craven fell to the ground. (6:34 – 6:39) (Doc. Nos. 20-2 at ¶¶10-14; 20-3 at ¶¶10-11). All parties agree that the lighting of the body camera video makes it impossible to see Mr. Craven's hands after they are seen moving down.

---

[3] As discussed further below, counsel for all parties admit that what is said cannot be fully heard and understood from the body camera video, other than perhaps the word "shoot."

7

After a short pause, the Officers moved in towards Mr. Craven. (6:49) (*Id*.) A few seconds later, Arndt asks, "Where did the handgun go?" and a light is flashed on it lying against a step (on which the body camera video shows there was no gun prior to the shooting). (6:56). Novelli and other MPD officers then went into the house to check on the family, and Arndt and others provided medical attention to Mr. Craven until paramedic personnel arrived. Mr. Craven died at the scene from the Officers' multiple gun shots. Other than the gunshots, no one inside the house (or any neighbors) heard or saw MPD's interaction with Mr. Craven. (*See* Doc. No. 20-7 at 62-63; Doc. No. 20-6 at 42-43, 61).

Amy Craven was appointed Administratrix of Mr. Craven's estate. She commenced this action by filing a Complaint in the Superior Court of Iredell County, North Carolina on September 7, 2021. The Defendants removed the action to this Court on December 3, 2021. (Doc. No. 1). In her Complaint, she asserts both federal and state law claims, including violation of 42 U.S.C. § 1983, wrongful death, assault and battery, negligence/gross negligence, and punitive damages. On January 20, 2023, Defendants filed a Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims. (Doc. No. 19). In addition to her response to that motion, Plaintiff filed a Motion in Limine and Motion to Strike, seeking to exclude all evidence related to the 911 call, on the grounds that the officers did not hear the call and it is "unduly prejudicial." (Doc. No. 28). Both parties filed consent motions to seal the Officers' body camera videos, the 911 call recordings and the autopsy report. (Doc. Nos. 17, 23).

8

# III. DISCUSSION

## A. Motion for Summary Judgment

While Plaintiff asserts numerous claims as listed above, the core of the legal dispute before the Court is whether a jury could reasonably find in favor of Plaintiff on her claim that the Officers used unconstitutionally "excessive" force against Mr. Craven, considering all the circumstances. If so, then some of Plaintiff's claims might survive summary judgment. If not, then Defendants are entitled to summary judgment on each of Plaintiff's claims. Thus, the Court will focus its attention on Plaintiff's lone federal claim under Section 1983 then address more briefly Plaintiff's state law claims, all of which also depend on a finding that the officers acted wrongfully in shooting Mr. Craven.

First, it is important to note that standard summary judgment rules apply to claims of excessive force against police officers. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). That is, "the Court must determine whether any material facts are genuinely disputed, i.e., is the evidence offered such that a reasonable jury might return a verdict for the non-movant." *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021); *Pritchard v. Mobley*, No. 4:20-CV-00060-M, 2022 WL 983159, at *4 (E.D.N.C. Mar. 30, 2022). However, because the alleged victim in excessive force cases may be unable to testify, the Fourth Circuit has cautioned the District Courts not to "overvalue the narrative testimony of an officer and to undervalue potentially contradictory" evidence. *Stanton*, 25 F.4th at 234. Still, our Court of Appeals is clear that this admonition ought not lead the Court to be "especially critical of officer testimony in these cases." *Id.* Rather, the Court "need only apply ... normal summary-judgment rules, which ask

9

whether reasonable juries might disagree over some material factual dispute." *Id.*; *see Heavner v. Burns*, No. 521CV00159KDBDCK, 2022 WL 17477561, at *3–4 (W.D.N.C. Dec. 6, 2022).

### 1. Section 1983

#### a) Alleged Excessive Force in Violation of the Fourth Amendment

Plaintiff's only claim under federal law is her First Cause of Action, which alleges that the Town and the Officers, who are sued in both their individual and official capacities, violated 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, a case filed under 42 USC § 1983 provides potential remedial relief for a plaintiff who can prove that a person acting under color of state law deprived him of a right secured by federal law, including violations of federal constitutional rights, as well as certain limited federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir.) (2022); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017). Here, Plaintiff alleges that the Officers "used excessive force … in violation of the Fourth Amendment's right to be free from unreasonable seizures." Doc. 1-1 at ¶38.

10

"The use of deadly force is a seizure subject to ... the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Knibbs*, 30 F.4th at 214; *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). The Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *Stanton*, 25 F.4th at 233. "Whether an officer has used excessive force is judged by a standard of objective reasonableness." *Id*., quoting, *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Moreover, "recognizing that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the 20/20 vision of hindsight." *Id*.; *Stanton*, 25 F.4th at 233. ("In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment.").

Thus, to determine whether such probable cause exists, the Court must ask whether the Officers' use of deadly force was 'objectively reasonable in light of the facts and circumstances confronting them, viewed in the light most favorable to the Plaintiff, without regard to the Officers' underlying intent or motivation. *Knibbs*, 30 F.4th at 214; *Hensley*, 876 F.3d at 582. The Court must focus on "the totality of the circumstances" based on the "information available to the Officers 'immediately prior to and at the very moment [they] fired the fatal shots.'" *Id*. In this case, the key factor, among those typically considered,[4] is "whether the suspect posed an immediate threat to the safety of the officers or others." *See Graham v. Connor* 490 U.S. 386, 396 (1989).

---

[4] The other *Graham* factors are "the severity of the crime" and "whether [the suspect] is actively resisting arrest or attempting to evade arrest." *Graham v. Connor* 490 U.S. at 396. While the danger

11

The record in this case cannot support a finding that the Officers' conduct was not objectively reasonable, viewing the evidence in the light most favorable to the Plaintiff. At the time the Officers fired their weapons, they undisputedly knew or believed the following: 1) they were confronting a person who had assaulted his wife; 2) Mr. Craven was, at a minimum, unstable and agitated because he had threatened "to blow his brains out" and had been yelling very shortly before; 3) Mr. Craven was armed with a handgun; and 4) after being told to raise his hands, he lowered his hands towards the holster in his waistband. Under such circumstances, it was objectively reasonable for the Officers to conclude – in the literal split second they had to make a decision whether to use deadly force – that Mr. Craven posed an immediate threat to their safety. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991); *Knibbs*, 30 F.4th at 215 (distinguishing but affirming the continued precedential value of *Anderson* and *Slattery*).

In *Slattery* and *Anderson*, two cases involving an officer's reasonable – but ultimately incorrect[5] – belief that an individual possessed a firearm and was about to use it, the court found that a suspect's movements toward a perceived firearm while disobeying the officer's command not to do so "would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm." *Knibbs*, 30 F.4th at 215; *see Slattery*, 939 F.2d at 215–16 (holding an officer reasonably feared for his life after he twice ordered the suspect to put his hands up, but the

---

to Ms. Craven and the children was indeed serious, at the time of the use of force they were in the house. Also, the incident happened so quickly that the Officers had not yet begun to arrest Mr. Craven. Therefore, as in *Knibbs*, "the first and third *Graham* factors offer only limited probative guidance." *Knibbs*, 30 F.4th at 216.

[5] Unlike in *Slattery* and *Anderson*, Mr. Craven did in fact have a gun, consistent with what the Officers were told before arriving at the house and what they say they saw prior to the shooting.

12

suspect ignored those commands, instead reaching down to an area out of the officer's sight and grabbing an object that turned out to be a beer bottle); *Anderson*, 247 F.3d at 128, 131 (holding that an officer reasonably feared for his life during an investigation of a man thought to be armed after the officer ordered the man to get down on his knees and put his hands up, but the man began reaching in his back left pocket for what turned out to be a Walkman radio).

More recently explaining these holdings, the Fourth Circuit said:

> In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts.

*Knibbs*, 30 F.4th at 220-221, quoting *Hensley*, 876 F.3d at 585 (emphasis added in *Knibbs*). Moreover, "[the Fourth Circuit] has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Id*., quoting *Anderson*, 247 F.3d at 131 (collecting cases). *See also Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787–88 (4th Cir. 1998) (holding that officers acted reasonably in fearing for their lives before shooting an individual who the officers knew had made threats to his own life and to the officers' lives after the individual exited his home while appearing to hold a knife, walked towards the officers, and disobeyed an officer's commands to stop).

Plaintiff urges the Court not to rely on *Slattery* and *Anderson*, but instead follow *Knibbs*, *Cooper*, and *Hensley*, cases in which the court held that police officers' use of deadly force were not objectively reasonable. The Court must decline that invitation, as those cases are

13

distinguishable on their facts.[6] In *Knibbs*, the Court emphasized that, unlike in this case, there were disputed issues of fact whether the decedent, who was inside his house with a gun, knew that law enforcement was on his darkened porch or whether Knibbs ever raised the gun to the officer. Under those different facts, the court held that if a jury found that the defendant shot Knibbs "simply because he had possession of a firearm within the confines of his own home" that would violate the Fourth Amendment. *Knibbs*, 30 F. 4th at 221-222. Here, there is no question that Mr. Craven knew that the police were coming to his home, went outside to meet them with his handgun and then failed to keep his hands raised when ordered to do so. Thus, the court's concern over a law enforcement officer shooting a homeowner who may be legitimately trying to protect his family and property from an unknown person on his porch is inapplicable.[7]

Similarly, in *Cooper,* the Court found that a reasonable officer would not have probable cause to feel threatened where the suspect "stood in the threshold of his home, holding his shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands." *Cooper*, 735 F.3d at 159. The Court also pointed out that it was important the officers never identified themselves and that if the officers had identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* Again, here the Officers identified themselves as

---

[6] Notably, neither the parties nor the Court of Appeals in deciding the various cases debate the governing legal standards, but rather the application of the facts to those principles.

[7] "[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force. Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Cooper*, 735 F.3d at 159. Instead, deadly force may only be used by a police officer when, for example, he has a reasonable concern for his immediate safety as discussed above.

14

police officers, and Mr. Craven clearly heard them as he initially complied with their commands by raising his hands. (Doc. No. 20-2 at ¶ 12; (06:31)). Further, Mr. Craven then ignored their command by lowering his hands.

Finally, in *Hensley*, the suspect had a gun when the police arrived on scene and then walked off his porch with the weapon pointed down. *Hensley*, 876 F.3d at 584. The Court found there was no reason for the police to suspect an immediate threat because none was offered and "no command to stop, drop the gun, or raise his hands" was issued. *Id*. at 585. So, *Hensley* is distinguishable for the same reasons as *Cooper*.[8]

In support of her efforts to come within the ambit of *Knibbs*, *Cooper*, etc., Plaintiff makes several factual contentions on which she argues that the jury could find in her favor. Still, to survive summary judgment Plaintiff must proffer evidence from which a jury could *reasonably* find for Plaintiff, *i.e.*, based on facts not, for example, speculation or sympathy. The Court finds that Plaintiff's arguments fall short of that mark. First, Plaintiff argues that the jury may not find the Officers to be credible based on alleged inconsistencies between the Officers' testimony and the

---

[8] Plaintiff also cites *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) as authority for her contentions. In *Cruz*, the Court allowed claims of excessive police force to proceed to trial, holding that a jury need not accept the testimony of law enforcement officers that a motorist at a traffic stop pulled a gun where there was circumstantial evidence that could give a reasonable jury pause, such as the fact that Plaintiff did not have a gun on him so why would he be reaching for a gun. *Id.* Beyond the non-binding nature of this authority, even if a jury here did not accept the Officers' testimony that they saw a gun, all the circumstantial evidence supports the existence of a gun, including that a gun was found next to Mr. Craven's body, he had on a holster and his wife testified he had a gun on him when she saw him in the home. (Doc. No. 20-7 at 69; Doc. No. 20-2 at ¶ 14; Doc. No. 20-3 at ¶ 11; (6:56)).

body camera videos. However, any variance between the Officers' recollections and the video must relate to a material disputed fact.

Plaintiff contends that there is a genuine issue of material fact as to whether Mr. Craven ever "brandished a gun" towards the Officers or reached for his waistband. Neither argument is persuasive. As to whether Mr. Craven actually pulled out his gun, even assuming that is a disputed issue because the video does not corroborate[9] the Officers' testimony,[10] the Officers' potential liability for excessive force does not turn on whether Mr. Craven grabbed his gun, thus it is not a material disputed fact. As discussed above, a police officer is not required to "wait until a gun is pointed at him before he is entitled to use deadly force." *See Knibbs*, 30 F.4th at 220-221.

With respect to whether Craven actually reached for his waistband, the video makes clear that he did, notwithstanding Plaintiff's suggestion otherwise. *See* Doc. 25 at 15. Plaintiff is of course entitled to argue her own version of what happened, but she must create that "version" from actual facts, not speculation, assertions or inferences at odds with undisputed video or physical evidence. Here, the video footage clearly shows Mr. Craven's hands coming down towards his waist, his right hand more quickly than his left hand. When a video "quite clearly contradicts the version of the story told by [Plaintiff] … so that no reasonable jury could believe it, a court should

---

[9] Plaintiff repeatedly and incorrectly argues that the video "contradicts" the Officers' testimony, when it cannot be determined what happened from the video on a particular point, such as whether or not Mr. Craven pulled out his handgun. Uncertainty is not contradiction. Rather, it is simply the absence of corroboration. That is, if the video does not show one way or the other if Mr. Craven "brandished" his gun then it is unavailable to support either Plaintiff's or the Officers' position. But, similarly, it does not "contradict" either position.

[10] However, other evidence is consistent with the Officers' testimony, including Mr. Craven's statement on the 911 call that he would be dead after the police arrived (i.e., he intended to pull his gun and expected the police would shoot and kill him) and the undisputed fact that after Mr. Craven was shot, his gun was a short distance behind him on the steps, which is unlikely unless the gun was already out of the holster when the shooting began.

16

not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007).

Plaintiff also questions whether Mr. Craven had a gun and whether Mr. Craven's hands were already coming down before he was ordered to get on the ground. Again, the video and physical evidence is clear on these points and no reasonable jury could find in Plaintiff's favor on these issues, even viewing the evidence in the light most favorable to the Plaintiff. [11]  Whether Mr. Craven had a gun with him when he encountered the Officers is not reasonably in dispute. Seconds after he was shot, his gun can be seen on the steps directly behind his body. (6:49, 6:56). And it can be seen on the video that no gun was on the steps when Mr. Craven walked to the side of the steps. (6:31, 6:33). Thus, the existence of the gun is fully corroborated by the physical evidence. Also, it is supported by both the testimony of Ms. Craven and the 911 call. *See* Doc. No. 20-7 at 69; Doc. No. 20-11 at 5. Similarly, the video clearly shows that Mr. Craven begins to bring his hands down before[12] Arndt tells him to get on the ground. (6:32-33).

---

[11] In the same vein, Plaintiff argues that the jury could find that the audio of the verbal statement being made as the Officers approached the house, (6:26-27), can reasonably be interpreted as Mr. Craven saying: "Ya'll know you *don't* have to shoot me" rather than the Officers' recollection that he said something to the effect of "you are going to have to shoot me." But, when questioned at oral argument as to what actual evidence supported that contention, Plaintiff's counsel correctly acknowledged that the audio was entirely unclear on that point and Plaintiff's suggested words could not be made out from listening to the audio. Again, the jury must make its decisions based on evidence, not speculation. So, in the absence of audio or other evidence from which the jury might conclude Plaintiff's alternate version of the statement was made, the Court cannot properly credit that possibility.

[12] At oral argument, Plaintiff's counsel argued that the two events were "close" in time or "simultaneous." Certainly, Mr. Craven's bringing his hands down was close in time to the command to get on the ground, as the entire incident took only a few seconds. However, the two events did not happen simultaneously. The video shows that Mr. Craven brought his hands down towards his waist just prior to being told to get on the ground.

17

Further, Plaintiff argues that the Officers' use of deadly force may be found to be excessive because Mr. Craven did not make any "furtive" movement towards his gun, relying on the dictionary definition of "furtive" as "done in a quiet and secretive way to avoid being noticed." *See* Doc. No. 25 at 15. However, the governing cases discussed above do not limit a suspect's movements that may allow an officer to use deadly force to "furtive" ones (although those are plainly encompassed by the cases). Nor, would it make sense to do so. Surely, even though a "secretive" movement can sufficiently prompt police action that doesn't mean more overt movements (like reaching for a gun on a nearby table) cannot. Again, the cases are clear that police don't have to wait for a suspect to draw and point the weapon, as in effect suggested by Plaintiff. Considering *Hensley*, *Cooper*, *Anderson* and *Slattery* together, the key distinction is whether, considering the totality of the circumstances (including due regard for the exigency of the situation), the suspect's movements are threatening or potentially dangerous (such as reaching for a potential weapon after being told to show his hands in *Anderson* and *Slattery*) rather than innocent or innocuous (for example holding a gun safely and walking or standing as in *Hensley* and *Cooper*). Here, Mr. Craven reached down towards his waistband after an order was given to show his hands, which would cause a reasonable officer to fear for his safety, regardless of whether or not the movement was considered "furtive."

Finally, Plaintiff faults the Officers for not attempting to "deescalate" the situation. Quite understandably, she wishfully envisions an alternative scenario in which the officers approached the volatile situation "calmly" and somehow reasoned with Mr. Craven not to hurt himself or others so that he remained alive. Even if that had been possible – and the 911 call in which Mr. Craven says that he will be dead once the police arrive obviously suggests the difficulty of achieving a

18

peaceful solution – it is not the Court's role to determine if that sad night could have ended differently. Neither "best practices" nor perfect outcomes are constitutionally mandated. Yes, the Officers' response to the 911 call could have turned out better,[13] but it also could have turned out far worse, with an armed man retreating back into the house and harming not only himself, but also his wife and children. It is a considerable understatement to say it is regrettable when police efforts intended to protect the community (here, specifically, Ms. Craven and her children) lead to tragic consequences. However, the Court must address the circumstances as they occurred and make a judgment only on the limited legal questions presented.

In sum, as discussed in detail above, Plaintiff has put forward neither testimonial nor physical evidence that materially contradicts the Officers' version of events. Thus, the Court can find no evidence from which a jury could reasonably find in favor of Plaintiff's claim that the Officers used unconstitutionally excessive force against Mr. Craven.

### b) Qualified Immunity

In addition to asserting the lawfulness of their conduct, the Officers contend they are entitled to qualified immunity from the Plaintiff's claims. When, as here, a law enforcement officer is sued in his individual capacity, he is "entitled to invoke qualified immunity, which is ... immunity from suit itself." *Cooper*, 735 F.3d at 158. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Knibbs*, 30 F.4th at 214 (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). In determining whether an officer is entitled to qualified immunity,

---

[13] The Court does not intend by this discussion to either commend or criticize the Officers' conduct. Plainly, the goal of any police encounter should be to protect all citizens involved, including the police, with minimal harm to the suspect, particularly one who is threatening suicide.

19

courts look to: (1) "whether a constitutional violation occurred"; and then (2) "whether the right violated was clearly established." *Id.*; *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry*, 652 F.3d at 531. The doctrine balances two important values—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

The Fourth Circuit has stated:

The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted) (emphasis added); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted).

In carrying out the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348,

20

353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *Pearson*, 555 U.S. at 236.

As discussed above, the Court finds that a constitutional violation did not occur so it need only further address the second question. A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 195 (2001). As the Fourth Circuit has explained:

> It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question. Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.

*E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018); *A.G. v. Fattaleh*, No. 520CV00165KDBDCK, 2022 WL 2758607, at *8–9 (W.D.N.C. July 14, 2022).

Under *Graham*, the law is clear that, as a general matter, a police officer must carefully measure the force used to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and any attempt to evade arrest or flee. *See Graham*, 490 U.S. at 396. But, the Supreme Court has emphasized that Graham is "cast at a high level of generality," *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)), and does not by itself "create clearly established law outside 'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017); *E.W.*, 884 F.3d at 186. As described above, the Fourth Circuit has applied *Graham* in numerous cases, none of which would have given notice to

21

the Officers that their conduct in this case would violate "clearly established law." Indeed, as previously discussed, *Anderson* and *Slattery* suggest that the Officers' actions were lawful. Therefore, the application of *Graham* to these circumstances is, at a minimum, uncertain. So, the Officers are entitled to qualified immunity, even if it were found that they committed a constitutional violation (which the Court does not find for the reasons stated earlier).

### c)    Official Capacity Claims Against the Officers

In addition to the Section 1983 claims asserted against the Officers as individuals, Plaintiff has asserted claims against the Officers in their "official capacity." An "official capacity" claim against an individual is "essentially the same as a claim against the entity;" therefore, courts often hold they "should be dismissed as duplicative when the entity is also named as a defendant." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 463 2016) ("duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed"). In this action, Plaintiff has sued the Town as well as the Officers. Accordingly, as candidly acknowledged by Plaintiff's counsel at oral argument, the "official capacity" claims against the Officers are duplicative. Further, because the Officers are not liable in their individual capacities on Plaintiff's Fourth Amendment claims, there can be no vicarious official Section 1983 liability as to any of Plaintiff's theories. *See, e.g., Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996). Thus, the Court will grant summary judgment on Plaintiff's claims against the Officers in their official capacity.

### d)    *Monell* Claim Against the Town of Mooresville

22

The last issue with respect to Plaintiff's Section 1983 claims is her claim against the Town for the Town's alleged failure "to adequately train and instruct its officers on how to interact with and respond to citizens experiencing a mental health crisis." Doc. No. 25 at 18. A municipality is considered a "person" and thus is subject to suit. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538 (4th Cir. 2018). However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Under *Monell*, there are four theories that can be potentially pursued under Section 1983 to show an unlawful custom, policy, or practice: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Beyond identifying a policy or practice that may be attributable to the governmental unit, the plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). In other words, a plaintiff must show that the action was taken with the requisite degree of culpability and must demonstrate a direct causal link

23

between the action and the deprivation of federal rights. *Id.* Indeed, "[t]he first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

The Supreme Court has thus made clear that a Plaintiff seeking to impose *Monell* liability bears a heavy burden: "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997) (citation omitted). The Fourth Circuit has similarly held that "[t]he substantive requirements for proof of municipal liability are stringent." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Plaintiff claims the Town violated Mr. Craven's constitutional rights under the third theory; that is, because of its "failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens.'" Plaintiff alleges that a training deficiency – the failure to instruct the Officers on how to interact and respond to citizens experiencing a mental health crisis – made the alleged constitutional violations a "reasonable probability rather than a mere possibility." *See Spell v. McDaniel*, 824 F. 2d 1380, 1390 (4th Cir. 1987); *Semple v. City of Moundsville*, 195 F. 2d 708, 713 (4th Cir. 1999).

At the outset, the Court notes what should be obvious – the Court's finding that the Officers did not violate Mr. Craven's constitutional rights also dooms Plaintiff's *Monell* claim against the Town. Because there must be a direct causal link between the failure to train and the alleged constitutional deprivation, if there is no constitutional violation then the causal connection cannot

24

be made. Further, as discussed below, the Court finds that even if Plaintiff had established a viable claim of a constitutional violation, the Town is not liable for a failure to train under *Monell*.[14] Therefore, Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims against the Town.

In *City of Canton v. Harris*, 489 U.S. 378, 389 (1989), the Supreme Court indicated "that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations." *See Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). Thus:

> [A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice- namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation--that the municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409-410, 117 S.Ct. 1382. The Supreme Court gave an example in *City of Canton*: the certainty that police officers will be required to arrest fleeing felons, and that because officers have been provided firearms to accomplish that task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.*, 489 U.S. at 390, n. 10 (internal citation omitted).

Still, in *City of Canton*, the Court required that "only where a failure to train reflects a deliberate or conscious choice by a municipality ... can a city be liable for such a failure

---

[14] The Court specifically limits this finding to the particular facts of this case and expresses no opinion as to whether the Town has sufficiently trained its police officers on handling citizens with mental health problems in other circumstances.

25

under § 1983." *Id.* at 390. The Court reasoned that "the focus must be on adequacy of the training

program in relation to the tasks that the particular officers must perform" and further stated, "that

a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the

city, for the officer's shortcomings may have resulted from factors other than a faulty training

program." *Id.* at 390-91. The Court continued:

> Neither will it suffice to prove that an injury or accident could have been avoided
> if an officer had better or more training, sufficient to equip him to avoid the
> particular injury-causing conduct. Such a claim could be made about almost any
> encounter resulting in injury, yet not condemn the adequacy of the program to
> enable officers to respond properly to the usual recurring situations with which they
> must deal. And, plainly, adequately trained officers occasionally make mistakes;
> the fact that they do says little about the training program or the legal basis for
> holding the city liable.

Moreover, under *Monell* a single incident is almost never enough to warrant municipal

liability. "Proof of a single incident of the unconstitutional activity charged is not sufficient to

prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F. 3d 708, 713-14

(4th Cir. 1999). "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones

v. City of Martinsburg*, 961 F. 3d 661, 672 (4th Cir. 2020). "A pervasive risk of harm may not

ordinarily be shown by pointing to a single incident or isolated incidents' ... nor is a showing that

individual officers violated a person's constitutional rights on an isolated occasion ... sufficient to

raise an issue of fact whether adequate training and procedures were provided." *Orpiano v.

Johnson*, 632 F. 2d 1096, 1101 (4th Cir. 1980); citing *Withers v. Levine*, 615 F. 2d 158, 161 (4th

Cir. 1980), and *McClelland v. Facteau*, 610 F. 2d. 693, 697 (11th Cir. 1979).

Plaintiff contends that the Officers received little or no specific training on handling

"citizens experiencing a mental health crisis." Defendants counter that the Officers received

26

training on handling persons with mental health issues during basic police training.[15] Also, and more relevant according to the Town, the Town has a policy (which Plaintiff has not challenged) related to the use of force and the Officers received training related to that policy and the use of force more generally. Again, even though Mr. Craven's unstable mental health was part of the knowledge they carried into the incident because he had threatened to kill himself, the Officers were called to respond to a domestic assault by an armed man in a home in which children were present. Therefore, this incident was not simply the handling of "a mental health crisis" or a "suicide prevention" call. Instead, the Officer's response to the 911 call primarily implicated broader training that Plaintiff does not contend was lacking.

Also, the Town argues that there is no evidence that it was on "notice" that its training of police officers related to handling citizens with "mental health issues" was inadequate.[16] The Court agrees. Plaintiff has proffered no evidence on this issue other than generally criticizing the alleged paucity of training. Indeed, Plaintiff has failed to describe with any specificity what training the Town should have provided and how such training would have prevented the alleged constitutional violation in these specific circumstances. Therefore, the Court find that the Town's training does not rise to the level of "deliberate indifference," so Plaintiff's forecast of evidence fails to establish the necessary elements to extend liability to the Town under 42 U.S.C. § 1983.

---

[15] As with its conclusions above with respect to alleged constitutional violations, the Court's ruling is not meant to suggest that the Town should not further train its police officers in handling the extremely challenging tasks of responding to citizens with mental health problems, particularly those who are armed and may hurt others or themselves.

[16] Plaintiff cites *Estate of Chivrell v. City of Arcata*, 2022 U.S. Dist. LEXIS 153466, *9-10 (N.D. Ca. Aug. 25, 2022), which held plaintiff had stated a Monell claim of inadequate training based on a single incident of a fatal police shooting of a mentally-ill man with a holstered firearm. Putting aside the factual differences of that case, it is not binding on this Court.

27

### 2.    State Law Claims

In addition to Plaintiff's Section 1983 claims, Plaintiff has asserted numerous claims under North Carolina state law, including assault and battery, wrongful death, negligence / gross negligence and punitive damages. As noted above, the merits of these claims primarily follow and depend on Plaintiff establishing – as was required under her federal claim – that the Officers acted wrongfully and violated Mr. Craven's rights, resulting in his death. Thus, the parties focused their arguments on Plaintiff's federal claim, which the Court has done as well in this Order. So, for the same reasons that the Court finds that the Defendants are entitled to summary judgment on Plaintiff's Federal law claim, they are also entitled to summary judgment on Plaintiff's state law claims. Nevertheless, each of Plaintiff's state law claims is addressed briefly below.

### a)    Assault and Battery

The Fourth Circuit has recognized that, "the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *Knight Estate of Graham v. City of Fayetteville,* 234 F. Supp. 669, 692 (E.D.N.C. 2017).  Therefore, state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Todd v. Creech*, 23 N.C. App. 537, 209 S.E.2d 293 (1974); *Bell v. Dawson,* 144 F. Supp.2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims.").

28

Plaintiff acknowledges that her assault and battery claim rises and falls with her Fourth Amendment claim. The entirety of Plaintiff's argument on the assault and battery claim is as follows: "Finally, because Plaintiff has stated claims under Section 1983 for Officers Arndt's and Novelli's use of excessive force in violation of Craven's Fourth Amendment rights, she has also sufficiently alleged state law claims for assault and battery." Doc. No. 25 at 24. Therefore, because Plaintiff has failed to establish that the Officers used excessive force or otherwise violated Mr. Craven's constitutional rights, Defendants are entitled to summary judgment on Plaintiff's claim of assault and battery.

> **b)     Wrongful Death, Negligence and Gross Negligence**

Plaintiff also asserts state law wrongful death claims and negligence/gross negligence claims against all Defendants. (Doc. No. 1 at ¶¶ 48-58, 69-72). In addition to their defenses on the merits, Defendants argue that the Officers are subject to public officials' immunity as to the individual capacity claims, and the Town is entitled to governmental immunity as to any official capacity claim.

Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). This immunity has been recognized at common law for over a century. *See Epps*, 122 N.C. App. at 202, 468 S.E.2d 846. North Carolina courts have deemed police officers engaged in performance of their duties as public officials for the purposes of public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003).

However, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 222 N.C. App. at 288, 730 S.E.2d 226. An individual acts with malice when he "wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Evans v. Croft*, 265 N.C. App. 601, 827 S.E.2d 342 (2019). There is no allegation that the Officers acted outside the scope of their authority or corruptly; therefore, whether the Officers are entitled to public official immunity turns on whether they acted with malice.

The Court finds there is no evidence that indicates the Officers acted with malice in responding to the 911 call at the Craven residence. The incident, from the time the Officers received the dispatch call until Mr. Craven was shot took less than seven minutes. There is simply no indication that during that time (or earlier) the Officers acted with any malice towards Mr. Craven or his family. On the contrary, from all the evidence in the record, they attempted to carry out their difficult job appropriately and fired on Mr. Craven only because they believed he posed an immediate threat to their safety.

Plaintiff contends that evidence of the Officers' malice can be found in text messages sent seven to sixteen months after August 2020 in which they, after reading press articles and being sued, inappropriately made insensitive remarks, including about the significance of their actions ("all we did was kill somebody") and the number of gunshots. *See* Doc. No. 33-3 at 4, 10, 12. Beyond the long temporal distance between the texts and the alleged incident, the texts do not establish that the Officers acted with malice. Indeed, the Officers' texts in the days immediately following the shooting were much more circumspect, with the Officers' texts saying that "it sucks

30

that it happened" and it was "unfortunate," but couldn't be avoided. *See* Doc. 33-3 at 5, 17, 23. Therefore, while the Court does not in any way condone the Officers' inappropriate texts cited by Plaintiff, the texts do not provide sufficient evidence of malice to support a finding that the Officers are not entitled to public officer immunity.

Similarly, there has been no waiver of the Town's governmental immunity. Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited to the extent of insurance coverage. *Satorre v. New Hanover Cnty. Bd. Of Comm'rs,* 165 N.C. App. 173, 176 (2004). All of the acts complained of occurred on August 2, 2020. During that time, the Town of Mooresville had in effect a general liability insurance policy that contains a non-waiver of governmental immunity provision. The provision specifically states, "This policy is not intended by the ASSURED to waive its governmental immunity as allowed by North Carolina General Statutes Section 115C-42, Section 153A-435, Section 160A-485, or any amendments thereof)." Similar language has been held to preserve governmental immunity. *See, e.g., Evans v. Chalmers,* 703 F.3d 636, 656 (4th Cir. 2012) (citing North Carolina authority).  Therefore, the Town has retained its governmental immunity from liability on Plaintiff's wrongful death and negligence / gross negligence claims.

### c)     Punitive damages

Finally, Plaintiff's "claim" for punitive damages cannot survive summary judgment. Although pled as a separate cause of action, Plaintiff's allegations make clear that her claim for punitive damages is only a request for additional relief on Plaintiff's claims under Section 1983 and North Carolina law. Having already determined that Defendants are entitled to summary judgment on Plaintiff's "underlying" claims, Defendants are also entitled

31

to summary judgment on any claim for punitive damages related to those claims. More specifically, as discussed above, there is no evidence in the record from which a jury could conclude that the Officers acted with "malice" or otherwise engaged in willful, wanton, or grossly negligent conduct. Therefore, Plaintiff's claim for punitive damages fails.

With respect to the Town, although a municipality may be liable for compensatory damages in § 1983 actions, it may not be subjected to punitive damages. *Newport v. Fact Concerts, Inc.* 453 U.S. 247, 271, (1981) ("consideration of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials"). Municipalities are also immune from punitive damages for state law claims "in the absence of statutory provision to the contrary." *Jackson v. Housing Authority of City of High Point,* 316 N.C. 259, 262-63 (1986). Notably, to abrogate the common law, a statutory provision must do more than merely provide for punitive damages; it must remove governmental immunity for those damages. *Id.,* 316 N.C. at 263. Plaintiff has not suggested that a statute has taken away the Town's immunity; therefore, the Town cannot be held liable for punitive damages.

### B.    Motion in Limine and Motion to Strike

Through a Motion in Limine and Motion to Strike, Doc. No. 28, Plaintiff asks the Court to exclude from evidence certain exhibits and testimony offered by Defendants in support of their Motion for Summary Judgment: 1) the copy of the 911 recorded call, (Doc. No. 20-12); 2) the transcript of the 911 call, (Doc. No. 20-11); and 3) excerpts from the deposition of Taylor Dunn and Amy Craven discussing the 911 call , (Doc. No. 20-6 at 43:5-25, 51:1-25, 56:1-57:25 and Doc. No. 20-7 at 69:1-25) (collectively the "911 Call Evidence"). In support of these motions, Plaintiff

argues that "because [the Officers] did not hear any portion of the 911 call" prior to their encounter with Mr. Craven the 911 Call Evidence is "entirely irrelevant." The Court disagrees.

While the Court would, if requested, likely provide a cautionary and/or limiting instruction to the jury if this evidence was offered at trial,[17] portions of the 911 Call Evidence are plainly relevant to Plaintiff's claims, even though the Officers' did not hear the 911 call. The call shows Mr. Craven's knowledge that the police had been called and were coming, that he went out to meet them and that he expressed his belief that he would soon be dead at their hands. Also, the 911 call contains evidence that Mr. Craven was carrying a handgun and of his yelling, information that was conveyed to the Officers. All of this evidence is relevant to fully understanding the circumstances of the shooting and/or to corroborate the Officers' testimony, including that Mr. Craven reached for and pulled a gun. Further, the 911 call reflects the 911 operator's focus on the situation as a domestic violence incident, emphasizing the safety of Mr. Craven's wife and children, which in turn is reflected in what was told to the Officers as they approached the house. And conversely, the Court has considered that the 911 Call Evidence does not contradict the Officers' version of the incident.

Accordingly, the 911 Call Evidence, properly understood and considered as reflected above in connection with the Motion for Summary Judgment, is not "entirely irrelevant" to Plaintiff's claims, and Plaintiff's Motion in Limine and Motion to Strike will be denied.

**C.    Motions to Seal**

---

[17] Of course, a cautionary and/or limiting instruction is not necessary for the Court's consideration of the Motion for Summary Judgment. The Court understands the appropriate purposes for which the 911 Call Evidence may be considered and is not unduly prejudiced by taking it into account.

33

In Consent Motions to Seal filed together with their memoranda related to the Motion for Summary Judgment, all Parties ask the Court to seal the most sensitive and graphic exhibits offered in support of their positions, including the Officers' body camera videos, the recording and transcript of the 911 call and the autopsy report. However, despite the Parties' understandable desire to protect the privacy of Plaintiff and her children and agreement on sealing this evidence, the Court must also consider the public interest in the transparency of judicial proceedings to determine if the evidence can be sealed. Weighing the competing needs for privacy and openness, the Court will in part grant and in part deny the motions, unsealing the evidence that the Court has relied on in making its decisions.

In general, the public has a right of access to judicial proceedings that stems from two sources: the common law and the First Amendment. *Rushford v. New Yorker Magazine, Inc*., 846 F.2d 249, 253 (4th Cir. 1988); *see also Press–Enterprise Co. v. Superior Court of Cal*., 464 U.S. 501, 508–09 (1984) (discussing the importance of an open trial as a means of both ensuring and giving the appearance of fairness in the judicial process). "[T]he common[-]law presumption in favor of access attaches to all 'judicial records and documents,'" *Stone v. University of Md. Med. Sys. Corp*., 855 F.2d 178, 180 (4th Cir. 1988) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)), but "the First Amendment guarantee of access has been extended only to particular judicial records and documents." *Id.* (citing *Rushford*, 846 F.2d at 253). Under the more rigorous First Amendment standard, "denial of access must be necessitated by a compelling government interest and narrowly tailored to serve that interest." *Id*.; *see also Press–Enterprise Co*., 464 U.S. at 509 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored

34

to serve that interest."); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07 (1982) ("[I]t must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.").

The Fourth Circuit applies the heightened First Amendment right of access standard to exhibits submitted in support of summary judgment motions in civil cases. *See Rushford*, 846 F.2d at 252 (applying the First Amendment right of access standard to summary judgment filings and noting "summary judgment adjudicates substantive rights and serves as a substitute for a trial"); *see also, e.g., Jones v. Lowe's Companies, Inc.*, 402 F. Supp. 3d 266, 277–78 (W.D.N.C. 2019), aff'd, 845 F. App'x 205 (4th Cir. 2021); *Painter v. Doe*, No. 3:15-CV-369-MOC-DCK, 2016 WL 3766466, at *3 (W.D.N.C. July 13, 2016) ("When a judicial document or record sought to be sealed is filed in connection with a dispositive motion, the public's right of access to the document in question arises under the First Amendment."). Accordingly, "a party moving to seal documents filed in support of a motion for summary judgment in a civil case bears a heavy burden." *Jennings v. Univ. of N. Carolina at Chapel Hill*, 340 F. Supp. 2d 679, 681 (M.D.N.C. 2004).

To limit access to documents submitted in connection with a summary judgment motion, the party seeking to seal the documents must make a showing "that the denial [of access] serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." *Rushford*, 846 F.2d at 253. However, courts have recognized that in certain circumstances, "private interests might also implicate higher values sufficient to override … the First Amendment presumption of public access." *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572, 580 (E.D. Va. 2009); *see Borkowski v. Baltimore Cnty., Maryland*, 583 F. Supp. 3d 687, 694 (D. Md. 2021) (granting motion to seal sensitive medical information).

Furthermore, before sealing the documents, "the district court must follow the procedural requirements laid out in *In re Knight Publ'g Co*., 743 F.2d 231, 234 (4th Cir. 1984)." *Id*. These are: 1) the district court must give the public adequate notice that the sealing of documents may be ordered; 2) the district court must provide interested persons "an opportunity to object to the request before the court ma[kes] its decision"; 3) if the district court decides to close a hearing or seal documents, "it must state its reasons on the record, supported by specific findings"; and 4) the court must state its reasons for rejecting alternatives to closure. *See Rushford*, 846 F.2d at 253–54. "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004). This approach also reflects the reality that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978), as well as that "the public's business is best done in public," *Cochran v. Volvo Grp. N. Am., LLC*, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).

The Parties' sealing motions primarily rely on North Carolina statutes classifying the videos as non-public "law enforcement agency recordings," *see* N.C. Gen. Stat. § 132-1.4A, and making information, recordings, photographs and documents contained in a Medical Examiner's autopsy report not subject to disclosure to the general public. *See* N.C.G.S. § 130A-389.1. However, these state law confidentiality definitions are not dispositive. *See Pegram v. Williamson*, No. 1:18CV828, 2022 WL 541495, at *27 (M.D.N.C. Feb. 23, 2022). Regardless of the state statutes, the proponent of a request to seal must identify the applicable public access right, if any, and justify the request under that standard. *Id*., *see Sluder v. Bentancourt*, No. 1:20CV135, 2020

36

U.S. Dist. LEXIS 151529, at *1–3 (W.D.N.C. Aug. 20, 2020) (denying blanket motions to seal documents purportedly "confidential pursuant to state and federal law").

In exercising its discretion to seal an exhibit offered in support of a dispositive motion, the Court may consider "the strength of any property and privacy interests asserted," *see Leopold v. United States*, 964 F.3d 1121, 1128 (D.C. Cir. 2020) (citing *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)); however, there is no exception to the presumption of public access merely because evidence is sensitive, particularly where, as here, the exhibits sought to be sealed contain evidence that is highly probative to the case. *See Narciso v. Cnty. of San Diego*, No. 20CV116-LL-MSB, 2022 WL 3447509, at *11 (S.D. Cal. Aug. 17, 2022) (declining to seal body camera video footage). Moreover, the body camera videos and the transcript of the 911 call are of significance to the public, who have an interest in the transparency of law enforcement activity, particularly the use of force. Indeed, body cameras are worn in significant part to promote public awareness and police accountability. Therefore, the Court finds there is strong public interest in disclosure of the body camera video of Officer Arndt (except as described below) and the transcript of the 911 call which is not offset by a sufficient compelling private interest, and it will deny the Parties' request to seal that evidence.

However, Plaintiff has expressed legitimate concerns that disclosure of the exhibits beyond what is necessary to satisfy the public interest would invade her and her children's privacy, needlessly adding to their grief. The Court agrees with the Plaintiff and will accordingly grant the motions to seal the autopsy report (Doc. No. 20-10), the body camera video of Officer Novelli, (Doc. No. 26-3) (on which the Court did not rely because it is materially duplicative of Officer Arndt's video) and the recording of the 911 call (Doc. No. 20-12). Disclosure of that information

37

would violate Plaintiff and her children's privacy without furthering the public's ability to have access to the relevant facts and evaluate the Court's rulings. Also, with respect to Officer Arndt's body camera video, the Court will seal the portion from 7:01 to 16:23, which only shows the efforts of the police and medical responders to revive Mr. Craven, all of which is intensely private and immaterial to the Court's order.[18]

Finally, the Court has complied with the *In Re Knight* procedures described above. The public has been provided with adequate notice and an opportunity to object to the Motions to Seal, which were filed on January 20, 2023, and February 7, 2023, respectively, and they have been accessible through the Court's electronic case filing system since that time. *See* Doc. Nos. 17, 23. The Court has explained the reasoning for its ruling in this order. Also, having considered less drastic alternatives to sealing the exhibits to be sealed, the Court concludes that sealing these exhibits in the limited manner ordered is necessary to protect the Plaintiff's privacy interests.

Accordingly, the Court will grant in part and deny in part the Parties' Motions to Seal as described.

## IV.   ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 19) is **GRANTED**;

2. Judgment is entered in favor of Defendants on Plaintiff's claims;

3. Plaintiff's Motion in Limine and Motion to Strike (Doc. No. 28) is **DENIED**;

---

[18] The Town will be directed to provide the Court with a redacted copy of Officer's Arndt's body camera video showing only 0:00 to 7:00 and 16:24 to the end.

38

4. The Parties Motions to Seal (Doc. Nos. 17, 23) are **GRANTED** in part and **DENIED** in part as described above;

5. The Town of Mooresville is directed to provide the Clerk of Court with a redacted copy of Officer's Arndt's body camera video showing only 0:00 to 7:00 and 16:24 to the end within 14 days of the date of this order; and

6. Following the filing of the redacted exhibit as directed above, the Clerk is directed to close this matter in accordance with this Order.

   **SO ORDERED ADJUDGED AND DECREED**.

   Signed: March 12, 2023

   Kenneth D. Bell
   United States District Judge

39

# United States District Court
# Western District of North Carolina
# Statesville Division

| | | |
|---|---|---|
| Amy Rhinehart Craven**,** | ) | JUDGMENT IN CASE |
| | ) | |
| Plaintiff(s), | ) | 5:21-cv-00174-KDB-DSC |
| | ) | |
| vs. | ) | |
| | ) | |
| Alexander Arndt | ) | |
| Christopher Novelli | ) | |
| Town of Mooresville**,** | ) | |
| | ) | |
| Defendant(s). | ) | |

 DECISION BY COURT. This action having come before the Court and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Court's March 13, 2023 Order.

March 28, 2023

Frank G. Johns, Clerk
United States District Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:21-cv-174-KDB-DSC**

| | |
|---|---|
| AMY RHINEHARDT CRAVEN, as Administratrix of the Estate of CHRISTOPHER KIMMONS CRAVEN,<br><br>         Plaintiff,<br><br>   v.<br><br>CHRISTOPHER NOVELLI, individually and in his official capacity as Officer of the Mooresville Police Department, ALEXANDER ARNDT, individually and in his official capacity as Officer of the Mooresville Police Department, and the TOWN OF MOORESVILLE,<br><br>     Defendants. | **NOTICE OF APPEAL** |

Plaintiff Amy Rhinehardt Craven, as Administratrix of the Estate of Christopher Kimmons Craven, by and through her undersigned counsel, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the following rulings in this action:

(1)     The Order entered on March 13, 2023, [Doc. 34], granting summary judgment for Defendants on all of Plaintiff's claims; and

(2)     The Clerk's Judgment in Case entered on March 28, 2023, [Doc. 35], upon the Order, [Doc. 34], including all interlocutory rulings merged therein that are adverse to Plaintiff.

This the 11<sup>th</sup> day of April, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
      jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*

2

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **NOTICE OF APPEAL** was electronically filed with the Clerk of the Court using the CM/ECF system, constituting service thereof on all counsel, as follows:

Patrick H. Flanagan
Jake W. Stewart
Cranfill Sumner LLP
PO Box 30787
2907 Providence Road, Ste. 200
Charlotte, North Carolina 28211
Via e-mail: phf@cshlaw.com; jstewart@cshlaw.com

This the 11th day of April, 2023.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Alexander Heroy
J. Alexander Heroy, NC Bar # 39752
Jennifer M. Houti, NC Bar # 45442
525 North Tryon Street, Ste. 700
Charlotte, North Carolina 28202
Email: aheroy@jmdlaw.com
        jhouti@jmdlaw.com
Fax: 704-333-5508
*Attorneys for Plaintiff*