# NO. 23-1393

In The

# United States Court Of Appeals
## For The Fourth Circuit

**AMY RHINEHART CRAVEN, as Administratrix of the Estate of Christopher Kimmons Craven,**

*Plaintiff – Appellant,*

**v.**

**CHRISTOPHER NOVELLI, individually and official capacity as Officer of Mooresville Police Department; ALEXANDER ARNDT, individually and official capacity as Officer of Mooresville Police Department; TOWN OF MOORESVILLE,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT STATEVILLE**

————————

## BRIEF OF APPELLEES

————————

Steven A. Bader
CRANFILL SUMNER LLP
P. O. Box 27808
Raleigh, NC  27611
(919) 828-5100

Patrick H. Flanagan
Jake W. Stewart
CRANFILL SUMNER LLP
P. O. Box 30787
Charlotte, NC  28230
(704) 332-8300

*Counsel for Appellees*

*Counsel for Appellees*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1393          Caption: Amy Craven v. Christopher Novelli

Pursuant to FRAP 26.1 and Local Rule 26.1,

Defendant Christopher Novelli
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                      ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Bader                     Date:        4-26-23

Counsel for: Defendants

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1393__        Caption: __Amy Craven v. Christopher Novelli__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Defendant Alexander Arndt__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                         ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Bader          Date: 4-26-23

Counsel for: Defendants

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1393       Caption: Amy Craven v. Christopher Novelli

Pursuant to FRAP 26.1 and Local Rule 26.1,

Defendant Town of Mooresville
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                           ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?           ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Bader                          Date:        4-26-23

Counsel for: Defendants

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF THE CASE .................................................................. 1

    Parties and allegations ..................................................................... 1

    Craven assaulted Amy and threatened suicide ................................ 2

    The officers were told that Craven assaulted his wife, that he had a gun and that he threatened to kill himself ........................... 4

    Craven had a gun in his waistband and he reached for it after the officers order him to show his hands .................................. 5

ARGUMENT SUMMARY ....................................................................... 7

ARGUMENT ............................................................................................ 8

    I.    THE OFFICERS' LETHAL FORCE DID NOT VIOLATE THE FOURTH AMENDMENT ............................. 9

        A.    Corporal Arndt and Officer Novelli did not violate the Fourth Amendment under *Slattery* and *Anderson* .................................................................. 10

        B.    This case is different from precedent where this Court found a potential Fourth Amendment violation ............................................................. 13

            1.    *Cooper* and *Hensley*: A firearm alone is not an objective threat to an officer who does not announce his presence .............................. 13

            2.    *Knibbs*: Fatal force is not allowed when a suspect may not realize they are dealing with police and they make no movement with their gun ............................................................ 15

i

3. *Franklin*: Deadly force is unjustified when a suspect tries to comply with an order to disarm.................................................. 17

4. *Aleman*: Lethal force is excessive when the suspect has not threatened violence and they make no sudden movements ...................... 19

C. Craven's miscellaneous arguments for reversal do not reveal an issue for trial.......................................... 22

II. THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ..................................................................... 24

III. THE ESTATE CANNOT SUSTAIN ITS *MONELL* CLAIM AGAINST MOORESVILLE.................................... 26

A. A failure to train claim requires stringent proof........ 27

B. The Estate has not put forth evidence to submit its *Monell* claim to the jury.......................................... 28

IV. THE DISTRICT COURT WAS RIGHT TO DISMISS THE ESTATE'S STATE LAW CLAIMS AND TO DENY THE ESTATE'S MOTION TO STRIKE.................... 29

CONCLUSION ...................................................................... 31

CERTIFICATE OF COMPLIANCE....................................... 32

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Aleman v. City of Charlotte,*
    80 F.4th 264 (4th Cir. 2023).............................................. 13, 19, 20

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................ 8

*Anderson v. Russell,*
    247 F.3d 125 (4th Cir. 2001) ................................................ *passim*

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
    520 U.S. 397 (1997) ...................................................................... 26

*Carter v. Morris,*
    164 F.3d 215 (4th Cir. 1999) ........................................................ 26

*City of Canton v. Harris,*
    489 U.S. 378 (1989) ................................................................ 26, 27

*Cooper v. Sheehan,*
    735 F.3d 153 (4th Cir. 2013) ................................................ *passim*

*Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.,*
    597 F.3d 163 (4th Cir. 2010) ........................................................ 24

*Elliott v. Leavitt,*
    99 F.3d 640 (4th Cir. 1996) ...................................................... 9, 11

*Estate of Jones v. City of Martinsburg,*
    961 F.3d 661 (4th Cir. 2020) ........................................................ 27

*Est. of Chivrell v. City of Arcata,*
    623 F. Supp. 3d 1032 (N.D. Cal. 2022) ........................................ 29

iii

*Foster v. Time Warner Entertainment Co., L.P.*,
    250 F.3d 1189 (8th Cir. 2001) ....................................................... 31

*Franklin v. City of Charlotte*,
    64 F.4th 519 (4th Cir. 2023) ....................................... 13, 17, 18, 20

*Glenn-Robinson v. Acker*,
    140 N.C. App. 606 (2000) ............................................................. 29

*Graham v. Connor*,
    490 U.S. 386 (1989) ........................................................................ 9

*Hensley on behalf of North Carolina v. Price*,
    876 F.3d 573 (4th Cir. 2017) ................................................. *passim*

*Hinkle v. City of Clarksburg*,
    81 F.3d 416 (4th Cir. 1996) ......................................................... 27

*Knibbs v. Momphard*,
    30 F.4th 200 (4th Cir. 2022) .................................................. *passim*

*Lytle v. Doyle*,
    326 F.3d 463 (4th Cir. 2003) ....................................................... 26

*Malley v. Briggs*,
    475 U.S. 335 (1986) ...................................................................... 24

*McLenagan v. Karnes*,
    27 F.3d 1002 (4th Cir. 1994) .................................................. 12, 25

*Monell v. New York City Department of Social Services*,
    436 U.S. 658 (1978) ................................................. 26, 27, 28, 29

*Orpiano v. Johnson*,
    632 F.2d 1096 (4th Cir. 1980) ..................................................... 28

*Phillips v. Bowen*,
    278 F.3d 103 (2d Cir. 2002) ......................................................... 31

*Pueschel v. Peters*,
   577 F.3d 558 (4th Cir. 2009) ........................................................ 8

*Reichle v. Howards*,
   566 U.S. 658 (2012) ...................................................................... 24

*Rowland v. Perry*,
   41 F.3d 167 (4th Cir. 1994) .......................................................... 22

*Scott v. Harris*,
   550 U.S. 372 (2007) ...................................................................... 23

*Semple v. City of Moundsville*,
   195 F.2d 708 (4th Cir. 1999) ................................................... 27, 28

*Sigman v. Town of Chapel Hill*,
   161 F.3d 782 (1998) ........................................................ 12, 25, 29

*Slattery v. Rizzo*,
   939 F.2d 213 (4th Cir. 1991) ................................................ *passim*

*Spell v. McDaniel*,
   824 F.2d 1380 (4th Cir. 1987) ..................................................... 27

*Stanton v. Elliott*,
   25 F.4th 227 (4th Cir. 2022) .......................................................... 9

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ........................................................................... 9

*White v. Pauly*,
   580 U.S. 73 (2017) ........................................................................ 24

**Statutes:**

42 U.S.C. § 1983 ................................................................... *passim*

**Constitutional Provisions:**

U.S. Const. amend. IV ........................................................ *passim*

**Rules:**

Fed. R. Civ. P. 56(a) .......................................................... 8

## STATEMENT OF THE CASE

*Parties and allegations*

On August 2, 2020, Mooresville police officers Alexander Arndt and Christopher Novelli shot and killed Christopher Craven. (JA14-15) The officers were dispatched to Craven's home after he assaulted his wife and threatened to "blow his brains out" with his children present. (JA71-77) The officers met Craven outside his home. (*Id.*) Craven was shirtless and in shorts. (*Id.*) He had a black handgun in his right waistband. (*Id.*) Craven walked toward the officers and they shouted "Mooresville police department!" and told Craven to put his hands up. (*Id.*) Craven raised his arms for a split-second and then dropped them fast so that his right arm reached for his gun. (*Id.*) The officers shot Craven after he made a move toward his gun. (*Id.*) Both officers saw Craven pull his gun from his waistband. (*Id.*)

Craven's Estate, administered by his wife Amy Craven, sued the officers and Mooresville for 42 U.S.C. § 1983 violations and state law tort claims for negligence, assault and battery, wrongful death, and punitive damages. (JA12-20)

*Craven assaulted Amy and threatened suicide*

Craven and Amy lived with their two minor children and with Taylor Dunn, Amy's adult daughter from a prior relationship. (JA200-203) Craven transitioned to a work-from-home schedule when the COVID-19 pandemic hit. (JA198-199, JA204-205) Amy continued to work outside the home. (*Id.*) Craven took on more duties at home during this time, which Amy contends took a toll on Craven's stress and anxiety. (JA206-207, JA187)

On August 2, 2020, Amy returned from work and retreated to her bedroom with Craven. (JA208-209) Craven asked Amy if she would sleep with him and Amy responded that she was exhausted. (JA209). Craven "lost it." (*Id.*) In the moments that followed, Craven held a gun to his head and told Amy that she would watch him kill himself. (*Id.*)

Dunn heard the commotion from the living room and she called 911. (JA109, JA186-187, JA189) The first thing Dunn told the 911 operator was "[m]y stepdad hit my mom in front of me and my siblings and he is threatening to blow his brains out and he is screaming and getting in her face and he won't stop." (JA225, JA232) Dunn then reported that Craven locked Amy in the bedroom with him. (JA226) A few moments later,

2

Craven exited the bedroom and stated, "[Dunn] called 911 so I'm going out there to do it right now. Thank you." (JA226, JA232)

Amy fled the bedroom and went to her son's room with Dunn and the other two children. (JA212) Amy tried to calm the children and Dunn remained on the phone with 911. (*Id.*) Dunn told dispatchers that Craven had a gun and that he had threatened to "go[] outside right now to go blow his brains out" or to "shoot himself in the head." (JA226, JA232)

Dunn told dispatch that Craven left the house and went to a family camper parked outside. (JA227, JA232) Craven then walked back into the house and said "[h]ey that's the one thing I asked y'all not to do? When they knock on my door of that camper, I'm gone its y'alls fault, goodbye." (JA227, JA232) Craven then exited the home again, only to come back moments later and ask for his cell phone so that he could "tell mom goodbye." (JA229, JA232) Craven then said "[w]hen the police show up here thank [Dunn] because … [y]ou won't have a [expletive] daddy no more." (*Id.*) Craven's last comment is "[y]ou can ask your [expletive] sister about that, your piece of [expletive] sister." (*Id.*) Dunn told dispatch that she heard gunshots outside moments after Craven said this. (JA230, JA232)

3

The 911 call is scary. (JA232) Craven makes numerous violent threats. (JA225-232) In the background, Craven's minor children scream, cry, and beg him not to kill himself. (*Id.*)

*The officers were told that Craven assaulted his wife, that he had a gun and that he threatened to kill himself*

Officer Novelli was parked in his patrol car when Dunn called 911. (JA216-217) Dispatch reported that a female called for assistance because her father or step-father had assaulted her mother. (JA71) Dispatch also reported that the man's name was Craven and that he may have a gun. (*Id.*)

Corporal Arndt was at the Mooresville police station when he heard the call. (JA75) Corporal Arndt heard that a man assaulted his wife and threatened to "blow his brains out." (*Id.*)

Officer Novelli and corporal Arndt drove to Craven's house in their separate vehicles. (JA72, JA75-76) It took them a little more than three and a half minutes to arrive. (JA531) As they drove, dispatch reported "male subject outside near a trailer or shed," "units heading towards [Craven home], there hasn't been a shot discharged yet," "male subject is still outside at this time," and "mother and son both confirming that he does have a gun on him." (JA233 [1:00, 2:06, 2:11, 2:15, 2:34, 3:11], JA531)

4

The officers parked a few houses away and approached the Craven home on foot. (JA72, JA76) Upon arrival, dispatch reported that "subject is outside – he may or may not be in the out-building or trailer" and that the family did not "have eyes on him, but he is outside." (JA233 [3:38, 5:01], JA531) Dispatch then reported that the "caller says that he may be coming back into the house" followed by "he is back in the house. I can hear him yelling in the background." (JA233 [5:34], JA531)

*Craven had a gun in his waistband and he reached for it after the officers order him to show his hands*

The officers approached the Craven residence about one minute later. (JA233 [6:20-25], JA532) A trailer was parked in the driveway. (*Id.*) Corporal Arndt approached the residence and Officer Novelli followed behind him. (JA233 [6:26-27], JA532)

Corporal Arndt's body camera captured the encounter. (JA233) Craven was near the front porch as the officers arrived. (JA233 [6:26-27], JA532) Corporal Arndt heard Craven say something like "just shoot me" or "you are going to have to shoot me" or "[expletive] shoot me." (JA76). Officer Novelli heard Craven say something like "what are you going to do" or "you're going to have to [expletive] kill me." (JA72)

5

Craven stepped away from his front porch and walked toward the officers. (JA233 [6:28-30] Craven was shirtless and he had a black handgun in the right waistband of his shorts. (JA72, JA76, JA233 [6:30]) Corporal Arndt announced "Mooresville police department!" and twice told Craven to "let me see your hands." (JA73, JA76, JA233 [6:28-30]) Craven raised his hands for an instant, but then lowered them quick and continued to walk toward the officers. (JA233 [6:28-33], JA532) Craven lowered his right arm faster than his left arm. (*Id.*) Corporal Arndt told Craven to get on the ground, but by then, Craven had moved his hand to his waist. (JA233 [6:33-40]) At that point, the officers opened fire until Craven was on the ground and no longer a threat. (JA73, JA76, JA233 [6:33-40]) Both officers swore that Craven pulled the gun from his waistband with his right hand and then raised it to his torso. (JA73, JA76)

The officers then approached Craven. (JA73, JA77, JA233 [6:48-58]) Craven's black handgun landed to his right. (*Id.*) Craven had a gun holster on his right waistband. (*Id.*)

6

## ARGUMENT SUMMARY

The Estate portrays Craven as a man in crisis who presented no risk to anyone, other than perhaps himself. This narrative, however, glosses over the troubling facts that foretold this tragedy.

The officers were told that Craven had assaulted his wife and that he had a gun. They were told that Craven threatened to "blow his brains out" in front of his kids. And when the officers first saw Craven, he made a comment about "shooting" and he had a gun in his waistband.

Craven walked toward the officers with his gun in his waistband. The officers shouted "Police!" and told Craven to raise his arms. Craven complied for no more than a second, then dropped his hands quick and his right hand went straight for his waistband. These facts caused the officers to fear for their life and resort to deadly force.

In *Knibbs v. Momphard*, this Court squared its precedent to explain when an officer may use lethal force in scenarios where a gun-toting suspect does not comply with officer directives. 30 F.4th 200 (4th Cir. 2022). In such cases, deadly force is justified if the suspect "makes some sort of furtive or other threatening movement" which signals that they may use the weapon. *Id*. at 225. Craven's conduct checked all three boxes:

(1) he had a weapon; (2) he did not follow the command to raise his hands; and (3) he made a rapid movement toward his gun just as he lowered his hands, contrary to the officer's instructions. Plus, the reason dispatch sent the officers to Craven was because he assaulted his wife and threatened to kill himself. So the officers knew that Craven was violent and volatile before he defied their orders and made a move for his gun.

This case is tragic. The record evidence, however, does not give rise to a triable constitutional violation against the officers and Mooresville. Summary judgment should be affirmed.

## ARGUMENT

Summary judgment is reviewed *de novo. Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). By rule, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit. *Id.* To defeat summary judgment, the nonmoving party must present evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. This standard controls

excessive force claims against police officers. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022).

## I.     THE OFFICERS' LETHAL FORCE DID NOT VIOLATE THE FOURTH AMENDMENT

The first issue is whether the evidence would permit a jury to find a Fourth Amendment violation. Deadly force does not give rise to a triable 42 U.S.C. § 1983 claim if the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). This question is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The fact is, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. When these events unfold, police officers "are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citations omitted). And "[t]his Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001).

This Court's precedent shows that Corporal Arndt and Officer Novelli had probable cause to believe that Craven posed a deadly threat such that lethal force was justified.

A.    Corporal Arndt and Officer Novelli did not violate the Fourth Amendment under *Slattery* and *Anderson*

This case is a near match with *Anderson*, *supra* and *Slattery v. Rizzo*, 939 F.2d 213, 214 (4th Cir. 1991). If anything, Craven was a bigger threat than the suspects in those cases. Either way, *Anderson* and *Slattery* teach that fatal force does not violate the Fourth Amendment when an officer has reason to believe a suspect is armed, the suspect is ordered to raise their hands, and the suspect ignores the command and reaches for the suspected weapon instead.

\*\*\*

In *Anderson*, the officer developed the impression that the suspect had a concealed gun on his person as he walked around a mall. 247 F.3d at 127-28. The officer approached the suspect and ordered him to raise his hands and get on his knees. *Id*. The suspect started to raise his hands, but then lowered them and reached toward the bulge. *Id*. The officer shot the suspect who, it turned out, was unarmed. *Id*.

10

On these facts, this Court held that the officer did not violate the Fourth Amendment. *Anderson*, 247 F.3d at 131. The officer had reason to believe the plaintiff had a gun, plus the officer had reason to fear for his safety when the plaintiff reached for the suspected gun after the officer told him to raise his hands. *Id*. This Court declined to second-guess the situation. *Id*. Whether the officer could have done something different, it noted, "is exactly the type of judicial second look that the case law prohibits." *Id*. (*quoting Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir. 1996)).

***

In *Slattery*, an officer approached a parked vehicle during a drug bust. 939 F.2d at 214-15. The officer ordered the front seat passenger to raise his hands and the passenger turned away. *Id*. At that point, the officer saw an object in the passenger's left hand. *Id*. The passenger then turned back toward the officer and the officer could not see the passenger's left hand. *Id*. The officer thought the passenger was coming at him with a weapon, so he shot him in the face. *Id*. The object was a beer bottle. *Id*.

This Court directed summary judgment for the officer. 939 F.3d at 216-17. The analysis focused on the officer's belief that the suspect had a weapon, the suspect's refusal to raise his hands as commanded, and the suspect's movement toward the officer after he ignored the officer's commands. *Id*. This Court held that a reasonable officer in this situation would "have had probable cause to believe that the [plaintiff] posed a deadly threat and therefore would be authorized to use deadly force." *Id*. at 216–17.

***

*Anderson* and *Slattery* affirmed that an officer does not need to see a weapon in a suspect's hand before lethal force may be justified. Rather, deadly force may be warranted if an officer has reason to believe a suspect is armed, the suspect ignores commands, and the suspect makes a move toward the weapon or the officer. *See also McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (1998) ("[n]otwithstanding the possibility of a dispute about whether a knife was actually in [the plaintiff's] hand at the moment of

the shooting, [the officer], and the other officers present, acted on the perception that [the plaintiff] had a knife in his hand").

B.    This case is different from precedent where this Court found a potential Fourth Amendment violation

Craven likens his case to *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 578 (4th Cir. 2017), *Knibbs v. Momphard*, 30 F.4th 200 (4th Cir. 2022), *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023) and *Aleman v. City of Charlotte*, 80 F.4th 264 (4th Cir. 2023). Those cases turned on unique facts that are not present here.

1.    *Cooper* and *Hensley*: A firearm alone is not an objective threat to an officer who does not announce his presence

In *Cooper*, two officers responded to a complaint about men screaming at each in a trailer home. 735 F.3d at 155. One officer knocked on the trailer, but he did not identify himself. *Id*. The plaintiff called out who's there, but the officers did not respond. *Id*. The plaintiff then walked onto the porch with a shotgun aimed toward the ground. *Id*. The officers, without warning, drew their weapons and shot the plaintiff. *Id*.

These facts gave rise to a Fourth Amendment violation because "no reasonable officer could have believed that [the plaintiff] was aware that

13

two sheriff deputies were outside," and "[a]bsent a threatening act, like raising or firing the shotgun" the officers had no reason to shoot. *Cooper*, 735 F.3d. at 157.

*Hensley* is a lot like *Cooper*. In that case, two officers responded to a domestic call and parked their vehicles in the suspect's front yard. 876 F.3d at 577. They sat in their cars and watched the plaintiff struggle with his daughters on the front porch. *Id*. at 578. The struggle ended, and the plaintiff walked into the front yard with a handgun pointed at the ground. *Id*. At that moment, the officers exited their vehicles and shot the suspect without warning. *Id*. The officers never ordered the suspect to drop his weapon, never ordered him to raise his hands, and in fact, never even announced their presence. *Id*.

Like in *Cooper*, this Court found it debatable whether the officers' fatal force was justified. 876 F.3d at 582. The suspect did not raise the gun (or point it at anyone), and the deputies never identified themselves or told the suspect to drop his weapon before the officers shot and killed him. *Id*. For these reasons, this Court declined summary judgment because "[t]he lawful possession of a firearm by a suspect at his home, without more, is an insufficient reason to justify the use of deadly force." *Id*. at 583.

14

\*\*\*

*Cooper* and *Hensley* turned on three facts that are missing from this case:

| ***Cooper* and *Hensley*** | **Craven** |
|---|---|
| The officers did not announce their presence. | The officers yelled "Mooresville police department!" and Craven looked at them and walked toward them. (JA71-76, JA233 [6:26-33]) Craven knew the officers were on the way because he knew Dunn called 911. (JA225-232) |
| The officers did not direct the plaintiffs to raise their hands or drop their guns. | The officers directed Craven to raise his hands. (JA71-76, JA233 [6:26-33]) |
| The plaintiffs took no threatening action toward the officers because they didn't even know the officers were present. | Craven raised his hands for an instant, but then reached quick toward his gun. (*Id.)* |

2. <u>*Knibbs*: Fatal force is not allowed when a suspect may not realize they are dealing with police and they make no movement with their gun</u>

The officer in *Knibbs* knocked on the suspect's door to ask about a dispute with his neighbors. 30 F.4th at 208. It was dark outside and the officer did not activate the blue lights on his parked squad car. *Id*. The plaintiff came to the door and racked his shotgun. *Id*. The officer shouted drop your weapon, but the plaintiff did not respond and the officer could

15

not see the plaintiff behind the door. *Id*. The officer moved across a window and saw the plaintiff standing motionless with his shotgun. *Id*. The officer shot and killed the suspect. *Id*. The parties disputed whether the suspect aimed his shotgun at the officer. *Id*. Both sides agreed, nonetheless, that the suspect did not move before the officer shot him. *Id*.

This Court held that two disputed facts created a potential Fourth Amendment violation. 30 F.4th at 214-17. First, this Court questioned whether the officer should have done more to identify himself given that it was late at night and the officer had not turned on his blue lights. *Id*. Second, the parties' disputed where the suspect pointed his shotgun. *Id*. A jury could hear this evidence and decide that the suspect brought his shotgun with him for protection as he looked to see who knocked on his door late at night. *Id*. A reasonable officer, under these circumstances, would not fear for his safety. *Id*. at 220.

\*\*\*

*Knibbs*, like *Cooper* and *Hensley*, turned on facts that are not present here:

| *Knibbs* | Craven |
|---|---|
| The suspect may not have known the officer was, in fact, law | Craven knew his family had called 911 due to his violent outburst; he |

| | |
|---|---|
| enforcement, which explained why he brought his gun to the door. | heard the officers yell "Mooresville police department!"; and he followed the officers' commands, at first. (JA71-76, JA233 [6:26-33]) |
| The suspect did not move after the office saw him standing in his home with his shotgun. | Craven raised his hands for an instant, then lowered them fast and toward the gun in his waistband. (*Id*) |

3.  *Franklin*: Deadly force is unjustified when a suspect tries to comply with an order to disarm

In *Franklin*, police were dispatched to a Burger King because a customer had a gun. 64 F.4th at 525. The officers arrived on scene and found the suspect crouched next to a parked car. *Id*. They yelled "[l]et me see your hands," and the man remained crouched down. *Id*. at 526. Then the officers yelled "[d]rop the gun" and "put it on the ground." *Id*. At that point the man reached into his jacket and retrieved a handgun. *Id*. The man moved slow and pointed the muzzle away from the officers. *Id*. The man appeared passive and his body stayed still throughout the encounter. *Id*. The officers, nonetheless, shot him as he held his gun. *Id*.

This Court found that a jury could decide the officer shot the suspect because he had a gun, just like in *Cooper* and its progeny. *Franklin*, 64 F.4th at 531-32. The suspect did not threaten the officers,

he made no sudden movements, and he tried to follow the officer's command to drop his weapon. *Id.* at 532-34. In particular, this Court reasoned that "there was nothing furtive or menacing about [the suspect's] response to the officers' commands." *Id.* at 532. More than that, the officers told the suspect to raise his hands and then to drop his weapon and these commands "were too ambiguous to transform [the suspect's] hesitation into recalcitrance." *Id.* at 532-33.

***

This case is not *Franklin* either:

| **Franklin** | **Craven** |
|---|---|
| The officers gave inconsistent commands: they told the suspect to raise his hands, then told him to drop his gun, which required him to reach inside his jacket. | The officers told Craven to raise his hands. He did, at first, then dropped his arms fast. (JA71-76, 233 [6:26-33]). The officers did not tell Craven to get on the ground until *after* he had dropped his hands toward his gun. |
| The suspect made no sudden movements. | Craven raised his hands quick, but then reached for the gun in his waistband. (JA71-76, JA233 [6:26-33]) |

4. <u>*Aleman*: Lethal force is excessive when the suspect has not threatened violence and they make no sudden movements</u>

In *Aleman,* the Spanish-speaking suspect called 911 and asked police to pick him up for pending misdemeanor charges. 80 F.4th at 270. He called himself "the Star God" and said that people were "following" him and that he couldn't "take it any longer." *Id*. at 271. The suspect reported that he had a gun, but he told dispatch that he would not hurt himself or anyone else. *Id*. Given this report, dispatch told officers to view the situation as "crisis intervention." *Id*. at 290, 292.

At the scene, one officer told the suspect "hands" in Spanish and gestured for the suspect to raise his hands. *Aleman*, 80 F.4th at 290. The suspect raised his arms 45 degrees and he had a gun in his left hand, which he held upside down. *Id*. The officers told the suspect to drop the gun in English, but they did not give a gesture to help the suspect understand the command. *Id*. The suspect appeared confused. *Id*. He froze with his left arm pointed away from the officers. *Id*. The suspect held this position until police shot him. *Id*.

This Court found a triable Fourth Amendment violation because the suspect wanted to follow commands, but he was confused due to a

19

language barrier. 80 F.4th at 292. In addition, the officers knew the suspect called to get help for himself and the suspect never made any movement to suggest he posed a threat to the officers. *Id*.

***

*Aleman* bears no similarities to this case:

| *Aleman* | Craven |
|---|---|
| The officers responded to a "crisis intervention" call. The suspect had made no threats against himself or others prior to the call. | The officers were told that Craven assaulted his wife and had threatened to "blow his brains out" with his kids nearby. (JA71-76) |
| The suspect complied with the officer's "hands" command. | Craven raised his hands for a moment, and then lowered them. (JA71-76, JA233 [6:26-33]) |
| The suspect stood still with the gun pointed away from police. | Craven walked toward police and lowered his hands toward the gun in his waistband. (*Id.*) |

***

Try as it might, the Estate cannot compare this case to *Cooper*, *Hensley*, *Knibbs*, *Franklin*, or *Aleman*. Those cases were decided on unique facts that called into doubt whether a reasonable officer, in the same place, would fear for their life. The situation before Corporal Arndt and Officer Novelli shared no similarities with these cases. Not one.

To the contrary, this case is a near dead-ringer for *Anderson* and *Slattery*. Craven had a weapon, the officers told him to drop it, and he disregarded the command and reached for his gun. If anything, the facts here present stronger grounds for lethal force than in *Anderson* and *Slattery*. Craven had a gun (the suspects in *Anderson* and *Slattery* did not); Craven had just assaulted his wife and threatened to "blow his brains out" with his kids at home (the suspects in *Anderson* and *Slattery* had not made violent threats); and Craven walked toward police with a black handgun in his right waistband (the suspects in *Anderson* and *Slattery* did not walk toward the officers and they did not display a gun). (JA71-76). Most important, just like in *Anderson* and *Slattery*, the officers told Craven to put his hands in the air and away from his gun. JA71-76, JA233 [6:26-33]) And just like in *Anderson* and *Slattery*, Craven shrugged-off the command and reached for his gun.

*Hensley* puts a finer point on *Anderson* and *Slattery*. "In both cases," this Court wrote, "once the officer issued a verbal command, the character of the situation transformed." 876 F.3d at 585. And in that transformed situation, "[i]f an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise

in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Id*. Under *Anderson* and *Slattery*, the officers' lethal force was justified.

C.    Craven's miscellaneous arguments for reversal do not reveal an issue for trial

Craven makes several other misplaced and disorganized arguments against summary judgment. None reveal a fact question for trial.

First, Craven contends that Corporal Arndt and Officer Novelli "escalated" the situation, just like in *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994). In *Rowland*, the officer wrangled a disabled man who picked up a five-dollar bill. *Id*. at 171. The man, on instinct, tried to free himself. *Id*. In response, the officer beat him up. *Id*. This Court had no time for the officer's justification given that he started the fight. *Id*.

That is not what happened here. Craven had a gun. He assaulted his wife. Then he threatened to kill himself. When the officers approached him, they were told that the situation was ongoing and that Craven's family was sheltered in the home. The officers did not escalate anything when they yelled "Police!" and told Craven to show his hands.

Craven downplays this reality and claims the "situation at the home had calmed to the point where Craven was sitting on his front steps

smoking a cigarette." (Opening Brief p. 13) That is a generous characterization given what is shown on Corporal Arndt's body camera footage and what is heard in the 911 audio.

On that note, the Estate disputes whether Craven even reached for his waistband. The body camera proves that he did though. (JA233 [6:26-33]). As the district court pointed out, the Estate is free to argue its case, but it must argue that case "from actual facts, not speculation, assertions or inferences at odds with undisputed video or physical evidence." (JA541) Indeed, when video footage "quite clearly contradicts the version of the story told by [the plaintiff] … so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007).

Last, the Estate argues that the situation with Craven was a mental health crisis and nothing more. That is not what the officers were told. To the contrary, the officers were called to a domestic assault where an armed man had threatened to kill himself with his children present. (JA71-76, JA225-232) It is misleading for the Estate to argue that the officers were dispatched for crisis intervention or suicide prevention.

23

They were sent into a dangerous and unpredictable situation with an armed man who had assaulted his wife and threatened suicide.

## II.  THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

A law enforcement officer sued for a Fourth Amendment violation is entitled to qualified immunity unless (1) the evidence reveals a possible constitutional violation, and (2) the right at issue was "clearly established" when the misconduct occurred. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010). A right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). The objective of qualified immunity is to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

For a Fourth Amendment right to be clearly established, a plaintiff must "identify a case where an officer acting under similar circumstances as [a defendant] was held to have violated the Fourth amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam).

As briefed *supra* I., the officers did not violate Craven's Fourth Amendment rights and summary judgment should be affirmed for this

reason alone. Still, if this Court gets to the qualified immunity question, summary judgment should still be upheld because Craven had no "clearly established" right to reach for a gun in his waistband after police told him to raise his hands.

The Estate argues that Craven's "clearly established" right emerges when *Cooper* and *Hensley* are reconciled with *Anderson*, *Slattery*, *Sigman*, and *McLenagan*. This Court did that accounting in *Knibbs* and discerned that

> the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*Knibbs*, 30 F.4th at 225.

As put forth in *Knibbs*, Craven: (1) was in possession of a weapon; (2) failed to obey a command to raise his hands; and (3) made a furtive or threatening movement to grab the gun after he was told to raise his hands. Under this framework, Craven had no "clearly established" right to avoid lethal force when Craven heard the officers' command to show his hands and he reached for his gun instead.

25

III.   THE ESTATE CANNOT SUSTAIN ITS *MONELL* CLAIM AGAINST MOORESVILLE

Under *Monell v. New York City Department of Social Services*, a local government can be liable for its unconstitutional policies under 42 U.S.C. § 1983. 436 U.S. 658, 690-94 (1978). This liability can only attach "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

The Estate contends that Mooresville failed to train its officers to handle persons in mental crisis such that its omission "manifest[s] deliberate indifference to the rights of citizens." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). This is a high standard. Indeed, the Supreme Court has held that *Monell* claims are subject to "rigorous standards of culpability and causation." *Bd. of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997) (citation omitted). The Estate must show that Mooresville's omission was the "moving force" behind this event such that there is a "direct causal link" between Mooresville's policy or custom and the alleged constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

26

As a threshold point, this Court should affirm summary judgment on the Estate's *Monell* claim because Corporal Arndt and Officer Novelli are not liable under 42 U.S.C. § 1983. *See e.g., Hinkle v. City of Clarksburg,* 81 F.3d 416, 420 (4th Cir. 1996). Apart from that, the Estate has not met its burden to show that Mooresville failed to train its officers.

A.    A failure to train claim requires stringent proof

A *Monell* violation may occur when a department makes a purposeful choice *not* to train officers on how to handle recurrent situations where constitutional rights are at stake. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). It is not enough to prove that an injury could have been avoided if the officers had received different training. *Id*. at 390-91.

A plaintiff must show that the department's choice not to train made the alleged constitutional violation a "reasonable probability rather than a mere possibility." *See Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987); *Semple v. City of Moundsville*, 195 F.2d 708, 713 (4th Cir. 1999). In practice, the municipality must have notice that its policy or custom, if left alone, will result in a constitutional harm. *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020). In application,

27

a single incident is almost never enough to prove such notice. *Semple v. City of Moundsville*, 195 F.3d 708, 713-14 (4th Cir. 1999); *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980).

B.    The Estate has not put forth evidence to submit its *Monell* claim to the jury

The Estate contends that Mooresville did not give its officers adequate training to deal with persons in mental crisis. Corporal Arndt and Officer Novelli, however, were not dispatched to a person in mental crisis. They were dispatched to an armed man who assaulted his wife and threatened to "blow his brains out" with his children present.

Nobody in the 911 call refers to Craven as a person in "mental crisis" or anything to that effect. By extension, dispatch never told the officers that Craven was in "mental crisis" or that he just needed help. Because the officers were not dispatched to deal with a mental crisis, Mooresville should not be liable under a failure to train theory.

In truth, Corporal Arndt and Officer Novelli were sent to an active situation where a man with a gun had made chilling threats to his family. Mooresville trained its officers on how to handle situations with violent and armed individuals. Craven does not argue otherwise.

Three final points bear mention on the *Monell* claim. First, the Estate presented no evidence that Mooresville had notice that its officers lacked training to handle citizens with mental health issue. Second, the Estate presented no particular evidence for how Mooresville should have trained its officers and how this training would have prevented this incident. Last, the one case cited by the Estate, *Est. of Chivrell v. City of Arcata*, is both non-precedential and distinct from a procedural standpoint because the case was decided at the motion to dismiss stage and not on summary judgment. 623 F. Supp. 3d 1032, 1041 (N.D. Cal. 2022).

IV.  <u>THE DISTRICT COURT WAS RIGHT TO DISMISS THE ESTATE'S STATE LAW CLAIMS AND TO DENY THE ESTATE'S MOTION TO STRIKE</u>

The Estate argues that its state law tort claims should have survived summary judgment. When a plaintiff's § 1983 claim fails because the officer's force was justified, any state law claims that stem from that same force should be dismissed as well. *See e.g. Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998). For brevity, Corporal Arndt and Officer Novelli incorporate their arguments in *supra*. I and II. on this point. For

this reason alone, this Court should affirm summary judgment on the state law tort claims.[1]

The Estate's last argument is that the district court abused its discretion when it considered the 911 call in ruling on the motion for summary judgment. The Estate claims that the call was irrelevant because the officers did not hear it before they were dispatched to Craven's home. The district court recognized this though. (JA558) Still, it found the call relevant because it showed that Craven was unstable, that he had a gun, that he knew police were on the way, and that dispatch viewed this as a domestic situation and not a mental health crisis. (*Id.*) Dispatch conveyed this information to the officers, which is what they knew when the approached Craven's home. (*Id.*) Plus, the 911 call confirmed the officer's testimony that Craven intended to confront them. (*Id.*)

Given these determinations, the Estate has not shown that the district court abused its discretion when it considered the 911 call in its

---

[1] In addition, the officers and Mooresville incorporate by reference their arguments for public official immunity and governmental immunity as briefed in support of their motion for summary judgment. (JA63-66) The officers and Mooresville will not rehash those arguments in this brief given that these claims cannot survive if this Court affirms summary judgment on the 42 U.S.C. § 1983 claims.

ruling. Further, to prove reversal on this point, the Estate would need to show that the district court would have ruled otherwise had the 911 call been excluded. *See e.g. Phillips v. Bowen*, 278 F.3d 103, 110 (2d Cir. 2002); *Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1197 (8th Cir. 2001). The Estate makes no argument to this effect.

## CONCLUSION

The constitution does not demand perfect outcomes and it does not dictate best practices. To keep these promises, courts are cautioned not to second-guess officers in the field. This is a tragic case, no doubt. But Corporal Arndt and Officer Novelli reacted to Craven's threat as the Fourth Amendment allows. Summary judgment, therefore, should be affirmed.

This the 19th day of October 2023.

CRANFILL SUMNER LLP

/s/ Steven A. Bader
STEVEN A. BADER
PATRICK H. FLANAGAN
JAKE STEWART

*Counsel for Appellees*

31

## CERTIFICATE OF COMPLIANCE

1. This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   this document contains 6,484 words.

2. This document complies with the typeface requirements because: This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook.

This the 19th day of October, 2023.

CRANFILL SUMNER LLP

/s/ Steven A. Bader
STEVEN A. BADER
E-mail:  sbader@cshlaw.com
P.O. Box 27808
Raleigh, North Carolina 27611-7808
Telephone: (919) 828-5100

PATRICK H. FLANAGAN
E-mail: phf@cshlaw.com

JAKE STEWART
E-mail:  jstewart@cshlaw.com
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300

*Counsel for Appellees*
