No. 23-01393

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

AMY RHINEHARDT CRAVEN,
AS ADMINISTRATRIX OF THE PLAINTIFF OF CHRISTOPHER KIMMONS CRAVEN,

*Plaintiff-Appellant,*

v.

CHRISTOPHER OFFICER NOVELLI, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS OFFICER OF THE MOORESVILLE POLICE DEPARTMENT,
ALEXANDER CORPORAL ARNDT, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS OFFICER OF THE MOORESVILLE POLICE DEPARTMENT, AND THE
TOWN OF MOORESVILLE,

*Defendants-Appellees.*

---

**REPLY BRIEF OF PLAINTIFF-APPELLANT**

---

Preston O. Odom, III
J. Alexander Heroy
Jennifer M. Houti
JAMES, MCELROY & DIEHL P.A.
525 North Tryon Street, Suite 700
Charlotte, North Carolina 28202
(704) 372-9870 (telephone)
(704) 333-5508 (facsimile)
podom@jmdlaw.com
aheroy@jmdlaw.com
jhouti@jmdlaw.com

# TABLE OF CONTENTS

**Table of Contents** ...................................................................... i

**Table of Authorities** ................................................................ iii

**Introduction** ............................................................................ 1

**Argument** ................................................................................ 2

I.  Defendants Improperly Eschew the Governing Standard of
    Review to Resolve Material Factual Disputes in the Light
    Most Favorable to Themselves .................................................. 2

    A.  The Only Evidence Supporting Defendants'
        Arguments is Unreliable Or Non-Existent ........................ 3

    B.  Defendants Misapply Precedent to the Evidentiary
        Forecast Here ................................................................. 10

II. The Officers Are Not Entitled to Qualified Immunity ............. 14

III. Defendants Wrongly Minimize the Officers' Escalation of
    Events ................................................................................... 16

    A.  Defendants Overlook that a Domestic Dispute Can
        Stabilize Before Police Arrive ........................................ 17

    B.  Defendants Ignore That a Domestic Dispute Call Can
        Also Be a Suicide Prevention Call .................................. 18

IV. The Town is Subject to Liability for Failing to Properly
    Train Its Officers on How to Interact with Persons
    Experiencing a Mental Health Crisis Because It Had
    Constructive Notice That  Such a Failure Would
    Precipitate Constitutional Violations ...................................... 20

    A.  The Town Had Constructive Notice of an Unlawful
        Outcome ......................................................................... 21

B.    The Town Insufficiently Implemented its Policy on Dealing with Persons Experiencing a Mental Health Crisis ..................................................................... 22

C.    Plaintiff Was Not Required to Offer Evidence on How the Town Should Have Trained Its Officers .................... 23

**Conclusion** ........................................................................ 24

**Certificate of Compliance** ............................................... 26

**Certificate of Service** ...................................................... 27

ii

# TABLE OF AUTHORITIES

Aleman v. City of Charlotte,
   80 F.4th 264 (4th Cir. 2023)............................................................ *passim*

City of Canton v. Harris,
   489 U.S. 378 (1989) ........................................................................23-24

Cooper v. Sheehan,
   735 F.3d 153 (4th Cir. 2013)......................................................10, 11-13

Franklin v. City of Charlotte,
   64 F.4th 519 (4th Cir. 2023) .......................................................... *passim*

Graham v. Connor,
   490 U.S. 386 (1986) .........................................................................18-19

Hensley v. Price,
   876 F.3d 573 (4th Cir. 2017)......................................................10, 11-13

Hill v. McIntyre,
   884 F.2d. 271 (6th Cir. 1989).........................................................23-24

Knibbs v. Momphard,
   30 F.4th 200 (4th Cir. 2022)........................................................... *passim*

Rowland v. Perry,
   41 F.3d 167 (4th Cir. 1994)............................................................... 16

Scott v. Harris,
   550 U.S. 372 (2007) ............................................................................ 6

## INTRODUCTION[1]

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ ███ ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

But that is where the universe of undisputed facts effectively ends in this case. Specifically, a review of the Order, JA526-64, the Opening Brief, the Brief of Appellees ("Appellees' Brief"), and the discussion herein reveals that material disagreements exist over the parties'

---

[1] Unless stated otherwise herein, all capitalized terms mean what the Opening Brief of Plaintiff-Appellant ("Opening Brief") says they mean.

1

competing forecasts of evidence about what happened—or didn't happen—in the chaotic moments immediately before the Officers killed Craven. As such, this Court should reverse the Order in all respects and remand for Plaintiff to present her various claims against Defendants to a jury to resolve.

## I.    Defendants Improperly Eschew the Governing Standard of Review to Resolve Material Factual Disputes in the Light Most Favorable to Themselves.

Defendants fail to honor the governing standard of review at the summary judgment stage in assessing the totality of the circumstances at the time the Officers shot Craven. They repeatedly rely on a version of facts favoring their own case despite conflicting evidence more favorable to Plaintiff, which contravenes well-settled law. See, e.g., Aleman v. City of Charlotte, 80 F.4th 264, 284 (4th Cir. 2023) (noting that a court considering a motion for summary judgment "may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant") (alterations, quotation marks, and citation omitted). Specifically, on a motion for summary judgment in an excessive force case, the officer's account "cannot be credited, nor can

2

inaccuracies in his account be excused as innocent misperceptions." Id. at 293 (quoting Franklin v. City of Charlotte, 64 F.4th 519, 529-30 (4th Cir. 2023)); accord Franklin, 64 F.4th at 530 ("[W]e may not take as true the officers' assertions that Franklin pointed his gun at them.") (alteration added). Yet Defendants attempt to do precisely that – credit their position despite contrary evidence and permissible inferences arising therefrom. This Court should reject their wayward attempt.

A.  <u>The Only Evidence Supporting Defendants' Argument is Either Unreliable or Non-Existent</u>.

Defendants rely exclusively on the Officers' affidavits to support the assertion that Craven reached into his waistband and withdrew a firearm. See Appellees' Brief, p. 1 (citing JA71-77 to state, *inter alia*: "Both officers saw Craven pull his gun from his waistband."); id., p. 6 ("Both officers swore that Craven pulled the gun from his waistband with his right hand and then raised it to his torso.").[2] Nothing else supports that claim – particularly Corporal Arndt's body worn camera ("BWC")

---

[2] In fact, only Officer Novelli made that assertion about Craven purportedly raising a gun to his torso. JA73 (¶12). Corporal Arndt, conversely, testified at his deposition that he did not recall whether Craven raised the gun. JA390.

footage. JA233 (at 6:31-6:32). And the Officers' varying accounts of what happened shows their testimony cannot be credited, *to wit*:

| Factual Issue | Arndt Evidence | Novelli Evidence |
|---|---|---|
| Craven's immediate response to Arndt's initial order: "Let me see your fucking hands!" | <u>Video</u><br><br>Craven showed his hands directly after Arndt's order. JA233 (at 6:30 – 6:31).<br><br><u>NCSBI Statements</u><br><br>Craven already had something in his hands. Upon the command, he reached toward his waistband, *then* raised his arms back up from his waistline. JA284.<br><br><u>Affidavit</u><br><br>Does not recall if Craven raised his hands. JA76 (¶ 9). | <u>Video</u><br><br>██████████████<br><br><u>Deposition</u><br><br>He did not see Craven's hands up. JA406.<br><br><u>Affidavit</u><br><br>Craven initially complied with the order. JA73 (¶ 12). |
| Whether Craven actually pulled a gun, either before or after ordered to "get on the fucking ground." | <u>Video</u><br><br>Not visible. JA233 (at 6:31 – 6:32).<br><br><u>Affidavit</u><br><br>Craven "reached into his waistband and pulled out a black handgun with his right hand." JA76 (¶ 10). | <u>Video</u><br><br>██████████████<br><br><u>Deposition</u><br><br>Arndt told Craven to show his hands. Craven said something back to Arndt. Then Arndt said get on the ground, *that's when Craven pulled the handgun out.* JA406-07. |

| Factual Issue | Arndt Evidence | Novelli Evidence |
|---|---|---|
| Whether Craven actually pulled a gun, either before or after ordered to "get on the fucking ground." (continued) | | <u>Affidavit</u><br><br>Craven reached for his handgun before Arndt issued the command to get on the ground. JA73 (¶ 13). |
| What Craven said when the police arrived. | <u>Video</u><br><br>States he doesn't remember what Craven said. JA233 (at 8:15 – 8:17).<br><br><u>Deposition</u><br><br>Before seeing Craven, he heard Craven say something that made him think "something is going to happen." JA379.<br><br><u>Affidavit</u><br><br>Craven said something like "Just shoot me" or "You're going to have to shoot me" or "Fucking shoot me." JA76 (¶ 8). | <u>Video</u><br><br>States he doesn't remember what Craven said. JA233 (at 8:02 – 8:05).<br><br><u>Video</u><br><br>██████████████████<br><br><u>Affidavit</u><br><br>Craven said something like "What are you going to do?" or "You're going to have to fucking kill me." JA72 (¶ 9). |

In an attempt to sidestep these credibility issues, Defendants claim

that Arndt's BWC footage clearly displays that 1) Craven reached toward

his waistband; 2) after having raised his hands,[3] he lowered them "quick" [*sic*]; and 3) he lowered his right arm faster than his left.  Appellees' Brief, p. 6.  Defendants also allege that such BWC footage shows that Craven walked towards the Officers, presumably implying this was further indication he posed a threat.  Id.  They invoke Scott v. Harris, 550 U.S. 372, 378, 380 (2007), with flagrant disregard for its inapplicability, stating, "[W]hen video footage 'quite clearly contradicts the version of the story told by [the plaintiff] … so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Appellees' Brief, p. 23.  On the contrary, not one of Defendants' "facts" appears on Arndt's BWC footage, and to further suggest that they are "clear" is befuddling.  Rather, Arndt's (and Novelli's) BWC footage is much more akin to that in Aleman, in which this Court stated:

> Because one of the few important things that is undisputed about the video footage is that it is not clear in all details and did not capture everything that occurred at the shooting scene … neither the district court nor this Court is permitted to decide at the

---

[3] All references to Craven "raising" his hands or his arms constitute citations to the Appellees' Brief or evidence they presented.  In fact, Corporal Arndt instructed that Craven "Let me see your fucking hands! Let me see your hands!"  JA233 (at 6:30 – 6:31).

summary judgment stage of these proceedings what the video footage shows or what it did not capture. Like ours, the role of the district court is limited to viewing the facts in the light most favorable to the plaintiff and leaving material factual disputes to be resolved by a jury.

80 F.4th at 293.

To be clear, Arndt's BWC footage shows that the moment Craven began to lower his arms, his right arm was no longer visible on the video. JA233 (at 6:32). It therefore is impossible to discern that Craven reached for his waistband with his right hand or that he lowered his right arm more quickly than his left. JA 233 (at 6:32 – 6:33). Such footage also shows Craven walking down the path towards his camper; that is, his direction of travel did not change upon the officers' arrival. JA233 (at 6:29 – 6:34). As Corporal Arndt testified, "[H]e was walking down the sidewalk towards the driveway… you know, you think of a triangle. He wasn't walking … directly towards me." JA380 (ellipses added). Therefore, at this stage of the proceedings, the BWC footage can only be said to show that, after Corporal Arndt shouted at Craven, "Let me see your fucking hands!" Craven did so, but then dropped them – his left at average speed, and his right at unknown speed. JA233 (at 6:29 – 6:33).

That is, when viewed in the light most favorable to Plaintiff, no evidence shows that Craven reached toward his waistband to retrieve a gun.

The remaining evidence – again, viewed in the light most favorable to Plaintiff – reveals only that Craven had earlier assaulted his wife; he probably possessed a legal firearm; and he lowered his arms while Arndt gave his second order, "Let me see your hands!"  JA233 (6:30 – 6:32).  As the following chart highlights, the facts here do not support the Order granting summary judgment for Defendants:

| Issue of Material Fact | Defendants' Purported Evidence | Problems with Defendants' Purported Evidence | Evidence Viewed in Light Most Favorable to Plaintiff |
|---|---|---|---|
| Whether Craven retrieved a handgun from his waistband | Novelli and Arndt testimony | Officers' credibility problems | Craven did not retrieve handgun from waistband |
| Whether Craven reached toward his waistband | Arndt BWC footage; Novelli and Arndt testimony | Not actually shown on BWC footage; Officers' credibility problems | Craven did not reach toward his waistband |

| Issue of Material Fact | Defendants' Purported Evidence | Problems with Defendants' Purported Evidence | Evidence Viewed in Light Most Favorable to Plaintiff |
|---|---|---|---|
| Whether Craven lowered his right arm faster than his left arm | Arndt BWC footage; Novelli and Arndt testimony | Not actually shown on BWC footage; Officers' credibility problems | Craven did not lower his right arm faster than his left |
| Whether Craven possessed a firearm | 911 call; Holster visible on BWC footage | Craven had a concealed carry permit | Craven probably had a legal firearm on his person at some point immediately before or during the encounter |
| Whether Craven dropped his arms after being instructed to show his hands | Novelli and Arndt testimony; BWC footage | BWC footage – Craven showed his hands, even when he lowered his arms | Craven obeyed police instructions |
| Whether Craven walked toward the Officers | BWC footage | Not actually shown on BWC footage; Arndt testimony | Craven did not walk toward the Officers |

9

B.   <u>Defendants Misapply Precedent to the Evidentiary Forecast Here</u>.

Defendants utilize inconsistent standards to make factual comparisons between the case law and the present case, which elicits the wrong conclusion.  , they attempt to distinguish <u>Knibbs v. Momphard</u>, 30 F.4th 200 (4th Cir. 2022), <u>Cooper v. Sheehan</u>, 735 F.3d 153 (2013), <u>Hensley v. Price</u>, 876 F.3d 573 (2017), <u>Franklin</u>, <u>supra</u>, and <u>Aleman</u>, <u>supra</u>, asserting that they turned on facts not present here . <u>Appellees' Brief</u>, p. 13.  In discussing those cases, Defendants properly recount the evidence at issue there in the light most favorable to the non-moving party; yet here, as previously stated, Defendants rely on the evidence most favorable to themselves.  Applying the correct, consistent standard, however, reveals that those cases are quite relevant.

For example, Defendants attempt to distinguish <u>Knibbs</u> because the suspect there, "did not move after the office [*sic*] saw him standing in his home with a shotgun," whereas, here, Craven allegedly reached toward a gun.  <u>Appellees' Brief</u>, pp. 16-17.  That argument perfectly highlights the infirmity of Defendants' overall argument.  That is, Defendants accurately recite the facts at issue in <u>Knibbs</u> in the light most favorable to the nonmovant there, <u>see</u> 30 F.4th at 213, but then compares

10

such properly viewed facts to facts at issue here construed in the light most favorable to themselves.  Indeed, Defendants omit from their argument that the officer in <u>Knibbs</u> stated the suspect had aimed his shotgun at him.  <u>Id.</u> at 215.  This Court, however, ruled that *for the purposes of the summary judgment motion*, the suspect had not aimed his gun at the officer.  <u>Id.</u> at 217.  This Court further elaborated on the summary judgment standard:

> Our application of these basic summary judgment standards lays the groundwork for our disagreement with our dissenting colleague.  Without citation to Rule 56 or the record, the dissent accepts essentially all of [the officer's] self-serving assertions and reads the record in the light most favorable to him, the party *moving* for summary judgment…. We routinely reverse district courts that have granted summary judgment based on this misapplication of the summary judgment standards.  With respect to our dissenting colleague, we once again decline to endorse the district court's misapplication of those standards in this case.

<u>Id</u>. (emphasis in original, ellipsis added, and cleaned up otherwise).

The same flaw applies to the Defendants' arguments regarding <u>Cooper</u> and <u>Hensley</u>.  Defendants attempt to distinguish both from the present case because, there, 1) the officers did not announce their presence, 2) the officers did not direct the plaintiffs to raise their hands or drop their guns, and 3) the plaintiffs took no threatening action

because they didn't know the officers were present.  Appellees' Brief, p.

15.  While Cooper and Hensley indeed differ from this case as to the first

two points,[4] neither decision can be assessed without the third factor: the

suspect made no threatening action toward the officers.  See Cooper, 735

F.3d at 159 ("When the Officers fired on Cooper, he stood at the threshold

of his home, holding the shotgun in one hand, with its muzzle pointed at

the ground.  He made no sudden moves.  He made no threats."); Hensley,

876 F.3d at 582 ("If a jury credited the plaintiffs' evidence, it could

conclude that the Deputies shot Hensley only because he was holding a

gun, although he never raised the gun to threaten the Deputies.").

    In discussing Cooper and Hensley, Defendants correctly recite the

evidence at issue there in the light most favorable to the respective

plaintiffs and disregard the contrary evidence – but tellingly do so

without noting the nature of the evidence disregarded.  For example, in

Cooper, the defendant claimed that the plaintiff had "raised his shotgun

---

[4] Regarding the second point, the officers in Hensley gave no commands,
see 876 F.3d at 585, while Corporal Arndt (and perhaps some other officer
located in a different location) issued some commands.  JA233 (at 6:30 –
6:33).    That does not mean Craven actually disobeyed a command,
however, as it is unclear from the BWC footage whether he ever placed
his hands in a position not visible to the Officers after Corporal Arndt
shouted at him, "Let me see your fucking hands."  JA233 (at 6:30 – 6:33).

to his hip and fired one time." 735 F.3d at 156, n.4.  Likewise, in <u>Hensley</u>, the defendant asserted that the plaintiff "had the muzzle of the gun pointed toward them in a 'shoot-from-the-hip' position."  876 F.3d. at 579. In each case, this Court acknowledged that the correct standard required it to conclude the plaintiff had made no threatening action.  <u>Id.</u> at 581; <u>Cooper</u>, 735 F.3d at 157.  Consideration of the evidence here – again, in the light most favorable to the Plaintiff – requires rejecting Defendants' contention that Craven made a threatening action.

The same is true with respect to <u>Franklin</u> and <u>Aleman</u>.  In discussing <u>Franklin</u>, Defendants once again claim that the suspect there made no sudden movements, whereas here, "Craven raised his hands quick [*sic*], but then reached for the gun in his waistband."  <u>Appellees' Brief</u>, p. 18.  In fact, the officer in <u>Franklin</u> said she repeatedly commanded the suspect to show his hands and that the suspect had brandished a gun in her direction.  <u>See</u> 64 F.4th at 527.  The plaintiff's evidence, however, showed the suspect had remained still and not pointed his gun.  <u>Id.</u> at 526.  This Court therefore stated, "observing the facts in the light most favorable to [the plaintiff] – there was nothing

furtive or menacing about Franklin's response to the officer's commands." Id. at 532.

Finally, Defendants claim that in <u>Aleman</u>, "[t]he suspect stood still with the gun pointed away from police," while, here, Craven "lowered his hands toward the gun in his waistband." <u>Appellees' Brief</u>, p. 20. Once again, Defendants recite the facts of <u>Aleman</u> as taken in the light most favorable to the plaintiff, and disregard that the defendant-officer there claimed the plaintiff had "pivoted his pistol toward [the officer]." 80 F.4th at 293. Likewise, construed correctly, the facts here do not support the Officers' testimony that Craven ever reached for, drew, or raised a gun.

## II. THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Plaintiff maintains that qualified immunity cannot shield the Officers because case law with the same material facts was clearly established when the Officers shot Craven to death on August 2, 2020. <u>Opening Brief</u>, p. 29. Defendants, conversely, argue that qualified immunity protects the Officers because "Craven had no 'clearly established' right to reach for a gun in his waistband after police told him to raise his hands." <u>Appellees' Brief</u>, p. 25. They point to <u>Knibbs</u>, <u>supra</u>, because Craven 1) possessed a weapon, 2) allegedly disobeyed the

14

command, and 3) purportedly made a threatening or furtive gesture to grab the gun. Id.

Aleman, though, summarized this Court's rulings on the subject and, quoting Knibbs, made clear that as of September 2017 – that is, almost three years before the Officers killed Craven – it was clearly established that

> the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

80 F.4th at 286-87 (internal citation omitted).

Here, Defendants say the Officers suspected that Craven possessed a weapon and that he initially obeyed, then disobeyed, Corporal Arndt's commands. As described above at length, considered in the light most favorable to Plaintiff, however, Craven made no threatening or furtive movement towards—or with—a weapon. As such, his right was "clearly established" and the Officers here are not entitled to qualified immunity.

## III.   DEFENDANTS WRONGLY MINIMIZE THE OFFICERS' ESCALATION OF EVENTS.

Plaintiff argues the District Court erred in failing to properly consider the escalation of events by the officers[5] prior to the moment Craven allegedly reached toward his waistband.  More specifically, if Craven did pull a firearm from his waistband, he did so in response to the hostile and threatening way the officers approached him, particularly while he was undergoing an MHC.  Plaintiff cites Rowland v. Perry, 41 F.3d 167, 173-174 (4th Cir. 1994), for the proposition that in proper situations, a court must consider an officer's actions that provoke the threat that in turn leads to the use of force.

Defendants deny the officers escalated the situation.  Specifically, they claim the officers were simply responding to a volatile domestic violence call – and did not "escalate anything when the yelled 'Police!' and told Craven to show his hands."  Appellees' Brief, p. 22.  Further, Defendants contest whether Craven was experiencing an MHC or that

---

[5] The word "officer(s)" is uncapitalized when referring to all six or seven officers that first advanced on Craven with raised rifles, rather than just Corporal Arndt and Officer Novelli.

the officers were dispatched for crisis intervention or suicide prevention.

Id., p. 23.  Defendants' argument fails in several respects.

      A.    <u>Defendants Overlook That a Domestic Dispute Can
Stabilize Before the Police Arrive.</u>

Defendants' argument entirely discounts that police may be called

to an initially unpredictable or unstable situation that has drastically

calmed by the time law enforcement personnel arrive.  The case law,

however, does recognize such possibility.  For example, in <u>Franklin</u>, this

Court emphasized:

> Despite receiving 911 accounts of a man *terrorizing*
> people [with a gun] at a fast-food restaurant, the officers
> arrived at a very different scene than the one described
> in those reports.  Franklin was no longer inside the
> restaurant, *nor was he aggressive or outwardly
> threatening when Officer Kerl approached him*.

64 F.4th at 532 (emphasis and alterations added).

The situation here was identical in all material respects.  Although

dispatch informed the police that Craven was unstable and threatening

to "blow his brains out", the officers arrived to a significantly more

quieted scene.  As in <u>Franklin</u>, Craven may still have been in possession

of a firearm (and in this case, legally so), but was no longer acting

erratically, nor did he threaten police. JA233 (at 6:27 – 6:30).  And as in

Franklin, where the suspect was no longer inside the restaurant and therefore not a threat to the people inside, here, Craven was alone outside his home, and no longer a threat to his family. JA233 (at 6:30). Indeed, when the police arrived, he was calmly smoking a cigarette and walking towards his camper. JA 233 (at 6:30). He was not yelling or waving a firearm. JA233 (at 6:30). In sum, taken in the light most favorable to Plaintiff, the evidence supports a reasonable conclusion that Craven posed no immediate threat to the officers, nor anyone else, when Corporal Arndt and Officer Novelli gunned him down in front of his home.

     B.    Defendants Ignore That a Domestic Dispute Call Can Also Be a Suicide Prevention Call.

Defendants fail to recognize that a 911 call regarding domestic violence can simultaneously involve an MHC. In Aleman, for instance, the suspect was described as "delusional" yet also as posing a threat of domestic violence to a female inside his apartment. 80 F.4th at 290. This Court deemed it "significant" that the police had been trained to regard such an event as "a crisis intervention" necessitating "effective communication" and "de-escalation." Id. at 292. Certainly, if the suspect in Aleman, who referred to himself in Spanish as the "Star God" and believed people were following him, id. at 271-72, required "crisis

intervention" and "de-escalation," id. at 290, then the same applies to Craven, who had threatened suicide.

Significantly, the Officers knew before arriving at the Cravens' home that Craven had "threatened to blow his brains out" – in fact, Corporal Arndt testified the threat indicated to him that "there was some sort of mental health crises [*sic*] going on." JA332. And Officer Novelli stated that the threat of suicide was why so many officers responded to the call. JA72 (¶¶ 4, 6). Significantly, Officer Novelli also acknowledged that an MHC could affect a person's perception of a gun being pointed at them. JA417.

Certainly, the officers' prior knowledge of Craven's condition explains Defendants' drastic understatement of the Officers' aggression when they arrived at the Craven home. The officers did not, as the Town claims, simply yell, "Police!" and "tell Craven to show his hands." Appellees' Brief, p. 22. Rather, a minimum of six officers appeared seemingly out of nowhere, in the dark of night, carrying rifles pointed directly at Craven, with Corporal Arndt shouting, "Police Department! Let me see your fucking hands! Let me see your hands!" JA76; JA273; JA284. In fact, Corporal Arndt testified the reason he used a curse word

was to convey "importance … you need to do this now." JA388 (ellipsis added). If, however, the Officers had proceeded in accordance with the Town's policies for handling the mentally ill, JA286-87, they would have tried to peacefully communicate with Craven and he more likely would be alive today.

## IV. The Town is Subject to Liability for Failing to Properly Train Its Officers on How to Interact with Persons Experiencing a Mental Health Crisis Because It Had Constructive Notice That Such a Failure Would Precipitate Constitutional Violations.

Plaintiff asserts that the Town's inadequate training of its officers regarding the handling of persons undergoing MHCs constitutes "deliberate indifference" to those persons' constitutional rights. Opening Brief, pp. 36-40. Furthermore, it was unnecessary for Plaintiff to show a previous pattern of such violations – which would ordinarily put the Town on notice that they were likely to recur – because the "reasonable probability" of such violations constituted constructive notice. See id.

The Town maintains it was not on notice that such violations would recur – otherwise said, the need for law enforcement to interact with

persons undergoing MHCs was not predictable.[6]  Further, it claims that
the issue of notice is immaterial because there was no MHC here.  <u>See</u>
<u>id.</u>, p. 28.   Finally, the Town claims that Plaintiff is not entitled to
recovery because she did not present evidence that additional training
would have prevented Craven's death.  <u>See id.</u>, p. 29.  Importantly, the
Town does not contend it had in fact sufficiently trained its officers on
interacting with persons during MHCs.

> A.    <u>The Town Had Constructive Notice of an Unlawful
>        Outcome</u>.

The Town's assertion that it was insufficiently aware its officers
would interact with people during MHCs and that, without proper
training, those interactions likely would cause constitutional violations
is, generously stated, absurd.  The Town cannot credibly deny knowledge
that persons experiencing any MHC can be erratic and sometimes prone
to use weapons either against themselves or others.  It follows, then, that
the police would have substantial dealings with such persons.  Indeed,

---

[6] As a threshold point, the Town argues that Plaintiff cannot sustain a
<u>Monell</u> claim because there was no constitutional violation in this case.
<u>See</u> <u>Appellees' Brief</u>, p. 27.  Plaintiff refers to her explanation above for
her position that a violation indeed occurred.

Officer Novelli acknowledged that such interactions are "pretty frequent." JA399.

Moreover, the mere fact that the Mooresville Police Department implemented "MPD Policy – Mentally Ill/Intoxicated Persons – General Order 400.13", which details how to respond to the mentally ill, including those who are armed – demonstrates that the Town was on notice. JA286-87. That policy includes taking "steps to calm the situation. When applicable, eliminate emergency lights and sirens, disperse crowds, and *assume a quiet non-threatening manner* when approaching or conversing with the individual." JA 286-87 (emphasis added). It also instructs, "Do not threaten the individual with arrest or in any other manner *as this may create additional fright, stress, and potential aggression*." JA287 (emphasis added).

      B.    <u>The Town Insufficiently Implemented its Policy on Dealing Persons Experiencing a Mental Health Crisis.</u>

Although the Town does not argue to the contrary, it bears noting that it knew of its officers' need to understand how to handle persons experiencing an MHC, yet implemented very little training. Indeed, the Officers' dearth of knowledge is clear from their own testimony: in conflict with the Police Department's policy on Mentally Ill Persons, Corporal

Arndt and Officer Novelli both swore, "Anytime we receive calls where someone is possible [*sic*] *suicidal* and/or has a firearm, we can get our long guns for a '*tactical'* advantage." JA72 (¶ 7) & JA76 (¶ 6) (emphasis added). That is, each affidavit of the Officers plainly contradicts the Town's policy, which calls for them to approach in "a quiet non-threatening manner." In fact, both Officer Novelli and Corporal Arndt testified that they *fired* at Craven, in part, because he "had threatened to kill himself[.]" JA73 (¶ 15), JA77 (¶ 13) (alteration added).

### C. Plaintiff Was Not Required to Offer Evidence on How the Town Should Have Trained Its Officers.

The District Court and the Town fault Plaintiff because she "presented no particular evidence for how Mooresville should have trained its officers and how this training would have prevented this incident." JA552; Appellees' Brief, p. 29. Yet nothing required Plaintiff to do so.

In City of Canton v. Harris, 489 U.S. 378 (1989), the Court cited three facts a plaintiff must prove in a failure to train case: "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's

23

injury." <u>Hill v. McIntyre</u>, 884 F.2d. 271, 275 (6th Cir. 1989) (quoting <u>Harris</u>, 489 U.S. at 390-91). The case law does not require a plaintiff to specify what additional training would be required to prevent the incident. This case perfectly demonstrates why: the training here was so woefully insufficient that causation is apparent without the need for additional evidence. Even though police interactions with persons experience a MHC are "pretty frequent," JA399, Officer Novelli testified that during law enforcement training, "They *touch* on the different types of mental illness." JA362. Corporal Arndt, for his part, could not recall whether the topic was covered at all. JA367-68. While one cannot know with certainty whether additional training would have made a difference here, that matter should be for the jury to decide.

## CONCLUSION

Based on the foregoing, this Court should reverse the Order and the Judgment, and remand for a trial on all of Plaintiff's claims against Defendants.

JAMES, MCELROY & DIEHL, P.A.

/s/ Preston O. Odom, III

Preston O. Odom, III, NC State Bar # 29587
J. Alexander Heroy, NC State Bar #39752
Jennifer M. Houti, NC State Bar #45442
525 North Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
podom@jmdlaw.com | aheroy@jmdlaw.com
jhouti@jmdlaw.com
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This **Reply Brief of Plaintiff-Appellant** complies with the typeface requirements of Fed. R. App. P. 32(a)(5) (2023) and the type style requirements of Fed. R. App. P. 32(a)(6) (2023) because it has been prepared in a proportionally spaced typeface with serifs using [Microsoft Word 2010] in [14-point Century Schoolbook font].

2.    This **Reply Brief of Plaintiff-Appellant** also complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains [no more than 6,500] **4,773** words, excluding the sections that Fed. R. App. P. 32(f) exempts from counting.

**JAMES, MCELROY & DIEHL, P.A.**

/s/ Preston O. Odom, III
_____
Preston O. Odom, III, NC State Bar # 29587
*Counsel for Plaintiff-Appellant*

26

## CERTIFICATE OF SERVICE

The undersigned certifies that this **REPLY BRIEF OF PLAINTIFF-APPELLANT** has this date been electronically filed with the Clerk of Court using the CM/ECF system, which will transmit notification of such filing, constituting service thereof, to Defendants-Appellees' counsel of record as follows:

> Steven A. Bader – sbader@cshlaw.com
> Jake William Stewart – jstewart@cshlaw.com
> Patrick Houghton Flanagan – phf@cshlaw.com

This the 9th day of November, 2023.

JAMES, MCELROY & DIEHL, P.A.

/s/ Preston O. Odom, III

Preston O. Odom, III, NC State Bar # 29587
J. Alexander Heroy, NC State Bar #39752
Jennifer M. Houti, NC State Bar #45442
525 North Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
podom@jmdlaw.com | aheroy@jmdlaw.com
jhouti@jmdlaw.com
*Counsel for Plaintiff-Appellant*

27